# DOMESTIC NUCLEAR DETECTION OFFICE

## Description:

The Domestic Nuclear Detection Office (DNDO) leads the development of the Global Nuclear Detection Architecture (GNDA), implements its domestic portion, and leads the integration of United States Government (USG) technical nuclear forensics capabilities.

## Responsibilities:

DNDO is the USG lead agency charged with developing the GNDA and implementing its domestic portion, as well as coordinating and stewarding the USG National Technical Nuclear Forensics (NTNF) enterprise. DNDO works closely with Federal, State, local, tribal, territorial, international, academic, national laboratory, and private sector partners.

| At a Glance | |
|---|---|
| *Senior Leadership:* | |
| *Dr. L. Wayne Brasure, Acting Director* | |
| *Paul Ryan, Acting Deputy Director* | |
| *Established: 2005* | |
| *Major Divisions: Architecture and Plans Directorate, Transformational and Applied Research Directorate, Product Acquisition and Deployment Directorate, Assessments Directorate, Operations Support Directorate, National Technical Nuclear Forensics Center* | |
| ***Budget Request:*** | ***$330,440,000*** |
| *Employees (FTE):* | *144* |

Functions include developing and acquiring radiological and nuclear (R/N) detection technologies in collaboration with interagency partners, evaluating detector performance, ensuring effective response to detection alarms, training and helping partners plan their GNDA contributions, integrating and ensuring readiness of U.S. nuclear forensics capabilities, conducting transformational research and development for R/N detection and forensics technologies, and reporting progress to external stakeholders. For both the detection and forensics missions, the likelihood of success is maximized by using and employing appropriate technologies, well-trained law enforcement, and intelligence capabilities.

## Service to the Public:

DNDO works to protect the United States from R/N terrorism by developing, acquiring, and deploying detection technologies, supporting operational law enforcement and homeland security partners; integrating technical nuclear forensic programs; and advancing state-of-the-art nuclear forensics technologies. To address gaps in the GNDA and dramatically improve the performance of R/N detection and technical nuclear forensics technologies, DNDO also invests in basic, applied, and developmental research to identify, explore, develop, and demonstrate innovative technologies. To foster and maintain expertise in specialized technical fields related to nuclear detection and forensics, DNDO supports academic programs, scholarships, and fellowships to advance research and encourage students to enter these fields of study. DNDO seeks to increase effectiveness of deployed technology through improved operational concepts, and DNDO works with mission partners to ensure that R/N detection capabilities provide the greatest level of protection possible through multiple layers of defense.

AR00188

Domestic Nuclear Detection Office

**FY 2016 Accomplishments:**

- Led the formation of a Joint Requirements Council R/N Subcommittee to facilitate interaction with DHS operational partners and validate requirements, ensuring that each dollar spent on R/N detection equipment is linked to threats and conditions in the field.

- Completed an assessment of R/N detection capabilities for maritime non-containerized cargo to determine the technical requirements in this challenging and important pathway.

- Fostered nuclear forensics expertise throughout the United States, supporting over 50 undergraduate, graduate, post-doctorate, and faculty fellowships, internships, or awards, as well as senior scientist/student mentoring, with 9 Ph.D.'s hired into the nuclear forensics workforce at the national laboratories or U.S. Federal agencies.

- Demonstrated a new spectroscopic plastic detector technology that enables higher sensitivity and better selectivity for isotope identification. These advances could lead to much less expensive R/N detection equipment, allowing wider distribution of detectors at lower cost in the future.



DNDO's Radiation Awareness and Interdiction Network Advanced Technology Demonstration – Monitoring Vehicles at Full Speed for Radiological Threats

- Completed development of a first-of-a-kind laboratory-scale processing capability to simulate non-U.S. production of plutonium materials for forensic signature development to better enable attribution.

- Enhanced homeland security by assisting international partners in developing their nuclear detection and forensics frameworks through work with the International Atomic Energy Agency, Global Initiative to Combat Nuclear Terrorism, and 2016 Nuclear Security Summit.

- Advanced the Securing the Cities initiative in Houston, Texas; Chicago, Illinois; and the National Capital Region, which, when fully implemented, will provide R/N detection coverage for approximately 42 percent of the Nation's critical infrastructure and over 30 percent of the U.S. population.

- Equipped DHS operational partners to execute R/N detection at and within our borders through the acquisition of portable detection equipment, including over 4,500 personal radiation detectors, and more than 1,800 basic handheld radiation identification devices.

- Executed a public-private partnership with Los Angeles' TraPac Container Terminal for automated Radiation Portal Monitors integrated with conveyors, to increase capacity for scanning cargo containers, enabling TraPac to handle larger ships and remain competitive.

- Facilitated a joint product development effort among DNDO, the DHS Science and Technology Directorate, U.S. Customs and Border Protection, and the United Kingdom Home Office to pilot an integrated, multi-threat, automated detection and identification cargo scanning platform at the Conley Container Terminal in Boston, leveraging

AR00189

Domestic Nuclear Detection Office

expertise and resources in order to enhance cargo security against a broad array of threats.

## BUDGET REQUEST

*Dollars in Thousands*

|  | FY 2016 Revised Enacted | | FY 2017 Annualized CR | | FY 2018 President's Budget | | FY 2017 +/- FY 2018 | |
|---|---|---|---|---|---|---|---|---|
|  | FTE | $000 | FTE | $000 | FTE | $000 | FTE | $000 |
| Operations and Support | 137 | $51,461 | 137 | $50,095 | 144 | $54,664 | 7 | $4,569 |
| Procurement, Construction and Improvements | - | $88,289 | - | $87,096 | - | $87,096 | - | - |
| Research and Development | - | $160,005 | - | $158,173 | - | $144,161 | - | ($14,012) |
| Federal Assistance | - | $47,281 | - | $46,695 | - | $44,519 | - | ($2,176) |
| **Net Discretionary** | **137** | **$347,036** | **137** | **$342,059** | **144** | **$330,440** | **7** | **($11,619)** |
| **Gross Discretionary** | **137** | **$347,036** | **137** | **$342,059** | **144** | **$330,440** | **7** | **($11,619)** |
| **Total Budget Authority** | **137** | **$347,036** | **137** | **$342,059** | **144** | **$330,440** | **7** | **($11,619)** |

### FY 2018 Highlights:

- **R/N Detection Equipment**..................................................................**$87.1M, 0 FTE**

  The total request level for R/N detection equipment programs is consistent with the FY 2017 Annualized CR level. It provides $62.5 million for large scale detection systems, including funding for the Radiation Portal Monitor (RPM) Replacement Program to ensure sustainment of the capability to scan virtually all containerized cargo entering the Nation. The request also includes $24.6 million for the requirements for human portable equipment of DHS operational Components.

- **Securing the Cities**............................................................................**$21.1M, 0 FTE**

  Includes $21.1 million for the Securing the Cities program, which seeks to reduce the risk of a successful deployment of a R/N terrorist weapon against major metropolitan regions in the United States. FY 2018 funding is consistent with the Annualized CR.

AR00190

# DHS Resource Table

AR00192

AR0019

## Department of Homeland Security
### Total Budget Authority

| | FY 2016 Revised Enacted | | | FY 2017 Annualized CR | | | FY 2018 President's Budget | | |
|---|---|---|---|---|---|---|---|---|---|
| | Pos. | FTE | $$$ | Pos. | FTE | $$$ | Pos. | FTE | $$$ |
| **Office of the Secretary and Executive Management** | | | | | | | | | |
| **Operations and Support** | 613 | 609 | 145,332 | 631 | 585 | 133,474 | 609 | 567 | 130,307 |
| Office of the Secretary | 67 | 67 | 18,697 | 76 | 69 | 18,525 | 66 | 68 | 18,043 |
| Office of Policy | 186 | 186 | 38,777 | 186 | 175 | 37,839 | 188 | 168 | 36,837 |
| Office of Public Affairs | 23 | 23 | 5,147 | 27 | 25 | 5,292 | 26 | 24 | 5,143 |
| Office of Legislative Affairs | 26 | 26 | 5,243 | 28 | 26 | 5,193 | 27 | 25 | 5,056 |
| Office of Partnership and Engagement | 52 | 48 | 20,040 | 54 | 47 | 12,833 | 48 | 45 | 12,603 |
| Office of General Counsel | 96 | 98 | 20,017 | 91 | 81 | 18,822 | 89 | 76 | 18,501 |
| Office for Civil Rights and Civil Liberties | 94 | 94 | 21,689 | 102 | 96 | 21,158 | 99 | 93 | 20,679 |
| Office of the Citizenship and Immigration Services Ombudsman | 26 | 26 | 6,622 | 30 | 27 | 6,099 | 29 | 26 | 5,944 |
| Privacy Office | 41 | 41 | 8,209 | 43 | 36 | 7,713 | 42 | 38 | 7,501 |
| **Net Discretionary** | 613 | 609 | 145,332 | 631 | 585 | 133,474 | 609 | 567 | 130,307 |
| **Adjusted Net Discretionary** | 613 | 609 | 145,332 | 631 | 585 | 133,474 | 609 | 567 | 130,307 |
| **Office of the Under Secretary for Management** | | | | | | | | | |
| **Operations and Support** | 1,457 | 1,432 | 737,848 | 1,814 | 1,814 | 762,518 | 2,070 | 2,070 | 696,131 |
| Immediate Office of the Under Secretary of Management | 17 | 17 | 3,252 | 17 | 17 | 3,291 | 31 | 24 | 6,867 |
| Office of the Chief Readiness Support Officer | 103 | 103 | 124,518 | 103 | 103 | 119,585 | 123 | 120 | 70,900 |
| Office of the Chief Human Capital Officer | 144 | 137 | 29,652 | 208 | 208 | 39,635 | 293 | 270 | 56,852 |
| Office of the Chief Security Officer | 257 | 257 | 68,991 | 257 | 257 | 67,246 | 313 | 298 | 74,963 |
| Office of the Chief Procurement Officer | 308 | 308 | 60,369 | 558 | 558 | 96,000 | 536 | 533 | 102,615 |
| Office of the Chief Financial Officer | 230 | 228 | 56,394 | 270 | 270 | 60,142 | 279 | 275 | 66,369 |
| Office of the Chief Information Officer | 398 | 382 | 394,192 | 401 | 401 | 376,619 | 495 | 495 | 317,565 |
| **Procurement, Construction, and Improvements** | | | 196,733 | | | 197,120 | | | 69,988 |
| Construction and Facility Improvements | | | 125,801 | | | 125,562 | | | |
| Mission Support Assets and Infrastructure | | | 70,932 | | | 71,558 | | | 69,988 |
| **Research and Development** | | | 2,500 | | | 2,495 | | | 2,545 |
| **Net Discretionary** | 1,457 | 1,432 | 937,081 | 1,814 | 1,814 | 962,133 | 2,070 | 2,070 | 768,664 |
| **Adjusted Net Discretionary** | 1,457 | 1,432 | 937,081 | 1,814 | 1,814 | 962,133 | 2,070 | 2,070 | 768,664 |
| **Analysis and Operations** | | | | | | | | | |
| **Operations and Support** | 845 | 818 | 260,224 | 845 | 818 | 254,303 | 885 | 837 | 252,405 |
| **Net Discretionary** | 845 | 818 | 260,224 | 845 | 818 | 254,303 | 885 | 837 | 252,405 |
| **Adjusted Net Discretionary** | 845 | 818 | 260,224 | 845 | 818 | 254,303 | 885 | 837 | 252,405 |
| **Office of Inspector General** | | | | | | | | | |
| **Operations and Support** | 867 | 796 | 161,467 | 867 | 796 | 137,151 | 720 | 720 | 133,974 |
| Transfer from FEMA-DRF | | | 24,000 | | | 24,000 | | | 24,000 |
| **Net Discretionary** | 867 | 796 | 161,467 | 867 | 796 | 137,151 | 720 | 720 | 133,974 |
| **Adjusted Net Discretionary** | 867 | 796 | 185,467 | 867 | 796 | 161,151 | 720 | 720 | 157,974 |

**Department of Homeland Security**
**Total Budget Authority**

| | FY 2016 Revised Enacted | | | FY 2017 Annualized CR | | | FY 2018 President's Budget | | |
|---|---|---|---|---|---|---|---|---|---|
| | Pos. | FTE | $$$ | Pos. | FTE | $$$ | Pos. | FTE | $$$ |
| U.S. Customs and Border Protection | 63,230 | 58,677 | 13,295,208 | 63,230 | 58,677 | 13,474,495 | 64,463 | 59,726 | 16,387,729 |
| Operations and Support | 51,947 | 47,394 | 10,651,944 | 51,158 | 46,605 | 10,638,799 | 51,189 | 46,460 | 11,592,541 |
| Mission Support | 4,853 | 4,043 | 1,513,371 | 4,853 | 4,043 | 1,482,575 | 5,485 | 4,910 | 1,762,185 |
| Enterprise Services | 3,549 | 2,931 | 1,276,624 | 3,549 | 2,931 | 1,237,717 | 4,071 | 3,555 | 1,460,254 |
| Office of Professional Responsibility | 639 | 543 | 152,240 | 639 | 543 | 159,040 | 699 | 669 | 204,679 |
| Executive Leadership and Oversight | 665 | 569 | 84,507 | 665 | 569 | 86,212 | 715 | 699 | 102,282 |
| Border Security Operations | 23,207 | 21,265 | 4,195,111 | 23,207 | 21,265 | 4,184,944 | 23,645 | 21,232 | 4,536,100 |
| US Border Patrol | 23,035 | 21,122 | 4,142,374 | 23,035 | 21,122 | 4,136,016 | 23,416 | 21,095 | 4,458,589 |
| Operations | 23,035 | 21,122 | 3,636,456 | 23,035 | 21,122 | 3,630,136 | 23,416 | 21,095 | 3,787,694 |
| Assets and Support | | | 505,718 | | | 505,880 | | | 670,895 |
| Office of Training and Development | 152 | 143 | 52,737 | 150 | 143 | 48,928 | 229 | 227 | 77,511 |
| Trade and Travel Operations | 21,202 | 19,763 | 3,935,179 | 20,413 | 18,974 | 3,981,098 | 19,084 | 17,719 | 4,210,017 |
| Office of Field Operations | 20,150 | 18,763 | 3,683,077 | 19,361 | 17,974 | 3,731,693 | 17,875 | 16,565 | 3,906,330 |
| Domestic Operations | 18,441 | 17,481 | 2,595,830 | 17,652 | 16,692 | 2,662,723 | 16,071 | 15,051 | 2,681,171 |
| International Operations | 639 | 630 | 157,383 | 630 | 630 | 157,094 | 944 | 652 | 142,272 |
| Targeting Operations | 769 | 652 | 101,609 | 769 | 652 | 99,775 | 862 | 862 | 236,372 |
| Assets and Support | | | 828,255 | | | 822,101 | | | 846,515 |
| Office of Trade | 865 | 820 | 213,844 | 865 | 820 | 211,844 | 1,000 | 954 | 263,301 |
| Office of Training and Development | 187 | 180 | 38,258 | 187 | 180 | 37,959 | 200 | 200 | 47,186 |
| Integrated Operations | 2,688 | 2,323 | 1,006,283 | 2,685 | 2,323 | 986,379 | 2,975 | 2,599 | 1,078,238 |
| Air and Marine Operations | 1,753 | 1,608 | 809,676 | 1,753 | 1,608 | 820,156 | 1,909 | 1,748 | 877,365 |
| Operations | 1,565 | 1,448 | 290,519 | 1,565 | 1,448 | 291,882 | 1,653 | 1,516 | 311,004 |
| Assets and Support | | | 527,304 | | | 506,436 | | | 529,046 |
| Air and Marine Operations Center | 190 | 160 | 21,853 | 190 | 160 | 21,838 | 245 | 232 | 46,183 |
| Office of International Affairs | 169 | 169 | 34,191 | 169 | 169 | 32,526 | 171 | 169 | 39,784 |
| Office of Intelligence | 275 | 180 | 67,013 | 275 | 180 | 62,234 | 391 | 268 | 59,994 |
| Office of Training and Development | | | 5,754 | | | | | | 6,233 |
| Operations Support | 484 | 366 | 65,403 | 484 | 366 | 65,026 | 516 | 415 | 103,571 |
| Procurement, Construction, and Improvements | | | 362,744 | | | 354,936 | | | 2,603,719 |
| Mission Support Assets and Infrastructure | | | 30,000 | | | 29,947 | | | 26,433 |
| Border Security Assets and Infrastructure | | | 76,621 | | | 61,857 | | | 1,715,163 |
| Trade and Travel Assets and Infrastructure | | | 116,553 | | | 116,345 | | | 109,240 |
| Integrated Operations Assets and Infrastructure | | | 69,900 | | | 80,300 | | | 153,108 |
| Airframes and Sensors | | | 69,900 | | | 80,300 | | | 137,335 |
| Watercraft | | | | | | | | | 1,373 |
| Other Systems and Assets | | | | | | | | | 12,298 |
| Operational Communications/Information Technology | | | 7,000 | | | 6,733 | | | |
| Construction and Facility Improvements | | | 62,870 | | | 59,754 | | | 59,775 |
| Immigration Inspection User Fee | 4,190 | 4,190 | 692,686 | 4,371 | 4,371 | 708,921 | 4,179 | 4,179 | 732,834 |
| Immigration Enforcement Fines | 5 | 5 | 818 | 5 | 5 | 832 | 4 | 4 | 1,000 |
| Electronic System for Travel Authorization (ESTA) Fee | 62 | 62 | 58,705 | 94 | 94 | 60,081 | 1,193 | 1,193 | 219,480 |
| Land Border Inspection Fee | 200 | 200 | 46,248 | 202 | 202 | 46,894 | 202 | 202 | 48,476 |
| COBRA Customs Fees | 1,575 | 1,575 | 528,580 | 2,538 | 2,538 | 543,666 | 2,538 | 2,538 | 562,151 |
| COBRA FTA | 1,569 | 1,569 | 234,810 | 1,010 | 1,010 | 242,538 | 1,287 | 1,287 | 265,000 |
| Agricultural Quarantine and Inspection Fees | 3,006 | 3,006 | 449,857 | 3,082 | 3,082 | 534,515 | 3,061 | 3,061 | 534,515 |

AR00195

## Department of Homeland Security — Total Budget Authority

| | FY 2016 Revised Enacted | | | FY 2017 Annualized CR | | | FY 2018 President's Budget | | |
|---|---|---|---|---|---|---|---|---|---|
| | Pos. | FTE | $$$ | Pos. | FTE | $$$ | Pos. | FTE | $$$ |
| Global Entry Fee | 254 | 254 | 150,067 | 416 | 416 | 154,410 | 416 | 416 | 159,000 |
| Puerto Rico Trust Fund | 292 | 292 | 91,346 | 215 | 215 | 92,500 | 215 | 215 | 92,500 |
| Virgin Islands Deposit Fund | 61 | 61 | 11,867 | 63 | 63 | 11,394 | 63 | 63 | 11,170 |
| User Fee Facilities | 69 | 69 | 8,644 | 76 | 76 | 9,397 | 80 | 80 | 9,081 |
| Customs Unclaimed Goods | | | 5,992 | | | 5,992 | | | 5,992 |
| 9-11 Response and Biometric Exit Account | | | | 35 | 27 | 72,620 | 35 | 27 | 90,550 |
| Net Discretionary - Fee | (1,630) | (1,630) | (242,454) | (1,086) | (1,086) | (251,935) | (1,367) | (1,367) | (274,001) |
| Discretionary - Fee | 254 | 254 | 150,067 | 416 | 416 | 154,410 | 416 | 416 | 159,000 |
| Net Discretionary | 53,585 | 49,032 | 11,258,142 | 52,344 | 47,691 | 11,242,670 | 52,556 | 47,827 | 13,930,061 |
| Adjusted Net Discretionary | 53,585 | 49,032 | 11,258,142 | 52,344 | 47,691 | 11,242,670 | 52,556 | 47,827 | 13,930,061 |
| Gross Discretionary | 53,539 | 49,286 | 11,409,109 | 52,660 | 48,107 | 11,397,080 | 52,972 | 48,243 | 14,089,061 |
| Adjusted Gross Discretionary | 53,539 | 49,286 | 11,409,109 | 52,660 | 48,107 | 11,397,080 | 52,972 | 48,243 | 14,089,061 |
| Mandatory - Fee | 9,391 | 9,391 | 1,886,099 | 10,570 | 10,570 | 2,077,415 | 11,491 | 11,485 | 2,298,668 |
| Adjusted Mandatory - Fee | 9,391 | 9,391 | 1,886,099 | 10,570 | 10,570 | 2,077,415 | 11,491 | 11,485 | 2,298,668 |
| U.S. Immigration and Customs Enforcement | 20,960 | 19,908 | 6,177,578 | 20,960 | 19,987 | 6,139,917 | 22,873 | 20,967 | 7,842,072 |
| Operations and Support | 20,570 | 19,592 | 5,776,579 | 20,570 | 19,671 | 5,765,018 | 22,176 | 20,591 | 7,812,563 |
| Mission Support | 1,554 | 1,459 | 330,975 | 1,554 | 1,467 | 339,111 | 1,687 | 1,534 | 350,391 |
| Office of the Principal Legal Advisor | 1,549 | 1,471 | 256,294 | 1,549 | 1,491 | 220,310 | 1,744 | 1,703 | 282,485 |
| Homeland Security Investigations | 8,782 | 8,667 | 1,947,068 | 8,782 | 8,726 | 1,976,461 | 8,974 | 8,822 | 2,018,873 |
| Domestic Investigations | 8,064 | 7,931 | 1,744,329 | 8,064 | 8,026 | 1,763,436 | 8,256 | 8,116 | 1,795,095 |
| International Operations | 301 | 296 | 122,971 | 301 | 296 | 133,452 | 301 | 296 | 140,873 |
| Intelligence | 417 | 396 | 79,768 | 417 | 416 | 79,573 | 417 | 410 | 79,905 |
| Enforcement and Removal Operations | 8,685 | 7,995 | 3,262,242 | 8,685 | 7,987 | 3,210,136 | 9,771 | 8,552 | 4,860,814 |
| Custody Operations | 5,748 | 5,271 | 2,367,544 | 5,748 | 5,303 | 2,311,131 | 5,903 | 5,385 | 3,601,472 |
| Fugitive Operations | 895 | 865 | 155,072 | 895 | 829 | 156,191 | 1,103 | 931 | 184,668 |
| Criminal Alien Program | 1,675 | 1,609 | 316,177 | 1,675 | 1,531 | 316,405 | 2,230 | 1,836 | 412,080 |
| Alternatives to Detention | 290 | 251 | 114,275 | 290 | 251 | 113,966 | 337 | 272 | 177,700 |
| Transportation and Removal Program | 81 | 62 | 309,174 | 81 | 73 | 312,411 | 146 | 106 | 484,894 |
| Procurement, Construction, and Improvements | | | 53,000 | | | 52,899 | | | 52,899 |
| Mission Support Assets and Infrastructure | | | 9,000 | | | 27,899 | | | 31,060 |
| Operational Communications/Information Technology | | | 44,000 | | | 25,000 | | | 21,839 |
| Construction and Facility Improvements | | | | | | | | | |
| Immigration Inspection User Fees | | | 145,510 | | | 135,000 | | | 135,000 |
| Breeched Bond Detention Fund | | | 57,167 | | | 42,000 | | | 55,000 |
| Student and Exchange Visitor Program | 316 | 316 | 145,322 | 316 | 316 | 145,000 | 397 | 376 | 186,610 |
| Net Discretionary | 20,570 | 19,592 | 5,829,579 | 20,570 | 19,671 | 5,817,917 | 22,176 | 20,591 | 7,865,462 |
| Adjusted Net Discretionary | 20,570 | 19,592 | 5,829,579 | 20,570 | 19,671 | 5,817,917 | 22,176 | 20,591 | 7,865,462 |
| Mandatory - Fee | 398 | 316 | 347,999 | 398 | 316 | 322,000 | 397 | 376 | 376,610 |
| Adjusted Mandatory - Fee | 398 | 316 | 347,999 | 398 | 316 | 322,000 | 397 | 376 | 376,610 |

AR00190

## Department of Homeland Security
### Total Budget Authority

| | FY 2016 Revised Enacted | | | FY 2017 Annualized CR | | | FY 2018 President's Budget | | |
|---|---|---|---|---|---|---|---|---|---|
| | Pos. | FTE | $$$ | Pos. | FTE | $$$ | Pos. | FTE | $$$ |
| **Transportation Security Administration** | 55,415 | 51,833 | 7,543,164 | 55,415 | 51,369 | 7,425,805 | 55,460 | 52,986 | 7,582,228 |
| Operations and Support | 55,227 | 51,686 | 7,074,105 | 55,227 | 51,132 | 6,971,471 | 55,460 | 52,986 | 7,258,724 |
| Mission Support | 1,914 | 1,733 | 918,901 | 1,914 | 1,737 | 919,534 | 1,911 | 1,645 | 869,258 |
| Aviation Screening Operations | 49,988 | 46,797 | 4,466,066 | 49,988 | 46,257 | 4,456,247 | 50,597 | 48,436 | 4,822,911 |
| Screening Workforce | 46,266 | 43,223 | 3,395,057 | 46,266 | 42,700 | 3,377,149 | 45,377 | 43,474 | 3,536,705 |
| Screening Partnership Program | | | 169,983 | | | 165,793 | 10 | 10 | 175,580 |
| Screener Personnel, Compensation, and Benefits | 46,086 | 43,049 | 2,996,659 | 46,086 | 42,525 | 2,973,827 | 45,087 | 43,190 | 3,128,064 |
| Screener Training and Other | 180 | 175 | 225,415 | 180 | 175 | 237,529 | 280 | 274 | 233,061 |
| Airport Management | 2,901 | 2,790 | 568,615 | 2,901 | 2,700 | 570,267 | 3,902 | 3,777 | 643,707 |
| Canine | 509 | 493 | 118,809 | 509 | 493 | 121,327 | 698 | 698 | 151,764 |
| Screening Technology Maintenance | | | 284,284 | | | 282,353 | 185 | 162 | 387,882 |
| Secure Flight | 312 | 290 | 99,301 | 312 | 290 | 103,151 | 347 | 325 | 102,763 |
| Other Operations and Enforcement | 3,325 | 3,122 | 1,691,058 | 3,325 | 3,122 | 1,595,690 | 3,642 | 2,878 | 1,566,555 |
| Inflight Security | 34 | 34 | 895,076 | 34 | 34 | 824,828 | 34 | 34 | 823,419 |
| Federal Air Marshals | | | 893,005 | | | 804,175 | | | 893,905 |
| Federal Flight Deck Officer and Crew Training | 36 | 36 | 20,758 | 36 | 36 | 20,653 | 38 | 36 | 19,514 |
| Aviation Regulation | 1,081 | 1,033 | 215,626 | 1,081 | 1,033 | 215,148 | 1,085 | 1,032 | 173,835 |
| Air Cargo | 641 | 615 | 90,945 | 641 | 615 | 93,519 | 648 | 611 | 102,721 |
| Intelligence and TSOC | 420 | 385 | 77,686 | 420 | 385 | 77,298 | 429 | 404 | 79,798 |
| Surface Programs | 813 | 761 | 110,798 | 813 | 761 | 110,702 | 528 | 477 | 86,316 |
| Vetting Operations | 333 | 292 | 369,859 | 333 | 292 | 273,695 | 336 | 315 | 300,774 |
| Vetting Programs | 133 | 122 | 74,959 | 133 | 122 | 74,542 | 130 | 122 | 60,215 |
| TWIC Fee | 42 | 42 | 67,788 | 42 | 42 | 82,267 | 44 | 45 | 64,449 |
| Hazardous Materials Endorsement Fee | 35 | 34 | 18,907 | 35 | 34 | 21,083 | 38 | 37 | 20,206 |
| General Aviation at DCA Fee | | | 590 | | | 400 | | 5 | 566 |
| Commercial Aviation and Airports Fee | | | 11,688 | | | 6,500 | | | 8,000 |
| Other Security Threat Assessments Fee | | | | | | 54 | | | 54 |
| Air Cargo/Certified Cargo Screening Program Fee | 11 | 11 | 4,711 | 11 | 11 | 3,500 | 11 | 11 | 5,230 |
| TSA Precheck Fee | 82 | 54 | 186,444 | 82 | 54 | 880,153 | 82 | 81 | 136,908 |
| Alien Flight School Fee | 24 | 24 | 4,886 | 24 | 24 | 5,200 | 15 | 15 | 5,200 |
| **Procurement, Construction, and Improvements** | 188 | 177 | 462,259 | 188 | 177 | 449,344 | | | 303,314 |
| Aviation Screening Infrastructure | 183 | 172 | 442,095 | 183 | 172 | 434,245 | | | 287,023 |
| Mission Support | 60 | 57 | 114,699 | 60 | 57 | 106,981 | | | 4,010 |
| Checked Baggage | 123 | 115 | 77,396 | 123 | 115 | 77,264 | | | 35,004 |
| Aviation Security Capital Fund (mandatory) | | | 250,000 | | | 250,000 | | | 250,000 |
| Air Cargo | 5 | 5 | 11,030 | 5 | 5 | 11,008 | | | |
| Surface Programs | | | | | | | | | |
| Vetting Programs | | | | | | | | | |
| Mission Support Assets and Infrastructure | | | 9,134 | | | 4,091 | | | 16,291 |
| Mission Support Assets and Infrastructure Final Items | | | | | | | | | |
| **Research and Development** | | | 5,600 | | | 4,990 | | | 20,190 |
| Discretionary - Fee | 176 | 146 | 290,040 | 176 | 146 | 193,953 | 178 | 178 | 235,356 |
| Discretionary - Offsetting Fee | | | 2,130,000 | | | 2,130,000 | | | 2,916,000 |
| Net Discretionary | 55,215 | 51,663 | 4,868,444 | 55,215 | 51,139 | 4,846,652 | 55,263 | 52,763 | 4,175,669 |
| Adjusted Net Discretionary | 55,215 | 51,663 | 4,868,444 | 55,215 | 51,139 | 4,846,652 | 55,263 | 52,763 | 4,175,669 |
| Gross Discretionary | 55,391 | 51,809 | 7,288,484 | 55,391 | 51,285 | 7,170,605 | 55,445 | 52,941 | 7,327,028 |
| Adjusted Gross Discretionary | 55,391 | 51,809 | 7,288,484 | 55,391 | 51,285 | 7,170,605 | 55,445 | 52,941 | 7,327,028 |
| Mandatory - Appropriation | | | 250,000 | | | 250,000 | | | 250,000 |
| Adjusted Net Mandatory Appropriation | | | 250,000 | | | 250,000 | | | 250,000 |
| Mandatory - Fee | 24 | 24 | 5,200 | 24 | 24 | 5,200 | 15 | 15 | 5,200 |
| Adjusted Mandatory - Fee | 24 | 24 | 4,886 | 24 | 24 | 5,200 | 15 | 15 | 5,200 |

AR00197

## Department of Homeland Security
### Total Budget Authority

| | FY 2016 Revised Enacted | | | FY 2017 Annualized CR | | | FY 2018 President's Budget | | |
|---|---|---|---|---|---|---|---|---|---|
| | Pos. | FTE | $$$ | Pos. | FTE | $$$ | Pos. | FTE | $$$ |
| **U.S. Coast Guard** | 49,560 | 46,555 | 10,893,631 | 49,560 | 47,927 | 10,940,660 | 50,147 | 48,550 | 10,671,010 |
| **Operating Expenses** | 48,104 | 45,263 | 6,827,776 | 48,104 | 46,565 | 6,879,692 | 48,677 | 47,181 | 7,213,464 |
| Military Pay and Allowances | 40,223 | 38,327 | 3,418,433 | 40,223 | 39,627 | 3,488,617 | 40,593 | 40,060 | 3,711,095 |
| Civilian Pay and Benefits | 7,881 | 6,936 | 792,229 | 7,881 | 6,936 | 792,229 | 8,084 | 7,121 | 851,178 |
| Training and Recruiting | | | 195,718 | | | 204,541 | | | 190,668 |
| Operating Funds and Unit Level Maintenance | | | 1,013,897 | | | 1,017,954 | | | 895,518 |
| Centrally Managed Accounts | | | 353,821 | | | 329,906 | | | 142,788 |
| Intermediate and Depot Level Maintenance | | | 1,053,628 | | | 1,046,445 | | | 1,422,217 |
| Overseas Contingency Operations (OCO)/Global War on Terrorism | | | | | | | | | |
| **Environmental Compliance and Restoration** | 25 | 20 | 13,321 | 25 | 23 | 13,196 | 25 | 23 | 13,397 |
| **Reserve Training** | 416 | 409 | 110,099 | 416 | 409 | 109,890 | 416 | 409 | 114,875 |
| **Acquisition, Construction, and Improvements** | 914 | 766 | 1,928,593 | 914 | 835 | 1,924,417 | 914 | 835 | 1,203,745 |
| Vessels | | | 1,309,430 | | | 1,244,551 | | | 977,100 |
| Survey and Design - Vessels and Boats | | | 15,000 | | | 15,000 | | | 1,500 |
| In-Service Vessel Sustainment | | | 68,000 | | | 68,000 | | | 69,500 |
| National Security Cutter | | | 658,430 | | | 723,551 | | | 54,000 |
| Offshore Patrol Cutter | | | 210,000 | | | 80,000 | | | 500,000 |
| Fast Response Cutter | | | 340,000 | | | 340,000 | | | 240,000 |
| Cutter Boats | | | 3,000 | | | 3,000 | | | 1,000 |
| Polar Icebreaker | | | 6,000 | | | 6,000 | | | 19,000 |
| Inland Waterways and Western Rivers Tender | | | | | | | | | 1,100 |
| Aircraft | | | 255,966 | | | 295,000 | | | 82,600 |
| HC-144 Conversion/Sustainment | | | 3,000 | | | 3,000 | | | |
| HC-27J Conversion/Sustainment | | | 102,000 | | | 102,000 | | | 52,000 |
| HC-130J Acquisition/Conversion/Sustainment | | | 145,000 | | | 150,000 | | | 5,600 |
| HH-65 Conversion/Sustainment | | | 5,966 | | | 40,000 | | | 22,000 |
| MH-60T Conversion/Sustainment | | | | | | | | | 2,450 |
| Small Unmanned Aircraft Systems | | | | | | | | | 500 |
| Other Acquisition Programs | | | 57,855 | | | 65,100 | | | 50,800 |
| Other Equipment and Systems | | | | | | | | | 4,000 |
| Program Oversight and Management | | | 17,220 | | | 20,000 | | | 15,000 |
| C4ISR | | | 32,977 | | | 36,600 | | | 22,000 |
| Coast Guard Logistics Information Management System | | | 7,658 | | | 8,500 | | | 9,800 |
| Shore Facilities and Aids to Navigation (ATON) | | | 192,800 | | | 202,600 | | | 75,000 |
| Major Shore, Housing, ATON, Survey and Design | | | 135,800 | | | 145,600 | | | 10,000 |
| Major Acquisition Systems Infrastructure | | | 52,000 | | | 52,000 | | | 60,000 |
| Minor Shore | | | 5,000 | | | 5,000 | | | 5,000 |
| Personnel and Related Support Costs | 914 | 766 | 112,348 | 914 | 835 | 116,876 | 914 | 835 | 118,241 |
| Research, Development, Test, and Evaluation | 96 | 83 | 18,019 | 96 | 83 | 17,986 | 96 | 83 | 18,641 |
| Medicare-Eligible Retiree Health Care Fund Contribution | | | 168,847 | | | 175,586 | | | 195,784 |
| Retired Pay | | | 1,604,000 | | | 1,604,000 | | | 1,699,852 |
| Boat Safety | 14 | 14 | 114,326 | 14 | 14 | 113,049 | 19 | 19 | 113,416 |
| Maritime Oil Spill Program | | | 107,329 | | | 101,000 | | | 101,000 |
| **Funds** | | | | | | | | | |
| General Gift Fund | | | 1,621 | | | 2,214 | | | 2,864 |
| Yard Fund | | | 1,621 | | | 2,214 | | | 2,864 |
| Supply Fund | | | | | | | | | |
| Rescission of Prior Year Unobligated Balances (Discretionary + Appropriation) | | | | | | | | | (12,640) |
| Net Discretionary | 49,555 | 46,541 | 9,066,355 | 49,555 | 47,913 | 9,120,397 | 50,128 | 48,531 | 8,759,906 |
| Adjusted Net Discretionary | 49,555 | 46,541 | 9,066,355 | 49,555 | 47,913 | 9,120,397 | 50,128 | 48,531 | 8,747,566 |
| Mandatory - Appropriation | 14 | 14 | 1,822,276 | 14 | 14 | 1,820,263 | 19 | 19 | 1,913,104 |
| Adjusted Net Mandatory Appropriation | 14 | 14 | 1,822,276 | 14 | 14 | 1,820,263 | 19 | 19 | 1,913,104 |
| [Overseas Contingency Operations] | [366] | [366] | [160,002] | [366] | [366] | [160,002] | | | |
| [Trust Funds] | | | [45,000] | | | [45,000] | | | [45,000] |

AR0019[ ]

## Department of Homeland Security
### Total Budget Authority

| | FY 2016 Revised Enacted | | | FY 2017 Annualized CR | | | FY 2018 President's Budget | | |
|---|---|---|---|---|---|---|---|---|---|
| | Pos. | FTE | $$$ | Pos. | FTE | $$$ | Pos. | FTE | $$$ |
| **U.S. Secret Service** | 6,714 | 6,481 | 2,191,808 | 6,714 | 6,481 | 2,190,481 | 7,150 | 6,934 | 2,208,626 |
| **Operations and Support** | 6,714 | 6,481 | 1,854,976 | 6,714 | 6,481 | 1,855,785 | 7,150 | 6,934 | 1,879,346 |
| Mission Support | 696 | 686 | 369,686 | 696 | 686 | 371,563 | 768 | 737 | 414,558 |
| Protective Operations | 3,153 | 3,009 | 876,285 | 3,153 | 3,009 | 874,877 | 3,312 | 3,216 | 894,475 |
| Protection of Persons and Facilities | 2,880 | 2,738 | 618,710 | 2,880 | 2,738 | 632,089 | 2,973 | 2,880 | 705,566 |
| Protective Countermeasures | 67 | 67 | 55,000 | 67 | 67 | 54,995 | 118 | 118 | 46,862 |
| Protective Intelligence | 206 | 204 | 42,066 | 206 | 204 | 42,895 | 221 | 218 | 47,547 |
| Presidential Campaigns and National Special Security Events | | | 159,500 | | | 144,998 | | | 4,500 |
| Field Operations | 2,661 | 2,582 | 549,296 | 2,661 | 2,582 | 547,750 | 2,849 | 2,762 | 596,235 |
| Domestic and International Field Operations | 2,646 | 2,567 | 528,946 | 2,646 | 2,567 | 527,440 | 2,841 | 2,754 | 588,653 |
| Support for Missing and Exploited Children Investigations | 8 | 8 | 7,566 | 8 | 8 | 7,550 | 8 | 8 | 7,582 |
| Support for Computer Forensics Training | 7 | 7 | 12,784 | 7 | | 12,760 | | | |
| Basic and In-Service Training and Professional Development | 204 | 204 | 59,709 | 204 | 204 | 59,595 | 221 | 219 | 64,078 |
| Procurement, Construction, and Improvements | | | 71,582 | | | 71,446 | | | 64,030 |
| Protection Assets and Infrastructure | | | 11,000 | | | 10,979 | | | 39,012 |
| Operational Communications/Information Technology | | | 34,332 | | | 34,317 | | | 25,018 |
| Construction and Facility Improvements | | | 26,250 | | | 26,150 | | | |
| Mission Support Assets and Infrastructure | | | | | | | | | |
| Research and Development | | | | | | | | | |
| Contribution for Annuity Accounts | | | 250 | | | 250 | | | 250 |
| **Net Discretionary** | 6,714 | 6,481 | 1,926,808 | 6,714 | 6,481 | 1,925,481 | 7,150 | 6,934 | 1,943,626 |
| **Adjusted Net Discretionary** | 6,714 | 6,481 | 1,926,808 | 6,714 | 6,481 | 1,925,481 | 7,150 | 6,934 | 1,943,626 |
| **Mandatory - Appropriation** | | | 265,000 | | | 265,000 | | | 265,000 |
| **Adjusted Net Mandatory Appropriation** | | | 265,000 | | | 265,000 | | | 265,000 |

AR00199

AR00020

**Department of Homeland Security**
**Total Budget Authority**

| | FY 2016 Revised Enacted | | | FY 2017 Annualized CR | | | FY 2018 President's Budget | | |
|---|---|---|---|---|---|---|---|---|---|
| | Pos. | FTE | $$$ | Pos. | FTE | $$$ | Pos. | FTE | $$$ |
| **National Protection and Programs Directorate** | 3,756 | 3,178 | 3,075,838 | 3,877 | 3,299 | 3,081,428 | 4,159 | 3,592 | 3,277,489 |
| Operations and Support | 2,275 | 1,792 | 1,292,747 | 2,275 | 1,792 | 1,291,384 | 2,557 | 2,085 | 1,488,275 |
| Cybersecurity | 418 | 356 | 89,995 | 418 | 354 | 75,500 | 435 | 349 | 87,557 |
| Cyber Readiness and Response | 603 | 408 | 583,735 | 603 | 408 | 593,765 | 743 | 579 | 720,557 |
| Cyber Readiness and Response | 309 | 230 | 153,334 | 309 | 234 | 151,726 | 376 | 286 | 200,963 |
| NCCIC Operations | 172 | 135 | 87,276 | 172 | 135 | 87,109 | 215 | 155 | 116,471 |
| NCCIC Planning and Exercises | 137 | 95 | 66,235 | 137 | 99 | 64,617 | 161 | 131 | 84,493 |
| Cyber Infrastructure Resilience | 34 | 15 | 42,191 | 34 | 15 | 42,053 | 48 | 38 | 41,194 |
| Cybersecurity Advisors | 16 | 5 | 8,243 | 16 | 5 | 8,216 | 30 | 22 | 14,692 |
| Enhanced Cybersecurity Services | 5 | 3 | 16,597 | 5 | 3 | 16,543 | 5 | 0 | 17,157 |
| Cybersecurity Education & Awareness | 11 | 5 | 17,346 | 11 | 5 | 17,294 | 10 | 0 | 10,093 |
| Federal Cybersecurity | 266 | 167 | 308,015 | 266 | 167 | 299,986 | 319 | 255 | 477,449 |
| Federal Network Resilience | 55 | 25 | 29,695 | 55 | 25 | 28,097 | 57 | 63 | 42,769 |
| Continuous Diagnostics and Mitigation | 31 | 29 | 5,140 | 31 | 29 | 5,136 | 55 | 40 | 93,780 |
| National Cybersecurity Protection System | 177 | 108 | 356,261 | 177 | 108 | 366,752 | 177 | 152 | 341,103 |
| Infrastructure Protection | 624 | 499 | 184,662 | 624 | 498 | 185,641 | 681 | 573 | 187,955 |
| Infrastructure Security Compliance | 350 | 267 | 110,025 | 337 | 267 | 109,588 | 374 | 318 | 115,515 |
| Infrastructure Capacity Building | 336 | 208 | 39,953 | 132 | 108 | 39,658 | 141 | 121 | 44,091 |
| Sector Risk Management | 121 | 98 | 32,847 | 121 | 98 | 32,782 | 148 | 122 | 35,677 |
| Protective Security Advisors | 28 | 19 | 14,290 | 20 | 16 | 14,122 | 20 | 10 | 14,729 |
| Bombing Prevention | 64 | 51 | 23,119 | 64 | 51 | 23,026 | 65 | 54 | 20,600 |
| Infrastructure Information and Sensitive Data Protection | 287 | 232 | 78,637 | 287 | 232 | 76,085 | 307 | 255 | 72,444 |
| Emergency Communications | 126 | 103 | 100,551 | 126 | 103 | 100,976 | 137 | 108 | 113,021 |
| Emergency Communications Preparedness | 98 | 77 | 43,558 | 98 | 77 | 44,163 | 107 | 82 | 49,066 |
| Priority Telecommunications Services | 30 | 29 | 56,993 | 30 | 26 | 56,813 | 30 | 26 | 63,955 |
| GETS/WPS/SRAS/TSP | 17 | 15 | 55,166 | 17 | 15 | 54,992 | 15 | 15 | 56,319 |
| Next Generation Networks Priority Services | 13 | 13 | 1,824 | 13 | 13 | 1,821 | 15 | 11 | 7,636 |
| Integrated Operations | 334 | 265 | 118,552 | 334 | 265 | 120,699 | 391 | 322 | 125,896 |
| Cyber and Infrastructure Analysis | 111 | 69 | 41,354 | 110 | 69 | 43,597 | 148 | 116 | 43,532 |
| National Infrastructure Simulation Analysis Center (NISAC) | | | 18,658 | | | 18,560 | | | 8,912 |
| Infrastructure Analysis | 111 | 69 | 22,704 | 110 | 69 | 25,028 | 148 | 116 | 34,410 |
| Critical Infrastructure Situational Awareness | 30 | 34 | 13,646 | 39 | 34 | 13,648 | 53 | 41 | 21,222 |
| Stakeholder Engagement and Requirements | 113 | 104 | 50,100 | 113 | 104 | 50,089 | 118 | 102 | 46,991 |
| Strategy, Policy, and Plans | 72 | 59 | 13,388 | 72 | 59 | 13,365 | 74 | 63 | 14,441 |
| Office of Biometric Identity Management | 176 | 161 | 215,252 | 176 | 161 | 214,683 | 176 | 154 | 219,429 |
| Identity and Screening Program Operations | 176 | 161 | 69,827 | 176 | 161 | 69,634 | 176 | 154 | 68,826 |
| IDENT/Homeland Advanced Recognition Technology Operations and Maintenance | | | 145,425 | | | 145,049 | | | 150,603 |
| **Procurement, Construction, and Improvements** | | | 333,521 | | | 332,889 | | | 335,033 |
| Cybersecurity | | | 189,173 | | | 188,813 | | | 241,309 |
| Continuous Diagnostics and Mitigation | | | 97,435 | | | 97,294 | | | 185,180 |
| National Cybersecurity Protection System | | | 91,738 | | | 91,519 | | | 56,129 |
| Emergency Communications | | | 78,550 | | | 78,401 | | | 48,905 |
| Next Generation Networks Priority Services | | | 78,550 | | | 78,401 | | | 48,905 |
| Biometric Identity Management | | | 65,800 | | | 65,675 | | | 40,100 |
| IDENT/Homeland Advanced Recognition Technology | | | 65,800 | | | 65,675 | | | 40,100 |
| Integrated Operations Assets and Infrastructure | | | | | | | | | 508 |
| Modeling Capability Transition Environment | | | | | | | | | 508 |
| Infrastructure Protection | | | | | | | | | 4,210 |
| Infrastructure Protection IP Gateway | | | | | | | | | 4,210 |

**Department of Homeland Security**
**Total Budget Authority**

| | FY 2016 Revised Enacted Pos. | FTE | $$$ | FY 2017 Annualized CR Pos. | FTE | $$$ | FY 2018 President's Budget Pos. | FTE | $$$ |
|---|---|---|---|---|---|---|---|---|---|
| **Research and Development** | | | | | | | | | |
| Cybersecurity | | | 6,119 | | | 6,107 | | | 11,126 |
| Infrastructure Protection | | | 2,030 | | | 2,020 | | | 4,699 |
| Integrated Operations R&D | | | 4,088 | | | 4,081 | | | 2,431 |
| | | | | | | | | | 4,000 |
| **Federal Protective Service** | | | | | | | | | |
| FPS Operations | 1,481 | 1,386 | 1,443,449 | 1,602 | 1,507 | 1,451,078 | 1,602 | 1,507 | 1,476,055 |
| Operating Expenses | | | 336,458 | | | 368,892 | | | 360,079 |
| | | | 306,858 | | | 368,052 | | | 360,079 |
| Countermeasures | | | 1,106,991 | | | 1,082,186 | | | 1,115,976 |
| Protective Security Officers | | | 1,085,699 | | | 1,061,371 | | | 1,071,286 |
| Technical Countermeasures | | | 21,292 | | | 20,815 | | | 44,690 |
| Discretionary - Offsetting Fee | 1,481 | 1,386 | 1,443,449 | 1,602 | 1,507 | 1,451,078 | 1,602 | 1,507 | 1,476,055 |
| Adjusted Discretionary - Fee | | | | | | | | | |
| Net Discretionary | 2,275 | 1,792 | 1,632,389 | 2,275 | 1,792 | 1,630,350 | 2,557 | 2,085 | 1,801,434 |
| Adjusted Net Discretionary | 2,275 | 1,792 | 1,632,389 | 2,275 | 1,792 | 1,630,350 | 2,557 | 2,085 | 1,801,434 |
| Gross Discretionary | 3,756 | 3,178 | 3,075,838 | 3,877 | 3,299 | 3,091,428 | 4,159 | 3,592 | 3,277,489 |
| Adjusted Gross Discretionary | 3,756 | 3,178 | 3,075,838 | 3,877 | 3,299 | 3,091,428 | 4,159 | 3,592 | 3,277,489 |
| **Office of Health Affairs** | 103 | 96 | 125,333 | 103 | 96 | 122,747 | 103 | 96 | 111,319 |
| Operations and Support | 103 | 96 | 125,333 | 103 | 96 | 122,747 | 103 | 96 | 111,319 |
| Mission Support | 103 | 96 | 26,974 | 103 | 96 | 24,575 | 103 | 96 | 28,419 |
| Chemical and Biological Readiness | | | 82,802 | | | 82,744 | | | 77,380 |
| Health and Medical Readiness | | | 4,495 | | | 4,487 | | | 4,120 |
| Integrated Operations | | | 11,062 | | | 10,941 | | | 1,400 |
| Net Discretionary | 103 | 96 | 125,333 | 103 | 96 | 122,747 | 103 | 96 | 111,319 |
| Adjusted Net Discretionary | 103 | 96 | 125,333 | 103 | 96 | 122,747 | 103 | 96 | 111,319 |
| **Federal Emergency Management Agency** | 5,205 | 9,673 | 15,712,464 | 5,335 | 9,838 | 16,151,751 | 5,350 | 9,869 | 15,552,106 |
| Operations and Support | 4,150 | 3,839 | 918,984 | 4,156 | 3,618 | 916,965 | 4,207 | 3,659 | 1,014,748 |
| Mission Support | 1,288 | 1,209 | 371,474 | 1,293 | 1,145 | 388,452 | 1,320 | 1,171 | 468,299 |
| Regional Operations | 1,115 | 1,092 | 151,460 | 1,112 | 978 | 154,158 | 1,112 | 978 | 156,417 |
| Mitigation | 67 | 67 | 28,108 | 69 | 64 | 30,032 | 83 | 73 | 36,141 |
| Preparedness and Protection | 527 | 506 | 149,527 | 528 | 422 | 148,916 | 522 | 416 | 131,081 |
| Response and Recovery | 1,155 | 965 | 218,285 | 1,154 | 1,099 | 228,407 | 1,168 | 1,021 | 221,920 |
| Response | 775 | 648 | 169,815 | 821 | 725 | 183,100 | 840 | 742 | 175,226 |
| Recovery | 375 | 317 | 48,570 | 333 | 284 | 45,307 | 328 | 279 | 46,694 |
| **Procurement, Construction, and Improvements** | | | 43,300 | 14 | 11 | 43,218 | | | 89,996 |
| Operational Communications/Information Technology | | | 2,800 | | | 2,795 | | | 12,018 |
| Construction and Facility Improvements | | | 29,000 | 14 | 11 | 28,945 | | | 44,519 |
| Mission Support Assets and Infrastructure | | | 11,500 | | | 11,478 | | | 33,459 |
| **Federal Assistance** | 447 | 411 | 3,037,916 | 460 | 412 | 3,022,732 | 380 | 364 | 2,064,130 |
| Grants | 73 | 68 | 2,752,652 | 73 | 68 | 2,747,992 | | | 1,900,863 |
| State Homeland Security Grant Program | | | 999,985 | | | 466,112 | | | 349,362 |
| Urban Area Security Initiative | | | 100,000 | | | 598,844 | | | 448,344 |
| Public Transportation Security Assistance | | | 100,000 | | | 99,810 | | | 47,309 |
| Port Security Grants | | | 50,000 | | | 99,810 | | | 47,309 |
| Countering Violent Extremism | | | | | | 409,005 | | | |
| Assistance to Firefighters Grants | | | 345,000 | | | 344,344 | | | 344,344 |
| Staffing for Adequate Fire and Emergency Response (SAFER) Grants | | | 345,000 | | | 344,344 | | | 344,344 |
| Emergency Management Performance Grants | | | 350,000 | | | 340,335 | | | 279,333 |
| Predisaster Mitigation Grant | | | 85,667 | | | 86,077 | | | 39,014 |

AR00201

**Department of Homeland Security**
**Total Budget Authority**

| | FY 2016 Revised Enacted | | | FY 2017 Annualized CR | | | FY 2018 President's Budget | | |
|---|---|---|---|---|---|---|---|---|---|
| | Pos. | FTE | $$$ | Pos. | FTE | $$$ | Pos. | FTE | $$$ |
| Flood Hazard Mapping and Risk Analysis Program (RiskMAP)... | 5 | 5 | 190,000 | 5 | 5 | 190,630 | | | |
| Emergency Food and Shelter... | | | 120,000 | | | 119,772 | | | |
| Education, Training, and Exercises... | | | | | | | | | |
| Center for Domestic Preparedness... | 374 | 343 | 275,264 | 387 | 344 | 274,740 | 380 | 364 | 165,267 |
| Center for Homeland Defense and Security... | 102 | 97 | 64,991 | 114 | 91 | 64,367 | 114 | 107 | 63,771 |
| Emergency Management Institute... | | | 18,000 | | | 17,066 | | | 17,066 |
| U.S. Fire Administration... | 92 | 80 | 20,560 | 92 | 88 | 20,530 | 98 | 85 | 18,824 |
| National Domestic Preparedness Consortium... | 134 | 132 | 42,266 | 135 | 128 | 42,183 | 135 | 129 | 41,913 |
| Continuing Training Grants... | | | 98,000 | | | 97,814 | | | |
| National Exercise Program... | | | 11,521 | | | 11,499 | | | |
| | 45 | 34 | 19,919 | 45 | 37 | 19,881 | 45 | 43 | 20,793 |
| **Disaster Relief Fund** | **55** | **44** | **7,310,693** | **66** | **44** | **7,374,693** | **66** | | **7,351,720** |
| Base Disaster Relief... | 55 | | 608,740 | 66 | | 661,740 | 66 | | 558,720 |
| Disaster Relief Category... | | 4,450 | 6,712,953 | | 4,737 | 6,712,953 | | 4,737 | 6,793,000 |
| **National Flood Insurance Program** | **383** | **371** | **4,403,759** | **469** | **450** | **4,794,408** | **527** | **493** | **5,032,536** |
| Mission Support... | 124 | 124 | 23,706 | 124 | 124 | 23,661 | 46 | 46 | 13,573 |
| Floodplain Management and Flood Mapping... | 217 | 205 | 183,669 | 217 | 205 | 157,193 | 287 | 266 | 239,927 |
| National Flood Insurance Fund... | 42 | 42 | 3,381,829 | 128 | 121 | 3,535,367 | 191 | 181 | 3,809,409 |
| National Flood Insurance Reserve Fund... | | | 817,555 | | | 1,078,187 | | | 969,627 |
| Radiological Emergency Preparedness Program | 170 | 153 | (1,158) | 170 | 161 | (265) | 170 | 170 | (1,024) |
| Rescission of Prior Year Unobligated Balances (Discretionary - Appropriations) | | | (1,049,217) | | | (1,049,217) | | | (581,345) |
| Discretionary - Offsetting Fee | 341 | 329 | 204,375 | 341 | 329 | 180,854 | 336 | 312 | 253,500 |
| Discretionary - Major Disasters (DRF) | | 4,450 | 6,712,953 | | 4,737 | 6,712,953 | | 4,737 | 6,793,000 |
| **Net Discretionary** | **4,822** | **4,852** | **4,595,752** | **4,866** | **4,651** | **4,644,300** | **4,823** | **4,639** | **3,726,570** |
| Transfer to OIG | | | | | | (24,000) | | | (24,000) |
| Adjusted Net Discretionary | 4,822 | 4,852 | 4,546,535 | 4,866 | 4,651 | 3,571,173 | 4,823 | 4,639 | 3,121,225 |
| **Gross Discretionary** | **5,163** | **9,631** | **11,513,080** | **5,207** | **9,717** | **11,538,197** | **5,159** | **9,688** | **10,773,070** |
| Adjusted Gross Discretionary | 5,163 | 9,631 | 10,463,863 | 5,207 | 9,717 | 10,464,980 | 5,159 | 9,688 | 10,167,725 |
| **Mandatory - Fee** | **42** | **42** | **4,199,384** | **121** | **123** | **4,613,554** | **181** | **181** | **4,779,034** |
| Adjusted Mandatory - Fee | 42 | 42 | 4,199,384 | 123 | 123 | 4,613,554 | 191 | 191 | 4,779,034 |

AR00020

**Department of Homeland Security**
**Total Budget Authority**

| | FY 2016 Revised Enacted | | | FY 2017 Annualized CR | | | FY 2018 President's Budget | | |
|---|---|---|---|---|---|---|---|---|---|
| | Pos. | FTE | $$$ | Pos. | FTE | $$$ | Pos. | FTE | $$$ |
| **United States Citizenship and Immigration Services** | 16,432 | 15,371 | 3,787,338 | 15,875 | 15,091 | 3,606,909 | 18,196 | 17,296 | 4,442,039 |
| Operations and Support | 415 | 398 | 104,560 | 419 | 398 | 101,281 | 419 | 398 | 108,886 |
| Employment Status Verification | 415 | 398 | 104,560 | 419 | 398 | 101,281 | 419 | 398 | 108,886 |
| Procurement, Construction, and Improvements | | | 15,111 | | | 15,082 | | | 22,685 |
| Verification Modernization (VER) | | | 15,111 | | | 15,082 | | | 22,685 |
| **Immigration Examinations Fee Account** | 15,828 | 14,788 | 3,604,366 | 15,271 | 14,508 | 3,430,546 | 17,592 | 16,713 | 4,238,339 |
| District Operations | 7,778 | 7,276 | 1,590,552 | 7,630 | 7,249 | 1,615,409 | 8,311 | 7,895 | 1,756,407 |
| Service Center Operations | 3,539 | 3,352 | 992,010 | 3,846 | 3,654 | 669,891 | 3,556 | 3,373 | 643,641 |
| Asylum, Refugee and International Operations | 1,606 | 1,447 | 284,231 | 1,381 | 1,312 | 259,042 | 1,668 | 1,585 | 399,382 |
| Records Operations | 396 | 360 | 129,368 | 359 | 341 | 124,177 | 430 | 408 | 133,477 |
| Premium Processing (Including Business Transformation) | 447 | 419 | 436,637 | | | 226,380 | 1,430 | 1,359 | 620,829 |
| Information and Customer Services | 317 | 299 | 979,932 | 360 | 342 | 124,041 | 325 | 313 | 109,445 |
| Administration | 1,522 | 1,423 | 434,316 | 1,472 | 1,398 | 384,585 | 1,645 | 1,563 | 522,010 |
| Systematic Alien Verification for Entitlements (SAVE) | 223 | 212 | 32,326 | 223 | 212 | 27,021 | 212 | 212 | 34,828 |
| **H-1B Nonimmigrant Petitioner Account** | | | 15,000 | | | 15,000 | | | 15,000 |
| Service Center Operations | | | 15,000 | | | 15,000 | | | 15,000 |
| **Fraud Prevention and Detection Account** | 185 | 185 | 48,301 | 185 | 185 | 45,000 | 185 | 185 | 67,187 |
| District Operations | 115 | 115 | 27,398 | 115 | 115 | 29,523 | 115 | 115 | 45,101 |
| Service Center Operations | 70 | 70 | 20,603 | 70 | 70 | 15,169 | 70 | 70 | 21,778 |
| Asylum and Refugee Operating Expenses | | | 308 | | | 308 | | | 308 |
| Net Discretionary | 415 | 398 | 119,671 | 415 | 398 | 116,363 | 415 | 398 | 131,513 |
| CIDMP (Mandatory) | | | (4,000) | | | (4,000) | | | (4,000) |
| Adjusted Net Discretionary | 415 | 398 | 115,671 | 415 | 398 | 112,363 | 415 | 398 | 127,513 |
| Mandatory - Fee | 16,013 | 14,973 | 3,667,667 | 15,456 | 14,693 | 3,490,546 | 17,777 | 16,898 | 4,310,526 |
| Adjusted Mandatory - Fee | 16,013 | 14,973 | 3,667,667 | 15,456 | 14,693 | 3,490,546 | 17,777 | 16,898 | 4,310,526 |
| **Federal Law Enforcement Training Center** | 1,133 | 1,106 | 244,480 | 1,095 | 1,068 | 243,994 | 1,139 | 1,112 | 272,759 |
| Operations and Support | 1,133 | 1,106 | 244,480 | 1,095 | 1,068 | 243,994 | 1,139 | 1,112 | 272,759 |
| Mission Support | 222 | 217 | 28,075 | 223 | 217 | 28,034 | 223 | 217 | 28,034 |
| Law Enforcement Training | 911 | 888 | 216,405 | 872 | 851 | 215,060 | 916 | 895 | 244,725 |
| Procurement, Construction, and Improvements | | | | | | | | | |
| Construction and Facility Improvements | | | | | | | | | |
| Net Discretionary | 1,133 | 1,106 | 244,480 | 1,095 | 1,068 | 243,994 | 1,139 | 1,112 | 272,759 |
| Adjusted Net Discretionary | 1,133 | 1,106 | 244,480 | 1,095 | 1,068 | 243,994 | 1,139 | 1,112 | 272,759 |
| **Science and Technology** | 480 | 480 | 776,653 | 480 | 480 | 771,690 | 431 | 455 | 637,324 |
| Operations and Support | 480 | 480 | 302,079 | 480 | 480 | 299,015 | 431 | 455 | 254,618 |
| Mission Support | 344 | 344 | 121,345 | 344 | 344 | 119,220 | 324 | 334 | 119,823 |
| Laboratory Facilities | 136 | 136 | 133,731 | 136 | 136 | 133,943 | 107 | 121 | 92,243 |
| Acquisition and Operations Analysis | | | 47,103 | | | 45,852 | | | 42,552 |
| Procurement, Construction, and Improvements | | | | | | | | | |
| Laboratory Facilities | | | 474,574 | | | 472,675 | | | 372,706 |
| Research, Development and Innovation | | | 434,850 | | | 432,951 | | | 342,982 |
| University Programs | | | 39,724 | | | 39,724 | | | 29,724 |
| Net Discretionary | 480 | 480 | 776,653 | 480 | 480 | 771,690 | 431 | 455 | 637,324 |
| Adjusted Net Discretionary | 480 | 480 | 776,653 | 480 | 480 | 771,690 | 431 | 455 | 637,324 |

AR00203

## Department of Homeland Security
### Total Budget Authority

| | FY 2016 Revised Enacted | | | FY 2017 Annualized CR | | | FY 2018 President's Budget | | |
|---|---|---|---|---|---|---|---|---|---|
| | Pos. | FTE | $$$ | Pos. | FTE | $$$ | Pos. | FTE | $$$ |
| **Domestic Nuclear Detection Office** | 137 | 137 | 347,036 | 137 | 137 | 342,059 | 158 | 144 | 330,440 |
| Operations and Support | 137 | 137 | 51,461 | 137 | 137 | 50,095 | 158 | 144 | 54,664 |
| Mission Support........ | 137 | 137 | 51,461 | 137 | 137 | 50,095 | 158 | 144 | 54,664 |
| Procurement, Construction, and Improvements | | | 88,289 | | | 87,096 | | | 87,096 |
| Large Scale Detection Systems........... | | | 51,269 | | | 53,096 | | | 62,524 |
| Human Portable RadNuc Systems.......... | | | 37,020 | | | 34,000 | | | 24,572 |
| Research and Development | | | 160,005 | | | 158,173 | | | 144,161 |
| Architecture Planning and Analysis......... | | | 15,758 | | | 15,575 | | | 15,937 |
| Transformational Research and Development..... | | | 64,684 | | | 63,943 | | | 60,581 |
| Detection Capability Development.......... | | | 21,029 | | | 20,788 | | | 15,155 |
| Detection Capability Assessments.......... | | | 39,503 | | | 39,051 | | | 34,127 |
| Nuclear Forensics....... | | | 19,031 | | | 18,813 | | | 18,361 |
| Federal Assistance | | | 47,281 | | | 46,695 | | | 44,519 |
| Federal, State, Local, Territorial, and Tribal Support.... | | | 26,168 | | | 25,560 | | | 23,384 |
| Securing the Cities....... | | | 21,113 | | | 21,135 | | | 21,135 |
| **Net Discretionary** | 137 | 137 | 347,036 | 137 | 137 | 342,059 | 158 | 144 | 330,440 |
| **Adjusted Net Discretionary** | 137 | 137 | 347,036 | 137 | 137 | 342,059 | 158 | 144 | 330,440 |
| **DEPARTMENT OF HOMELAND SECURITY** | 226,916 | 217,150 | 65,674,835 | 226,947 | 218,403 | 65,978,997 | 233,613 | 225,836 | 70,692,491 |
| Rescission of Prior Year Unobligated Balances (Discretionary - Appropriation) | | | (1,049,217) | | | (1,049,217) | | | (903,745) |
| Net Discretionary - Fee | [11,638] | [11,638] | (263,454) | [11,086] | [11,086] | (251,935) | [11,367] | [11,367] | (274,001) |
| Discretionary - Fee | 430 | 400 | 441,007 | 902 | 562 | 348,263 | 508 | 504 | 304,257 |
| Discretionary - Offsetting Fee | 1,822 | 1,715 | 3,777,824 | 1,943 | 1,836 | 3,761,932 | 1,938 | 1,819 | 4,645,555 |
| Discretionary - Major Disasters (DRF) | | 4,450 | 6,712,953 | | 4,737 | 6,712,953 | | 4,732 | 6,793,060 |
| **Net Discretionary** | 198,790 | 185,825 | 42,294,746 | 197,830 | 185,530 | 42,311,771 | 201,187 | 189,714 | 44,661,433 |
| **Adjusted Net Discretionary** | 198,790 | 185,825 | 41,241,529 | 197,830 | 185,530 | 41,288,554 | 201,187 | 189,714 | 44,063,688 |
| **Gross Discretionary** | 201,042 | 192,390 | 53,226,530 | 200,365 | 192,665 | 53,135,019 | 203,723 | 196,864 | 56,494,347 |
| **Adjusted Gross Discretionary** | 201,042 | 192,390 | 52,177,313 | 200,365 | 192,665 | 52,085,802 | 203,723 | 196,864 | 55,909,002 |
| **Mandatory - Appropriation** | 14 | 14 | 2,342,276 | 14 | 14 | 2,335,263 | 19 | 19 | 2,438,104 |
| **Mandatory - Fees** | 25,860 | 24,746 | 10,106,029 | 26,568 | 25,724 | 10,508,715 | 29,871 | 28,983 | 11,770,040 |
| [Overseas Contingency Operations] | | | [160,002] | | | [160,002] | | | [160,002] |
| [Trust Funds] | | | [45,000] | | | [45,000] | | | [45,000] |

AR00201



Official website of the Department of Homeland Security



U.S. Department of Homeland Security

# The Perils of Illegal Border Crossing

**Release Date:** July 19, 2018

The Trump Administration has repeatedly referenced the dangers of trekking to and attempting to illegally enter the southwest border of the United States. As the perilous realities of these journeys have gone underreported, the Department of Homeland Security has compiled a list of the illegality stemming from trafficking and smuggling, the health and safety risks of entrusting someone to illegally take you across the border, and the dangerous transnational criminal organizations that exploit the porous southwest border to bolster their numbers in the interior.

On July 10, Secretary Kirstjen M. Nielsen met with foreign and security ministers from Guatemala, Honduras, El Salvador, and Mexico in Guatemala City, Guatemala to discuss how to expand and share joint public messaging efforts to dissuade potential migrants from taking the dangerous journey north—and work to counter-message the advertising and false information promoted by human smugglers.

## Human Smugglers/Traffickers

- July 16, 2018 (https://www.ice.gov/news/releases/using-data-analytics-target-human-smugglers): DHS Directorate uses data analytics to target human smugglers.

AR00205

Due to the lapse in federal funding, this website will not be actively managed. More info.

- July 16, 2018 (https://www.cbp.gov/newsroom/local-media-release/rio-grande-valley-border-patrol-agents-seize-narcotics-worth-over-673k) : U.S. Border Patrol agents discover an assortment of narcotics during a failed smuggling attempt worth over $673K.

- July 16, 2018 (/redirect?url=https%3A%2F%2Fwww.ntd.tv%2Finspiring%2Flife%2F3-year-old-abandoned-by-human-traffickers-rescued-along-river-by-us-border-patrol-agents.html) : 3-year-old, abandoned by human traffickers, rescued along river by US border Patrol agents

- July 14, 2018 (/redirect?url=http%3A%2F%2Fwww.foxnews.com%2Fus%2F2018%2F07%2F13%2Fice-agents-arrest-18-human-smugglers-117-illegal-immigrants-in-texas-new-mexico.html) : ICE agents arrest 18 human smugglers, 117 illegal immigrants in Texas, New Mexico

- July 14, 2018 (/redirect?url=https%3A%2F%2Fwww.star-telegram.com%2Fnews%2Fstate%2Ftexas%2Farticle214891520.html) : CBP identified a stash house in Rio Grande Valley attempting to smuggle 54 illegal aliens from Guatemala, Honduras, India, Mexico, El Salvador, and Ecuador.

- July 11, 2018 (https://www.cbp.gov/newsroom/local-media-release/rio-grande-valley-border-patrol-agents-arrest-six-criminal-aliens-one) : Border Patrol agents across the Rio Grande Valley arrested four gang members and two sex offenders including active members of MS-13 and the 18th Street gang.

- July 5, 2018 (https://www.cbp.gov/newsroom/national-media-release/border-patrol-agents-rescue-64-illegal-aliens-trapped-tractor) : Border Patrol Agents Rescue 64 Illegal Aliens Trapped in Tractor Trailers

- July 2, 2018 (https://www.cbp.gov/newsroom/local-media-release/twelve-discovered-tractor-trailer-rio-grande-valley) : U.S. Border Patrol agents assigned to the Falfurrias Checkpoint arrested two United States citizens attempting to smuggle 12 illegal aliens inside a tractor-trailer.

- July 2, 2018 (/redirect?url=https%3A%2F%2Fwww.breitbart.com%2Ftexas%2F2018%2F07%2F03%2Fborder-patrol-finds-two-teen-human-trafficking-victims-with-migrant-group%2F) : Border patrol finds two teen human trafficking victims with migrant group

- July 2, 2018 (https://www.cbp.gov/newsroom/local-media-release/cbp-officers-laredo-port-entry-weekend-apprehend-man-warrant-sex) : CBP Officers at Laredo Port of Entry This Weekend Apprehend Man with Warrant for Sex-related Offenses Against a Child

AR00206

- **June 30, 2018** (/redirect?url=https%3A%2F%2Fwww.nytimes.com%2Finteractive%2F2018%2F06%2F30%2Fworld%2Fsmuggling-illegal-immigration-costs.html) : NYT describes the perils of an El Salvadorian immigrant's attempt to cross the U.S.-Mexico border with assistance from professional human traffickers whose services cost more than $12,000. Traffickers forced 70 illegal immigrants into a "stash home," in Texas where they deprived the immigrants of food and water for 36 hours.

- **June 26, 2018** (https://www.cbp.gov/newsroom/local-media-release/child-smuggler-arrested-rio-grande-valley) : CBP arrested a US national attempting to smuggle an unaccompanied 8 year old alien from Honduras across a checkpoint near Falfurrias, TX.

- **June 20, 2018** (https://www.cbp.gov/newsroom/local-media-release/agents-rescue-6-year-old-abandoned-smuggler) : CBP rescued a 6-year-old illegal alien from Costa Rica who had been abandoned by a smuggler near Lukeville, AZ, in temperatures over 100F.

- **June 19, 2018** (https://www.ice.gov/news/releases/federal-criminal-complaint-filed-against-driver-and-4-others-involved-south-texas) : Smugglers led ICE agents on a high speed chase that resulted in the death of 5 illegal aliens when their driver crashed near Eagle Pass, Texas. The SUV was carrying 13 suspected illegal aliens in total, including a juvenile, and the survivors were hospitalized.

- **June 18, 2018** (/redirect?url=https%3A%2F%2Fwww.nytimes.com%2F2018%2F06%2F18%2Fus%2Fpolitics%2Fdhs-kirstjen-nielsen-families-separated-border-transcript.html) : Kirstjen Nielsen Addresses Family Separation at Border: Full Transcript

- **June 15, 2018** (https://www.cbp.gov/newsroom/local-media-release/10-illegal-aliens-found-douglas-home) : CBP agents found 10 illegal aliens near Tucson, AZ, in a home with no air conditioning, littered with trash, decaying food and human feces.

- **June 8, 2018** (https://www.cbp.gov/newsroom/local-media-release/laredo-sector-border-patrols-agents-rescue-six-illegal-aliens-trapped) : CBP discovered six illegal aliens trapped inside cabinets in the back of a truck. The cabinets were closed with ratchet straps and had no air circulation on a hot day.

- **June 5, 2018** (https://www.cbp.gov/newsroom/local-media-release/three-deceased-individuals-found-less-24-hours-rio-grande-valley-multi) : The bodies of three illegal

AR00207

immigrants who had been abandoned by smugglers were discovered in the Rio Grande Valley near Edinburg, TX in separate incidents.

- May 11, 2018 (https://www.cbp.gov/newsroom/local-media-release/border-patrol-agents-arrest-sex-offender-human-smuggling-attempt): CBP agents arrested a convicted sex offender from California who was attempting to smuggle four illegal aliens from Mexico west of Yuma, AZ.

- May 8, 2018 (https://www.cbp.gov/newsroom/local-media-release/laredo-sector-border-patrol-agents-rescue-over-680-illegal-aliens): CBP discovered a severely dehydrated illegal alien that claimed to have been assaulted by a smuggler on a ranch near Laredo, TX.

- April 7, 2018 (https://www.cbp.gov/newsroom/local-media-release/laredo-sector-border-patrol-agents-continue-rescue-efforts-0): CBP agents discovered 9 illegal aliens near Laredo, TX, over the course of two days. Two of the illegal aliens had been abandoned by smugglers and one was severely dehydrated and in need of immediate medical attention.

- April 2, 2018 (https://www.cbp.gov/newsroom/local-media-release/border-patrol-agents-rescue-man-abandoned-smugglers): CBP agents near Tucson, AZ rescued an injured and severely dehydrated 34-year old illegal alien from Guatemala who had been abandoned by smugglers, along with 11 other illegal aliens, two of whom had to be treated for dehydration.

- February 2, 2018 (https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-department-justice-s-human-trafficking-summit): A recent DOJ partnership with Mexico has resulted in federal prosecution of more than 50 international defendants for various roles in trafficking women and young girls. In 2017, more than 500 defendants were convicted for various human trafficking offenses.

- October 5, 2017 (/redirect?url=https%3A%2F%2Fwww.theguardian.com%2Finequality%2F2017%2Foct%2F05%2Friding-the-beast-child-migrants-reveal-full-horror-of-their-journeys-to-us): Young women and girls face extraordinary risk of sexual violence on the journey to the United States. 60 (/redirect?url=https%3A%2F%2Ffusiondotnet.files.wordpress.com%2F2014%2F09%2Famr410142010eng.pdf) -80 (/redirect?url=https%3A%2F%2Fsplinternews.com%2Fis-rape-the-price-to-pay-for-migrant-women-chasing-

AR00208

the-1793842446) % of the women and girls who cross Mexico to get to the U.S.
border are raped along the way.

- July 28, 2017 (/redirect?url=https%3A%2F%2Fwww.cnn.com%2F2017%2F07%2F28%2Fus%
  2Fmigrant-deaths-and-human-trafficking-by-the-numbers%2Findex.html) : The deadly toll of
  human smuggling and trafficking in the US

- April 21, 2017 (https://www.justice.gov/opa/pr/eight-members-mexican-sex-trafficking-
  enterprise-plead-guilty-racketeering-sex-trafficking) : Eight Mexican drug cartel members
  were convicted for participating in the trafficking of nine women, two minors,
  and the prostitution of a twelfth woman. The young Mexican and Guatemalan
  women were recruited on false promises, smuggled into the United States and
  sold into sex slavery in various states.

# Dangerous Means of Transportation

- July 12, 2018 (https://www.cbp.gov/newsroom/local-media-release/border-patrol-arrests-
  kansas-man-smuggling-two-and-recover-stolen) : Border Patrol Arrests Kansas Man
  Smuggling Two and Recover Stolen Vehicle

- July 11, 2018 (/redirect?url=https%3A%2F%2Fvoiceofoc.org%2F2018%2F07%2Fborder-patrol-
  says-human-smuggling-by-boat-increased-in-oc-and-so-cal%2F) : Human smuggling by
  boat has increased in Southern California

- July 9, 2018 (https://www.cbp.gov/newsroom/local-media-release/border-patrol-discovers-
  narcotics-vehicle-s-front-floorboards) : Border patrol discovers a roughly $133,122
  worth of narcotics in vehicle's front floorboards.

- July 3, 2018 (https://www.cbp.gov/newsroom/local-media-release/laredo-sector-border-
  patrol-agents-discover-illegal-aliens-concealed) : Laredo Sector Border Patrol Agents
  Discover Illegal Aliens Concealed Inside Duffle Bags

- July 2, 2018 (https://www.cbp.gov/newsroom/local-media-release/mexican-national-arrested-
  smuggling-six-others) : Willcox Border Patrol agents arrested seven Mexican
  nationals on interstate during attempt to smuggle six persons inside 2003
  Chrysler 300 trunk.

- June 22, 2018 (https://www.cbp.gov/newsroom/local-media-release/us-border-patrol-agents-
  rescue-distressed-immigrant) : Border Patrol rescued an illegal alien from Mexico off

of the top of a train he had jumped on to, sustaining injuries to his ankle and ribcage.

- June 19, 2018 (/redirect?url=https%3A%2F%2Fwgno.com%2F2018%2F06%2F19%2Fstate-police-rescue-25-illegal-immigrants-including-2-children-from-human-trafficking-operation%2F) : Louisiana State Police rescue 25 immigrants, including 2 children, from human trafficking operation

- June 19, 2018 (https://www.cbp.gov/newsroom/local-media-release/border-patrol-agents-find-18-illegal-aliens-inside-utility-truck) : CBP agents discovered 18 illegal aliens inside a utility truck near Tucson, AZ, including two children. The truck had no source of light, fresh air ventilation or air conditioning, water or any means of escape from the inside.

- March 7, 2018 (https://www.cbp.gov/newsroom/local-media-release/border-patrol-efforts-south-texas-yields-448-illegal-alien-rescues) : During January and February alone, CBP rescued 448 illegal aliens being smuggled in tractor trailers in the South Texas Corridor.

- July 24, 2017 (/redirect?url=https%3A%2F%2Fwww.theguardian.com%2Fus-news%2F2017%2Fjul%2F24%2Fsan-antonio-migrants-texas-human-trafficking) : A tractor-trailer filled with at least 90 illegal aliens was discovered in a Walmart parking lot in San Antonio, TX, with temperatures around 101F. 10 of illegal aliens died as a result of severe dehydration and lack of oxygen, with an additional 20 in "dire condition" and suffering from heatstroke.

# Environment

- June 29, 2018 (https://www.cbp.gov/newsroom/local-media-release/large-groups-family-units-and-unaccompanied-children-continue-cross) : CBP encountered 31 illegal aliens near the Rio Grande in Texas, primarily comprised of families and unaccompanied children from Guatemala, Honduras and El Salvador.

- June 29, 2018 (https://www.cbp.gov/newsroom/local-media-release/rio-grande-valley-border-patrol-agents-save-lives-inclement-weather) : CBP agents rescued four illegal aliens who had been swept away by a river on separate occasions, the body of one illegal alien floating in the Rio Grande near Peñitas, Texas and, at a later occasions, an alien from Honduras who was pronounced dead when agents arrived on scene near Falfurrias, Texas.

AR00210

- June 28, 2018 (https://www.cbp.gov/newsroom/local-media-release/border-patrol-partners-marine-corps-rescue-six-distress) : CBP rescued six illegal aliens from Mexico and Honduras, three of whom were rescued from the peak of the Mohawk mountains and had to be treated for dehydration.

- June 26, 2018 (/redirect?url=https%3A%2F%2Fnypost.com%2F2018%2F06%2F26%2Fmore-migrants-are-dying-from-heat-near-us-mexico-border%2F) : The number of migrants dying from extreme heat on the U.S.-Mexico border rose 55 percent in the past nine months from 31 deaths during the same period in 2017 to 48 in 2018.

- June 23, 2018 (/redirect?url=https%3A%2F%2Ftucson.com%2Fnews%2Flocal%2Fborder-patrol-smugglers-abandoned-immigrants-in-arizona%2Farticle_5b6b3cee-7720-11e8-b5d9-6b1749efeb1f.html) : CBP rescued 57 aliens who were abandoned by their smuggler guides during a record heatwave of 108F in the Arizona desert. The group included 36 minors, 17 of whom were unaccompanied including a one-year-old toddler. An underage pregnant female had to be provided with intravenous fluids by CBP EMTs.

- June 26, 2018 (https://www.cbp.gov/newsroom/local-media-release/border-patrol-agent-rescues-honduran-national) : CBP rescued a previously deported illegal immigrant from Honduras who was drowning in the Yuma River near Yuma, AZ.

- June 11, 2018 (https://www.cbp.gov/newsroom/local-media-release/del-rio-sector-border-patrol-warns-against-danger-extreme-heat) : CBP reported that 11 illegal aliens had lost their lives due to heat exhaustion near Del Rio, Texas since October of 2017.

- May 23, 2018 (/redirect?url=https%3A%2F%2Fwww.cbsnews.com%2Fnews%2Ftexas-tractor-trailer-full-undocumented-immigrants-raymondville-many-dehydrated%2F) : 80 illegal immigrants were found in the rear of a tractor trailer, 50 miles from the Mexican border, after being detained, many were treated for dehydration.

- May 11, 2018 (https://www.cbp.gov/newsroom/local-media-release/us-border-patrol-agents-arrest-teen-smuggling-fentanyl) : CBP intercepted a teenage girl attempting to smuggle fentanyl across an immigration checkpoint near Tucson, AZ.

- March 2, 2018 (https://www.cbp.gov/newsroom/local-media-release/tucson-sector-agents-rescue-injured-man-who-fell-35-feet) : CBP rescued an illegal alien from Mexico who had fallen 35 feet from a cliff near Tucson, AZ.

AR00211

- February 27, 2018 (https://www.cbp.gov/newsroom/local-media-release/border-patrol-agents-rescue-4-drowning-men) : CBP rescued three illegal aliens from drowning near Calexico, CA.

- February 20, 2018 (https://www.cbp.gov/newsroom/local-media-release/border-patrol-rescues-woman-drowning-new-river) : CBP rescued a suspected illegal alien who was drowning in the New River, along the US-Mexico border.

- February 15, 2018 (https://www.cbp.gov/newsroom/local-media-release/comstock-border-patrol-agents-recover-body) : CBP discovered the body of an illegal alien who had previously been injured and most likely fell into a canyon while attempting to transit with a group of migrants.

- February 8, 2018 (https://www.cbp.gov/newsroom/local-media-release/border-patrol-agents-rescue-mother-and-son-after-illegal-entry-resulted) : CBP found an injured illegal alien from Mexico and her teenaged son, in the wash near Douglas, AZ.

- February 6, 2018 (/redirect?url=https%3A%2F%2Fwww.iom.int%2Fnews%2Fmigrant-deaths-remain-high-despite-sharp-fall-us-mexico-border-crossings-2017) : 412 migrants died attempting to cross into the United States illegally in 2017, this number is a small increase above the 398 deaths that occurs in 2016, but is relatively high compared with year-to-year border apprehensions which fell 44 percent between 2016-2017. The report notes documentation of 1,468 immigrant deaths on the U.S.-Mexico border since 2014.

- February 6, 2018 (/redirect?url=https%3A%2F%2Fwww.iom.int%2Fnews%2Fmigrant-deaths-remain-high-despite-sharp-fall-us-mexico-border-crossings-2017) : 191 immigrants perished in 2017 attempting to cross into the United States over the Rio Grande River, a 26 percent increase over the 151 fatalities recorded in Texas in 2016. The cause of the increase has been attributed to increased rainfall in 2016 which caused the Rio Grande to flow faster and deeper than in past years.

- December 18, 2017 (https://www.cbp.gov/newsroom/local-media-release/ten-immigrants-found-dead-during-unseasonably-cold-weather-rio-grande) : CBP agents found ten illegal aliens who had frozen to death on separate occasions.

# Dangers Posed by Other Illegal Aliens Entering Via Similar Routes

- July 13, 2018 (https://www.ice.gov/news/releases/8-ms-13-members-indicted-dallas-charges-including-racketeering-conspiracy-attempted) : 8 MS-13 members indicted in Dallas on charges including racketeering conspiracy, attempted murder and assault with a dangerous weapon

- June 29, 2018 (https://www.cbp.gov/newsroom/local-media-release/rio-grande-valley-border-patrol-captures-gang-members-child-molesters) : CBP arrested two illegal aliens who were convicted child molesters on separate occasions near Donna and Falfurrias, Texas.

- June 22, 2018 (https://www.cbp.gov/newsroom/local-media-release/cbp-officers-laredo-port-entry-48-hours-apprehend-two-travelers) : CBP officers in Laredo Texas apprehended two individuals with outstanding warrants for aggravated sexual assault and sexual assault of a child, respectively, on two separate occasions.

- June 18, 2018 (https://www.cbp.gov/newsroom/local-media-release/border-patrol-agents-apprehend-convicted-rapist-eagle-pass-1) : CBP officers near Del Rio, Texas apprehended a Honduran national who had been convicted of aggravated sexual assault of a child, and was attempting to re-enter the country after having been previously deported.

- June 1, 2018 (https://www.cbp.gov/newsroom/local-media-release/rio-grande-valley-border-patrol-agents-stop-gang-members-and-sex) : Within the span of three days, CBP officers in Texas arrested four criminal aliens who had prior convictions for child molestation.

Topics:  Border Security (/topics/border-security) , Immigration and Customs Enforcement (/topics/immigration-enforcement)

Keywords:  Border Security (/keywords/border-security)

Last Published Date: July 23, 2018

# DEPARTMENT OF HOMELAND SECURITY

# Office of Inspector General

## DETENTION AND REMOVAL
## OF
## ILLEGAL ALIENS

U.S. Immigration and Customs Enforcement (ICE)



## Office of Audits

**OIG-06-33**

**April 2006**

*Office of Inspector General*

**U.S. Department of Homeland Security**
Washington, DC 20528



April 14, 2006

Preface

The Department of Homeland Security (DHS) Office of Inspector General (OIG) was established by the Homeland Security Act of 2002 (*Public Law 107-296*) by amendment to the Inspector General Act of 1978.   This is one of a series of audit, inspection, and special reports prepared as part of our oversight responsibilities to promote economy, efficiency, and effectiveness within the department.

This report assesses DHS's Immigration and Customs Enforcement program for detaining and removing illegal aliens apprehended in the United States and at ports of entry. It is based on interviews with employees and officials of relevant agencies and institutions, direct observations, and a review of applicable documents.

The recommendations herein have been developed to the best knowledge available to our office, and have been discussed in draft with those responsible for implementation. It is our hope that this report will result in more effective, efficient, and economical operations. We express our appreciation to all of those who contributed to the preparation of this report.

*Richard L. Skinner*

Richard L. Skinner
Inspector General

# Table of Contents/Abbreviations

Executive Summary ................................................................................................................ 1

Background ............................................................................................................................. 3

Results of Audit ..................................................................................................................... 4

    Detention and Removal of Illegal Aliens.......................................................................... 4

    ICE Budget Shortfall in FY 2005 ................................................................................... 11

    Expansion of the Criminal Alien Program...................................................................... 14

    Other Factors Impacting the Repatriation of Illegal Aliens............................................ 15

    Availability of Critical Data to Monitor DRO Performance ........................................... 19

    DRO's Strategic Plan...................................................................................................... 22

Conclusions and Recommendations ..................................................................................... 23

Management Comments and OIG Analysis .......................................................................... 24

## Appendices

| | | |
|---|---|---|
| Appendix A | Types of Apprehensions..................................................................... | 28 |
| Appendix B | Apprehensions Released..................................................................... | 30 |
| Appendix C | ICE Apprehension, Detention, and Removal Process........................... | 32 |
| Appendix D | BTS Detention Prioritization and Requirements Memorandum ............. | 33 |
| Appendix E | Purpose, Scope, and Methodology ..................................................... | 37 |
| Appendix F | Management's Comments................................................................... | 39 |
| Appendix G | Major Contributors to this Report ...................................................... | 46 |
| Appendix H | Report Distribution........................................................................... | 47 |

## Abbreviations

| | |
|---|---|
| ACAP | Alien Criminal Apprehension Program |
| BOP | Bureau of Prisons |
| BORCAP | Border Patrol Criminal Alien Program |
| BTS | Border and Transportation Security |
| CAP | Criminal Alien Program |
| CBP | Customs and Border Protection |
| DACS | Deportable Alien Control System |
| DHS | Department of Homeland Security |
| DOJ | Department of Justice |
| DRO | Office of Detention and Removal (ICE) |
| EOIR | Executive Office of Immigration Review |
| EREM | Enforce Removal Module |
| FTE | Full Time Equivalent |
| FY | Fiscal Year |
| GAO | Government Accountability Office |
| HHS | Health and Human Services |
| ICE | Immigration and Customs Enforcement |
| IEA | Immigration Enforcement Agent |
| IJ | Immigration Judge |
| INA | Immigration and Nationality Act |
| INS | Immigration and Naturalization Service |
| IRP | Institutional Removal Program |
| LACJ | Los Angeles County Jail |
| OI | Office of Investigation (ICE) |
| OIG | Office of Inspector General |
| OTM | Other Than Mexican |
| SIC | Special Interest Countries |
| SST | State Sponsors of Terrorism |
| USCIS | United States Citizenship and Immigration Services |

# OIG

**Audit Report**

*Department of Homeland Security*
*Office of Inspector General*

## Executive Summary

This report presents the results of our review of DHS's Immigration and Customs Enforcement (ICE) program for detaining and removing illegal aliens[1] apprehended in the United States and at ports of entry. The program is administered through ICE's Office of Detention and Removal (DRO). The objective of our review was to determine the extent to which DRO is performing its mission to remove all illegal aliens who are removable, including those that pose a potential national security or public safety threat to the U.S.

Currently, DRO is unable to ensure the departure from the U.S. of all removable aliens. Of the 774,112 illegal aliens apprehended during the past three years, 280,987 (36%) were released largely due to a lack of personnel, bed space, and funding needed to detain illegal aliens while their immigration status is being adjudicated. This presents significant risks due to the inability of Customs and Border Patrol (CBP) and ICE to verify the identity, country-of-origin, and terrorist or criminal affiliation of many of the aliens being released. Further, the declining personnel and bed space level is occurring when the number of illegal aliens apprehended is increasing. For example, the number of illegal aliens apprehended increased from 231,077 in FY 2002 to 275,680 in FY 2004, a 19 percent increase. However, during the same period, authorized personnel and funded bed space levels declined by 3 percent and 6 percent, respectively. These shortfalls encourage illegal immigration by increasing the likelihood that apprehended aliens will be released while their immigration status is adjudicated.

Further, historical trends indicate that 62 percent of the aliens released will eventually be issued final orders of removal by the U.S. Department of Justice Executive Office of Immigration Review (EOIR) and later fail to surrender for removal or abscond. Although DRO has received additional funding to

---

[1] For the purposes of this report, "illegal aliens" is a comprehensive term intended to include those foreign-born individuals who enter, reside, or work in the United States without complying with U.S. immigration law; "removable aliens" are those illegal aliens who have been adjudicated as subject to removal from the U.S.; "criminal aliens" are those illegal aliens who have been convicted of a crime in the U.S.; and "high risk aliens" includes both criminal aliens and other illegal aliens, such as those from state sponsors of terrorism or special interest countries.

enhance its Fugitive Operations Program, it is unlikely that many of the released aliens will ever be removed. As of December 30, 2005, there were more than 544,000 released aliens with final orders of removal who have absconded.

Declining bed space and personnel levels are also making it difficult for ICE/DRO to detain and remove illegal aliens that are from countries other than Mexico (OTM) including aliens from countries whose governments support state sponsored terrorism (SST) or who promote, produce, or protect terrorist organizations and their members (SIC).  Of the 605,210 OTMs apprehended between FY 2001 and the first six months of FY 2005, 309,733 were released of which 45,008 (15%) purportedly originated from SST and SIC countries.

DRO estimates that in FY 2007 there will be 605,000 foreign-born individuals admitted to state correctional facilities and local jails during the year for committing crimes in the U.S.  Of this number, DRO estimates half (302,500) will be removable aliens.  Most of these incarcerated aliens are being released into the U.S. at the conclusion of their respective sentences because DRO does not have the resources to identify, detain, and remove these aliens under its Criminal Alien Program (CAP). It is estimated that DRO would need an additional 34,653 detention beds, at an estimated cost of $1.1 billion, to detain and remove all SST, SIC, and CAP aliens.

Additionally, DRO's ability to detain and remove illegal aliens with final orders of removal is impacted by (1) the propensity of illegal aliens to disobey orders to appear in immigration court; (2) the penchant of released illegal aliens with final orders to abscond; (3) the practice of some countries to block or inhibit the repatriation of its citizens; and (4) two recent U.S. Supreme Court decisions which mandate the release of criminal and other high-risk aliens 180 days after the issuance of the final removal order except in "Special Circumstances." Collectively, the bed space, personnel and funding shortages coupled with the other factors, has created an unofficial "mini-amnesty" program for criminal and other high-risk aliens.

DRO's goal is to develop the capacity to remove all removable aliens, and it has developed a strategic plan covering 2003-2012 entitled "Endgame," to accomplish that goal.  However, the plan identifies several significant challenges beyond its control, including the need for sufficient resources, political will, and the cooperation of foreign governments.  Current resources, including those included in the FY 2006 Appropriations Act and the Administration's FY 2007 budget request, are not sufficient to detain all high-risk aliens, including those from SST and SIC countries.

We are recommending that the Assistant Secretary (ICE) develop a plan to provide ICE with the capacity to: (1) detain and remove high-risk aliens; (2)

AR00219

intensify its efforts to develop alternatives to detention; and (3) resolve with the State Department issues that are preventing or impeding the repatriation of illegal OTMs.  Also, we are recommending that DRO expedite its efforts to implement a data management system that is capable of meeting its expanding data collection and analysis needs relating to the detention and removal of illegal aliens. Such a system would significantly enhance DRO's ability to support future budget requests, identify emerging trends, and assess its overall mission performance.

## Background

The mission of ICE's DRO is to promote public safety and national security by ensuring the departure from the United States of all removable aliens through the fair and effective enforcement of the nation's immigration laws. [2] This is accomplished through the detention and timely processing of all illegal aliens with final orders of removal.

Each year more than one million aliens attempt to illegally enter the United States without proper documentation - or enter legally but overstay or violate their visas.[3] Although other state, local, or federal agencies are frequently involved in the identification, apprehension, and detention of illegal aliens, the primary responsibility belongs to DHS and its subordinate agencies ICE and CBP. Appendix C to this report illustrates the process from the point of apprehension through the actual removal of an illegal alien from the United States.

The shortage of detention bed space and its impact on DRO's ability to remove illegal aliens with final orders of removal were problems long before the merger of the legacy INS into DHS. As early as 1996, a Department of Justice (DOJ) OIG report cited the shortage of detention bed space as impacting DOJ's ability to deport illegal aliens with final orders of removal. Specifically, the DOJ OIG concluded that the legacy INS program for deporting illegal aliens had been largely ineffective, finding that 89 percent of the non-detained aliens released into the U.S. who were subsequently issued final orders of removal were not removed (absconded). Between 1999 and FY 2002, the U.S. Attorney General identified the lack of detention bed space as a top management issue for the DOJ.

---

[2] Illegal aliens are removable after they have been issued a final order of removal, deportation, or exclusion.
[3] Source: February 2003 U.S. DOJ report titled *"The Immigration and Naturalization Service's Removal of Aliens Issued Final Orders"*. Report Number I-2003-004

## Results of Audit

### Detention and Removal of Illegal Aliens

**Bed Space and Personnel Levels Fail to Keep Pace with Increase in Alien Apprehensions.** The number of illegal aliens apprehended has increased from 231,077 in FY 2002 to 275,680 in FY 2004, a 19 percent increase.[4] During the same period, authorized DRO personnel levels decreased by 3 percent while funded bed space levels declined by 6 percent. These resource shortfalls are having a negative impact on the number of illegal aliens that are being released into the U.S. population. For example, between FY 2002 and FY 2004, the number of illegal aliens released by DRO increased from 78,977 to 108,891, a 38 percent increase. Chart 1 shows the trend in alien apprehensions and releases from FY 2002 through FY 2004.

**Chart 1 – Alien Apprehensions and Releases
(FY 2002 through FY 2004)**



Source: DRO

Table 1 shows the number of apprehensions and the number of authorized personnel and funded bed space available for DRO use between FY 2002 and FY 2004.  The data shows that authorized personnel and funded bed space declined while the number of apprehensions increased.

---

[4] For purposes of this review, only apprehensions that are placed as active cases under DRO for detention, case processing, or removal were considered (See Appendix A).

AR00221

| Table 1<br>Apprehensions, Authorized Personnel, and<br>Funded Bed Space Levels<br>(FY 2002 to FY 2004) | | | |
| --- | --- | --- | --- |
| Fiscal Year | Number of New Illegal Aliens Apprehended During the Fiscal Year | DRO Authorized Personnel Levels | DRO Funded Bed Space[5] |
| 2002 | 231,077 | 4,203 | 19,081 |
| 2003 | 267,355 | 4,087 | 18,000 |
| 2004 | 275,680 | 4,087 | 18,000 |

Source: ICE and DRO

Bed space and personnel shortages will continue through FY 2007 despite efforts by the Administration and Congress to fund more beds and personnel. For example, the Administration's FY 2005 budget request for DRO included $24 million to fund 534 additional detention beds and 66 personnel. Congress added $16 million to the Administration's request for a total planned increase of 1,216 beds for FY 2005. However, the increased funding for additional bed space and support personnel did not flow to DRO until the last quarter of FY 2005 due to an ICE budget shortfall estimated at about $500 million. The delay in the disbursement of enhancement funding prevented DRO from increasing its detention bed space levels during most of FY 2005. The FY 2006 budget will increase the total funded bed space level to 20,800.[6] The Administration's FY 2007 budget request will, if approved by Congress, increase total funded bed space levels to 27,500, well short of the 34,653 additional detention beds needed to detain all SIC, SST, and CAP aliens that pose a potential national security or public safety risk to the U.S.

**Increase in the Number of Illegal Aliens Requiring Mandatory Detention.**
A sharp increase in the number of aliens requiring mandatory detention may soon limit DRO's ability to detain non-mandatory aliens who pose a potential national security or public safety risk.[7] From October 2003 to June 2005, the percentage of detention bed space devoted to mandatory detainees increased from 63 percent to 87 percent. The increase is significant because it further

---

[5] Excludes detention bed space funded by the Bureau of Prisons (BOP) and Health and Human Services (HHS).
[6] Excludes beds funded by BOP and HHS
[7] The aliens who are detained are referred to as mandatory detainees. According to the INA (P.L. 82-414, June 27, 1952 as amended) §236 and §236A, the government is required to detain certain illegal aliens who pose a national security risk or commit crimes in the U.S. Criminal aliens include those that have been convicted of crimes involving moral turpitude, drug smuggling, murder, and other aggravated felonies, however, some criminal aliens convicted of less serious crimes may not require mandatory detention. The government is also required to detain certain illegal aliens with final orders while awaiting removal during the 90-day removal period.

limits ICE's ability to detain high risk/high priority aliens that CBP and DRO officials believe pose a potential national security or public safety risk to the U.S.

DRO's ability to detain high-risk aliens is impacted by the mandatory detention requirements set by the Immigration and Nationality Act (INA). Further, detention guidelines issued by the former Border and Transportation Security (BTS) directorate (see Appendix D for BTS Detention Guidelines) established high, medium, and low detention priorities for all other non-mandatory categories of aliens. For example, the BTS detention guidelines do not require the mandatory detention of "High Priority" aliens despite the fact that they could exhibit specific, articulable intelligence-based factors for terrorism or national security concerns.

These guidelines also do not require the mandatory detention of aliens who are associated with ongoing criminal investigations, have committed fraud, are apprehended as part of work-enforcement arrest, are suspected alien or narcotic smugglers, or have demonstrated a marked propensity to abscond. Taken together, the high threshold for mandatory detention set by the INA and BTS guidelines, the increasing number of aliens requiring mandatory detention, and ongoing bed space and personnel shortages, are forcing DRO to release thousands of non-mandatory aliens that normally would have been detained while their immigration status was being adjudicated. Table 2 compares mandatory to non-mandatory detainees during October 2003 and June 2005.

| Table 2 Comparison of Mandatory Versus Non-Mandatory Aliens Detained In October 2003 and June 2005 | | |
|---|---|---|
| | Number/Percentage of Mandatory Detainees | Number/Percentage Non-Mandatory Detainees |
| October 2003 | 12,873 - 63% | 7,431 - 37% |
| June 2005[8] | 16,021 - 87% | 2,487 - 13% |
| Percent Change | 24% Increase | 67% Decrease |

Source: DRO

---

[8] DRO Population report dated June 15, 2005.

**Detention and Removal of Illegal Aliens**

6

**Detention and Release of Criminal Aliens.** Of the 345,006 criminal aliens apprehended from FY 2001 through FY 2004, 27,947 (8%) were released. Whether they were released because of a lack of detention bed space or for some other reason could not be determined because such information is not tracked by ICE/DRO. What is known, however, is that the number of criminal aliens being apprehended and released has increased sharply and that 20,967 (75%) of these criminal aliens originated from countries where the notorious Mara Salvatrucha (MS-13) gang members are known to be active.[9]  Given the percentage of illegal aliens with final orders that abscond each year and given that ICE/DRO has relatively few resources to expend on the apprehension of absconders in general, it is unlikely that many of the criminal aliens apprehended and released to date will ever be removed. Table 3 provides a breakdown of the criminal aliens apprehended and released from FY 2001 through FY 2004.

| Table 3 Breakdown of Criminal Aliens Apprehended and Released FY 2001 – FY 2004 | | |
| --- | --- | --- |
| **Fiscal Year** | **Criminal Apprehensions** | **Number/Percentage Criminals Released** |
| **2001** | 82,990 | 5,429 / 7% |
| **2002** | 81,819 | 5,394 / 7% |
| **2003** | 90,712 | 7,736 / 9% |
| **2004** | 89,485 | 9,388 / 10% |
| **Totals** | **345,006** | **27,947 / 8%** |

Source: DRO

Table 4 identifies the number of criminal aliens apprehended and released from selected countries from October 1, 2001 through September 30, 2004.

---

[9] Mara Salvatrucha gang members are known to be active in Canada, El Salvador, Guatemala, Honduras, and Mexico.

| Table 4<br>Criminal Aliens Apprehended and Released from Selected Countries<br>From October 1, 2001 through September 30, 2004 | | | |
|---|---|---|---|
| **Country** | **Total Alien Apprehensions** | **Total Criminal Apprehensions** | **Total Number / % Criminal Released** |
| Canada | 4,725 | 2,726 | 1,003 / 37% |
| Columbia | 33,540 | 5,121 | 298 / 6% |
| Cuba | 23,893 | 3,969 | 537 / 14% |
| Dominican Republic | 16,372 | 8,926 | 1,101 / 12% |
| El Salvador | 58,013 | 9,573 | 556 / 6% |
| Guatemala | 47,923 | 6,417 | 322 / 5% |
| Honduras | 65,313 | 8,232 | 555 / 7% |
| Jamaica | 7,734 | 5,734 | 522/ 9% |
| Mexico | 480,563 | 257,718 | 18,531 / 7% |
| Nicaragua | 5,227 | 1,281 | 116 / 9% |
| Philippines | 4,792 | 1,990 | 260 / 13% |
| **Totals** | **748,095** | **311,687** | **23,801 / 8%** |

Source: DRO

**Influx of Illegal Aliens From Countries Other than Mexico.** Another factor impacting DRO's ability to detain and remove aliens who could pose a national security or public safety risk is the increasing number of illegal aliens from countries other than Mexico who are being apprehended and released. For example, between FY 2001 and FY 2004, the number of OTMs apprehended increased from 114,266 to 145,367, a 27 percent increase. The increase poses a significant workload issue for DRO since OTMs, unlike apprehended Mexican aliens, cannot be turned around and returned at the border. Instead, they are often released into the U.S. population while their immigration status is adjudicated. From FY 2001 and through the first six months of FY 2005, 605,210 OTMs were apprehended, of which 309,733 (51%) were released.

The rate in which OTMs are being apprehended and released (OTM release rate) is also a growing concern. Between FY 2001 and FY 2004, the OTM release rate increased from 42 percent to 54 percent. Further, the data shows that the OTM release rate continues to increase. During the first 6 months of FY 2005, the OTM release rate jumped from 54 percent to an unprecedented 68 percent. As a result, more OTMs than ever before are being released of which a majority will eventually receive final orders and abscond. Table 5

AR00225

shows the number of OTM apprehensions and the number and percentage of OTM releases from FY 2001 through the first 6 months of FY 2005.

| Table 5 OTMs Apprehended and Released (FY 2001 through March 31, 2005) | | | |
|---|---|---|---|
| Fiscal Year | Total OTM Apprehensions | Total OTMs Released | OTM Release Rate % |
| 2001 | 114,266 | 47,721 | 42% |
| 2002 | 117,916 | 54,511 | 46% |
| 2003 | 140,369 | 69,448 | 49% |
| 2004 | 145,367 | 78,566 | 54% |
| 2005 (6 mo) | 87,292 | 59,487 | 68% |
| Total | 605,210 | 309,733 | 51% |

Source: DRO

DRO lacks the requisite detention bed space and support personnel needed to detain OTMs apprehended along the northern and southwest borders and within the U.S.   It is not clear the extent to which decisions to release OTMs are being made on a risk-based versus resource-based manner. Even if risk is considered, the high release rate could undermine the public's confidence in the department's ability to secure our northern and southern borders.

**Illegal Aliens from Special Interest Countries and State Sponsors of Terrorism Countries.** A significant number of OTMs that are apprehended and released each year originate from SIC and SST. From FY 2001 through the first half of FY 2005, 91,516 SIC and SST aliens were apprehended of which 45,000    (49%) were later released. It is not known exactly how many of these SIC and SST aliens were ultimately issued final orders of removal and were actually removed since such data is not tracked by DRO. However, assuming SIC and SST aliens are being removed at the same rate as other apprehended and released aliens, 85 percent of the SIC and SST aliens released who eventually receive final orders of removal will abscond. Table 6 provides a breakdown of OTMs from SIC and SST countries that were apprehended and released from FY 2001 through the first 6 months of FY 2005.

| | Table 6 OTMs Apprehended and Released by DRO From SIC and SST (FY 2001 thru March 31, 2005) | | | | |
|---|---|---|---|---|---|
| Fiscal Year | SIC[10] Apprehensions | SST Apprehensions | Total SIC and SST Apprehension | Total Released From SIC and SST | Percent SIC and SST Aliens Apprehended and Released |
| 2001 | 9,419 | 6,233 | 15,652 | 7,499 | 48% |
| 2002 | 11,962 | 6,574 | 18,536 | 8,807 | 48% |
| 2003 | 24,102 | 8,718 | 32,820 | 19,319 | 59% |
| 2004 | 8,078 | 7,717 | 15,795 | 6,099 | 39% |
| 2005[11] | 3,824 | 4,889 | 8,713 | 3,284 | 38% |
| Total | 57,385 | 34,131 | 91,516 | 45,008 | 49% |

Source: DRO

Immigration officials run background checks on each apprehended alien, including SIC and SST aliens, to determine whether they have a criminal record in the U.S. or are listed in various terrorist watch lists. However, the effectiveness of these background checks is uncertain due to the difficulty that CBP and ICE have in verifying the identity, country-of-origin, terrorist or criminal affiliation of aliens in general. Therefore the release of these OTMs poses particular risks. For example, a DHS official testified that U.S. intelligence assessments indicate terrorist organizations, including those operating within SIC and SST countries, believe illegal entry into the U.S. is more advantageous than legal entry for operations reasons.[12]

Mandatory detention for the current number of OTMs entering the U.S. from SST and SIC would require an additional 1,503 detention beds based on a 90-day detention stay and would cost approximately $50 million annually for the additional beds.[13]

---

[10] Excludes OTM aliens apprehended from SIC countries that are also classified as state sponsors of terrorism (Iran, Libya, Sudan, Syria).
[11] First six months of FY 2005
[12] Statement of the former DHS Deputy Secretary on the World Wide Threat on February 16, 2005, before the U.S. Senate Select Committee on Intelligence.
[13] On average, the detention time for illegal aliens from developing nations in regular INA 240 removal proceedings takes 89 days. Source: Testimony of Acting Director of Detention and Removal Operations before the Senate Subcommittee on Terrorism, Technology, and Homeland Security and Subcommittee on Immigration, Border Security, and Citizenship, 7 June 2005. One thousand detention beds cost approximately $33 million per year.

AR00227

DRO's ability to monitor OTMs from SIC and SST could benefit from advances in DRO's Alternatives to Detention programs, too.[14] As noted in the following section, ICE's FY 2005 budget constraints postponed the distribution of $11 million worth of enhancement funding that had been authorized by the Congress to expand the Alternatives to Detention program. The FY 2006 Appropriations Act includes a total of $28 million for this program.

## ICE Budget Shortfall in FY 2005

According to ICE, it had a budget shortfall of almost $500 million during FY 2005.[15] To compensate for the lack of funding, ICE placed strict limits on detention bed space, recruitment, training, travel, and the expansion of critical programs.[16] As a result, average bed space levels fell below 2003 levels, critical vacancies were left unfilled, and the planned expansion of the fugitive operations programs were postponed.[17]

Additionally, ICE postponed transferring the IRP and ACAP programs from the Office of Investigations to DRO. These programs prevent the release of criminal aliens into the community through the identification, processing, and removal of criminal aliens incarcerated in federal, state, and local correctional facilities. The IRP had been criticized in past Department of Justice IG reports for not identifying and removing thousands of criminal aliens incarcerated in state, county, and local jails who are removable but who are not being removed at the conclusion of their respective sentences due to insufficient personnel resources.

In an effort to further minimize the effect of its FY 2005 budget shortfall, ICE withheld from DRO $124 million worth of program enhancement funding provided by the Congress to increase detention bed space levels and expand DRO's Fugitive Operations and Criminal Alien Program capabilities.  ICE also withheld DRO's funding to cover overhead and support costs by $132 million. After ICE withholdings and payroll costs, DRO was left with $610 million for general detention and removal operations. This was $165 million less funding than DRO had spent on general detention and removal operations during FY 2004. As a result of the decreased operating budget, DRO's bed space level was well below the 19,216 detention beds intended by Congress

---

[14] Intensive Supervision Appearance Program and Electronic Monitoring Device Program. This pilot program is exploring alternative ways of rationalizing DRO custody management resources.

[15] ICE estimate as of April 2005.

[16] In FY 2004, ICE had a budget shortfall of almost $416 million (OIG-05-32, dated August 2005).

[17] DRO's average daily bed space levels dropped to 18,000 during the first 8½ months of FY 2005. In comparison, DRO maintained an average daily bed space level of 18,269 during FY 2003. These numbers included only DRO directly funded beds and excludes BOP and HHS funded beds.

during FY 2005.[18]  Table 7 contains a comparison of DRO funding levels for FY 2003 through FY 2005.

| Table 7 Comparison of DRO Funding (FY 2003 –FY 2005) | | | |
|---|---|---|---|
| | FY 2003 ($000) | FY 2004 ($000) | FY 2005[19] ($000) |
| DRO Funding | $1,072 | $1,217 | $1,231 |
| Enhancements Withheld | 0 | 0 | (124) |
| Overhead & Support Withheld | (97) | (141) | (132) |
| Payroll | (269) | (301) | (365) |
| Total Available for DRO Operations | $706 | $775 | $610 |

Source: ICE

On May 11, 2005, the President signed into law an emergency supplemental appropriations act (P.L. 109-13) that significantly improved the ICE and DRO funding situation by providing ICE with an additional $369 million to address its base budget shortfalls and improve its border enforcement capabilities.[20] Congress was aware that ICE had been unable to obligate funds for FY 2005 enhancements and initiatives due to the uncertainty of its financial condition and a pending reprogramming.  Congress specified in the conference report that $93 million (25%) of the supplemental funding is to add 1,950 detention beds; 50 new criminal investigators; and 168 immigration enforcement agents and deportation officers.[21] Also, $11 million and 79 FTEs are to be used to ease the effects of the hiring freeze put in place during FY 2004 and FY 2005. The conference report also directed ICE to make available an additional $54 million from fee collections and implements the Department's March 11, 2005, request to realign $84 million in funding to detention bed space (Custody Management) and $73 million to DRO's Fugitive Operations and CAP Programs.

According to ICE's final budget execution plan, DRO will receive $83 million over and above the original FY 2005 appropriation.[22] Further, ICE will no longer withhold DRO's original enhancement funding of $124 million and $103 million in funding that was previously withheld to cover overall ICE

---

[18] DRO had 18,000 funded beds in FY 2004 (excludes BOP and HHS funded beds). Congress provided $40 million worth of funding for 1,216 additional detention beds in the original FY 2005 appropriation.
[19] Includes DRO's original FY 2005 appropriation. Excludes supplemental funding and reflects the status of DRO funding and ICE withholdings as of June 15, 2005.
[20] Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief, 2005.   P.L. 109-13.
[21] H.R. Rep. No. 109-72, at 137-138.
[22] As of September 16, 2005.

AR00229

overhead and support funding shortages.  Tables 8 and 9 outline the effect of the Emergency Supplemental on DRO in FY 2005.

| Table 8 Emergency Supplemental Effects on DRO in FY 2005 ($ in millions) | | | |
|---|---|---|---|
| | FY 2005 Enacted | End Result[23] | Net Increase/ Decrease |
| Custody Management | $504 | $666 | $162 |
| Case Management | 192 | 125 | (67) |
| Fugitive Operations | 35 | 78 | 43 |
| Criminal Alien Program | 34 | 53 | 19 |
| Alternatives to Detention | 14 | 11 | (3) |
| Transportation & Removal | 312 | 187 | (125) |
| Subtotal | $1,091 | $1,120 | $29 |
| Breached Bond Detention Fund | 70 | 114 | 44 |
| User Fees | 70 | 80 | 10 |
| Total | $1,231 | $1,314 | $83 |

Source: ICE

| Table 9 Comparison of DRO FY 2005 Funding Before and After the Supplemental ($ in millions) | | |
|---|---|---|
| | Before the Supplemental[24] | After the Supplemental[25] |
| DRO Funding | $1,231 | $1,314 |
| Enhancements Withheld | (124) | (-0-) |
| Overhead & Support Withheld | (132) | (100) |
| Payroll | (365) | (369) |
| Total Available for DRO Operations | $610 | $845 |

Source: ICE

The additional funding provided by the supplemental allowed DRO to maintain average detention bed space levels of approximately 18,500 for the remainder of FY 2005 or 581 beds less than what was authorized by Congress during FY 2002. As a result, DRO is also well short of the bed space levels

---

[23] Excludes $13.6 million of supplemental funds delayed until FY 2006.
[24] DRO's original FY 2005 Appropriation. Excludes supplemental funding and reflects the status of DRO funding and ICE withholdings as of June 15, 2005.
[25] DRO's original FY 2005 Appropriation plus $83 million in supplemental funding.  It also reflects the status of DRO funding and ICE withholdings as of September 16, 2005.

needed to address the increasing workload associated with OTMs and other high risk aliens.

## Expansion of the Criminal Alien Program

The difficulty that DRO is having detaining, processing, and removing illegal aliens is expected to escalate once it implements a plan to expand its CAP.[26] The CAP identifies and processes criminal aliens incarcerated in federal, state, and local correctional institutions and jails who have no legal right to remain in the U.S. after serving out their sentence. DRO estimates that in FY 2007 there will be 605,000 foreign-born individuals admitted to state correctional facilities and local jails during the year for committing crimes in the U.S. Of this number, DRO estimates half (302,500) will be removable aliens.[27] Currently, most of these incarcerated aliens are being released into the U.S. at the conclusion of their respective sentences due to the lack of DRO resources.

To date, the ICE budget provides for 261 immigration enforcement agents (IEAs) to support the CAP through FY 2006. Each IEA is expected to process 300 criminal aliens annually for a total of 78,300 criminal alien cases per year by FY 2008.[28] In the short-term, DRO estimates that it will need a total of 8,581 detention beds to support its efforts to detain CAP aliens over the next two years. In the long term, DRO estimates that it will need a total of 1,008 IEAs and 33,150 CAP detention beds to identify, detain, process, and remove all criminal aliens incarcerated in state and local correctional institutions and jails who are removable.[29]

Currently, ICE does not have the detention beds or support personnel needed for the planned expansion of the CAP in its FY 2006 and FY 2007 budgets. DHS and ICE need to ensure that any planned increase in DRO's ability to identify and remove criminal aliens be accompanied by a comparable increase in support personnel, detention bed space, equipment, infrastructure, and funding to ensure the timely removal of criminal aliens from the U.S. Table 10 contains DRO's CAP caseload estimates based on IEAs to be hired,

---

[26] DRO's CAP is currently working to combine the Institutional Removal Program (IRP), the Alien Criminal Apprehension Program (ACAP), and the Border Patrol Criminal Alien Program (BORCAP) into one program. These programs are responsible for identifying and removing criminal aliens who have completed their respective sentences that are removable.

[27] Excludes the 25,000 criminal aliens who are expected to be arrested and incarcerated in Federal correctional facilities.

[28] Each IEA is expected to screen 600 incarcerated aliens per year of which 300 (50%) are expected to qualify for removal.

[29] At an estimated cost of $1.1 billion (at $33 million per 1,000 detention beds). Estimate excludes the cost of support personnel.

**Detention and Removal of Illegal Aliens**
14

trained, and deployed during FY 2005 and FY 2006.  Table 11 includes DRO's
estimate of the number of additional detention beds it will need to
accommodate the expansion of its CAP through the end of FY 2008.

| | | | | |
|---|---|---|---|---|
| **Table 10**<br>**CAP Caseload Estimates**<br>**FY 2006 thru FY 2007** | | | | |
| **Fiscal Year Hired** | **IEAs Hired** | **FY2006 Caseload Estimates** | **FY 2007 Caseload Estimates** | **FY 2008 Caseload Estimates** |
| **FY 2005** | 161 | 26,565 | 48,300 | 48,300 |
| **FY 2006**[30] | 100 | 6,750 | 27,000 | 30,000 |
| **Total** | 261 | 33,315 | 75,300 | 78,300 |

Source: DRO Estimates as of October 18, 2005

| | | | |
|---|---|---|---|
| **Table 11**<br>**CAP Detention Bed Space Needed**<br>**FY 2006 thru FY 2008**[31] | | | |
| | **FY 06** | **FY 07** | **FY 08** |
| **Detention Beds Needed** | 3,651 | 8,252 | 8,581 |

Source: DRO Estimates as of October 18, 2005.

## Other Factors Impacting the Repatriation of Illegal Aliens

Other factors impact DRO's ability to detain and remove illegal aliens with
final orders of removal, including: (1) the failure of illegal aliens to obey
orders to appear in immigration court;[32]  (2) the propensity of released illegal
aliens with final orders to abscond; (3) the practices of some countries to block
or inhibit the repatriation of its citizens; and (4) two recent decisions by the
U.S. Supreme Court which mandate the release of aliens whose removal

---

[30] FY 2006 staffing of 100 IEAs is based on the FY 2006 Budget Appropriation.
[31] Length of stay for bed space calculated at 40 days.
[32] Of the 461,556 immigration judge decisions and administrative closures by the Executive Office of Immigration and
Review (EOIR) between FY 2001 and FY 2004, 39 percent (181,807) were issued to aliens who had been released on
bond, released on recognizance, or never detained and later failed to appear at their respective hearings.

orders could not be executed within a 180-day period without a determination
that the alien meets the exceptionally stringent "Special Circumstances"
requirements.[33]

**Failure of Illegal Aliens to Obey Orders to Appear in Immigration Court.**
Each year, thousands of illegal aliens fail to respond to orders to appear at their
scheduled immigration hearing. In most of these cases, the Immigration Judge
(IJ) will conduct an *in absentia* (in the absence of) hearing and order the alien
removed from the U.S. However, a failure to appear does not always result in
an *in absentia* order. In 4 percent of the cases the IJ may also administratively
close a failure to appear case without ordering the alien removed.[34] Of the
461,556-immigration judge decisions and administrative closures issued by the
Executive Office of Immigration and Review (EOIR) between FY 2001 and
FY 2004, 39 percent (181,807) were issued to illegal aliens who had been
released but later failed to appear at their respective immigration hearings.[35]
Table 12 shows a comparison of the failures to appear rates for released aliens
between FY 2001 and FY 2004.

| Table 12 Comparison of Failure to Appear Rates for Released Aliens (FY 2001-FY 2004) | | | | |
|---|---|---|---|---|
| **Fiscal Year** | **IJ Decisions/ Administrative Closures** | **Failures to Appear** | **Percentage Of Total** | **Annual Percent Increase** |
| 2001 | 96,703 | 42,030 | 43% | -0- |
| 2002 | 106,068 | 43,873 | 41% | 4.3% |
| 2003 | 124,601 | 43,014 | 35% | 1.9% |
| 2004 | 134,184 | 52,890 | 39% | 22.9% |
| **Total** | **461,556** | **181,807** | **39%** | ------- |

Source: U.S. Department of Justice

Although the percentage of released aliens who failed to appear at their
respective hearings has declined in recent years, the total number of aliens
failing to appear is increasing. During FY 2001, 42,030 aliens failed to appear

---

[33] According to 8 CFR 241.14, Special Circumstances aliens are those individuals: (1) that have a highly contagious
disease that threatens public safety; (2) whose release would have adverse foreign policy implications; (3) present a
significant threat to national security; or (4) are violent criminals with a mental disorder.
[34] Between FY 2000 and FY 2004, administrative closures comprised 4 percent of the 935,119 Immigration Judge
decisions issued.
[35] Includes individuals who have not been in physical custody of DHS or the Department of Justice Institutional hearing
Program. It also includes aliens who were detained at some point during proceedings and subsequently released on bond
or personal recognizance.

compared to 52,890 who failed to appear during FY 2004, a 26 percent increase.

**Propensity of Illegal Aliens With Final Orders to Abscond.** Based on past history, the vast majority of illegal aliens who are released that are later issued final orders of removal by the EOIR will abscond. This is because DRO lacks the trained personnel, infrastructure, and funding needed to detain all apprehended aliens while their immigration status is being adjudicated. For example, DRO statistics indicate that 73 percent of the immigration cases for released illegal aliens brought before the immigration judge resulted in the issuance of final orders of removal. According to DRO, 85 percent of the illegal aliens released that have been issued final orders of removal, will abscond. Between FY 2002 and FY 2004, 280,987 illegal aliens were released of which 174,212 are likely to abscond based on past statistics. As of December 30, 2005, there were more than 544,000 absconders in the U.S.[36]

**Countries Blocking or Inhibiting Repatriation of Illegal Aliens.** Thousands of criminal aliens with final orders are released because of the unwillingness of some countries to issue travel documents necessary for repatriation.[37] These countries employ a variety of means to delay the removal process. For example, Ethiopia will only issue travel documents to persons who prove that their parents were born in Ethiopia, provide proof of birth in Ethiopia, are able to speak the language, and prove that they have family still residing in Ethiopia today. Eritrea will not grant the requisite travel documents to any individual who was not issued a "blue identity card" or a passport that was obtained after Eritrea gained its independence from Ethiopia in 1991.

Other methods for blocking repatriation include:

- requiring illegal aliens to produce overwhelming documentary evidence of their nationality (Iran);
- imposing a slow and problematic travel document issuance process (Iran, China, Jamaica, India);
- limiting the number of travel interviews being conducted (Ethiopia);
- refusing to repatriate nationals (Laos and Vietnam).

As a result of these barriers to removal, DRO is being forced to devote a significant percentage of its funded detention bed space (14%) to illegal aliens whose countries are either slow and/or unwilling to issue travel documents needed for removal. During FY 2003, the detention of criminal/non-criminal aliens from the top eight uncooperative countries that block or inhibit repatriation consumed 981,202 detention days and $83 million.[38] Table 13

---

[36] Includes officially designated absconders, unexecuted orders estimated to be absconders but not officially designated as such, and unconfirmed voluntary departures.

[37] These countries include Ethiopia, Eritrea, China, India, Iran, Jamaica, Laos. And Vietnam,

[38] The equivalent of 2,688 detention beds or 14 percent of the 19,444 funded bed space authorized during FY 2003.

contains a breakdown of FY 2003 detention days and estimated resources devoted to illegal aliens from eight countries that block or inhibit the repatriation of illegal aliens issued final orders of removal.

| Table 13 Breakdown of FY 2003 Detention Days and Estimated Resources Devoted to Aliens From Eight Countries That Block or Inhibit Repatriation | | |
|---|---|---|
| **Eight Countries** | **Detention Days FY 2003** | **Estimated Annual Cost @ ($85/day)** |
| Vietnam | 137,280 | $11,668,800 |
| Jamaica | 241,114 | $20,494,690 |
| Iran | 42,884 | $ 3,641,740 |
| India | 99,482 | $ 8,455,970 |
| Ethiopia | 34,761 | $ 2,954,685 |
| Eritrea | 6,401 | $   544,085 |
| China | 366,540 | $31,155,900 |
| Laos | 52,740 | $ 4,482,900 |
| **Total** | **981,202** | **$83,398,770** |

Source: DRO

The difficulty that DRO is experiencing removing illegal aliens with final orders has, in effect, created a mini-amnesty program for tens of thousands of illegal aliens that are subject to removal from the U.S. It also encourages individuals from non-cooperating countries such as China, India, and Iran to make attempts to enter the U.S. illegally. As of June 2004, more than 133,662 illegal aliens with or pending final orders of removal had been apprehended and released into the U.S. and who are unlikely to ever be repatriated if ordered removed because of the unwillingness of their country of origin to provide the documents necessary for repatriation. Table 14 contains a breakdown of the detained/non-detained aliens from eight countries that block or inhibit the repatriation of its citizens from the U.S.

AR00235

| Table 14 Breakdown in the Number of Illegal Aliens From Countries That Block or Inhibit Repatriation (As of June 29, 2004) | | | |
|---|---|---|---|
| **Eight Countries** | **Detained Criminal/Non-Criminal** | **Non-Detained Criminal/Non-Criminal** | **Total** |
| Vietnam | 352 | 5,807 | 6,159 |
| Jamaica | 715 | 11,568 | 12,283 |
| Iran | 105 | 7,039 | 7,144 |
| India | 253 | 28,540 | 28,793 |
| Ethiopia | 108 | 4,454 | 4,562 |
| Eritrea | 21 | 637 | 658 |
| China | 885 | 72,315 | 73,200 |
| Laos | 140 | 3,302 | 3,442 |
| **Total** | **2,579** | **133,662** | **136,241** |

Source: DRO

**Impact of the U.S. Supreme Court Decisions.** Two U.S. Supreme Court decisions - Zadvydas v. Davis 533 U.S. 678 (2001), and Clark v. Martinez, 543 U.S. 371 (2005), mandate the release of criminal and other high-risk aliens 180 days after the issuance of the final removal order, if their repatriation to their country of origin is not likely to occur in the reasonably foreseeable future except in "Special Circumstances." Exactly how many criminal and other high-risk aliens have been released as a result of the Zadvydas and Martinez decisions is not known since DRO did not begin tracking these releases until FY 2005.[39]

## Availability of Critical Data to Monitor DRO Performance

The Office of Detention and Removal's Deportable Alien Control System lacks the ability to readily provide DRO management with data analysis capabilities to manage the detention and removal program in an efficient and effective manner. The lack of reliable program and analysis capabilities could detrimentally affect DRO's ability to identify emerging trends, and to assess its resource requirements.

The Deportable Alien Control System (DACS), a 20-year old mainframe system, was placed into operation by legacy INS in 1984 and continues to be used by DRO to track docket control functions associated with the apprehension, detention, and deportation of illegal aliens. However, DACS does not contain or is not capable of readily furnishing key information for

---

[39] DRO has reported that 696 illegal aliens were released into the U.S. during the first 6 months of FY 2005 as a result of these two Supreme Court decisions.

reliable assessments of the detention and removal program. For example, DACS cannot provide statistical data related to (1) the number of aliens categorized as mandatory, high, medium, or low priority as specified in current detention guidelines; (2) the number of aliens who failed to show for immigration hearings; (3) the source of apprehension, i.e. Border Patrol, Investigations; and (4) the number released into the U.S population due to a lack of resources. Because the aging mainframe system has limited query capabilities, it cannot readily provide statistical detention and removal information, such as the number of aliens apprehended by year, their detention and release status, and their country of origin. Although this information is stored in DACS, in order to provide the requested data DRO had to rely on special programs written by DRO personnel or contractors to download, compile, manipulate, and analyze information stored in the system.

Furthermore, information stored in DACS is not always accurate and up to date. According to DRO, data quality problems are largely the result of: repetitive data entry functions, incomplete data entry, delays in the actual entry of detention and removal data, and the ability of DRO staff to delete or edit historical information stored in the DACS system. Although we did not independently assess the controls in place to ensure the reliability of data maintained in DACS, GAO and the legacy INS Office of Internal Audit (OIA) reported significant problems with DACS data reliability,[40] including:

- no assurance that all aliens in the removal process are entered into DACS;
- final alien removal actions were not always recorded in DACS;
- inadequate controls to ensure timely data entry;
- insufficient training for DACS users; and
- lack of written standards to ensure the quality of the data entered into DACS.

Recognizing the shortcomings of DACS, in FY 2001, DRO undertook an effort to improve its data collection and analytical capability. The Enforce Removal Module project (EREM) as it is called, is intended to replace DACS with an automated data collection and analysis system capable of providing more timely, accurate and complete analysis of immigration-related data including the ability to monitor all actions and decisions relating to individual alien cases and provide DRO with the statistical information it needs to optimize its operations.

---

[40] Source: February 2003 U.S. DOJ report titled *"The Immigration and Naturalization Service's Removal of Aliens Issued Final Orders"*. Report Number I-2003-004.

AR00237

Implementation of the EREM project has been has been delayed due to system performance and compatibility problems. As a result of these problems, DRO allowed the existing developer contract to lapse in April 2004, accepted new contract bids, and awarded a new contract to a different developer in September 2004. However, due to the time required to obtain security clearances for its personnel, the new developer was not able to begin work until late December 2004. To date, DRO has invested more than $15 million into the EREM project with little to show for its effort. Further, DRO could not predict when the EREM project will be fully implemented or at what additional cost.

GAO Standards for Internal Control in the Federal Government and the Government Performance Results Act of 1993 require that agencies ensure the integrity of information for use by management in controlling operations and making decisions and that each agency be able to assess the level of success in achieving set performance goals, respectively.

In order to allow management sufficient oversight over the detention and removal program, DRO should expedite its efforts to develop, test, and implement a data management system that is capable of meeting DRO's data collection and analysis requirements. The data management system, at a minimum, should be able to provide the following immigration-related data with improved data quality for each illegal alien:

- country of origin;
- date apprehended, released, or removed;
- detention location;
- information detailing the results of the risk assessments for illegal aliens detained and released (by risk category –high-medium-low priority);
- the type and category of crime(s) committed (for criminal aliens);
- the rationale underlying DRO's decision to release an alien from detention (if applicable);
- the rationale underlying DRO's decision not to detain individual aliens;
- the date when individual final orders of removal were issued; and
- the date when the final order of removal was executed.

The data management system should also be able to provide the following information regarding the entire population of illegal aliens in DRO custody on a monthly and annual basis:

- bed space turnover rate for mandatory and non-mandatory detainees;
- the number/percentage of detainees that were detained from apprehension to removal; and
- the number of mandatory and non-mandatory aliens apprehended and detained.

The use of an improved information technology system, coupled with quality controls, would greatly enhance DRO's ability to support resource requirements, identify emerging trends, and assess the success of its overall mission.

## DRO's Strategic Plan

In June 2003, DRO released its 2003-2012 Strategic Plan, entitled "Endgame," establishing a goal of developing within 10 years the capacity to remove all removable aliens. The plan includes specific objectives for optimizing the means for detaining illegal aliens, including:

- Ensuring sufficient and appropriate bed space is available based on detention category, characteristic, and condition of release;
- Enhancing partnerships with other federal detention agencies for better use of their resources, to include facilities and training; and
- Developing a National Custody Management Plan promoting the effective utilization of available bed space and alternative detention settings.

However, the plan identified several significant challenges, many beyond DHS' control, including the number of aliens to remove, limited resources, political will, foreign governments, and non-removable aliens. For these reasons, DHS needs to intensify its efforts to provide ICE with the resources and interagency support needed to overcome these challenges.

AR00239

## Conclusions and Recommendations

DRO has developed a comprehensive plan to detain and remove illegal aliens, but its success depends on sufficient resources and other factors beyond its control. Congress has appropriated funds to advance the plan, but those funds still fall far short of the amount needed to detain and remove all high-risk aliens. Further, DRO lacks the analytical capability to manage the program effectively. Additional actions are needed to mitigate the risks created by these circumstances.

**We recommend that the Assistant Secretary, ICE:**

**Recommendation #1**: Develop a detailed plan to ensure that ICE has the capacity to detain, process, and remove aliens that pose a potential national security or public safety risk to the U.S., including SIC, SST, and CAP aliens. The plan should include personnel, training, equipment, infrastructure and funding requirements.

**Recommendation #2:** Intensify efforts to obtain the resources needed to expedite the development of alternatives to detention to minimize required detention bed space levels.

**Recommendation #3:** In collaboration with the Department of State, develop a detailed plan to resolve travel document and related issues that are preventing or impeding ICE's ability to repatriate OTM aliens. The plan should include timelines, milestone dates, the identity of personnel and organizations responsible for creating and implementing the plan, and any funding requirements.

**Recommendation #4:** Expedite efforts to develop and implement a data management system that is capable of meeting its expanding data collection and analyses needs relating to the detention and removal of illegal aliens. The plan should include timelines, milestone dates, equipment and infrastructure requirements, a bi-annual reporting requirement outlining the progress being made on the project, the identity of the organizational entities to be responsible for implementing the planned upgrade, and any short and long-term funding requirements.

AR00240

## Management Comments and OIG Analysis

We issued a draft version of the report to the Department on December 28, 2005. The Department provided its written response on February 21, 2006. (See appendix F.) These comments were extremely useful and were incorporated into the final report, as appropriate. The final report is based on the analysis of information provided to us through March 13, 2006.

We are pleased to learn of the Department's commitment to provide ICE with resources it desperately needs to detain, process, and remove aliens that pose a potential national security or public safety risk to the U.S. This commitment is demonstrated by the Department's concurrence with recommendations 1, 3, and 4, and its partial concurrence with recommendation 2. However, we are concerned that the Department's response does not specifically outline the steps it will take to implement these recommendations, the resources that will be directed at these efforts, and the timeline for their completion. Our comments are as follows.

**Recommendation 1:** Develop a detailed plan to provide ICE with the capacity to detain, process, and remove aliens that pose a potential national security or public safety risk to the U.S., including SIC, SST, and CAP aliens. The plan should include personnel, training, equipment, infrastructure and funding requirements.

**DHS Comments:** The Department concurred with the recommendation. Under the Department's Secure Border Initiative (SBI) program, DRO is doing precisely that. DRO, as part of the SBI process, has made progress in creating models to determine bed space needs, staffing requirements, infrastructure, removal requirements and funding requirements based on expectant arrest numbers as provided by the initiating agency. It is also engaging with other federal law enforcement agencies such as the Bureau of Prisons (BOP), U.S. Citizenship and Immigration Services (USCIS), the Department of State, and the Department of Justice to jointly develop a more efficient complex detention and removal system.

**OIG Comments:** The OIG is pleased that DRO is making progress to better identify its requirements and the recommendation is considered resolved. However, the intent of our recommendation is not completely addressed in the response. Specifically, the response does not include specific actions the Department will take to provide ICE with the personnel, training, equipment, infrastructure, and funding needed to provide ICE with the capacity to detain, process, and remove aliens that pose a potential national security or public safety risk to the U.S. The recommendation will remain open until the Department provides the specific actions it plans to take to address the recommendation.

AR00241

**Recommendation 2:** Intensify efforts to provide ICE with the resources needed to expedite the development of alternatives to detention to minimize required detention bed space levels.

**DHS Comments:** The Department partially concurred with the recommendation. Currently, ICE employs alternative means of release (the preferred term vice "alternatives to detention"), such as the Intensive Supervision Appearance Program (ISAP) and the Electronic Monitoring Device (EMD) Program. DRO is still evaluating these pilot programs. Once evaluation is complete, decisions will be made about further expansion.

**OIG Comments:** We understand the need to evaluate the ongoing pilot programs and examine the results before deciding whether to expand these efforts and/or embark on other alternative programs. Nevertheless, we remain concerned about the degree to which these pilots have been funded in the past as well as the timeliness of these efforts. The ISAP Program has been ongoing since June 2004. The EMD pilot, on the other hand, dates back to May 2003. We look forward to learning the results of these pilots and the Department's plans to move forward in the development of cost-effective alternatives to detention. This recommendation is considered resolved but will remain open until the Department provides its plan for using alternative means of release.

**Recommendation 3:** In collaboration with the Department of State, develop a detailed plan to resolve travel document and related issues that are preventing or impeding ICE's ability to repatriate OTM aliens. The plan should include timelines, milestone dates, the identity of personnel and organizations responsible for creating and implementing the plan, and any funding requirements.

**DHS Comments:** The Department concurred with the recommendation. Under the Department's SBI program, DRO is working closely with the Department of State (DOS) to address travel document and related issues preventing or impeding the repatriation of illegal OTM aliens. Great strides have been made in this area with Central and South American countries. The initiation of video teleconferencing, dedicated consulate staffs as well as soon to be implemented electronic travel documents have greatly decreased the time needed for the issuance of a travel document.

Additionally, DRO participates in a Sanctions Working Group, which includes representatives from ICE, DOS, the National Security Council, and Homeland Security Council. This group's focus on Jamaica resulted in the resolution of issues associated with that country's issuance of travel documents, and the Government of Jamaica now issues travel documents within acceptable timeframes. Current efforts are now focused on Ethiopia, with visa sanctions as a distinct possibility if no increased cooperation is seen in the near future.

**OIG Comments:**  We are pleased to learn of the progress being made by the Department to resolve longstanding travel document issues, which have resulted in the release of many OTM aliens into the U.S.  However, these efforts have yet to fully address the potential national security and public safety risks associated with the Department's inability to remove tens of thousands of illegal aliens from China, Iran, and India from the U.S. due to travel document-related issues. Many of these are criminal aliens who have been issued final orders of removal but have not been removed due to the inability of authorities to obtain the necessary travel documents.  We believe the Department needs to develop and implement a plan of action to resolve the travel document issues and to ensure that detention personnel and bed space are used effectively and to expedite the removal of criminal aliens and other high-risk aliens.  Therefore, the recommendation is considered resolved but will remain open until the Department develops and implements the plan of action.

**Recommendation 4:**  Expedite efforts to develop and implement a data management system that is capable of meeting its expanding data collection and analyses needs relating to the detention and removal of illegal aliens. The plan should include timelines, milestone dates, equipment and infrastructure requirements, a bi-annual reporting requirement outlining the progress being made on the project, the identity of the organizational entities to be responsible for implementing the planned upgrade, and any short and      long-term funding requirements.

**DHS Comments:**  The Department concurred with the recommendation.  The ICE Office of Chief Information Officer (OCIO) is preparing a project plan for DRO that reflects efforts to expedite the development and deployment of enhanced information technology (IT) solutions capable of meeting the expanding data collection and analysis needed relating to the detention and removal of illegal aliens. The new system will allow users to capture, search, and review information in important functional areas.

**OIG Response:**  We are pleased to learn of ICE's plan to develop an automated data management system that will be capable of meeting its expanding data collection and analysis needs relating to the detention and removal of illegal aliens.   The current system is more than 20 years old and either does not contain or does not easily provide key information needed for reliable assessments of ICE's detention and removal program. Further, we remain concerned that previous efforts by ICE to develop such a system were largely unsuccessful despite 5 years of effort and the expenditure of at least $15 million.   If properly designed, the system should significantly enhance ICE's ability to support future budget requests, identify emerging trends, and assess its overall mission performance.   We are hopeful that the latest effort

AR00243

will be more successful and look forward to seeing ICE's plan for making it happen.  This recommendation is resolved but will remain open until the ICE project plan is approved.

## Other Comments

The Department/ICE proposed a number of technical comments in response to the draft report.  We have worked closely with the Department to address their concerns and revised the report where necessary.

The Department/ICE stated on page 2 of their comments that there appears to be a lack of differentiation between an alien's pre- and post-order status as it relates to the release statistics throughout the report, and stated that mixing the discussion and analysis of pre- and post-order status throughout the report may lead to the reader's confusion.  We have discussed this issue with DRO officials.  Based on these discussions, we have determined that this issue has no impact on our findings or conclusions and would represent only an insignificant change to the data presented in Chart 1, Tables 3 through 6, and Table 15.

The Department/ICE stated on page 3 of their comments that the release rates used in our report may be slightly inflated, as they would include release premised on factors outside the control of DRO.  As stated in the Department/ICE comments, every effort was made to take these numbers out of the statistics. We agree with the Department/ICE position that the statistics could be slightly inflated and that the release numbers might be fewer than quoted. However, we do not believe that any differences in the release statistics affect the overall conclusions and recommendations in this report. To minimize reader confusion and identify the limitations of the statistics in this report, we have included a detailed explanation in Appendix B regarding the reasons and circumstances that cause aliens both pre- and post-final order to be released.

Appendix A
Types of Apprehensions

There are numerous types of apprehensions made by a number of different sources within DHS. Not all apprehensions require DRO intervention in terms of detention, case management, or removal services. The apprehensions that do require DRO services are referred to in this report as active cases under DRO for detention (if resources available), case processing, and removal (if ordered removed). All apprehension statistics in this report include only those placed as active cases under DRO. The various types of apprehensions and their consideration in this report are as follows:

- *Aliens apprehended by ICE in the United States in violation of the INA due to unlawful presence in the United States*. Most of these apprehensions would be processed for an immigration hearing before an immigration judge and either placed in detention or released into the U.S. population on bond or own recognizance. These are placed as active cases under DRO and are included in the apprehension statistics for purposes of this report.

- *Aliens apprehended by Border Patrol between the ports of entry for entry without inspection*. Most of these aliens (primarily Mexicans) will voluntarily return (depart) under safeguard back to their country. A voluntary return under safeguard is an administrative removal at the request of the alien. No formal immigration hearing before an immigration judge is required. Other than sometimes providing transportation services to the border, voluntary returns are not placed as active cases under DRO and are therefore excluded from the apprehension statistics for purposes of this report. If the alien does not voluntarily return, then the alien is processed for an immigration hearing before an immigration judge and either placed in detention or released into the U.S. population on bond or own recognizance. Those that do not voluntarily return are placed as active cases under DRO and are included in the apprehension statistics for purposes of this report.

- *Aliens apprehended by CBP Officers at ports of entry.* Most of these aliens are immediately removed by CBP Officers without any intervention by DRO. These are placed as active cases under DRO and are excluded from the apprehension statistics for purposes of this report. If for any reason the alien is placed into removal proceedings, then the alien is placed as an active case under DRO and is included in the apprehension statistics for purposes of this report. Two examples are if the alien claims

AR00245

Appendix A
Types of Apprehensions

Legal status or if the alien claims asylum, but the claim is denied or otherwise referred for an asylum hearing.

- *Aliens apprehended that are incarcerated.* The federal or state institution detains the alien while the criminal sentence is served, but DRO provides actual case processing and removal services. These are placed as active cases under DRO and are included in the apprehension statistics for purposes of this report.

- *Aliens denied asylum or referred for an asylum hearing after filing a claim with DHS Citizenship and Immigration Services (USCIS).* These are placed as active cases under DRO and are included in the apprehension statistics for purposes of this report.

Appendix B
Apprehensions Released

Apprehended individuals are released into the U.S. population in a number of ways. An individual can be released into the population at the time of initial apprehension. An individual can be detained by DRO either at time of apprehension or at a later date and subsequently released into the population on bond, on own recognizance, on orders of supervision, or on parole. The release could occur while the individual's immigration status is being adjudicated or after receiving a final order of removal.

For purposes of this review, the release statistics in this report in Chart 1 and Tables 3 through 6 only include those individuals that were released at time of initial apprehension and had not been detained by DRO as of November 2004 for the FY 2001 through FY 2004 apprehensions or April 2005 for FY 2005 apprehensions (first six months). Many of these individuals were released into the U.S. population. Some were not released into the U.S. population because they were immediately issued an administrative or reinstated removal order and removed from the U.S. shortly following apprehension without the need for DRO detention.

DRO could not quantify how many individuals were removed under these circumstances. To the extent possible, individuals not actually released into the U.S. population were excluded from the release statistics. Specifically, expedited removals, voluntary returns, IRP removals, and incarcerated aliens were excluded from the release statistics because while these individuals were not detained by DRO they also were not released into the U.S. population.

Further, DRO could not identify releases into the U.S. population due to a lack of resources because such information is not tracked. While many were released into the U.S. population due to resource shortages, some were released into the U.S. population because the individual did not appear to pose a flight, public safety, or national security risk.

For purposes of this review, the release statistics in Chart 1 and Tables 3 through 6 do not include individuals that DRO detained at time of apprehension or at a later date and subsequently released into U.S. population on bond, own recognizance, order of supervision, or parole. Some of these releases into the U.S. population are due to resource shortages, but there are several other possible reasons for the release from detention.

According to DRO, releases from detention on parole are not likely to be due to resources at all, but rather for humanitarian or some other compelling

AR00247

Appendix B
Apprehensions Released

reason. Some of the primary non-resource driven reasons that DRO releases individuals from detention on bond, own recognizance, or order of supervision are as follows:

- Immigration judges ordered the individuals released from detention.

- The INA and Supreme Court decisions mandate that DRO release most aliens if not removed within a specified period following issuance of a final order of removal.

- In the professional judgment of DRO, the alien does not pose a flight or known safety risk to the public.

Because DRO does not track the specific reason an individual is released from detention, it is not possible to determine exactly how many of the releases on bond, own recognizance, or order of supervision, were due to a lack of detention resources. Therefore, these types of releases are excluded from Chart 1 and Tables 3 through 6 even though some are likely due to detention resource limitations. Table 15 contains the number of releases for individuals detained at time of apprehension that were later released on bond, own recognizance, or under an order of supervision from FY 2001 through FY 2004.

| Table 15 Aliens Apprehended, Detained and Later Released On Bond, Own Recognizance (OR), and Order of Supervision (OS) (FY 2001 –FY 2004) | | | |
|---|---|---|---|
| | **Apprehensions** | **Detained and Released On Bond, OR, and OS** | **Percentage Released On Bond, OR, and OS** |
| **Total Apprehensions** | 998,481 | 80,594 | 8% |
| **OTM Apprehensions** | 517,918 | 65,159 | 13% |
| **Criminal Apprehensions** | 345,006 | 15,483 | 4% |
| **Criminal Apprehensions from select countries listed in Table 4** | 311,687 | 10,060 | 3% |
| **SIC and SST Apprehensions** | 82,803 | 10,420 | 13% |

Source: DRO

If DRO tracked the number of individuals released into the U.S. population, including those specifically due to resources or other factors, then DRO could more precisely quantify problem areas and the impact on the effectiveness of DRO operations.

Appendix C
ICE Apprehension, Detention, and Removal Process



**Source:** INS Detention and Removal Program, Critical Influences on INS Detention, May 2001, page 4, and DHS-OIG Analysis

AR00249

Appendix D
BTS Detention Prioritization and Requirements Memorandum

U.S. Department of Homeland Security
Washington, DC 20528


Homeland
Security

OCT 18 2004

MEMORANDUM TO:   Robert C. Bonner
                 Commissioner
                 U.S. Customs and Border Protection

                 Michael J. Garcia
                 Assistant Secretary
                 U.S. Immigration and Customs Enforcement

FROM:            Asa Hutchinson
                 Under Secretary for Border and Transportation Security

RE:              Detention Prioritization and Notice to Appear Documentary
                 Requirements

This memorandum provides priorities for the detention of aliens and outlines
documentary requirements that must be met when transferring custody of aliens to
Immigration and Customs Enforcement (ICE), Office of Detention and Removal
Operations (DRO). The guidance in this memo supercedes all outstanding guidance
regarding priorities for the detention of aliens within Border and Transportation Security
(BTS). All BTS personnel must adhere to legal authorities and the procedures set forth
below in making decisions regarding whether to detain an alien.[1]

### I.  Detention Priorities

The following guidelines provide priority categories for the detention of aliens subject to
detention. An alien being considered for detention should be placed in the highest
numbered priority within the top category possible (i.e., an alien found to have a credible
fear of persecution with an aggravated felony conviction would still meet the
requirements of Mandatory, #2). In the case of mandatory detention, the Director of ICE
DRO is to heed the guidelines strictly. In all other cases, the DRO Director retains the
discretionary authority with respect to allocation of bed space and other detention-related
resources. In all cases, the DRO Director is to heed these guidelines to the greatest
extent possible when determining detention priorities.

---

[1] This policy does not supercede any requirement to release an alien under Zadvydas v. Davis, 533 U.S.
678 (2001) and implementing guidance in 8 CFR §§ 241.4, 241.13 and § 241.14 nor does it apply to
unaccompanied juveniles.

www.dhs.gov

Appendix D
BTS Detention Prioritization and Requirements Memorandum

All such aliens must be detained unless they fall within one of the exceptions to mandatory detention. There are no priority designations among categories of cases subject to mandatory detention. Questions as to whether a given alien falls under one of these categories and must be detained should be directed to local legal counsel.

**Mandatory**

- Aliens subject to mandatory detention under INA 236A[2]
- Aliens in expedited removal (INA § 235) with limited exceptions[3]
- Aliens subject to mandatory detention in removal and deportation proceedings under INA 236(c)[4]
- Aliens who have final orders of removal subject to mandatory detention under INA 241(a)(2), whether ordered removed pursuant to INA 238 or 240 proceedings[5]

**High Priority**

1. National Security Interest aliens including aliens who are subject to an ongoing national security investigation or who, by virtue of specific information or intelligence specific to the alien in question raise a national security concern, as identified either by 1) the Joint Terrorism Task Force, 2) Immigration and Customs Enforcement, or 3) by U.S. Customs and Border Protection (CBP).[6]
2. Continued detention of aliens with final administrative orders past 180 days on account of special circumstances (i.e. 8 CFR 241.14).
3. Aliens who have been issued final removal orders over 90-days old, where removal is foreseeable.
4. Aliens who present an articulable danger to the community (claimant agency must be able to articulate the danger)
5. Aliens who exhibit specific, articuable intelligence-based risk factors for terrorism or national security concern not solely based on the alien's race, ethnicity, nationality or religion (as identified by either 1) the Joint Terrorism Task Force, 2) Immigration and Customs Enforcement, or 3) by U.S. Customs and Border Protection.
6. Aliens associated with ongoing significant criminal investigations;

---

[2] Prior approval of the ICE National Security Unit and the ICE Office of the Principal Legal Advisor is required before charges may be brought under either INA § 212(a)(3) or INA § 237(a)(4).
[3] Not all aliens in expedited removal proceedings are subject to mandatory detention, however. See, for example 8 CFR § § 235.3(b)(2)(iii), 235.3(b)(4)(ii), and 235.3(b)(5)(i) allowing for parole in limited circumstances of medical emergency, or where necessary for a legitimate law enforcement objective.
[4] Note that INA 236(c)(2) authorizes release to provide for protection of a witness, etc., where the alien does not pose a danger to the safety of others or to property and is likely to appear for any scheduled proceedings.
[5] This includes aliens ordered removed under INA 240 and criminal aliens ordered removed under INA 238. These aliens may not be released under any circumstances during the 90-day removal period set forth in INA 241(a)(2). Following the 90-day period, the continued detention of such aliens should be determined pursuant to criteria in Zadvydas, *supra* and implementing guidance in 8 CFR §§ 241.4, 241.13, and 241.14.
[6] ICE and CBP shall track all cases where the two bureaus disagree on whether a particular alien poses a national security threat. CBP and ICE shall review these cases on a quarterly basis.

2

AR00251

Appendix D
BTS Detention Prioritization and Requirements Memorandum

7. Remaining criminal aliens not subject to 236(c) ;
8. Aliens whose detention is essential to national border enforcement initiatives;

**Medium Priority**

1. Suspected alien and narcotics smugglers
2. Aliens who committed fraud
3. Inadmissible, non-criminal aliens (other than expedited removal cases)

**Lower Priority**

1. Worksite enforcement arrests
2. Final orders (beyond 179 days-not likely to remove)
3. Aliens placed in expedited removal found to have a credible fear and referred for full 240 proceedings.
4. Other aliens not subject to required detention

II. Documentary requirements.

Each component must ensure apprehended aliens are processed efficiently and placed in the appropriate and most expedient removal process. (e.g. stipulated, reinstatement, administrative, expedited)  At a minimum, the following documents must be completed by the apprehending entity and presented to DRO to ensure each case moves swiftly through the removal process:

- Original charging documents;
- Completed Form I-213 (Record of Deportable/Inadmissible Alien) or approved equivalent;
- 2 completed Forms FD-249 (fingerprint cards);
- R-84 Form with prints and biographical information completed;
- Print out of results, including negative responses, of name search in IBIS "SQ11" function.
- IAFIS printout relating to criminal history; if IAFIS is not available, print out of results, including negative responses, based on name search in either NCIC or NLETS.
- Record of Fingerprint Identification Number (FIN) generated by the Automated Biometric Identification System (IDENT);
- 4 photographs;
- Completed Form I-217 (Information for Travel Document or Passport if required);
- Documentation of Consular Notification;
- Certified conviction records, when applicable.  In the event that conviction records are not immediately available, the arresting officer must provide written notification to the file that a Certified Copy of the Conviction Document has been requested, and include in the administrative file the following information:  the exact date and jurisdiction where the alien was convicted, the name and telephone number of the referring officer and the supervisor, the name and contact

3

Appendix D
BTS Detention Prioritization and Requirements Memorandum

---

information of the agency official responsible for procuring the conviction record. Furthermore, the arresting agency must produce the actual conviction record within 30 days of issuance of the NTA;[7]

- Documentation reflecting that appropriate record checks (Central Index System (CIS), Non-Immigrant Information System (NIIS), National Crime Information Center (NCIC), IDENT, Interagency Border Inspection System (IBIS), etc.) have been completed;
- Completed Form I-203 or I-203A [Order to Detain or Release Alien(s)] bearing the appropriate official's signature must accompany each detainee presented for detention;
- Notice of Custody Determination (Form I-286), indicating date and time custody decision was made and probable charges against alien;
- And any other relevant documents pertaining to the detainee.

To ensure maximum efficiency in the use of the Department's finite detention bed resources, it is imperative that this documentation is prepared and presented. Custody responsibility will not be transferred to ICE/Detention and Removal Operations (DRO) until ICE/DRO verifies that all of the above required documentation has either been provided or has been waived by an ICE/DRO authorizing official at the detention site. The arresting or delivering officer will ensure that detainees turned over to the custody of ICE/DRO are accompanied by any personal items, identity documents, baggage and/or prescription medications in that detainee's possession at the time of arrest.

The requirements I issued in my memorandum of March 30, 2004, *Guidance on ICE Implementation of Policy and Practice Changes Recommended by the Department of Justice Inspector General*, remain in effect. You are responsible for ensuring implementation of these requirements.

---

[7] CBP shall establish within 30 days of this memorandum points of contact in each field office to coordinate obtaining conviction records for cases where the conviction record is not timely produced. Contact information shall be provided to the DRO Field Office Directors and the ICE Chief Counsels.

4

Appendix E
Purpose, Scope, and Methodology

The purpose of this audit was to determine whether ICE has sufficient resources and detention facilities available to house detainees. Our audit was designed to determine whether:

- DRO is removing all illegal aliens with final orders of removal.

- Budgetary constraints are impacting DRO's ability to perform the detention and removal mission.

- External factors outside of DRO's control are impacting its ability to perform its detention and removal mission;

- DRO's Deportable Alien Control System is able to provide management with the data analyses needed to measure its effectiveness in performing the detention and removal mission.

We focused our work at the Customs and Border Protection and Immigration and Customs Enforcement headquarters in Washington, D.C.; and, Border and Transportation Security offices in Arizona, Texas, and Florida. Our scope included information and activities through March 13, 2006.

To identify detention and resource issues, we interviewed DHS headquarters officials in the CBP and ICE offices in Washington D.C. At CBP and ICE headquarters, we reviewed agency documents containing budget, staffing, apprehension, release, detention, absconder, and removal information. We relied on the data provided by DRO, ICE, and Department of Justice for purposes of this audit. We did not test the validity or reliability of the data provided.

We interviewed DRO, Border Patrol, CBP officials, and ICE Investigators at numerous field offices. We judgmentally selected the field offices based on those offices with the highest number of apprehensions as reported by DHS data, based on CBP and ICE officials' suggestions, and to ensure audit coverage included air, land, and sea operational environments. During the period January 2004 and April 2004, we made site visits to DRO offices in Dallas, San Antonio, Port Isabel, and Harlingen, Texas; Phoenix and Florence, Arizona; and Miami, Florida. Additionally, we made site visits to Border Patrol offices in McAllen, Texas, Tucson, Arizona; and Miami, Florida and visited CBP officers at the Brownsville, Texas and Nogales, Arizona ports of entry.

Appendix E
Purpose, Scope, and Methodology

To determine if illegal aliens requiring mandatory detention were being released into United States communities, at each DRO field office visited, we reviewed a random sample from the non-detained population provided by DRO from the DACS that included apprehension and detention information to identify status and classification according to the detention policy. With the exception of comparing DRO field office documentation to the DACS data, we did not test the validity or reliability of the data provided. Based on our limited testing, we conclude the data was sufficiently reliable to meet the audit objective.

We conducted our audit between September 2003 and March 2006 under the authority of the *Inspector General Act of 1978*, as amended, and according to generally accepted government auditing standards.

We would like to extend our appreciation for the cooperation and courtesies extended by ICE to our staff during the review.

AR00255

Appendix F
Management's Comments



*Office of the Assistant Secretary*

**U.S. Department of Homeland Security**
425 I Street, NW
Washington, DC  20536

U.S. Immigration
and Customs
Enforcement

FEB 2 1 2006

MEMORANDUM FOR: Richard L. Skinner
Inspector General
Department of Homeland Security

THROUGH:          Steven J. Pecinovsky
Director
Department GAO/OIG Liaison Office

FROM:             Julie L. Myers
Assistant Secretary

SUBJECT:          OIG Draft Report: Detention and Removal of Illegal Aliens,
OIG-06-XX, December 2005

This memorandum contains the coordinated response of U. S. Immigration and Customs
Enforcement (ICE) and the Department of Homeland Security (Department).  The Department
and ICE welcome the suggestions made by the Office of the Inspector General (OIG).

The Department's responses to the recommendations display a continued commitment toward
effective and efficient detention and removal of illegal aliens.

**Management Comments**

Immigration and Customs Enforcement appreciates the Office of Inspector General's efforts
culminating in the release the **OIG Audit Report: Detention and Removal of Illegal Aliens,
OIG-06-XX.**  The duration of the audit highlights the complexity of issues confronting
Detention and Removal Operations and how their efforts impact immigration enforcement more
broadly.  ICE welcomes the OIG's overarching concern for the need for adequate resources to
accomplish Detention and Removal Operation's (DRO) mission to "*Promote the public safety
and national security by ensuring the departure from the United States of all removable aliens
through the fair and effective enforcement of the nation's immigration laws.*"

It is important to note at the outset that this audit was conducted from September 2003 to
November 2005.  Indeed, after conducting the Second Stage Review of the Department,
Secretary Michael Chertoff concluded that we needed to reform our detention and removal
processes.  For that reason, he launched an effort, the Secure Border Initiative (SBI), to tackle the
very problems identified in the report.  In particular, he concluded that we needed to streamline
and make more efficient our detention and removal operations.  Under Secretary Chertoff's
leadership, SBI is providing an integrated systems approach to the immigration phenomenon,
with national security and public safety as the two overarching priorities.  Working in close
coordination with ICE and U.S. Customs and Border protection (CBP), SBI immediately

Appendix F
Management's Comments

Subject:  OIG Draft Report: Detention and Removal of Illegal Aliens, OIG-06-XX,
          December 2005
Page 2

established a working group to "re-engineer" the detention and removal system.  We were
pleased that a member of the OIG staff was involved in that effort.

This "re-engineering," which is currently in progress, will result in a more efficient and robust
detention and removal system that is able to detain a higher percentage of apprehended aliens and
remove them swiftly and at a lower cost.  As outlined in these Management Comments and the
Response To Recommendations, steps have already been taken and progress will continue in
improving performance and accountability.  For example, models have been created to determine
bed space, staffing requirements, infrastructure, removal requirements, and funding requirements.
The Department is also exploring the expansion of alternative means to detention, and is working
with the participation of the Department of State (DOS) to resolve travel document and related
issues that prevent or impede the repatriation of illegal Other Than Mexican (OTM) aliens.
Additionally, DRO is working on the development and implementation of a replacement data
management system for the legacy Immigration and Naturalization Service (INS)
Deportable Alien Control System (DACS), to ensure that the data collection and analysis needs
of the Department are fully met.

When reading the OIG report, it is important to note that SBI was not yet fully functional at the
time of the conclusion of the OIG staff's review.  This prevented OIG from evaluating and
incorporating the results of the Department's recent progress in re-engineering our Nation's
immigration enforcement strategy to manage, control, and secure our borders in the most
effective and efficient manner possible.  We note that, through SBI, the Department has already
raised and taken steps to address many of the recommendations and findings of this report.
Under SBI, more than 6,650 non-Mexican individuals have been turned over to ICE custody for
detention in connection with the Expedited Removal program.  Thus far, ICE has removed
roughly 5,800 of these individuals from the country, a removal rate of 99 percent under SBI. The
average length of stay in ICE detention for aliens placed into Expedited Removal is
approximately 20 days, down significantly from the average of 90 days spent in ICE detention by
aliens prior to the creation of the SBI.

The complexity of technical and legal issues particular to DRO makes defining, accumulating,
and analyzing statistical data surrounding DRO a difficult process. The content of the report
contains volumes of statistical data.  In the statistics provided throughout the report there appears
to be a lack of differentiation between an alien's pre- and post-order status as it relates to
releases.  An alien cannot be removed until a final order of removal is granted.  Mixing the
discussion and analysis of pre- and post-order status throughout the report may lead to the
reader's confusion.

Pursuant to the Immigration and Nationality Act (INA), ICE has the authority to detain certain
aliens pre-final order (while their immigration process is pending) and post-final order (after the
alien has received an administrative final order of removal).  As this report correctly illustrates,
DRO presently lacks the personnel and resources to detain all the aliens it has the authority to
detain; thus, it often releases aliens who may legally be kept in detention.  One primary focus of
SBI's efforts to re-engineer the detention and removal system is to eliminate the other types of
releases--those which result from lack of detention space and often termed "catch and release."
However, the INA, regulations, and pertinent case law often require that DRO release aliens,
regardless of resource and/or personnel issues.  Examples of this are cases in which the
Immigration Judge has the jurisdiction to set bond and release an alien; when an alien is granted
an immigration benefit; when prosecutorial discretion has been used; when custody is transferred
to a law enforcement agency to allow the alien to assist with a prosecution; when a final order

AR00257

Appendix F
Management's Comments

Subject:  OIG Draft Report: Detention and Removal of Illegal Aliens, OIG-06-XX,
          December 2005
Page 3

alien has not been issued a travel document during the 90-day statutory removal period and they
are not a risk to the community or a flight risk; and in cases of final order aliens whose removal
is not significantly likely and for whom the post-order detention has been over 6 months.  Unless
these releases have been properly accounted for in the statistics, the reflected release rates may b
slightly inflated, as they would include release premised on factors outside the control of DRO.
It was understood that every effort was made to take these numbers out of the statistics, but ICE
is concerned that the release numbers may be fewer than quoted.

**Response To Recommendations**

**RECOMMENDATION # 1:  Develop a detailed plan to provide ICE with the capacity to
detain, process, and remove aliens that pose a potential national security or public safety
risk to the U.S., including SIC, TSC, and CAP aliens. The plan should include personnel,
training, equipment, infrastructure and funding requirements.**

**ORGANIZATION STATUS: Concur.**  Under the Secretary's SBI program, DRO is doing
precisely that.  DRO, as part of the SBI process, has made progress in creating models to
determine bed space needs, staffing requirements, infrastructure, removal requirements and
funding requirements based on expectant arrest numbers as provided by the initiating agency.  It
is also engaging with other federal law enforcement agencies such as the Bureau of Prisons
(BOP), U.S. Citizenship and Immigration Services (USCIS), the Department of State, and the
Department of Justice to jointly develop a more efficient complex detention and removal system

**RECOMMENDATION #2 :  Intensify efforts to provide ICE with the resources needed to
expedite the development of alternative means of detention to minimize required detention
bed space levels.**

**ORGANIZATION STATUS: Partially Concur.**  Currently, ICE employs alternative means o
release (the preferred term vice "alternatives to detention"), such as the Intensive Supervision
Appearance Program (ISAP) and the Electronic Monitoring Program (EMD).  DRO is still
evaluating these pilot programs.  Once evaluation is complete, decisions will be made about
further expansion.

**RECOMMENDATION #3 :  In collaboration with the Department of State, develop a
detailed plan to resolve travel document and related issues that are preventing or impedin
the repatriation of illegal OTM aliens.  The plan should include timelines, milestone dates,
equipment and infrastructure requirements, a bi-annual reporting requirement outlining
the progress being made on the project, the identity of the organization entities to be
responsible for implementing the planned upgrade, and any short- and long-term funding
requirements.**

**ORGANIZATION STATUS: Concur.**  Under the Secretary's SBI program, DRO is working
closely with the Department of State (DOS) to address travel document and related issues
preventing or impeding the repatriation of illegal OTM aliens.  Great strides have been made in
this area with Central and South American countries.  The initiation of video teleconferencing,
dedicated consulate staffs as well as soon to be implemented electronic travel documents have
greatly decreased the time needed for the issuance of a travel document.

Additionally, DRO participates in a Sanctions Working Group which includes representatives
from ICE, DOS, the National Security Council, and Homeland Security Council.  This group's

Appendix F
Management's Comments

Subject: OIG Draft Report: Detention and Removal of Illegal Aliens, OIG-06-XX,
December 2005

Page 4

focus on Jamaica resulted in the resolution of issues associated with that countries issuance of travel documents, and the Government of Jamaica now issues travel documents within acceptable timeframes.

**RECOMMENDATION #4 : Expedite efforts to develop and implement a data management system that is capable of meeting its expanding data collection and analyses needs relating to the detention and removal of illegal aliens. The plan should include timelines, milestones dates, equipment and infrastructure requirements, a bi-annual reporting requirement outlining the progress being made on the project, the identity of the organizational entities to be responsible for implementing the planned upgrade, and any short- and long-term funding requirements.**

**ORGANIZATION STATUS: Concur.** The ICE Office of the Chief Information Officer (OCIO) is preparing a project plan for DRO that reflects efforts to expedite the development and deployment of enhanced information technology (IT) solutions capable of meeting the expanding data collection and analysis needs relating to the detention and removal of illegal aliens.

The new system will allow users to capture, search, and review information in the following functional areas:

- DETENTION—Detention-related data such as book-in, book-out, and housing information
- BIO—Subject-related data such as biographic, family, contact, alias, and passport information
- REMOVAL—Case management-related data such as case details, proceedings, custody determination, bonds, and case transfer information
- QUERY AND REPORT—Report- and Forms-related data such as generating reports and subject search information, and printing forms
- TRANSPORT—Transportation-related data for the monthly statistics report
- ADMIN—System administration-related data such as adding or modifying dockets and facility information
- EXT SYSTEMS—Interface to IDENT

**Technical Corrections**

1. Page 1, 1st paragraph, 3rd sentence  - Report refers to aliens "eligible for removal". Aliens are eligible for benefits; they are removable or inadmissible for immigration purposes.

2. Page 1, 2nd paragraph, 2nd sentence  - Report discusses aliens in "DRO jurisdiction." Aliens come into DRO custody and may remain as active cases under DRO once released; however, there is no DRO "jurisdiction".

3. Page 1, 2nd paragraph, 2nd sentence  - Report states that release statistics deal with aliens apprehended while their immigration status is pending.  This should be clarified to state that there are many factors contributing to the release of apprehended aliens such as Immigration Judges (IJs) bonding out non-arriving/non-mandatory aliens prior to conclusion of their immigration hearings, and DRO releasing certain aliens considered low priority for detention due to low risk to community or low flight risk such as families seeking asylum in the United States who do not pose a risk to the community.

AR00259

Appendix F
Management's Comments

Subject: OIG Draft Report: Detention and Removal of Illegal Aliens, OIG-06-XX,
December 2005

Page 5

4. Page 1, 2nd paragraph, 3rd sentence - Report asserts that risks exist because CBP and ICE
are releasing aliens for whom they do not have an identity or who present
criminal/terrorist risks. This is not supported by any immediate data, nor does it reflect
DRO's prioritization of aliens for detention which emphasizes the detention of aliens
considered criminal/terrorist risks and those aliens whose identities are unknown.

5. Page 3, 1st paragraph, 1st sentence - Zadvydas does not "mandate the release of criminal
and other high risk aliens" but allows for a presumptively reasonable 6-month period in
which DRO can effectuate an alien's removal post-final order. After 6 months, if it is
determined that the alien's removal is not significantly likely in the reasonably
foreseeable future, then the alien must be released, unless he or she fits into the stringent
special circumstances criteria for continued detention. See 8 CF.R. §§ 241.13 and
241.14.

6. Page 3, footnote 10 - Footnote 10 cites the money spent on the detention of aliens with
final or pending orders, from traditionally "uncooperative" countries unwilling to issue
travel documents. However, since DRO cannot begin the repatriation process for aliens
with pending final orders this statistic is only useful for final order aliens.

7. Page 6, 3rd paragraph - Report compares the INA's policy on mandatory detention
(INA § 236(c)) to BTS guidelines regarding "high priority" detentions. These are not
comparable, the INA is a legal mandate from Congress and is law, and DRO must follow
it. Border and Transportation Security (BTS) guidelines were issued as policy to most
effectively focus DRO's resources on its priority missions.

8. Page 6, 3rd paragraph - Report states that BTS detention guidelines do not require
mandatory detention for aliens that pose terrorism or national security concerns. BTS
cannot issue guidance requiring mandatory detention; it would be *ultra vires*. However,
the detention priorities place great emphasis on aliens with risk factors including those
aliens who are known or suspected terrorists. INA § 236(c) requires mandatory detention
for aliens charged under national security grounds.

9. Page 6, footnote 15 - Report states that under the INA, the government is required to
detain mandatory aliens who "intend to commit crimes in the US." This is not included
in INA § 236(c).

10. Page 6, footnote 15 - Report states that the government must detain all illegal aliens for
90 days post-final order; this is not the case. DRO must only detain aliens inadmissible
under § 212(a)(2), 212(a)(3)(B), or deportable under 237(a)(2), or 237(a)(4)(B) for
90 days post-final order.

11. Page 6, footnote 15, last sentence - Report states that "the government is also required to
detain illegal aliens for 90 days after receiving a final order of removal". Statement fails
to recognize that this detention occurs only if DRO is unable to remove the alien during
the time period.

12. Page 8, Table 4 - Report notes the underlying data by Source: DRO then adds "* Denotes
those countries where the notorious Mara Salvatrucha (MS-13) gang is active". DRO

Appendix F
Management's Comments

Subject: OIG Draft Report: Detention and Removal of Illegal Aliens, OIG-06-XX,
December 2005

Page 6

does not track gang data as such. Table implies gang information was received from
DRO.

13. Page 8, 1st paragraph, 4th sentence - Report states that OTMs are generally released into
the population, but then states that only half (51 percent) were. Generally implies
something greater than half.

14. Page 14, 1st paragraph, 3rd sentence - Report states that "It is estimated that there are
605,000 foreign-born aliens incarcerated in state and local facilities in the US …".
Sentence should include **federal** in addition to state and local.

15. Page 14, 1st paragraph, 3rd sentence - Report states that "Each IEA is expected to process
300 criminal aliens annually for a total of 78,300 criminal alien cases per year by
FY2008." Sentence should include **the screening of 600 aliens per year** in addition to
processing.

16. Page 17, 3rd paragraph - Report section titled: "Countries Blocking or Inhibiting
Repatriation of Illegal Aliens," discusses mandatory detention under INA § 236(c)
(pre-final order detention). DRO cannot repatriate non-final order aliens; thus, detention
under § 236(c) is irrelevant in terms of blocked repatriation.

17. Page 18, 1st paragraph - Report discusses countries "accept[ing]" aliens. Post the Jama
decision in the Supreme Court, a country does not need to accept an alien in order for
repatriation to occur. Also, countries do not "take back" their aliens, but issue travel
documents for their nationals to use when being removed.

18. Page 18, 3rd paragraph, 2nd sentence and Title of Table 13- "Recalcitrant" is not a correct
term for countries unwilling to issue travel documents. An alternate word should be
considered.

19. Page 20, 1st paragraph - The Zadvydas opinion is incorrectly stated as previously noted
for Report footnote 10. Zadvydas does not "mandate the release of criminal and other
high risk aliens" but allows for a presumptively reasonable 6-month period in which DRO
can effectuate an alien's removal post-final order. After 6 months, if it is determined that
the alien's removal is not significantly likely in the reasonably foreseeable future, then the
alien must be released, unless he or she fits into the stringent special circumstances
criteria for continued detention.  See 8 C.F.R. §§ 241.13 and 241.14.

20. Page 21, 2nd paragraph, 1st sentence - Report states "…and the ability of DRO staff to
freely delete or edit historical information in the DACS system." As the term "freely"
may inappropriately imply bad faith modifications to DRO databases suggest the word be
changed to read "timely."

21. Page 22, Bullet listing of requirements for the data management system:
--The rationale underlying DRO's decision to release an alien from detention
(if applicable)
--The rationale underlying DRO's decision not to detain individual aliens
These items call for data input on a decision that is not quantifiable. These decisions are
contextual and have to be based on the totality of circumstances applicable to the case. In
fact, there may be multiple reasons for a decision to release, or a decision not to detain.

**Detention and Removal of Illegal Aliens**

AR00261

Appendix F
Management's Comments

Subject: OIG Draft Report: Detention and Removal of Illegal Aliens, OIG-06-XX,
December 2005
Page 7

22. Page 24 - Recommendation #2 states that DRO should develop alternative means of
detention. Possibly OIG means alternative Order of Supervision (O/S) measures. DRO
believes the statement should be alternative means to detention, not "of detention." ICE
and the courts consider the ISAP and EMD a release. There are not alternative means of
detention, and custody is custody.

23. Page 31, Appendix B Chart, 1st bullet - Report states " Immigration judges ordered the
individuals released from detention despite DRO's desire to detain the individual." It is
not DRO's desire; but rather, it is the government's enforcement of the INA.

24. Page 32, Appendix C Chart - The chart does not reflect Deportation Officers as
apprehending officers.

Jim Velesz, ICE DRO, (202) 732-2949, is the point of contact available to answer any questions
you might have regarding this review.

Appendix G
Major Contributors to This Report

## Washington, DC Office

Richard T. Johnson, Director
USCG and Maritime Security Operations Audit Division

## Miami Field Office

Julie A. Fleisher, Senior Auditor
Gary L. Cox, Senior Auditor
Danny M. Helton, Auditor

AR00263

Appendix H
Report Distribution

**Department of Homeland Security**

Secretary
Deputy Secretary
Chief of Staff
Deputy Chief of Staff
General Counsel
Executive Secretary
Assistant Secretary for Public Affairs
Assistant Secretary for Policy
Assistant Secretary for Legislative and Intergovernmental Affairs
Assistant Secretary for ICE
DHS GAO/OIG Liaison
ICE Audit Liaison
Office of Detention and Removal Audit Liaison

**Office of Management and Budget**

Chief, Homeland Security Branch
DHS OIG Budget Examiner

**Congress**

Congressional Oversight and Appropriations Committees, as appropriate

**Additional Information and Copies**

To obtain additional copies of this report, call the Office of Inspector General (OIG) at (202) 254-4100, fax your request to (202) 254-4285, or visit the OIG web site at www.dhs.gov/oig.

**OIG Hotline**

To report alleged fraud, waste, abuse or mismanagement, or any other kind of criminal or noncriminal misconduct relative to department programs or operations, call the OIG Hotline at 1-800-323-8603; write to DHS Office of Inspector General/MAIL STOP 2600, Attention: Office of Investigations - Hotline, 245 Murray Drive, SW, Building 410, Washington, DC 20528, fax the complaint to (202) 254-4292; or email DHSOIGHOTLINE@dhs.gov. The OIG seeks to protect the identity of each writer and caller.

UNCLASSIFIED//FOR OFFICIAL USE ONLY

1



Immigration Weekly
Wednesday, October 24, 2018

# Secretary's Weekly

# Immigration Briefing

*Prepared by DHS OPS Reporting, Office of Operations Coordination.*

Data is compiled by DHS OPS Reporting, based on preliminary reporting as of October 22nd, 2018. Unless otherwise noted, data is provided by:

- US Border Patrol apprehension data: Statistics and Data Integrity Branch, US Border Patrol.
- Office of Field Operations apprehension data: Planning, Program Analysis & Evaluation (PPAE) of Enterprise Reporting and Data Systems, Office of Field Operations.
- Immigration and Customs Enforcement data: Office of Enforcement and Removal Operations.
- US Citizenship and Immigration Services data: Refugee, Asylum and International Operations Directorate.
- US Department of Justice data: Executive Office for Immigration Review (EOIR), Planning, Analysis, and Statistics Division (PASD).

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

2



**Immigration Weekly**
Wednesday, October 24, 2018

## Contents

USBP Southwest Border (SBO) Overview ................................................................................. 4
    Recent Trends by Category ........................................................................................... 4
    USBP SBO Fiscal Year-to-Date Comparison ................................................................ 4
OFO Southwest Border Inadmissible Aliens Overview ......................................................... 5
    Recent Trends by Category ........................................................................................... 5
    OFO SBO Fiscal Year-to-Date Comparison ................................................................. 5
HHS UAC Snapshot ................................................................................................................. 6
CBP In-Custody ....................................................................................................................... 7
CBP Apprehensions and Encounters of Countries of Interest .............................................. 7
    CBP Country of Interest Apprehensions/Encounters Nationwide FY18TD .............. 8
    OFO Nationwide Inadmissible Aliens – Countries of Interest by Initial Case Disposition ... 8
CBP Credible Fear Overview .................................................................................................. 9
    USBP Nationwide Credible Fear Claims ..................................................................... 9
    OFO Nationwide Credible Fear Claims ....................................................................... 9
USCIS Overview .................................................................................................................... 10
    Credible Fear Overview ............................................................................................. 10
    Credible Fear Decisions ............................................................................................. 11
    Top 6 Credible Fear Decisions by Nationality .......................................................... 11
    Affirmative Asylum Overview .................................................................................... 12
    Top 6 Affirmative Asylum Cases by Nationality ....................................................... 13
    Refugee Admissions Overview .................................................................................. 13
Department of Justice ........................................................................................................... 14
U.S. Department of Justice (DOJ) Overview ........................................................................ 15
    DOJ Affirmative Asylum ............................................................................................ 15
    DOJ Defensive Asylum ............................................................................................... 16
    DOJ Asylum Decisions by Nationality ....................................................................... 17
    DOJ Pending Cases and Completed Initial Immigration Cases (ICC) ....................... 17
    DOJ Immigration Initial Case Completions by Nationality ...................................... 18
References ............................................................................................................................. 19
    CBP Total SBO Apprehensions/Inadmissible Encounters ....................................... 20
    CBP UAC Apprehensions/Inadmissible Encounters Country of Origin .................. 20
    CBP FMUA Apprehensions/Inadmissible Encounters Country of Origin ............... 21
    CBP Single Adult Apprehensions/Inadmissible Encounters Country of Origin ...... 21
    USBP SBO Apprehension Totals by Month and FY .................................................. 22
    USBP SBO Apprehensions by Country of Citizenship .............................................. 22
    USBP Local Repatriations to Mexico FY18TD ........................................................... 23
    OFO SBO Apprehension Totals by Month and FY .................................................... 24
    OFO SBO Inadmissible Encounters by Country of Citizenship ................................ 24

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

3

 **Homeland Security**

## Immigration Weekly
### Wednesday, October 24, 2018

| USBP & OFO | Southwest Border Current Trends | Page |
|---|---|---|
| Apprehensions | USBP FMUA apprehensions saw a significant increase from last week, while OFO FMUA encounters declined. So far in FY19, USBP FMUA apprehensions are nearly 5 times higher than FMUA apprehensions for this time in FY18. UAC apprehensions and encounters have remained relatively flat over the last few weeks for both USBP and OFO. | 4-5, 9 20-24 |
| Holding Facilities | USBP holding facilities are 51% occupied.  OFO holding facilities are 57% occupied. | 7 |

| HHS | UAC In-Care Trends | Page |
|---|---|---|
| HHS Shelters | The current 'in-care' occupancy rate increased this week from 85% to 88%. This is due in part to HHS moving 600 temporary shelter beds from active capacity to reserve capacity, resulting in a reduction in the overall current funded capacity. | 6 |

| ICE | Arrest, Detention, and Removal Trends | Page |
|---|---|---|
| Book-Ins/Detention | No updates at this time. | N/A |
| Removals | No updates at this time. | N/A |

| USCIS | Credible fear and Asylum Trends | Page |
|---|---|---|
| Credible Fear | This week, 1,610 credible fear requests were granted (79%). As of September 1, 2018, 76% of all decisions have resulted in 'fear established', and 10% resulted in 'fear not established'. | 10-11 |
| Asylum and Refugee | For FY19, the maximum number of refugee admissions has been set at 30,000, a decrease of 15,000 admissions from FY18. So far for FY19, the U.S. has admitted 902 (~3%) of the 30,000 refugees allowed for FY19. | 12-14 |

| DOJ | Asylum and Case Completion Trends | Page |
|---|---|---|
| Affirmative Asylum | DOJ reports 29% of August's affirmative asylum decisions resulted in asylum being granted. | 15 |
| Defensive Asylum | DOJ reports only 13% of August's defensive asylum decisions resulted in asylum being granted. | 16-18 |

| Other | Maritime Migration Trends | Page |
|---|---|---|
| USCG Interdictions | This week, there were no USCG interdictions at sea of individuals from Haiti, Dominican Republic, or Cuba. | N/A |

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

4

 **Homeland Security**

Immigration Weekly
Wednesday, October 24, 2018

## USBP Southwest Border (SBO) Overview
### Recent Trends by Category



USBP SBO Apprehensions by Week by Category

| | 4-Aug | 11-Aug | 18-Aug | 25-Aug | 1-Sep | 8-Sep | 15-Sep | 22-Sep | 29-Sep | 7-Oct | 14-Oct | 21-Oct |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| UAC FY18 | 933 | 973 | 909 | 1,000 | 1,078 | 943 | 988 | 1,004 | 1,178 | 1,004 | 1,030 | 1,127 |
| FMUA FY18 | 2,321 | 2,574 | 2,733 | 3,211 | 3,446 | 3,251 | 3,769 | 3,907 | 4,647 | 4,610 | 4,601 | 5,720 |
| SA - FY18 | 4,367 | 4,337 | 4,451 | 4,706 | 4,910 | 4,674 | 4,494 | 4,705 | 5,374 | 5,217 | 4,987 | 4,810 |
| Total FY18 | 7,621 | 7,884 | 8,093 | 8,917 | 9,434 | 8,868 | 9,251 | 9,616 | 11,199 | 10,831 | 10,618 | 11,657 |

### USBP SBO Fiscal Year-to-Date Comparison



USBP Total SBO Apprehensions FYTD
as of October 21, 2018

FY16  FY17  FY18  FY19

UNCLASSIFIED//FOR OFFICIAL USE ONLY

AR00269

UNCLASSIFIED//FOR OFFICIAL USE ONLY

5



Immigration Weekly
Wednesday, October 24, 2018

## OFO Southwest Border Inadmissible Aliens Overview
### Recent Trends by Category



OFO SBO Inadmissible Aliens by Week by Category

| | 4-Aug | 11-Aug | 18-Aug | 25-Aug | 1-Sep | 8-Sep | 15-Sep | 22-Sep | 29-Sep | 7-Oct | 14-Oct | 21-Oct |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| UAC FY18 | 70 | 81 | 73 | 81 | 94 | 92 | 75 | 90 | 65 | 82 | 77 | 83 |
| FMUA FY18 | 553 | 506 | 486 | 611 | 645 | 491 | 520 | 580 | 672 | 695 | 761 | 624 |
| SA FY18 | 1,215 | 1,250 | 1,161 | 1,163 | 1,219 | 1,291 | 1,288 | 1,355 | 1,272 | 1,209 | 1,238 | 1,302 |
| Total FY18 | 1,988 | 1,988 | 1,866 | 1,981 | 2,103 | 2,006 | 2,049 | 2,128 | 2,139 | 2,125 | 2,197 | 2,179 |

### OFO SBO Fiscal Year-to-Date Comparison



OFO SBO Inadmissibles FYTD
as of October 21, 2018

UNCLASSIFIED//FOR OFFICIAL USE ONLY

AR00270

UNCLASSIFIED//FOR OFFICIAL USE ONLY

6



Immigration Weekly
Wednesday, October 24, 2018

## HHS UAC Snapshot



*OFO UAC Inadmissible (NC) - UAC deemed inadmissible nationwide, from non-contiguous countries (i.e. Mexico and Canada).*
*USBP UAC Apprehensions (OTM) – UAC apprehended by USBP along the southwest border, excluding UAC from Mexico.*
**Note: Crosshatched columns signify weekends.**



HHS data is provided by the Administration for Children and Families, Office of Refugee Resettlement. It is based on unreconciled data provided daily. The data in the above graphs are derived from reports as of October 22, 2018.

UNCLASSIFIED//FOR OFFICIAL USE ONLY

AR00271

UNCLASSIFIED//FOR OFFICIAL USE ONLY

7

 **Homeland Security**

Immigration Weekly
Wednesday, October 24, 2018

## CBP In-Custody

As of 0600 October 22nd, there were **7,176** individuals in CBP custody 6,602 with USBP, 574 with OFO).





## CBP Apprehensions and Encounters of Countries of Interest

A 'Country of Interest' is a country with a significant number of individuals or groups known or evaluated to have a nexus to terrorism and travel patterns that include a point of origin or segment tied to current assessments of national and international threat environments. The following graphs include only Countries of Interest with a minimum of a 100 or more total apprehensions and encounters and significant growth from the previous FYTD.



UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

8



Immigration Weekly
Wednesday, October 24, 2018

## CBP Country of Interest Apprehensions/Encounters Nationwide FY19TD





| | EGYPT | KENYA | KYRGYZSTAN | LEBANON | UZBEKISTAN |
|---|---|---|---|---|---|
| OFO | 20 | 9 | 9 | 12 | 21 |
| USBP | 0 | 0 | 0 | 0 | 2 |

## OFO Nationwide Inadmissible Aliens – Countries of Interest by Initial Case Disposition

The majority of inadmissible aliens from Egypt, Kenya, and Lebanon withdraw or have a disposition of withdraw or voluntarily return. The majority of inadmissible aliens from Nigeria and Venezuela are placed in expedited removal (ER) or withdraw in lieu of NTA or ER.



UNCLASSIFIED//FOR OFFICIAL USE ONLY

AR00273

UNCLASSIFIED//FOR OFFICIAL USE ONLY

9

 **Homeland Security**

Immigration Weekly
Wednesday, October 24, 2018

## CBP Credible Fear Overview
### USBP Nationwide Credible Fear Claims

As of October 22, 2018, a total of 10,356 have been placed in Expedited Removal, of which, 3,454 claimed Credible Fear.



## OFO Nationwide Credible Fear Claims

As of October 22, 2018, a total of 4,248 were placed in Expedited Removal, of which, 1,285 claimed Credible Fear.



UNCLASSIFIED//FOR OFFICIAL USE ONLY

AR00274

UNCLASSIFIED//FOR OFFICIAL USE ONLY

10

 **Homeland Security**

Immigration Weekly
Wednesday, October 24, 2018

## USCIS Overview
### Credible Fear Overview

As of September 1, 2018, USCIS has made a total of 88,571 Credible Fear Case decisions in FY 2018, of which, 76% resulted in "Fear Established".



FY18 Credible Fear Decisions by Finding
as of September 1, 2018

12,294
14%

■ Fear Established  ■ Fear Not Established  ○ Closed



FY17 and FY18 Credible Fear Receipts

|  | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FY17 Receipts | 10,184 | 9,076 | 9,007 | 9,919 | 6,148 | 6,141 | 2,509 | 3,900 | 4,179 | 4,811 | 6,229 | 6,461 |
| FY18 Receipts | 7,296 | 7,307 | 7,462 | 8,121 | 6,621 | 8,266 | 8,500 | 9,968 | 9,742 | 6,565 | 10,230 | |

—— FY17 Receipts   —— FY18 Receipts

*When CBP places an alien into Expedited Removal (under INA § 235) and the alien expresses a fear of return or requests asylum, CBP or ICE refers the alien to a USCIS Asylum Office for a credible fear screening. If USCIS finds the alien has a credible fear of persecution or torture after a screening interview, USCIS places the alien into removal proceedings under INA § 240 in a Department of Justice, Executive Office for Immigration Review immigration court, where the alien may apply for asylum or other forms of relief as a defense to removal.*

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

11

 **Homeland Security**

Immigration Weekly
Wednesday, October 24, 2018

## Credible Fear Decisions

From October 8, 2018 to October 14, 2018, USCIS reports a total of 1,610 Credible Fear decisions were made, of which, 79% (1,272) were found to have a credible fear ("Fear Established") and the alien was placed into removal proceedings in an immigration court.



## Top 6 Credible Fear Decisions by Nationality

The Top 6 Nationalities (Honduras, Guatemala, El Salvador, Nicaragua, Cuba, and India) account for nearly 86% of this week's Credible Fear decisions ("Fear Established").



USCIS Top 6 Weekly Credible Fear by Nationality
9/24/2018 - 9/30/2018

|  | HONDURAS | GUATEMALA | EL SALVADOR | NICARAGUA | CUBA | INDIA |
|---|---|---|---|---|---|---|
| Closings | 22 | 134 | 8 | 0 | 1 | 1 |
| Fear Not Established | 56 | 38 | 31 | 4 | 3 | 29 |
| Fear Established | 578 | 223 | 271 | 122 | 179 | 141 |

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

12



Immigration Weekly
Wednesday, October 24, 2018

## Affirmative Asylum Overview

As of September 1, 2018, USCIS has completed a total of 73,059 Affirmative Asylum cases in FY 2018, of which, 24% resulted in approval of the asylum claim.





USCIS has observed the recent downturn in affirmative asylum receipts. While USCIS is unable to determine the specific cause for the decline at this time, it may be associated with the reinstitution of reform ("last in-first out" or LIFO) interview scheduling. USCIS will continue to monitor this emerging trend.

*Asylum status is a form of protection available to people who have suffered persecution or fear that they will suffer persecution due to race, religion, nationality, membership in a particular social group, or political opinion. Generally, under INA § 208, individuals inside the United States who are not in removal proceedings may affirmatively submit a Form, I-589, Application for Asylum and For Withholding of Removal, to USCIS for adjudication of their asylum claim by a USCIS Asylum Office.*

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

13


Homeland Security

Immigration Weekly
Wednesday, October 24, 2018

## Top 6 Affirmative Asylum Cases by Nationality

From October 1, 2018 to October 7, 2018, USCIS reported a total of 1,611 Affirmative Asylum case receipts. The Top 6 Nationalities (Venezuela, Guatemala, China, El Salvador, Mexico, and Honduras) make up 68% (1,091) of these cases.



USCIS Top 6 Weekly Affirmative Asylum Cases by Nationality
10/1/2018 - 10/7/2018

| | VENEZ | GUATE | CHINA | ELSAL | MEXIC | HONDU |
|---|---|---|---|---|---|---|
| Closings | 9 | 32 | 24 | 31 | 64 | 17 |
| Denials | 2 | 0 | 2 | 6 | 0 | 1 |
| Referrals | 118 | 60 | 71 | 46 | 197 | 42 |
| Grants | 81 | 6 | 70 | 14 | 14 | 11 |

## Refugee Admissions Overview

| Refugee Admissions | | | | | |
|---|---|---|---|---|---|
| FY19 Key Metrics for Refugees Worldwide (by individual, not case) | FY19 Total Annual | FY19-Q1 | FY19-Q2 | FY19-Q3 | FY19-Q4 |
| Refugee Admissions Ceiling | 30,000 | * | * | * | * |
| Refugee Admissions | 902 | 902 | | | |
| Refugee Interviews | 136 | 136 | | | |

*Data as of October 19, 2018. Data provided by Department of State, Bureau of Population, Refugees, and Migration, Office of Admissions - Refugee Processing Center.*

*The President, in consultation with Congress, determines the number of refugee eligible for admission each fiscal year. This determination sets the maximum number for admission. The USCIS role in U.S. Refugee Admissions Program is to interview refugee applicants and determine eligibility for resettlement to the United States under INA section 101(A)(42).*

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

14



Immigration Weekly
Wednesday, October 24, 2018

## Department of Justice

UNCLASSIFIED//FOR OFFICIAL USE ONLY

AR00279

UNCLASSIFIED//FOR OFFICIAL USE ONLY

15

 **Homeland Security**

Immigration Weekly
Wednesday, October 24, 2018

## U.S. Department of Justice (DOJ) Overview
### DOJ Affirmative Asylum

For the month of August, DOJ reports 1,331 Affirmative Asylum decisions were made, of which, 29% (380) were granted asylum.





UNCLASSIFIED//FOR OFFICIAL USE ONLY

AR00280

UNCLASSIFIED//FOR OFFICIAL USE ONLY

16



Immigration Weekly
Wednesday, October 24, 2018

## DOJ Defensive Asylum

For the month of August, DOJ reports 5,866 Defensive Asylum decisions were made, of which, 13% (751) were granted asylum.





UNCLASSIFIED//FOR OFFICIAL USE ONLY

17



Immigration Weekly
Wednesday, October 24, 2018

## DOJ Asylum Decisions by Nationality

As of September 6, 2018 FYTD, DOJ has made a total of 131,978 asylum (affirmative and defensive) decisions, of which, 31,524 (24%) resulted in asylum granted and 53,438 resulted in asylum denied.



## DOJ Pending Cases and Completed Initial Immigration Cases (ICC)

As of August 31, 2018 FYTD, there are 759,235 pending DOJ cases, a 17% increase from FY17. DOJ has also completed 165,397 immigration initial cases* FYTD18.



UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

18

 **Homeland Security**

Immigration Weekly
Wednesday, October 24, 2018

## DOJ Immigration Initial Case Completions by Nationality

As of September 6, 2018 FYTD, DOJ completed 165,397 Initial Cases* (ICC). So far FYTD18, Mexico accounts for 33% of all ICCs, with 53,821 completions.



*\* DOJ initial cases are comprised of: Asylum Only Case, Continued Detention Review, Credible Fear Review, Claimed Status Review, Departure Control, DD Appeal, Deportation, Exclusions, NACARA Adjustment, Rescission, Reasonable Fear Case, Removal, and Withholding Only.  FYTD18 data is through August, all other years are total.*

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

19

 Homeland Security

Immigration Weekly
Wednesday, October 24, 2018

# References

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

20



Immigration Weekly
Wednesday, October 24, 2018

The following reference pages contain graphs updated on a monthly basis, providing the reader with reconciled month-end totals and historical context.

## CBP Total SBO Apprehensions/Inadmissible Encounters



| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEPT | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FY18 | 34,871 | 39,051 | 40,519 | 35,905 | 36,751 | 50,347 | 51,168 | 51,862 | 43,180 | 40,149 | 46,719 | 50,568 | 521,090 |
| FY17 | 66,713 | 63,363 | 58,418 | 42,464 | 23,557 | 16,589 | 15,773 | 19,944 | 21,657 | 25,019 | 30,567 | 31,152 | 415,216 |
| FY16 | 45,516 | 45,755 | 48,742 | 33,657 | 38,311 | 46,118 | 48,511 | 55,386 | 45,671 | 46,909 | 51,893 | 56,474 | 562,943 |
| FY15 | 35,903 | 33,032 | 34,243 | 30,180 | 32,550 | 39,162 | 38,296 | 40,683 | 38,619 | 38,611 | 42,415 | 41,165 | 444,859 |

## CBP UAC Apprehensions/Inadmissible Encounters Country of Origin



UNCLASSIFIED//FOR OFFICIAL USE ONLY

AR00285

UNCLASSIFIED//FOR OFFICIAL USE ONLY

21



Immigration Weekly
Wednesday, October 24, 2018

## CBP FMUA Apprehensions/Inadmissible Encounters Country of Origin



## CBP Single Adult Apprehensions/Inadmissible Encounters Country of Origin



UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

22



Immigration Weekly
Wednesday, October 24, 2018

## USBP SBO Apprehension Totals by Month and FY



**United States Border Patrol**
**Southwest Border Apprehensions**
**Total (FY16 - 18)**

| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEPT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FY18 | 25,488 | 29,085 | 28,995 | 25,975 | 26,666 | 37,390 | 38,243 | 40,339 | 34,089 | 31,299 | 37,524 | 41,486 |
| FY17 | 46,184 | 47,211 | 43,251 | 31,576 | 18,754 | 12,195 | 11,127 | 14,519 | 16,087 | 18,187 | 22,288 | 22,537 |
| FY16 | 32,724 | 32,838 | 37,014 | 23,758 | 26,072 | 33,316 | 38,089 | 40,337 | 34,450 | 33,723 | 37,048 | 39,501 |
| FY15 | 26,450 | 24,641 | 25,019 | 21,514 | 24,376 | 29,791 | 29,750 | 31,576 | 29,303 | 28,388 | 30,239 | 30,286 |

## USBP SBO Apprehensions by Country of Citizenship



USBP Apprehensions by Country FY18

The above graph indicates the country of origin for individuals apprehended between the ports of entry along the southwest border as of September 30, 2018.

UNCLASSIFIED//FOR OFFICIAL USE ONLY

AR00287

UNCLASSIFIED//FOR OFFICIAL USE ONLY

23



Immigration Weekly
Wednesday, October 24, 2018

## USBP Local Repatriations to Mexico FY19TD

A total of 8,074 aliens from Mexico have been repatriated this FYTD. Of these 508 are UAC - we estimate this accounts for 90% of all Mexican UAC apprehended and 17% of all UAC apprehended.



UNCLASSIFIED//FOR OFFICIAL USE ONLY

AR00288