Pages 1 - 94

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Richard Seeborg, Judge

INNOVATION LAW LAB; et al.,      )
                                 )
            Plaintiffs,          )
                                 )
   VS.                           )     NO. C 19-00807 RS
                                 )
KIRSTJEN NIELSEN, Secretary of   )
Homeland Security, in her        )
official capacity; et al.,       )
                                 )
            Defendants.          )
_____  )

                          San Francisco, California
                          Friday, March 22, 2019

                    **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
                    AMERICAN CIVIL LIBERTIES UNION
                     Foundation
                    125 Broad Street - 18th Floor
                    New York, New York  10004
               BY:  **JUDY RABINOVITZ, ATTORNEY AT LAW**
                    **LEE GELERNT, ATTORNEY AT LAW**

                    AMERICAN CIVIL LIBERTIES UNION
                     FOUNDATION OF NORTHERN CALIFORNIA
                    39 Drumm Street
                    San Francisco, California  94111
               BY:  **JENNIFER CHANG NEWELL, ATTORNEY AT LAW**
                    **KATRINA L. EILAND, ATTORNEY AT LAW**
                    **JULIE M. VEROFF, ATTORNEY AT LAW**

            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporter

1   **APPEARANCES**:  (CONTINUED)

2   For Plaintiffs:

3                      THE CENTER FOR GENDER AND REFUGEE
                          STUDIES
                       UC Hastings College of the Law
4                      200 McAllister Street
                       San Francisco, California  94102
5             BY:  **EUNICE C. LEE, ATTORNEY AT LAW**
                   **BLAINE BOOKEY, ATTORNEY AT LAW**
6
                       SOUTHERN POVERTY LAW CENTER
7                      1101 17th Street N.W. - Suite 705
                       Washington, D.C.  20036
8             BY:  **MELISSA CROW, ATTORNEY AT LAW**

9   For Defendants:

10                     U.S. DEPARTMENT OF JUSTICE
                       Office of Immigration Litigation
                       P. O. Box 868 - Ben Franklin Station
11                     Washington, D.C.  20044
              BY:  **SCOTT G. STEWART**
12                 **DEPUTY ASST. ATTORNEY GENERAL**

13                     U.S. DEPARTMENT OF JUSTICE
                       Office of Immigration Litigation
14                     450 5th Street N.W.
                       Washington, D.C.  20530
15            BY:  **EREZ REUVENI, ASSISTANT DIRECTOR**

16

17

18

19

20

21

22

23

24

25

1    <u>**Friday - March 22, 2019**</u>                              <u>**9:34 a.m.**</u>

2                              P R O C E E D I N G S

3                                 ---000---

4        **THE CLERK:**  Calling case C 19-807, Innovation Law Lab

5    versus Nielsen.

6        Counsel, please come forward and state your appearances.

7            **MS. RABINOVITZ:**  Judy Rabinovitz for the plaintiffs.

8            **THE COURT:**  Good morning.

9            **MS. RABINOVITZ:**  Good morning.

10       **MR. STEWART:**  Good morning, Your Honor.  Scott Stewart

11   on behalf of the United States.  I'm joined by my colleague

12   Erez Reuveni.

13           **THE COURT:**  Good morning.

14       Any other appearances on the plaintiffs' side?

15           **MR. GELERNT:**  Good morning, Your Honor.  Lee Gelernt

16   for plaintiffs.

17           **THE COURT:**  Good morning.

18           **MS. VEROFF:**  Good morning, Your Honor.  Julie Veroff

19   for plaintiffs.

20           **THE COURT:**  Good morning.

21           **MS. NEWELL:**  Good morning.  Jennifer Chang Newell for

22   plaintiffs.

23           **THE COURT:**  Good morning.

24           **MS. BOOKEY:**  Blaine Bookey for plaintiffs.

25           **THE COURT:**  Good morning.

1              **MS. CROW:**  Good morning, Your Honor.  Melissa Crow for

2      the plaintiffs.

3              **THE COURT:**  Good morning.

4              **MS. EILAND:**  And, finally, good morning, Your Honor.

5      I'm Katrina Eiland for the plaintiffs.

6              **THE COURT:**  Good morning.  Everyone who is planning to

7      say anything has introduced themselves?

8          Okay.  Let me make some preliminary comments, which I hope

9      are going to assist you in focusing the arguments this morning.

10         There are three principal motions that we're going to be

11     addressing:  The motion to transfer to the Southern District of

12     California, the motion for preliminary injunction, and then the

13     motion to strike extra-record evidence or to admit depending

14     upon which party is making the motion.  So those are what we

15     have on the table.

16         While I am not precluding discussion of certain of these

17     motions, I do want to go through some of them so that you know

18     where I would really like you to focus your attention and

19     issues where you've provided me with thorough briefing that I

20     have had an opportunity to spend time with.

21         And, again, you certainly are free to direct comments on

22     the motions that I'm going to be listing in a moment, but I do

23     want the principal time to be spent on some of the issues that

24     I'm going to talk about in a moment.

25         With respect to the motion to transfer to the Southern

1    District of California, I will tell you that having read the

2    papers, I don't think there's a basis to transfer this case to

3    San Diego.  The nature of this case is such that there is no

4    particular district I think that is the obvious place for it to

5    be venued.

6        A 1404 transfer to San Diego simply because I think the

7    happenstance in some ways of the MPP policy has initially been

8    implemented through the port of entry in San Ysidro doesn't

9    mean that in a classic 1404 analysis that San Diego, Southern

10   District of California, has any particular connection to that.

11   We don't have witnesses resident there, we don't have materials

12   that are more likely to be found there, and we do have the fact

13   that several of the plaintiffs' organizations are resident in

14   this district.

15       Now, that is, I think, sufficient to trigger perhaps not

16   the full flow of deference to the plaintiffs' choice of forum

17   if there had been more of a connection here, but it's certainly

18   enough to provide for deference to that forum.  I really just

19   don't think that there is -- one district is more obvious than

20   another in light of the nature of this case.

21       With respect to the preliminary injunction motion, the

22   issues of standing and justiciability are significant issues,

23   but I will say that I'm inclined to think -- on the standing

24   question, I've got some *amicus* briefing and some other briefing

25   that effectively is saying, well, the Ninth Circuit law is

wrong.

And I understand why parties make that argument when they need to; but for my purposes, the Ninth Circuit law is never wrong. It is the binding law. So if it's fairly clear that the Ninth Circuit current law provides a particular avenue, it's the avenue I'm going to take until the Ninth Circuit decides that they want to take another avenue. And I think on the standing question, certainly organizational standing, the circuit has given me some pretty clear direction that there is standing in this case.

And on the justiciability issue, I think that these are justiciable questions. I don't think this is a case where we're talking about a discretionary decision in a particular case by an immigration official, which would not be reviewable, but it really is going to the interaction between the expedited removal provision and the contiguous territory return provision, and whether or not certain conduct is violative of the APA; and I think that that is appropriate for consideration and, indeed, I think the Supreme Court case of this week in the decision that they did make on that question, on the justiciability question, is not contrary to that.

And then ticking off the list, I know there's a great deal of material that's been provided about irreparable harm, declarations that I've received. You certainly can address those questions but, again, I don't think that is the focus of

1    where I would like to have our discussion today.

2         And, finally, on the list of items that I would say don't

3    need as much attention are really the questions of what is

4    extra-administrative record evidence or not.  I mean, the

5    parties seem to effectively agree that I can consider

6    extra-record evidence when we're considering standing issues

7    and irreparable harm issues, but I can't consider the materials

8    with respect to the merits determination.  It's the

9    administrative record on an APA review that is going to call

10   the question.

11        The dispute seems to be what is certain of these materials

12   being offered for in reality, and those questions I think I can

13   address through the briefing that you've provided so I'm not

14   particularly asking for discussion on that.

15        So that brings us to the subjects I do think we need to

16   spend some time on, and that is the proper statutory

17   interpretation of Section 1225, whether or not those to whom

18   the MPP is being applied are or are not subject to contiguous

19   territory return under the statute; and then the question with

20   respect to -- I'm probably going to pronounce this

21   incorrectly -- *refoulement*.  Is that how it's pronounced?  Does

22   anybody -- anyway, you-all know what it is.  You know, as

23   that's codified in 1231, whether or not the procedures that are

24   contemplated in the MPP process are contrary to our

25   *non-refoulement* obligations as the subject of 1231 and then

1    also the 1967 protocols flowing from the 1950 agreements.

2         So those are the areas that I am principally interested in

3    hearing from the parties focus on.  So that's a long intro, but

4    why don't we start with the moving party, whoever wants to

5    begin the discussion, and then we'll go from there.

6         **MS. RABINOVITZ:**  Thank you, Your Honor.

7         So I'm going to start with the statute.  As you were

8    saying, this has to do with 1225(b) and how it relates to the

9    contiguous territory provision 1225 -- well, there's 1225(b)(1)

10   and then there's 1225(b)(2)(C), which is the contiguous

11   territory provision.

12        **THE COURT:**  Right.

13        **MS. RABINOVITZ:**  So the basic thing when we look at

14   the contiguous territory provision is that it says that it

15   doesn't apply -- it only applies to people described in

16   paragraph (A) of 1225(b)(2), and (A) makes an exception for

17   people that are exempt under (A) or (B), and this is where we

18   come to the critical language because (B) says that those

19   people that are not subject to 1225(b)(2)(A) and, therefore,

20   not subject to the contiguous territory provision are aliens

21   who are subject -- let me just find this provision.

22                        (Pause in proceedings.)

23        **MS. RABINOVITZ:**  Exception, an alien to whom paragraph

24   (i) applies, which means 1225(b)(2)(i).

25        So really the issue --

1          **THE COURT:**  You say it doesn't matter whether or not

2     it's actually been applied.

3          **MS. RABINOVITZ:**  Right.

4          **THE COURT:**  It's anyone who theoretically could be

5     subject to be expedited removal.

6          **MS. RABINOVITZ:**  Yeah.  We're basically saying that

7     the statute -- to whom the statute applies.

8          **THE COURT:**  Let me ask you.  Under your

9     interpretation, who would be subject to (C)?  Who would be

10    subject to the contiguous removal provision?

11         **MS. RABINOVITZ:**  Anybody who is not -- who is an

12    applicant for admission who doesn't fall under the expedited

13    removal provision.

14         **THE COURT:**  I understand.  Well, who are they?  Who

15    are they?

16         **MS. RABINOVITZ:**  Okay.  So those are people who

17    arrive -- maybe I should start by saying the expedited removal

18    provision is a narrower provision that applies to applicants

19    for admission who are arriving in the United States --

20         **THE COURT:**  Right.

21         **MS. RABINOVITZ:**  -- and who lack documents or have

22    fraudulent documents.

23         **THE COURT:**  Right.

24         **MS. RABINOVITZ:**  There are many other reasons why

25    somebody could be an applicant for admission who's

1    inadmissible.  They could be an individual who is inadmissible

2    for public charge grounds.  They could be a person who's

3    inadmissible for criminal grounds.  There's, like, 20, 30

4    different --

5              THE COURT:  So it's only people -- because the focus

6    is on at the time that you are arriving, if you will, so it

7    wouldn't -- it doesn't involve people, for example, who

8    overstay a visa.

9              MS. RABINOVITZ:  Actually, when you look at the

10   Section 1225(b)(2)(i) or 1225(b)(2), 1225(b)(2) does apply more

11   broadly to even people who have overstayed their visas and

12   are -- well, actually, not.  Overstayed their visas, they've

13   been admitted --

14             THE COURT:  That's my question.

15             MS. RABINOVITZ:  -- but it does apply to people who

16   enter without inspection and have been here for years.  Those

17   are not the arriving aliens, though, and they're not subject to

18   contiguous territory return.

19        So contiguous territory return is a subset of those who

20   are under 1225(b)(2).  It's going to be those who are arriving

21   and who are subject, but they're different than 1225(b)(1)

22   because they're charged with inadmissibility on different

23   grounds than those who are subject to expedited removal.

24        And that's where I want to just cite the language from

25   *Jennings* where it says 1225(b)(1) and 1225(b)(2) authorize the

1   detention of certain aliens.  Aliens covered by 1225 -- 1220 --

2   let me just look at the section.  Section 1225 -- it says this,

3   sorry (reading):

4           "Applicants for admission fall into one of two

5       categories:  Those covered by 1225(b)(1) and those covered

6       by 1225(b)(2).  Section 1225(b)(1) applies to aliens

7       initially determined to be inadmissible due to fraud,

8       misrepresentation, or lack of valid documentation.

9       Section 1225(b)(2) is broader.  It applies to all

10      applicants not covered by 1225(b)(1)."

11      And that's why I'm saying it's a broader group of people.

12  It could be someone, for example, who has a document, somebody

13  who has a green card but there's a question about whether

14  they've abandoned their residence, whether they have a

15  conviction that renders them now inadmissible.  It could be

16  people who have commuter cards that are somehow or other being,

17  you know, questioned, but they're not people without documents

18  or fraudulent.

19      And you could even have somebody who is -- you know, if

20  DHS decides to charge somebody with any ground of

21  inadmissibility other than the two that make you subject to

22  1225(b)(2), then they're put into the other category.

23          THE COURT:  Well, you know, I'm sure you know why I'm

24  asking the question.  It's to try to understand.  If I embraced

25  your interpretation, would it result in the reality that really

1 nobody is subject to (C)?  And you're saying that's not true.

2        MS. RABINOVITZ:  No, that's not the case.

3        THE COURT:  Okay.  Let me shift the question a bit.

4        As I understand your argument, you don't have any --

5 you're not disputing the right of DHS to exercise the

6 discretion to shift people into two and to have a full-fledged

7 1229(a) removal proceeding?  You're not disputing that they can

8 do that?

9        MS. RABINOVITZ:  Well, let me clarify, Your Honor.

10 We're not disputing that somebody who's in 1225(b)(1), they

11 could decide to put them into regular removal proceedings.

12        THE COURT:  Right.

13        MS. RABINOVITZ:  We don't think that puts them into

14 1225(b)(2) as long as there's someone who's --

15        THE COURT:  No, I understand that --

16        MS. RABINOVITZ:  Okay.  But they can be put there.

17        THE COURT:  -- but they can do it.

18        MS. RABINOVITZ:  Right.

19        THE COURT:  I mean, you're not saying, oh, you don't

20 have a right, if you're someone who (b)(1) could apply to, you,

21 the government, have no discretion to move that person into a

22 removal -- a normal, if you will, removal proceeding.  You say

23 they can do that.

24        MS. RABINOVITZ:  That's correct, Your Honor.

25        THE COURT:  Right.  You say if they do that, those

1   people carry with them the label, if you will, that they're

2   always (b)(1) people.

3          **MS. RABINOVITZ:**  And they not only carry the label,

4   they are (b)(1) people because all that's happening is under

5   (b)(1), the government can put people into regular removal

6   proceedings.  It's just created a screening that they have to

7   go through a credible fear screening first.

8       Essentially what the government can do is say, "We're

9   going to waive the screening and just put you into regular

10  removal proceedings."  You're still someone who's described in

11  1225(b)(1).

12      And essentially our argument is really a textual argument.

13  Congress when it created the contiguous territory provision and

14  did 1225(b)(2), it said there is an exception, and the

15  exception are individuals who fall under paragraph (1) so -- or

16  to whom paragraph (1) applies.

17         **THE COURT:**  What would be the legislative intent

18  behind -- and maybe the premise is something you won't

19  necessarily agree with.  It's a benefit in a sense, certainly

20  from your perspective, not to be subject to the (C) provision.

21  Why would the (b)(1) individuals, those who could potentially

22  be subject to expedited removal, why would they be the

23  benefiting group that they are excluded from eligibility for

24  (C)?  Why would Congress want to do that?

25         **MS. RABINOVITZ:**  Well, I can't really, you know,

1    answer that question except to say there's already a screening

2    in (b)(1).  You know, so in some ways (b)(1) has a screening

3    that 12(b)(2) [sic] has instead a contiguous territory return

4    provision, which we also think should be subject to some kind

5    of screening.  So it's not like you're saying -- if they want

6    to do a screening, they can do a screening under credible fear;

7    if they don't, then they can put them in regular removal

8    proceedings.

9        But I think the critical issue is that when Congress wrote

10   this statute, what does it mean to say it doesn't apply to

11   people to whom 1221 -- or it exempts people to whom 1221 --

12   1225(b)(1) applies?  You know, that has to mean something.  The

13   government says it means to whom they have applied it, but

14   that's not what it says.  It says --

15       **THE COURT:**  But isn't the government effectively

16   saying, "Well, if we exercise our discretion, which we have, to

17   put people into regular removal proceedings, that's potentially

18   going to take longer than expedited removal.  For those people

19   we think, while that's going on because it's going to take

20   longer, they have to go back to the contiguous country from

21   which they came through and so there's a perfectly logical

22   reason why we say those individuals under the statutory scheme

23   should be subject to contiguous return, but the expedited

24   removal people because we're going to expedite the removal

25   process, they don't -- we won't be necessarily -- we won't be

1  removing them under the contiguous removal statute because

2  they're exempted"?  Why doesn't that make sense?

3         **MS. RABINOVITZ:**  It could in one way make sense, but

4  it's not -- first of all, it's not what Congress said, and

5  they've said that you're still under 1225 -- well, that they're

6  two separate provisions.  If you look at it, 1225(b)(1) says

7  "inspection of certain aliens" and 1225(b)(2) says "inspection

8  of other aliens."  They're two different categories.

9      The mere fact that they decide not to exercise their --

10 not to put somebody into expedited removal and to waive the

11 credible fear interview and just to put them into regular

12 removal proceedings doesn't move them from one bucket to the

13 other.

14     And one example would be, for example, if you're -- if you

15 could be subject to criminal charge for shoplifting and the

16 government decides to instead, "Oh, we're not going to

17 prosecute you for this," that doesn't mean that the shoplifting

18 statute doesn't apply to you.  The shoplifting statute still

19 applies to you.  It's just they've decided not to exercise

20 their -- not to prosecute you under it.

21     So in terms of why Congress might have thought this, you

22 know, they were -- I mean, the fact that Congress created --

23 you know, they decided to create this expedited system for

24 people who came without documents, but they also recognized

25 that many of those people who come without documents are asylum

1    seekers because that's just the reality.  Asylum seekers don't

2    have documents.  That's why they come -- and that's why they

3    come by land.  If they had documents, they could fly here, they

4    could get tourist visas, whatever.  So many of these people are

5    asylum seekers and, therefore, Congress was clear it set up a

6    threshold screening, a credible fear screening, which is a low

7    screening, to make sure that people would not -- who actually

8    do face persecution would not be erroneously returned.

9         So there is a concern for this group of people, and I

10   think that it doesn't quite make sense that they would have

11   that concern and then would say, "Oh, but you can be returned

12   to contiguous territory pursuant to a provision that the

13   government says has no constraints at all."  Now, obviously we

14   disagree with them on that as well, but --

15             **THE COURT:**  We'll get to those issues.

16             **MS. RABINOVITZ:**  -- it just -- so I think that it is

17   consistent with the fact that Congress said "These are people

18   who are particularly vulnerable.  We've recognized this by

19   making sure there's a credible fear screening."  If the

20   government wants to get rid of the credible fear screening and

21   just put them into regular removal proceedings, fine, but it

22   shouldn't be able to use that as a way to circumvent the

23   protection.

24        Essentially the way that the government interprets this --

25             **THE COURT:**  But, again, that goes back to this initial

1    question.  If they have a -- if it's within their discretion to

2    move people into the regular removal process, to support your

3    argument, there would have to be some indication, some record

4    that it's being disingenuously employed; and I know you may

5    think it is, but where's -- I don't have that in the record.

6         So your argument right now is the statute --

7              **MS. RABINOVITZ:**  Right.

8         **THE COURT:**  -- if I read the statute, but I don't know

9    how you get beyond once you've answered the question that says

10   that they have discretion to move people into the removal

11   process.  This idea that they for all time have the mark of

12   (b)(1) even when they're in regular removal is a tall order,

13   and I don't know where that is, you know, in the statute.

14        I mean, I understand you could perhaps develop some

15   argument at some point that says it's being implemented in an

16   entirely disingenuous fashion to end-run, just as you suggest;

17   but as far as I know, that's not the record that I have in

18   front of me.

19             **MS. RABINOVITZ:**  Right, but I think that -- I mean,

20   even if you look at the language in *Jennings* and the way that

21   it construed the provision, it said people who were in

22   1225(b)(1) who then were given credible fears, were put into

23   regular removal proceedings, they were still in 1225(b)(1).

24   The fact that they were in --

25             **THE COURT:**  Well, they still could have been in

1    1225(b)(1) but they're not anymore if they're in regular

2    removal.

3          **MS. RABINOVITZ:**  No.  Actually *Jennings* says that they

4    still are because we had argued that, no, they moved into a

5    different provision and they were governed by a different

6    statute; and the Supreme Court said, "No.  They're still

7    governed by that statute while their asylum applications are

8    being considered.  So they're still under 1225(b)(1)."

9          **THE COURT:**  Well, that's while their asylum

10   application is being considered.  In this instance, though,

11   it's sort of an alternative avenue; and once you go into

12   (b)(2), I'll go back and look, but you think *Jennings* says you

13   carry with you this (b)(1) concept?

14         **MS. RABINOVITZ:**  It basically says you don't get out

15   of (b)(1).

16         **THE COURT:**  Okay.

17         **MS. RABINOVITZ:**  You don't get out of (b)(1).

18         **THE COURT:**  I'll look into that.

19         **MS. RABINOVITZ:**  Those people who pass credible fear

20   don't get out of (b)(1).  They're still under (b)(1).  So --

21         **THE COURT:**  Let me shift the discussion a little and

22   go back to some basics here to make sure I understand what you

23   are basing your argument upon.

24        You have six claims for relief in your complaint, and

25   you're moving only on the APA claims on preliminary injunction,

1  as I understand it, the fifth claim for relief, which is just

2  the straight *refoulement* -- *non-refoulement* violation of

3  international law.  That, you're not moving on.

4           **MS. RABINOVITZ:**  Right.

5           **THE COURT:**  So it's the five APA claims.  But they're

6  different, the five APA claims.  We've been talking about --

7  and this is where perhaps my first question should go -- what

8  we've just had a discussion about is really your, I think --

9           **MS. RABINOVITZ:**  The first claim.

10          **THE COURT:**  -- your first claim for relief.

11          **MS. RABINOVITZ:**  And only a portion of it because we

12  made a broader claim for why the statute didn't apply.

13          **THE COURT:**  Okay.  And then you have, which we'll talk

14  about in a moment, you have the notice-and-comment issue; you

15  have an issue regarding *non-refoulement* under the APA, which

16  goes to effectively the procedures for determining whether or

17  not there is a fear of persecution/torture if returned to

18  Mexico; right?

19          **MS. RABINOVITZ:**  Right.

20          **THE COURT:**  And then you have a sixth claim, which is

21  sort of the whole process effectively deprives someone of their

22  right to apply for asylum.

23          **MS. RABINOVITZ:**  Yeah.  That is not part -- that's

24  not -- we're not moving on that.

25          **THE COURT:**  Okay.  That's why I wanted to make sure I

 1  understand the ground rules of what you're arguing.

 2          **MS. RABINOVITZ:**  Yeah.  What we're moving on is the

 3  statutory argument that we were just discussing.

 4          **THE COURT:**  Yes.

 5          **MS. RABINOVITZ:**  The second argument I would say is

 6  sort of a combination of an argument that the new procedure --

 7  the new process that they've put in place to determine if

 8  somebody has a fear and is eligible, that that violates the

 9  withholding statute and is also arbitrary and capricious.

10          **THE COURT:**  Right.  And that argument, again just to

11  confirm my understanding, that argument is not dependent on the

12  statutory interpretation issue we've just discussed.

13          **MS. RABINOVITZ:**  Right.  Right.

14      And then our third argument is a notice-and-comment

15  argument, that they came up with this new process without

16  notice and comment and then it's a legislative rule and, you

17  know, also it changed from prior rules.

18          **THE COURT:**  Yes.  So let's --

19          **MS. RABINOVITZ:**  And the last is just arbitrary and

20  capricious in general, that the MPP is arbitrary and capricious

21  because, you know, for a variety of reasons it doesn't really

22  serve the purposes that they said.  They didn't actually -- the

23  evidence doesn't support it.  They've distorted the evidence or

24  misunderstood the evidence.  They haven't looked into certain

25  things that they should have looked into in terms of was this

1  really going to deter anybody and how is this going to affect

2  *bone fide* asylum seekers.  So that's the fourth.

3       **THE COURT:**  And those are all questions where I am

4  going to be -- everyone agrees I'm looking at the

5  administrative record.

6       **MS. RABINOVITZ:**  Right, although I think what we

7  thought -- what we argued was that, yes, you're looking at the

8  administrative record but there's certain exceptions that we

9  think that -- look, we think you can decide for us by just

10  looking at the administrative record, but there's certain

11  things that we put in that we think fall within exceptions that

12  you can look at just for that purpose; and if you want me to

13  address that, I can now or I'll address it later.

14       **THE COURT:**  No.  As you know, because you cited it, I

15  just went through a variant on this theme with the census case.

16       **MS. RABINOVITZ:**  Right.

17       **THE COURT:**  Let me go back to basics and then I want

18  you to touch on a couple of the ones we've just addressed that

19  you haven't spoken of in any detail yet, and that is the

20  standard that I apply here.

21       We all know that in the Ninth Circuit we have the standard

22  which contemplates a bit of a sliding scale on irreparable harm

23  and substantial issues as opposed to the language of likelihood

24  of success on the merits; but in trying to apply that to this

25  case, that is a workable standard when you're -- the

1    substantial issues idea on the merits side is something that's

2    easy to grasp when you're talking about, well, the factual

3    record is likely to be developed as you go forward; but on what

4    we have now, even if there is a demonstration of substantial

5    likelihood of success on the merits, that's evident if there is

6    a strong showing of irreparable injury and there are

7    substantial questions that are raised, it's enough for

8    temporary injunctive relief and we go to the next step.

9         This case is more -- the questions that are presented for

10   decision on what we've all just talked about don't seem to be

11   really subject to further development particularly, and so I'm

12   wondering how you see the Ninth Circuit test being applied

13   here.

14        I mean, is there really for this case a difference between

15   looking to you as the plaintiffs to show likelihood of success

16   on the merits as opposed to substantial likelihood?  Let's

17   assume you've made a compelling showing of irreparable harm.

18   How would kind of the reduced merits showing apply here?

19   "Reduced" is maybe the wrong word, but you know what I'm

20   getting at.

21        **MS. RABINOVITZ:**  Yes.  I would agree with you that for

22   our statutory claim --

23        **THE COURT:**  Yeah.

24        **MS. RABINOVITZ:**  -- I don't see that there's any

25   further development.

1          **THE COURT:**  Okay.  Well, I agree with you, yeah.

2          **MS. RABINOVITZ:**  Okay.  I don't think that's the case

3     with respect to our arbitrary and capricious claim or even

4     necessarily with respect to our notice-and-comment claim.   I

5     mean, we're -- you know, there's a whole issue of whether the

6     administrative record is complete or whether there's other

7     stuff -- other material that should have been there that

8     explains, you know, they were contemplating, you know, rule

9     making.  You know, four times they said they were contemplating

10    rule making and then they withdrew it.  That isn't even in the

11    administrative record so we think that there may be more --

12         **THE COURT:**  I see.

13         **MS. RABINOVITZ:**  -- more documentation around that

14    that would -- when we complete the administrative record, that

15    would allow us -- I mean, we think that we -- you know, we have

16    a likelihood of success on the notice-and-comment claim as it

17    is now, but that's something that further development could

18    change it.

19         And same thing with the arbitrary and capricious general

20    argument because it does have to do with, you know,

21    completing -- determining whether the administrative record is

22    complete or whether there are other things that they should

23    have looked at that they didn't, and that's going to -- that's

24    not the moment that we're at right now.

25         **THE COURT:**  Okay.

 1          **MS. RABINOVITZ:**  And I think that might -- you know,

 2   might even be true -- I guess that that would even be true with

 3   our arbitrary and capricious claim, the part of it that has to

 4   do with the actual fear procedure, the *refoulement* procedure.

 5   So to the extent that -- you know, one of our arguments for the

 6   arbitrary and capricious claim is they don't even acknowledge a

 7   departure from other procedures that they've used in the past.

 8   They don't explain why they're not doing it.  Maybe -- you

 9   know, is there stuff in -- material in the -- you know, that we

10   could get that should have been in the administrative record

11   about this?  I don't know.

12          But with respect to the statutory claim, there's nothing

13   else that we're going to do that I -- you know, to develop it.

14          **THE COURT:**  Let's go back through the arguments you

15   haven't had a full opportunity to talk about, and that is what

16   you've just alluded to, the *non-refoulement* procedures, if you

17   will, and then also the notice-and-comment argument and the

18   other argument.  So let's start with the arguments about the

19   process.

20          If I understand, and let me just make sure I understand

21   the process, an asylum officer or an immigration officer has a

22   discussion with the migrant and the migrant, first of all, has

23   to volunteer that there's some fear, and then there's an

24   interview; and then there's a decision and if the decision is

25   that, well, they're not convinced, then that's the end of the

1    process because there's no appeal.

2         So is that -- that's your understanding of how it works?

3              **MS. RABINOVITZ:**  Right.

4              **THE COURT:**  Okay.  So tell me why that violates the

5    APA.

6              **MS. RABINOVITZ:**  Okay.  So, first of all, I want to

7    say that we have two arguments, one that it violates the

8    withholding statute and one that it's arbitrary and capricious.

9         The government takes the --

10             **THE COURT:**  The withholding statute is 1231.

11             **MS. RABINOVITZ:**  1231, exactly, 1231(b)(3).

12             **THE COURT:**  All right.

13             **MS. RABINOVITZ:**  The government takes the position

14   that the withholding statute has absolutely no application to

15   the contiguous territory provision because they're two

16   provisions.  The contiguous territory provision says nothing;

17   but bottom line, they concede, as they have to, that the

18   contiguous territory provision only applies to people who are

19   in 240 removal proceedings, and the right to apply for

20   withholding of removal attaches to anybody who is in --

21             **THE COURT:**  Is this the argument that keys off of

22   "return" as opposed to "remove"?

23             **MS. RABINOVITZ:**  Yeah.

24             **THE COURT:**  Okay.

25             **MS. RABINOVITZ:**  So the fact that this is a return

 1   versus a removal, I mean, it keys off of that but on some level

 2   it's irrelevant.  I mean, I could go off on return, remove, I

 3   mean, the bottom line is, you know, if you're returned to a

 4   country where you're going to face persecution or torture, it

 5   doesn't matter that you were returned versus removed.  You're

 6   going to face persecution or torture so there's no real

 7   practical difference.

 8        But even from a legal point of view, we're talking about

 9   somebody who has a right to apply for this form of relief; and

10   at a very minimum, the contiguous territory provision has to be

11   interpreted in a way that doesn't eviscerate that right.

12        **THE COURT:**  And under 1231, if you're going through a

13   removal proceeding, there is a procedural mechanism for this.

14        **MS. RABINOVITZ:**  Right.

15        **THE COURT:**  Is that the mechanism you think that

16   should be applied in this instance?

17        **MS. RABINOVITZ:**  Well, that's a question, Your Honor.

18   I don't think we have to deal with it now because the procedure

19   is so completely off the charts of what they're doing.  I mean,

20   if you were in regular removal proceedings, you'd have a

21   hearing, a full-blown hearing, before an immigration judge.

22   You'd be able to consult with counsel.  You'd be able to

23   develop evidence.  You'd be able to cross-examine witnesses.

24   Then if you lose, you'd be able to go to the Board of

25   Immigration Appeals.

1    All of this would happen and you'd be in the United States

2    and it wouldn't be -- it would extend over a period of months

3    if not longer.  And then you would have to show -- ultimately

4    you'd have to meet this burden of showing it's more likely than

5    not that you would face persecution or torture.

6    What they have done, though, is to say "We're going to

7    require you to meet that same standard, you know, not in a

8    hearing before an immigration judge, not with an opportunity to

9    consult with counsel, not to obtain any evidence, not even with

10   notice that you're going to have to do this," and that somehow

11   or other that comports.  I mean, they're just completely --

12   they're completely -- it's so extreme it's hard to imagine it

13   because they're imposing that same standard but with procedures

14   that are so deficient.

15   And one way to look at this is that there are other

16   procedures they've implemented in streamlined removal

17   proceedings -- whether it's expedited removal or reinstatement

18   of removal or, you know, administrative removal -- where you

19   don't get the full-blown withholding hearing but you get a

20   threshold screening.  And what's so important is that threshold

21   screening does not require that you meet the full-blown

22   standard; it's that you show, you know, a significant

23   possibility that you'd be able to establish asylum or

24   withholding or a reasonable possibility.  And not only is the

25   standard different, the procedures are better.  You're allowed

1    to consult with counsel.  If you have -- you have the interview

2    with the asylum officer, but then you can get review of that

3    decision by an immigration judge.

4         You know, so none of that is here, and so this is just so

5    patently off the charts that it just -- it can't comply with

6    the withholding statute, it can't -- it's arbitrary and

7    capricious because they haven't even acknowledged any of this.

8    It just doesn't serve its purpose.

9         I mean, if they say -- you know, if they say -- they

10   won't -- they won't -- they disagree that they actually have to

11   do anything.  They say the statute doesn't require anything,

12   which again is -- we disagree with, but then they say "We're

13   going to implement it consistent with our *non-refoulement*

14   obligation."  How this is consistent, it's not going -- I mean,

15   it's consistent if it actually prevents people from being

16   removed who could, you know, face torture or persecution.

17        But to give them an on-the-spot interview where they have

18   to prove the ultimate, you know, standard, virtually nobody can

19   pass this.  And, you know, I mean I suppose that might be the

20   only other thing that further development of the record would

21   be interesting to know, has anyone passed it.

22        You know, I mean we already know they're not giving it to

23   that many people out of the number of people that they subject

24   to the return.  It seems like it's a small fraction that they

25   even give the interview to.  Because that's a whole other

1    issue, notice, whether you even are told.  I mean, in the

2    credible fear context, they have to ask you if you have a fear

3    and tell you that you can express it.  Here, people don't even

4    know that.

5         **THE COURT:**  If a decision were to be rendered in your

6    favor on this question and perhaps not on the others, what

7    would the remedy be?  It would be a remand to the agency,

8    wouldn't it?  Because they could address these concerns.

9         **MS. RABINOVITZ:**  Yeah.  I mean, it would be enjoining

10   the policy until they come up with something that's --

11        **THE COURT:**  Right.

12        **MS. RABINOVITZ:**  -- that is legal.

13        **THE COURT:**  Well, and just as a mechanical exercise,

14   is it a remand at that point?  Is it an imposition of the

15   attempt of a preliminary injunction with a remand to the

16   agency, or is it just "You're enjoined and come back to us

17   someday if you come up with some new procedures"?  Or how does

18   it work?  Because the injunction is on the statutory

19   interpretation question.  There isn't any repairing to be done

20   that's available.

21        **MS. RABINOVITZ:**  Well, I suppose they could just --

22   they could change MPP and say "We're not going to apply it to

23   people who are -- to whom 235(b)(1) applies.  We're going to

24   apply it to other people" because it still does apply to other

25   people.

1          But I don't really have an answer, Your Honor.  I could

2     imagine you could go both ways.  The main concern is that it be

3     enjoined, that they stop using an illegal process.  And, yes,

4     they may be able to cure it by coming up with a process that

5     is -- that does comply with the withholding statute or does

6     comply with the *non-refoulement* obligation, but this isn't it.

7          **THE COURT:**  Okay.  So now let's go back to the

8     notice-and-comment issue and then also just -- well, you've

9     kind of covered the arbitrary and capricious argument, but

10    let's talk a little about notice and comment and whether or not

11    this is a legislative rule.

12         So your argument is grounded on the notion that the MPP

13    is -- the MPP in totality is a legislative rule?

14         **MS. RABINOVITZ:**  No.  We're not saying the MPP is a

15    legislative rule.

16         **THE COURT:**  Okay.  Tell me what you're --

17         **MS. RABINOVITZ:**  MPP is discretionary.  What is a

18    legislative rule is this process that they've developed, this

19    special -- I don't even know if I can call it a process, but

20    this -- the standard that they've set for determining whether

21    somebody is eligible or ineligible for MPP.

22         **THE COURT:**  And is that the Secretary's January 25th

23    policy guidance for implementation of the MPP?

24         **MS. RABINOVITZ:**  Right.  Right.

25         **THE COURT:**  And then there's another policy document

1    that I have here somewhere.  And then there's the January 28th,

2    2019, guidance for implementing Section 235(b)(2)(C).  Are

3    those the documents you say together constitute something

4    that --

5            MS. RABINOVITZ:  I think so, Your Honor, but if I want

6    to be 100 percent sure, I should look at them.

7            THE COURT:  All right.

8                    (Pause in proceedings.)

9            MS. RABINOVITZ:  But I would assume that you're

10   picking out the right ones.

11       The U.S. Citizenship and Immigration...  Yeah, Guidance

12   for Implementing.

13           THE COURT:  Okay.

14           MS. RABINOVITZ:  Yeah, that's the one from

15   January 28th that's issued by CIS, and then -- which is the

16   other one you mentioned?

17           THE COURT:  Well, there was one that was January 28th

18   and one that was January 25th.

19           MS. RABINOVITZ:  Oh, January 25th.

20           THE COURT:  One's from Secretary Nielsen and the other

21   one is --

22           MS. RABINOVITZ:  Okay.  The January 25th one also sets

23   out -- yes, I think it sets out the procedure and then says

24   there will be further guidance.

25           THE COURT:  Yes.

1          **MS. RABINOVITZ:**  Right.

2          **THE COURT:**  And then the fact that you note, which was

3    that at various points in time there was some indication that

4    they were going the notice-and-comment route --

5          **MS. RABINOVITZ:**  Right.

6          **THE COURT:**  -- was that in conjunction with -- remind

7    me, was that the MPP?  What were specifically what they were

8    indicating they were going to do in notice and comment?

9          **MS. RABINOVITZ:**  It was about the implementation of

10   the contiguous territory return provision in a way that was

11   consistent with the statute.

12         **THE COURT:**  Okay.

13         **MS. RABINOVITZ:**  So that's all that it said.  It

14   didn't give more specifics than that.  You know, it just

15   followed from an Executive Order that had said "We're going to

16   start using the contiguous territory return provision"; and

17   then after, that every six months they would start -- that was

18   in early 2017 -- every six months they said "Okay.  We're going

19   to make rules now to implement this to make sure that it's

20   implemented consistent."

21         **THE COURT:**  Okay.

22         **MS. RABINOVITZ:**  So our position is that this fear

23   determination mechanism that they've set up is a legislative

24   rule, and it's a legislative rule because it's not something

25   discretionary that somebody can choose whether to follow or not

to follow.  It says this is what you do.  This is what the standard is.  This is who you can decide is ineligible for MPP. And so it's binding.  It's not something that somebody can choose to follow.

The government will explain what their position is, but that doesn't matter because the MPP itself is discretionary and the fact that this just says if you're eligible or not.  Well, that may be the case but this itself falls within the definition of a legislative rule.

And I think that that's why we think it's subject to notice and comment.  There's also an argument that it's an amendment of a legislative rule because it's creating a procedure that's unlike any procedure they've had before.

When CAT was -- the CAT treaty was implemented in regulations after FARA was enacted, you know, they then promulgated regulations to meet that obligation and they're regulations that are part of the withholding statute, that are part of reinstatement, whatever, that, you know, create a reasonable fear procedure in certain contexts.

But here, this is a new procedure.  They're saying -- now, they're saying, "Well, we're not really implementing it.  We're not -- we're just doing it because we want to."  But it's a new mechanism that's completely unlike any other mechanism they've had before, and that would be another thing that would -- I mean, that -- they went through rule making before for that.

 1    That's one argument.

 2        There's also the argument that with respect to the

 3    contiguous territory return provision itself, there is a reg

 4    that they have in place, which doesn't say anything about a

 5    fear determination mechanism; and if they're amending it now to

 6    create a fear determination mechanism, they need to go through

 7    rule making.  So that's what our argument is there.

 8        **THE COURT:**  The final set of questions before I'll

 9    give the government a chance, then obviously give you a chance

10    to get back again and respond to what they have to say.

11        On this issue of national scope of injunction, the law is

12    evolving in each of the circuits on that question, what is --

13    you know, one, the government would say "Don't issue any

14    injunctive relief; but if you issue injunctive relief, limit it

15    to the 11 individuals that we're talking about and the

16    organizations we're talking about here and don't go beyond

17    that.  And in different parts of the country, if this is

18    implemented, they go to their courts and they get an injunction

19    if it's appropriate."

20        What is it about this that would warrant the national --

21    why is the record sufficient for a sole little District Court

22    in one district out of the 94 to issue a national injunction?

23        **MS. RABINOVITZ:**  Well, I think that the standard is

24    whether you need to be able to issue relief that is meaningful

25    for the plaintiffs.  Now, it may be that for the individual

plaintiffs you could just give them relief, but we've got

organizational plaintiffs here whose missions are being

affected, you know, have a lot at stake because of this new

policy.

And I don't know how you would craft a limited injunction

that would protect them.  You can't craft it, you know, in

terms of just their current plaintiffs because it's forward

looking.  They're looking at their future.  Are they going to

be able to survive or are all their clients going to be stuck

in Mexico and they're going to have to move to Mexico, which

unfortunately isn't really possible for most of them?

And geographically you can't limit it because their

clients come -- they're all different places along the border,

not just --

**THE COURT:**  And I assume that I can assume just

uniform application of -- whatever procedures are being

utilized here, it's uniformly applied.

**MS. RABINOVITZ:**  Yeah.  I mean, to be fair, they just

started -- they started it in San Ysidro.  Now they're

expanding it, and I understand they're expanding it today to

El Paso.  I'm not sure exactly.

**THE COURT:**  Eagle Pass or whatever.

**MS. RABINOVITZ:**  We keep on hearing different things,

that it has been expanded or will be expanded, but it is being

expanded.  We do know that it has been expanded to certain

1  places.  And they've made it clear that their goal is to really

2  use this on a very, very large unprecedented level, which is

3  why we feel a preliminary injunction obviously is so necessary

4  because, you know, we think that it needs to be stopped in its

5  tracks before it, you know, gets even greater.

6       **THE COURT:**  Is this issue before any other court?

7  Many of these cases, as you know, you know, there will be

8  cases -- at least overlapping cases in several different

9  districts.  Are there any similar ones?

10       **MS. RABINOVITZ:**  No.  There are no other cases.

11       **THE COURT:**  Okay.

12       **MS. RABINOVITZ:**  I know that you weren't asking me to

13  address this, but I do just want to do it for a minute.  In

14  terms of the arbitrary and capricious argument, I did address

15  it to some extent in terms of the fear determination mechanism,

16  but there's a broader -- we do have a broader arbitrary and

17  capricious argument about the whole MPP or forced return

18  policy, and that is just the one that looks at the same kinds

19  of things that you would look at in any case to determine

20  whether something is arbitrary and capricious.

21      You know, what are the Government's reasons?  Is there

22  support for the Government's reason?  Is it based on -- you

23  know, is it based on reliance on facts that really are there in

24  the record?  Have they failed to look at certain things?  Does

25  it really serve the policy -- the purposes they say?  And we

1  think on all of those things, even without considering the

2  extra-record evidence, they can't -- you know, it's arbitrary

3  and capricious.

4       And just to give an example, you know, there is a lot of

5  evidence out there that people migrate to the United States not

6  because of what the U.S. laws are, and this has come up in case

7  after case against the government.  So it's not something new

8  that they -- they don't need the declaration from Cecilia

9  Menjivar that we have to know this.  I mean, her declaration

10 was part of the *RALR* case that we litigated, as was somebody

11 else's declaration, another migration expert's was there, and

12 there's been other cases where this has come up.

13      There are many, many migration studies -- studies about

14 migration that say:  You can detain people.  You can do this.

15 You can do this.  You can do this.  People make migration

16 decisions because of what they're facing in their home

17 countries, and that's why they come and they're going to keep

18 coming.

19      So for them to say one more thing, "Okay.  We tried

20 detention.  We tried criminal prosecution.  We tried separating

21 families.  We tried the asylum ban.  Well, now, we're going to

22 try this, we're just going to keep them out and that will stop

23 them from coming," well, they at least have an obligation as

24 part of -- you know, they're making this policy to look and

25 consider is it going to have that effect or are they just

1    imposing misery on people for no effect.

2         THE COURT:  Well, what do you understand to be the

3    policy?  How is -- what's your understanding of what the

4    government articulates is the policy that's being furthered by

5    the MPP?

6         MS. RABINOVITZ:  They say that the policy is to

7    deter -- I mean, is to deter fraudulent asylum claims, to

8    prevent people from absconding.  I mean, we think, first of

9    all, that the evidence that's -- you know, that they base this

10   on about, like, nine out of ten asylum claims are denied,

11   that's patently wrong, but also the notion that all of these

12   asylum claims are fraudulent we also think is wrong.  The

13   figures that they rely on for absconsion, you know,

14   unfortunately the declaration that we have, you can't --

15        THE COURT:  When we're at that point in the process

16   of, well, we don't think they have the better argument that

17   it's going to further the policy goal of reducing absconding,

18   they've articulated that as one of the reasons that supports

19   the policy, aren't we then in the position that it's not

20   whether or not I think that's a good idea or not or I think

21   it's going to be a policy that's going to work or not, it's

22   they've articulated a policy; and as long as they --

23        MS. RABINOVITZ:  Right.

24        THE COURT:  -- have a basis for making that argument,

25   even if I think they're profoundly wrong, that's not for me to

1   say; right?

2       MS. RABINOVITZ:  Definitely, Your Honor.

3       THE COURT:  Okay.

4       MS. RABINOVITZ:  But I think that there are things,

5   like, if they don't look at certain things, if they haven't

6   looked at is this really going to have a deterrent effect, is

7   this really -- you know, then -- you know --

8       THE COURT:  I mean, for example, you're not saying

9   that it's an improper policy objective to try to reduce

10  absconding?

11      MS. RABINOVITZ:  No.

12      THE COURT:  You're not suggesting that it's, you know,

13  for --

14      MS. RABINOVITZ:  No.

15      THE COURT:  Okay.  And even the policy objective of

16  disincentivizing efforts to migrate to the United States, is

17  that an improper --

18      MS. RABINOVITZ:  No.

19      THE COURT:  It may be a policy you profoundly disagree

20  with, but it's not an improper decision on the Administration's

21  or the political branch's --

22      MS. RABINOVITZ:  I think it's not improper to say "We

23  want to disincentivize people from coming here illegally and

24  raising fraudulent claims."  I think I would take issue with

25  whether it's legitimate to say "We're going to try to deter

 1     *bone fide* asylum seekers from coming here."

 2          **THE COURT:**  Yes.  Yes.

 3          **MS. RABINOVITZ:**  And one thing that they don't look at

 4     here, the other thing in addition to the deterrence part, you

 5     know, whether this is actually going to have a deterrent

 6     effect, and I'm just saying they need to look at it.  I'm not

 7     saying that -- you know, that they -- you know, that they end

 8     up having to come to the same conclusion, but they have to look

 9     at it, you know, take it seriously.  They've adopted this

10     policy which is affecting a lot of people.  They say it's an

11     unprecedented policy.  You know, you want to see what the

12     effect is going to be.

13          And the other effect they need to see is what's going to

14     be the effect on *bone fide* asylum seekers who are returned to

15     Mexico.  They say that one of -- you know, this is where

16     there's sort of kind of a tension.  They say that one of the

17     interests in addition to deterring fraudulent claims and

18     deterring absconsion is to assist legitimate asylum seekers.

19     Well, I don't know how this policy assists legitimate asylum

20     seekers.

21          You know, and the government knows the conditions in

22     Mexico are bad.  I mean, it's not unexpected that having people

23     in Mexico have to show up for a hearing in the states is going

24     to be, you know, somewhat chaotic.  I mean, how are they going

25     to get counsel?

1      The lists of attorneys that they send to them are

2  attorneys in the United States.  You know, people can't access

3  those attorneys from Mexico.  I mean, people we spoke to said,

4  "We tried calling the list and they said come here, come to

5  California."  I mean, some of our plaintiff organizations have

6  gotten calls, you know, plaintiff organizations in

7  San Francisco, from somebody in Mexico.  Well, what are they

8  supposed to do?  They have to go to Mexico.

9      But, anyway, they haven't looked at -- even though it

10  doesn't require any extra-record evidence to do this, they

11  haven't looked at it, what -- you know, considered how is this

12  going to affect *bone fide* asylum seekers both to return them to

13  danger, you know, which they know it's a dangerous situation,

14  there's plenty of stuff in -- material in their administrative

15  record that shows that, and they didn't object to this Mexico

16  country report that -- you know, that the -- the State

17  Department report that says migrants -- you know, human rights

18  abuses against -- you know, this is one of the biggest -- one

19  of the main human rights issues in Mexico is the treatment of

20  migrants.  So they know this.  So to not look at what the

21  effect of the policy is going to be and, yet, they're thinking

22  of doing this on a major scale?  So there's that.

23      Then there's the question of, you know, in terms of even

24  if the purpose is to single out those people who have -- you

25  know, to deter fraudulent asylum claims and people who abscond,

the people who are being returned, they're not screening them
to see if they have fraudulent asylum claims.  They're not
looking at them to see whether they're people who would be
likely to abscond.  They're just sending them back, and that
starts to seem like a Judalon-type thing of, like, what kind of
criteria, you know, are they doing.

So while some of these goals might be legitimate, the
policy, you know, itself isn't.  And then there's also certain
goals that I don't think are legitimate when they've come out
and said, "You know, we need to do this because there are, you
know, misguided court decisions and outdated laws, and these
are creating these results and so we've got to do this."  Well,
I don't think that's legitimate.

THE COURT:  Yes, although I think in fairness to the
government when I went back and looked at that, I think that
they were saying that the misguided laws and the aberrant court
decisions, and the like, have created what they characterize as
the crisis, which is then addressed by -- they're not saying
that the reason for the MPP is they're trying to get around
misguided court opinions and laws or what have you.  I think
they were saying that's what's created the problem they say
they have to address through this process.

In fairness to them, I mean, I don't -- yeah.

MS. RABINOVITZ:  Well, you're fairer than I am.

(Laughter)

1          **THE COURT:**  All right.  On that note, let me hear from

2    Mr. Stewart, and then I'll have you come back up,

3    Ms. Rabinovitz, and we'll go from there.

4          **MS. RABINOVITZ:**  All right.

5          **MR. STEWART:**  Thank you, Your Honor.  I'll follow your

6    lead and focus on a number of the legal issues that Your Honor

7    highlighted in this case.

8          For the reasons stated in our briefing, the Migration

9    Protection Protocols guidance is a lawful exercise of DHS's

10   discretionary and broad authority.

11         I think Your Honor described very well the way

12   Section 1225 works here.  Somebody who falls into the

13   possibility of getting a full removal proceeding, if they also

14   meet the criteria to go into expedited removal, that means that

15   they're not necessarily -- that they're not fully -- or

16   automatically entitled to a full removal proceeding but they

17   can go either way.  The decision is one left to discretion.

18         It's conceded in paragraph 73 of the complaint and in the

19   ERM or the Immigration Appeals decision, other decisions, it's

20   well understood that this is a discretionary decision because

21   somebody who falls both under Section 1225(b)(2)(A) but also

22   under Section 1225(b)(1) can have both provisions potentially

23   apply, and it's a question of which track the Department of

24   Homeland Security --

25         **THE COURT:**  What is the policy reason why someone who

1   the government has elected to go the (b)(2) route and,

2   therefore, under your analysis is subject to the contiguous

3   removal provision, why are those migrants -- from a policy

4   perspective, what's -- what's the -- or perhaps I should say

5   from the sort of legislative intent perspective, why should

6   they be removed to Mexico or returned, in your word, as opposed

7   to those who are going through expedited removal?

8        Because we all agree if you're in (b)(1) -- I don't think

9   anybody's saying the statute provides that you're exempted out

10  of (C); right?

11           MR. STEWART:  Right.  Right.

12           THE COURT:  So we're talking about the cohort of

13  migrants who you have decided are going into (b)(2).  Why

14  should they -- just from an intent -- legislative intent

15  purpose, why are they subject to going back to Mexico while the

16  people in expedited removal aren't going back to Mexico?

17           MR. STEWART:  Sure, Your Honor.  I think you might

18  have identified this yourself earlier when you recognized that

19  the thought behind expedited removal by its name is that it

20  will be a fast process.  Somebody will be screened.  If they

21  don't have a credible fear, and if they -- that isn't changed

22  upon administrative review.

23           THE COURT:  Well, from the government's perspective,

24  the fact that the (b)(1) people aren't subject to contiguous

25  return is not sort of a benefit being bestowed on them.  It's

1  that they're going to be processed more quickly.  So just from

2  a practical standpoint, you don't need (C) anymore.

3       MR. STEWART:  That's right, Your Honor.  And I'd

4  emphasize the hope and desire of folks who go into the (b)(1)

5  process, they're trying to get into full removal proceedings.

6  So it's really a screening mechanism where if somebody --

7       THE COURT:  Although then they are subject -- I mean,

8  I'm not saying this is wrong, but if they succeed and they get

9  into (b)(2), then they may -- then they may be told "But now

10 you're going back to Mexico right now.  Even though you've come

11 from another country, you're going back to Mexico because

12 you're no longer an expedited removal anymore so now you're

13 subject to the contiguous return."

14      MR. STEWART:  Not under the guidance currently stated,

15 Your Honor.  I think the guidance lays out that if somebody

16 goes from expedited removal into full removal, if that's how

17 they go into full removal proceedings, it's not going to be --

18 the MPP is not going to be applied to them.

19      Because the issue hasn't been squarely joined, I'd prefer

20 to table how that might shake out with a plaintiff who finds

21 him or herself in that position; but the guidance does say,

22 "You know, look, if you go from expedite -- if you have -- if

23 you have Section 1225(b)(1), that process applied to it, you're

24 subjected to it and you go into full removal proceedings."

25 From there you won't be subject to the --

1          **THE COURT:**  Well, remind me.  These 11 plaintiffs,

2    individual plaintiffs, were they determined to be -- they were

3    going into full removal proceedings.

4          **MR. STEWART:**  Right.  They were --

5          **THE COURT:**  Right.  And once they were -- that

6    determination was made, then the MPP was applied to them and

7    they were returned to Mexico?

8          **MR. STEWART:**  Correct, Your Honor.  Correct.

9          So I think that's sort of, I think, the logic behind the

10   system, Your Honor, and it's one that makes sense.

11         The 1225(b)(2)(C) was enacted in response to the BIA's

12   *Sanchez Avila* decision where the BIA said, "Look, this return

13   to territory mechanism makes sense.  You could have a system

14   where people are coming into the United States.  They're

15   overloading the system.  They're straining the detention

16   resources and there are good policy reasons for returning them

17   to contiguous territory, but we're just not seeing the

18   statutory authority here."

19         Congress responded, it's responded with 1222(b)(2)(C), and

20   it was clearly in response to fill that gap and say, "Look,

21   this is what we're doing here.  People who are placed into full

22   removal proceedings can indeed be returned and stay there

23   pending their removal proceedings."

24         So I think that's kind of the statutory logic here,

25   Your Honor.  And although the plaintiffs have been quite clear,

 1  particularly on pages 2 and 3 of their transfer motion, that

 2  they see this as a facial challenge, I will say since the

 3  plaintiffs have pointed to other events, my understanding is

 4  that so far of the 11 plaintiffs who have had this applied to

 5  them, I believe all are represented by counsel.  I think 10

 6  have appeared for proceedings.  One got a continuance.  Only

 7  five of the 10 have expressed a fear so they go through the MPP

 8  effort to claim a fear process.  Five have evidently not

 9  expressed such a fear, so they have not claimed that.

10      So this process is moving along.  It's something that --

11  there will be occasional hiccups and things to work out

12  certainly, but it's going.  It's underway.  The Department of

13  Homeland Security made an effort to roll this out in a

14  deliberate way and -- sort of stepwise and, anyway, it's

15  underway and I think it's going as Congress envisioned in the

16  statutory text; and consistent with the text, with background

17  principles of prosecutorial discretion, with the plaintiffs'

18  concessions, and with Board of Immigration Appeals decisions,

19  this is a statutory -- statutorily authorized process.

20      If I can hit the various *non-refoulement* points that my

21  friends raise, Your Honor.  We've explained why the provisions

22  at issue here, Section 1231, provisions regarding CAT

23  implementation, they by their terms apply to removal.  They

24  don't apply to return.

25          **THE COURT:**  Okay.  Let's talk about that.  I'm having

1    trouble following the distinction you're drawing between

2    "return" and "removal."  I mean, certainly from the perspective

3    of the migrant, it doesn't make any difference whether or not

4    they're saying, "Oh, your label is you're being returned.

5    You're not being removed."

6         I mean, why -- there's historical back and forth on how

7    the term developed and we can or cannot go into that if you

8    think it's helpful, but just from the standpoint of why there's

9    a distinction, why should there be a distinction?

10        I mean, the same thing is happening to these people for

11   good or for bad.  They're having (C) apply and they're going

12   back to Mexico.  So I don't see why issues of your -- if you

13   have a legitimate fear of torture and issues that are

14   contemplated there, why it would make any difference whether or

15   not the designation under which you've gone to Mexico is return

16   or removal.

17        MR. STEWART:  Sure, Your Honor.  Here's the reason:

18   The MPP is not being applied to Mexican nationals.  We're

19   talking about really folks from the Northern Triangle

20   countries.

21        THE COURT:  Right.

22        MR. STEWART:  And what -- withholding of removal,

23   whether statutory or under the regulations implemented in the

24   Convention Against Torture, it's about preventing you from

25   being returned to a particular country where you've articulated

1    a fear.

2        So these are third-country nationals.  They're not Mexican

3    nationals.  And by its terms, when people go through removal

4    proceedings and they have a final removal order and they seek

5    to have the removal withheld, it's country specific, "I don't

6    want to go back to Guatemala."

7            THE COURT:  Sure.

8            MR. STEWART:  So it's a distinction that -- it's

9    really a textual distinction.  It's a sensible distinction.

10           THE COURT:  But is it sensible?  I mean, the concept

11   as it's been embraced in 1231 and other places is the concern

12   about returning a migrant -- return or remove, or what have

13   you -- to a place where they have a legitimate fear of

14   persecution, torture, et cetera.

15       And I agree with you that there are different ways in

16   which that can manifest.  You're either going back to the

17   country from which you came; or, in this instance, because of

18   the way (C) is phrased, you're going to a country that isn't

19   your original country but it's a country that perhaps have --

20   you have legitimate concerns.  Why should it make any

21   difference?  I mean, isn't what that concept is trying to get

22   at is don't send someone to a place where they can establish

23   they have a legitimate fear of persecution, torture, and the

24   like?

25       Why does it matter if it's the country from which they

 1   initially sought to leave or -- I mean, I just don't understand

 2   the policy reason why we would draw that distinction.

 3          MR. STEWART:  Sure, Your Honor.  It may be something

 4   that Congress could have decided to do differently.  Congress

 5   has been very clear, however, that there is a distinction

 6   between return and removal.

 7       And there's a logic to why return might be different in

 8   kind.

 9          THE COURT:  Well, that's what I'm trying to

10   understand.

11          MR. STEWART:  Sure, Your Honor.

12          THE COURT:  What is the logic?

13          MR. STEWART:  I think Congress could have -- there's

14   not a great -- the statute does not go on and on about this by

15   any means, and I don't believe there's a great deal of history

16   elucidating it; but Congress could have believed, "Look, our

17   relationships with our contiguous neighbors are different in

18   kind from people who are farther from us.  We have a little bit

19   more -- we have a snugger relationship, a little bit more

20   control, a little bit more, like, 'Hey, neighboring government,

21   we need to address this issue.'"

22       So Congress could have thought, "Look, we have a different

23   in kind situation where we're not going to see the dangers in

24   our contiguous neighbors or we can control them or we can find

25   ways to deal with them or we have a better sense of them, those

1  kinds of things, where they might not -- that might not be

2  readily available with farther countries where we just don't

3  have the snug, neighborly relationship.

4      **THE COURT:**  Well, wouldn't the way to address that is

5  that would manifest itself in the decisions that are made once

6  the process is applied on whether or not you say, "No, I don't

7  think that is a legitimate fear because of an understanding of

8  the situation in Mexico, which may be more refined than an

9  understanding of a situation in another country"?  So the

10  distinction or the concern you're drawing is one that would

11  then be addressed if the process is applied.

12      The concern that the plaintiffs have is, as I understand

13  it, there is no mechanism to even assess that at the moment.

14  There's no opportunity for the migrant who is potentially going

15  to be subject to the subsection (C) removal to have their

16  opportunity, as they would in a 1231 removal process, to go

17  through and determine whether or not they have a legitimate

18  fear or not.

19      **MR. STEWART:**  There is a process, Your Honor.  This is

20  pages 2273 to '74 of the administrative record.  That's part of

21  the guidance that USCIS put out on how we're going to do these

22  interviews, how we're going to find out whether somebody can be

23  returned to Mexico.

24      So I guess before I hit and squarely answer your point,

25  Your Honor, if I can hit -- as a preliminary matter, I would

1    emphasize that some may question the decision Congress made but

2    it treated return and removal as different in kind.  Plaintiffs

3    have not challenged that as somehow an illegitimate decision

4    that Congress was not entitled to make, but that's a

5    preliminary point.

6        Two, that's a significant --

7        **THE COURT:**  I think their argument would be that

8    that's just not -- they don't think that's right, that Congress

9    didn't treat it differently; that when they go through the

10   historical development of the use of these terms, that at the

11   end of the day you'll find there isn't that distinction.

12       So I think their principal argument is not that Congress

13   has made a mistake or is not entitled to treat these things

14   differently.  I think they're saying they didn't treat them

15   differently at the end of the day.

16       **MR. STEWART:**  That's correct.  They have not made that

17   further argument that I was saying, Your Honor, but what I am

18   saying is -- what I'm emphasizing is that when Congress uses

19   "return" in one way and, you know, doesn't impose the same kind

20   of penalties on people who are moved into Mexico by return

21   versus people -- or people who are returned versus removed to

22   Mexico, the Supreme Court has been very clear that those

23   important distinctions in language matter and they reflect

24   congressional decisions to do differently.

25       Secondly -- and then I will get right to your point,

1  Your Honor -- Congress' choices really matters here, because

2  whatever the customary international law obligations are, when

3  there's a statute on point, we need to look to Congress to see

4  the extent to which those are embodied and enforceable in law.

5  That's quite important here.

6      But, third -- and this is what I was about to get to in

7  response to Your Honor's question about the guidance -- is that

8  even if you don't agree with us on the return-removal

9  distinction, even if you don't agree with that piece, the MPP

10  interview and guidance here does satisfy any international

11  obligation that could apply.

12      As I've said, this is at 2273 to 2274.  In particular, it

13  talks about the hearing is nonadversarial.  They need to make

14  sure the alien understands.  Page 1 of the administrative

15  record says, "Look, somebody can raise a fear claim at any

16  point, and at that point they're going to be referred and

17  they'll be able to do this."  So it's not just, like, they go

18  in there and then they're told later they'll return to Mexico

19  and they can't say anything about that.  They can say something

20  about that and the process will go and they'll have a chance to

21  make that claim, and that's been well guarded for.

22      It's not the procedure that the -- that my friends in this

23  case want, but it is consistent with the obligation -- any

24  obligation that could apply here not to return somebody to a

25  territory where they face life or torture.

1          Now, as I emphasize, Your Honor, again, the plaintiffs in

2     this case, they're showing up at their hearings.  Only about --

3     from my understanding is only five of ten so far have actually

4     claimed a fear in Mexico.  That can be -- that can be dealt

5     with.  The officers here, the guidance says, "Look, you know,

6     consider somebody's circumstances.  You know, see, like, what

7     is somebody going to be facing in Mexico.  Can they go to one

8     region that's going to be a problem for them versus another?"

9     So there's an effort here to make sure that any obligation that

10    needs to be satisfied is satisfied.

11         If I can move to a couple other merits points, Your Honor.

12    The APA, the procedural requirements and the reasonable

13    requirements are surely satisfied in this case.  The

14    reasonableness requirements, I think Your Honor articulated

15    this and I believe even my friend articulated the theory behind

16    a lot of what's going on here.  It's that due to various

17    constraints and difficulties in enforcing the immigration laws

18    and detaining and having capacity and having resources, there's

19    been a huge strain on the asylum system.

20         And the Secretary reasonably looked at the situation and

21    said, "Look, we have this problem here where it's not a good

22    calibration of incentives.  Somebody is being told by

23    smugglers, by whoever else, that you can come across the border

24    as a family unit.  It almost certainly guarantees release.

25    Even if you don't have any realistic possibility of getting

asylum, you can still get release into the country for years
even if you don't show up at your hearings, even if you don't
apply for them."  AR 48 to 49 lays this out well including the
kind of -- the approach taken to see this problem.

        **THE COURT:**  So the justification is -- or the policy
reason for this is the absconding concern?

        **MR. STEWART:**  I'd put it a little broader.  Absconding
is a big deal, Your Honor.  I think it's -- a central reason
for this is to deter baseless asylum claims that lead to an
overtaxing of detention capacity and overtaxing of the
immigration asylum system.

        We have I'm going to say 800,000 -- but I believe it's
more by now, Your Honor -- 800,000-case backlog in our
administrative immigration courts.  And the Secretary said,
"Look, this is not tenable especially when we look at the
numbers of folks from Northern Triangle countries when it looks
like ultimately when they begin credible fear proceedings, only
about 17 percent in FY 2018 even got asylum, more than half
didn't show up or didn't even apply for asylum.  They absconded
into the interior.  We don't have the resources" --

        **THE COURT:**  Is this all in the administrative record?
All the justifications that you've just gone over, they're all
contained in there?

        **MR. STEWART:**  They are, Your Honor, and I believe at
pages 48 to 49 --

1          **THE COURT:**  Okay.

2          **MR. STEWART:**  -- I think almost all of that is.

3    That's an asylum interim final rule that lays out kind of all

4    these issues, but that's a good -- we cite --

5          **THE COURT:**  Is that where I look for effectively your

6    answer to their argument that there is -- this kind of merges

7    into their arbitrary and capricious argument -- that there is

8    just an insufficient basis for, even accepting the

9    justification that you've articulated, that there just -- the

10   record is not sufficient to show that the department looked

11   into -- has a basis of support that would go to those

12   justifications?

13         **MR. STEWART:**  Right, Your Honor.  I'd fault -- let me

14   identify two faults in what I think -- I'd attribute to

15   their -- just -- I could give others, but I'd say one of the

16   faults is that -- I mean, aside from using a different

17   methodology, I mean, take their number of, you know, only -- or

18   87.5 percent of people show up for their immigration

19   proceedings.  The absconsion rate is not as high as the

20   government states.  Even taking that as true, that's one out of

21   eight people who isn't showing up.

22        When you have 2,000 people arriving daily at the border,

23   that's a lot of folks, Your Honor, and that's, you know, cases

24   piling up in the system, resources are being put to them,

25   people are lost in the interior.  But we've explained that the

 1  numbers are actually a lot worse than that.

 2      Second, Your Honor, a lot of plaintiffs' arguments focus

 3  on this idea, like, look, this won't deter lawful migration --

 4  or this won't deter migration from the Northern Triangle

 5  because people are really afraid of the conditions there.  It's

 6  very bad.

 7      And our response is what we're really focusing on here,

 8  what the big focus is not these folks who have really strong

 9  claims, it's people who don't have strong claims come here

10  anyway, are able to gain release into the United States and

11  then don't apply, abscond, all those things.

12      So it's this ultimately baseless asylum claim problem and,

13  again, people -- it's not just people show up, they lose, oh,

14  now we go -- now we have to leave.  It's not even applying, not

15  even showing up, winning in very few cases.  So I'd say those

16  are the key kind of this is what the agency was relying on.

17      On the procedural requirements, Your Honor, the point I'd

18  emphasize here is that the guidance at each step emphasizes

19  it's imbued with discretion.  Even if somebody could be

20  returned to Mexico, they may not be.  The officer at issue

21  could say, like, "Oh, you know, I don't think this is an

22  appropriate case."

23      True, there are mandatory things that need to be done, but

24  that's true in general statements of policy quite often.  I

25  mean, this was the *Regents* case in the deferred action for

childhood arrivals.  The Ninth Circuit said, "Look, the DACA
program has elements that are mandatory.  You know, we're not
going to take applications after a certain time or renewals
after a certain time."  There were also other deferred action
requirements about chronology, presence, lack of criminal
history, just kind of hard bars.

The presence of hard bars doesn't take this out of the
general statement of policy.  This is a case -- this is a
situation that involves prospective applications or guidance
regarding the exercise of discretion.

So this is a general statement of policy.  It's immaterial
that the agency had announced at one time, "Hey, we may do a
rule making on this."  Ultimately what it decided to do -- and
not dissimilar from when Congress thinks about enacting a law,
it doesn't enact a law and the absence of the law doesn't
necessarily mean that the authority on the issue didn't exist.
For example, said, "Look, instead of doing a rule making, we're
going to give guidance on the exercise of discretion on this
1225(b)(2)(C) authority that Congress gave us more than 20
years ago, it's imbued with discretion, that we've done on a
case-by-case scale here and there; but given the strains on our
system, we want to do it a little -- we want to do it broadly,
more broadly."  So I'd emphasize that.

A couple points, Your Honor.  The point I would emphasize
is that the plaintiffs have really -- they've relied on

1  evidence and extra-record evidence pieces, but in their

2  transfer motion in particular -- again this is at page 2 and

3  3 -- they've said, "Look, this doesn't rely on the application

4  of the policy to particular -- the guidance to particular

5  folks.  It's really a facial matter."

6          **THE COURT:**  Their opposition to your transfer motion?

7          **MR. STEWART:**  Correct, Your Honor.

8      At page 2 the plaintiff said, I'm going to try to quote

9  this directly (reading):

10          "Plaintiffs' claims do not arise from or depend on

11         the details of the policy's initial implementation in the

12         Southern District or any other border location.  Rather,

13         plaintiffs challenge a national policy emanating from

14         Washington, D. C., as unlawful on its face."

15      As Your Honor knows, it's extraordinarily difficult to

16  succeed on a facial challenge.  You can't invalidate something

17  on a facial ground if it has a plain legitimate -- plainly

18  legitimate sweep.  Here, the guidance here is being applied, by

19  all indications, in a reasonable, modest way consistent with

20  discretion.  Folks are showing up for their hearings.  They're

21  not being ordered removed *in absentia*.  Folks are getting

22  continuances.  Many have counsel.  People are filing asylum

23  applications.  They can assert fear at different parts of the

24  process.

25      So that shows that this guidance has a plainly legitimate

1   sweep and that there's no basis for this Court to invalidate

2   the guidance on any sort of facial way, particularly given the

3   very limited startup -- limited current use of the policy.

4        **THE COURT:**  What's the difference, if there is any, in

5   your mind between -- I know your basic argument is that there

6   should be no injunction in this case, but I assume you may have

7   a view on if there is injunctive relief, it should be limited

8   in certain ways and the like.

9        First of all, on the national scope of any injunctive

10  relief, I know you're saying, "Well, at the very least you

11  shouldn't issue an injunction that would be beyond the

12  plaintiffs in this case."  How is that workable?

13       **MR. STEWART:**  Sure, Your Honor.  In this case, we

14  clearly have identifiable sets of plaintiffs.  We have

15  individuals.  This is not like the recent East Bay case where

16  it was -- you had what the Court saw as a problem because you

17  wouldn't even have people crossing the border or individuals

18  who faced the harmed claim -- the harm claim so all you have is

19  organizations.

20       Here you have folks that have identifiable injuries,

21  identifiable alleged injuries, and you can carve it in a

22  different way.

23       Also, you have here a policy --

24       **THE COURT:**  There's no question, though, is there?  I

25  mean, I think the answer is obvious, but I still want to hear

1    it from you.  There is no suggestion that different procedures

2    are going to be implemented in different locales; i.e., this

3    San Ysidro port of entry is going to be in a different position

4    than Eagle Pass or wherever it gets rolled out to.  It's all

5    going to be a national program, isn't it?

6          **MR. STEWART:**  I believe at this stage, Your Honor, the

7    announced intent is to roll it out more broadly.  I don't know

8    that there's a commitment yet to say we are going to do this

9    exactly this way.  I mean, it could -- this is, again, an issue

10   imbued with discretion, and the Secretary could say, "Look, I

11   think we need to tweak this here because we have this challenge

12   at this border or this is, you know, different -- circumstances

13   could be different."

14        So I don't know that -- I don't think there's a commitment

15   to doing it definitively in the precise same way at different

16   places.  We just don't know that yet, and we have a pretty

17   limited starting point here of -- I mean, the named plaintiffs

18   here are at one port of entry.  So I don't -- I don't mean to

19   be difficult because I did -- I do know there's an intent to

20   expand it, and that's been announced; but I'd say that it's

21   possible that the guidance, you know, could evolve and there is

22   also this discretionary piece.

23        **THE COURT:**  Well, I suppose -- I didn't see anything

24   in what is identified to me as the rollout, if you will, that

25   is contemplating any kind of tailored process based upon the

 1   port of entry that someone comes through.

 2        But, okay.  Let me ask you while I'm on the question of

 3   sort of just remedy and injunctive relief.  If a decision were

 4   to be rendered that wasn't, say, on the statutory

 5   interpretation question, the first question, but was on the

 6   *non-refoulement* aspect of the government's obligations and

 7   whether or not there's a process by which that's being

 8   implemented and let's assume for purposes of discussions I deem

 9   it to be inadequate, is the remedy then a remand or is the

10   remedy just an injunction and you let the dust settle as it

11   settles?

12        I mean, what -- I know you don't want me to issue an

13   injunction; but if I issued an injunction, would you make some

14   argument that it should be limited in any fashion beyond the

15   national scope issue which we've already talked about?

16            **MR. STEWART:**  Certainly, Your Honor.  You're saying --

17            **THE COURT:**  Let me rephrase it because it may be a

18   difficult question.

19        If the basis of a decision is that there are defects in

20   the process, more a procedural problem, as opposed to a

21   decision that it's violative of the statute and, therefore,

22   say, for example, the MPP program is inconsistent with

23   statutory interpretation and it's enjoined, that's one avenue

24   they're asking me to take.

25        They're also asking me to say the procedures that have

been implemented to address the *non-refoulement* issue are

simply defective, they're inadequate.

Those could theoretically be repaired.  I mean, it's not

that the government may -- DHS may decide they want to do that,

but they theoretically could do that.  So does that have any

impact on how the injunctive relief should be crafted with the

understanding you don't think any injunctive relief should be

crafted?

**MR. STEWART:**  Understood, Your Honor.

I think, yes.  I mean, I think *California versus Azar*, the

court's recent opinion, does emphasize the limited nature of

any injunctive relief.  And if the Court were to find, "Look,

this is fine under Section 1226 but the issue is we need more

procedures," I think it would be an appropriate "Look, remand

to the agency; or, look, the agency, you can keep doing this

but you have to make sure that you hit these procedural marks."

It's not just stop things dead in its tracks, not to say

you can't do this at all, not to say -- and it would be, I

think, as limited geographically as possible.  I do think the

courts of Texas, for example, if it were to happen there, are

equally able to address any concerns.

But I would say the agency should be able to continue to

do this so long as it satisfies whatever procedures; for

example, if Your Honor would say procedures are required.  I

think that's -- I think that's right, or I think that would

1    be -- I'll put it this way, I think if that's --

2              THE COURT:  I understand.

3              MR. STEWART:  Yeah.

4              THE COURT:  Okay.

5              MR. STEWART:  Your Honor, one request I would make is

6    that if the Court were to issue any kind of injunctive relief

7    or anything like that at all, I would like to request a stay of

8    that so that -- a stay pending appeal so the government could

9    consider this.  This is a very important initiative.  The

10   Executive Branch is responding to a very, very difficult

11   problem.

12       Obviously this is -- as before, it's an area that I don't

13   think the Court needs to get to; but if there were any kind of

14   relief issued against the guidance here, we would respectfully

15   ask for a stay pending appeal so that we could seek relief.

16             THE COURT:  Should there be, though, a decision that

17   there's either defective process or there's inconsistent with

18   the statutory scheme, what would be the justification for

19   allowing the process to continue?

20       I mean, I could see a distinction, perhaps, in requiring a

21   return of individuals who've already been processed.  Well, I

22   hear your request --

23             MR. STEWART:  Right.

24             THE COURT:  -- and I'll think it through.

25             MR. STEWART:  I appreciate that, Your Honor.  I just

1    wanted to make sure I got it out --

2              THE COURT:  Okay.

3              MR. STEWART:  -- because, of course, we can't predict

4    but we wanted to have that there.

5              THE COURT:  All right.  All right.

6         Okay.  Well, why don't we take a break, and then I'll come

7    back and we can have some further discussion, and we'll go from

8    there.

9         So let's start at 11:15.

10                   (Recess taken at 11:01 a.m.)

11                   (Proceedings resumed at 11:17 a.m.)

12             THE COURT:  Very well.  Ms. Rabinovitz, if you want

13   to -- anything further you would like to discuss?

14             MS. RABINOVITZ:  Yeah.  Just four points, Your Honor.

15        One is on the statute.  I think that the government still

16   hasn't -- there's no clarity as to what this provision does.

17   There is an exception in the statute for people to whom this

18   applies.

19        It seemed like the government was hedging about whether

20   this applies to somebody, for example, who is put into

21   expedited removal and passes a credible fear.  And if -- I

22   guess I would like to understand what the government's position

23   is on that because if they're taking the position that it could

24   be applied, then the notion that someone would have to go

25   through the credible fear but could still be returned to

1  contiguous territory would seem to undermine --

2      THE COURT:  Walk through with me again what you

3  think -- your understanding of what they're saying and why that

4  causes you concern.  They're saying -- well, go ahead.  I'm not

5  sure I understand this.

6      MS. RABINOVITZ:  I think there's not clarity.  Right

7  now they are not applying -- my understanding is they've

8  decided not to apply MPP to anyone who's been processed for

9  expedited removal, but I don't know if they read the statute

10  as --

11      THE COURT:  Precluding that?

12      MS. RABINOVITZ:  -- as precluding that; or if their

13  position is once you're in 240 removal proceedings, you are

14  then under 235(b)(2) so you could be subject to contiguous

15  territory return, and that seems completely wrong.

16   I mean, the whole purpose here was Congress wanted to

17  protect these people, you know, with the credible fear

18  screening.  It doesn't seem like that to then subject them to

19  contiguous territory return -- it's a big deal to go back to

20  Mexico.

21      THE COURT:  Okay.  Well, Mr. Stewart, do you want to

22  comment on what the government's -- how it works from the

23  government's perspective?

24      MR. STEWART:  Your Honor, as I explained before, I

25  don't want to foreclose that possibility as to it being applied

1   in the future.  My pitch is that Ms. Rabinovitz should find an

2   actual plaintiff that faces that situation.  Then the issue

3   could be joined at that time.

4       What I can say for now is that MPP as currently issued

5   does not have a situation where somebody goes through credible

6   fear and then ends up in Section 240 removal proceedings and

7   then is subjected to (b)(2)(C).

8       I would say that I don't understand her suggestion that

9   that would be somehow irrational if the point of -- the point

10  of putting people in full removal proceedings in a return

11  category, that would make sense if somebody's now in a very

12  long process that will take a very long period of time.

13      But, again, I don't want to join issue any farther than

14  that because we do not have that circumstance.

15      **THE COURT:**  So the concern you're talking about is

16  someone has that initial -- expresses a fear, has the initial

17  interview with the asylum officer, immigration officer, and the

18  conclusion is they have articulated a credible fear.  Then they

19  go into ordinary removal proceedings, and then they get

20  subjected to the contiguous removal provision.

21      So you're postulating a person who has passed the

22  threshold of establishing a credible fear and, nonetheless,

23  gets removed -- gets returned, to use the government's term,

24  back to Mexico?

25      **MS. RABINOVITZ:**  Yes.

1          **THE COURT:**  All right.  And you're saying that

2     certainly didn't happen with respect to these 11?

3          **MS. RABINOVITZ:**  It could.

4          **MR. STEWART:**  The issue hasn't been joined,

5     Your Honor; but, again, I don't see the illogic of that because

6     the whole purpose of going through ex pat removal proceedings

7     stating a credible fear is to get into full removal

8     proceedings.  That's the hope.

9          **THE COURT:**  Well, but if you -- well, isn't that

10    mixing -- I mean, the credible fear issue is about your concern

11    about being returned to Mexico; right?  It's not the -- and so

12    if -- the assumption in the question by Ms. Rabinovitz is

13    assume a migrant who has shown credible fear.  The

14    determination is, yeah, that you've passed that threshold.  And

15    then -- so they're in a removal proceeding, and then they're

16    subjected to going back through the contiguous return policy.

17         And there is an inconsistency, I suppose, I hear her

18    saying, between passing the threshold on credible fear and then

19    finding yourself in normal removal proceedings and being

20    returned to Mexico.

21         **MR. STEWART:**  I think I see the issue, Your Honor.

22    Credible fear is not about -- for Northern Triangle nationals,

23    it's not about Mexico.  It's about Guatemala.  You know --

24         **MS. RABINOVITZ:**  But it could be.  Mexicans could be

25    subject to this as well.

1           **MR. STEWART:**  They are not subject to this at this

2     time.  The issue is not joined and, again, this is a facial

3     challenge.

4           **THE COURT:**  Wait a minute.  Okay.

5       So the credible fear -- so I want to keep my categories

6     separate.  The credible fear discussion is at that initial

7     interview.  I thought that there was -- the triggering event

8     for the credible fear discussion is if a migrant says --

9     volunteers, "I'm concerned that I'm going to be subject to

10    torture and mistreatment if you send me back to Mexico."

11          **MS. RABINOVITZ:**  No.

12          **THE COURT:**  All right.

13          **MS. RABINOVITZ:**  Let me explain.  The credible fear

14    process is part of expedited removal.  Expedited removal was

15    intended by Congress to just --

16          **THE COURT:**  Yes.

17          **MS. RABINOVITZ:**  -- it's separate from the MPP,

18    separate from contiguous territory return.

19          **THE COURT:**  Right.  Understood.

20          **MS. RABINOVITZ:**  And it just was concerned -- it was

21    against a backdrop that people are here pursuing their cases

22    and they're going to be returned without a hearing unless they

23    pass a credible fear of showing that they have a significant

24    possibility of facing persecution or torture in their home

25    country.

1          THE COURT:  Yes.

2          MS. RABINOVITZ:  Then if they do, now they're given a

3   regular 240 removal proceeding, and this could be Mexicans.  It

4   could be -- and, in fact, at the time --

5          THE COURT:  Yes, well, but putting those aside --

6          MS. RABINOVITZ:  Right.  But --

7          THE COURT:  -- and Mr. Stewart is saying, "Well, we're

8   not applying that to that group of migrants," isn't he right

9   that there's nothing inconsistent with if you establish a

10  credible fear about your return to one of the Northern Triangle

11  countries, that doesn't by definition mean you can't be subject

12  to the contiguous removal process?

13         MS. RABINOVITZ:  It doesn't mean by definition, but I

14  think that there's a few things here.

15      First of all, when Congress enacted this in 1996, the

16  majority of the people who were subject to expedited removal

17  were Mexicans.  It's changed.  The migration patterns have

18  changed and now it's Central Americans.  So I do think it's

19  relevant to think of who you're thinking about because -- and

20  because in theory the way that -- we're looking at how the

21  statute can be construed, and it can be applied to Mexicans and

22  that was the large group of people that they thought it would

23  be applied to.

24      So what you're saying --

25         THE COURT:  Isn't Mr. Stewart right, though, that that

1    case has to wait for those individuals?

2          MS. RABINOVITZ:  No, because we're talking about the

3    statute and what it means.  And what I'm trying to understand

4    is what does this -- what does the -- Congress made an

5    exemption for people to whom paragraph (1) applies.  It seems

6    to us that that was in recognition that these are asylum

7    seekers, they're vulnerable, and we're making sure that they're

8    not returned, you know, by having a credible fear thing; and

9    we're not going to return them to Mexico, you know, if they're

10   afraid.  Just we're not going to subject them to that.

11         It's true, it's not --

12         THE COURT:  Afraid of Mexico or afraid of what?

13         MS. RABINOVITZ:  Well, you could -- I mean, afraid of

14   persecution or torture in Mexico, which can also include, which

15   is a big issue right now, that from Mexico, they'll be sent

16   back to their home country.  So that's all part and parcel.

17         But there's no question -- there's two issues.  There's no

18   question that this subjects to Mexico.  So you have to make

19   sure that you read the statute in a way that Mexicans -- it

20   would make sense as applied to Mexicans.

21         Secondly, there's no question that Central Americans also

22   have fears of persecution and torture in Mexico, and all of our

23   named plaintiffs are that.  I mean, to say that our named

24   plaintiffs don't have strong claims, you know, of fear in

25   Mexico is just not true.

1          **THE COURT:**  No, I know.  And the declarations you

2     provided that go to the irreparable harm issue certainly make

3     note of the fact of some of the concerns that they have about

4     Mexico.

5          **MS. RABINOVITZ:**  So what I'm concerned about is if the

6     government is not ready to disclaim -- and I understand they

7     say it's not before you, but we're trying to understand what

8     this statute means; and the government doesn't disclaim that

9     the statute could mean that they could still -- that to say to

10    whom this applies doesn't mean someone to whom they've applied

11    expedited removal and given them a credible fear.  Now that

12    they're in 240 removal proceedings, the government is saying

13    they're not going to give up the possibility that the exemption

14    doesn't apply to them.

15         And then my question is:  Who does the exemption apply to?

16    Why did Congress even put this in?  If the exemption only

17    applies to individuals who are expeditedly removed, they're not

18    in 240 proceedings.  Why would there even need to be an

19    exemption there?

20         So the exemption means something beyond that, and I don't

21    understand, you know, why the government -- I mean, what the

22    government's position is.

23         And it also goes to the question of trying to say, well,

24    how long are these proceedings going to take and maybe it made

25    sense that Congress thought people, you know, who were in 240

1  removal proceedings would be longer; but people who pass a

2  credible fear in 240 removal proceedings, that's going to take

3  awhile also.  Yet, we think clearly Congress didn't think that

4  after they've passed a credible fear and they're in their 240

5  removal proceedings, they should be returned to a contiguous

6  territory, which could be their own home country, you know,

7  without any kind of protection at all.  It just doesn't make

8  sense.

9        I mean, I think that return to Mexico obviously is clear

10 for somebody who's fleeing Mexico and seeking persecution, but

11 it's also a big deal for the Central Americans because there's

12 plenty of evidence out there that's in the administrative

13 record -- you don't need our evidence -- that it's dangerous

14 there.  It's dangerous for migrants, and one of the dangers is

15 that they can be sent back to their home countries.

16      So I guess all that I want to say is that this -- we need

17 to understand why Congress would have exempted them from

18 contiguous country return.

19           THE COURT:  Okay.  That was -- I think you said you

20 had four.  That was one.

21           MS. RABINOVITZ:  That was one.  And I just --

22           THE COURT:  Any more on one, this point that

23 Ms. Rabinovitz has just gone over, that you want to say?

24           MR. STEWART:  Just two very quick points, Your Honor.

25 The first is that if we're getting into a situation where this

statute could -- that there could be guidance that could be
applied in a certain way that is inconsistent with the statute,
it's tantamount to a confession that there is no basis for
merit success for the plaintiffs here.  That's point one.

And point two is, Your Honor asked, and my friend just
highlighted:  Why would Congress do this?  Why would Congress
allow return to Mexico?  And I'm glad that my friend brought up
the feature that Section 240 proceedings do take time.  They
take awhile.  There's review with the federal courts of
appeals.  It could take years.

If Congress really believed that people who would be
subject to (b)(2)(C) would get full-on IJ, BIA, Court of
Appeals review, then it really didn't believe in return to
territory.  It's imputing an absurd motive to Congress that
return to territory would be completely ineffectual because it
would be years before somebody could be returned to territory
when they've exhausted all of their claims.

So getting to the sense of why the difference between
return and removal, that's a big piece of it, Your Honor.
Withholding a removal comes only after you have a final removal
order and you can go up through the PFR process.

So this does explain -- this is a logic behind why return
to a contiguous territory is different from removal to, say, a
Northern Triangle country.

        THE COURT:  Okay.

1      **MS. RABINOVITZ:**  Well, since counsel has moved on to

2  the whole question of would the contiguous territory provision

3  be meaningless if there were actually real protections, there

4  are people who, you know, live in Mexico, who, you know, would

5  go back to Mexico.  We're talking about involuntary return of

6  people who fear persecution, and that's whom the provision --

7  now that they're moving on to withholding, that's who -- and

8  *non-refoulement*, that's who the provision needs to protect.

9     And for the government to claim --

10    **THE COURT:**  Well, as I understood your argument

11  before, it was you're not taking the position that the only

12  proper procedure is to implement the entire 1231 structure.

13  You're just saying the current procedures, such as they are,

14  are deficient and they've got to come back with new

15  procedures --

16    **MS. RABINOVITZ:**  Correct.

17    **THE COURT:**  -- but they don't necessarily have to be

18  the full panoply -- maybe they do from your perspective; but

19  you're not suggesting that the only thing, the only legal way

20  they could proceed is to apply the entire panoply of 1231

21  procedures.

22    **MS. RABINOVITZ:**  That's true, Your Honor, but I think

23  that it needs to be a very rigorous process.  I think that

24  we're talking about -- I mean, I could --

25    **THE COURT:**  Where do I go to find the legal support

1    for the proposition, which I may well agree with just from a

2    policy perspective, that there ought to be those?  What do I

3    look for?

4          **MS. RABINOVITZ:**  One thing might be to look at the

5    kind of process that they implemented in two other contexts,

6    which was reinstatement of removal and administrative removal,

7    which were both contexts where -- different than ours right now

8    because they were situations where Congress singled out a

9    certain population of people and said, "You guys don't get

10   anything.  We're not going to give you any kind of, you know,

11   relief at all.  You're prohibited from any relief."

12         And notwithstanding that, they implemented regs that

13   required a reasonable fear interview and procedures that are so

14   far more protective than what they have here.

15         Now, we think --

16         **THE COURT:**  Well, even if I form the judgment that

17   that's a better way to proceed, why are they legally required

18   to do that?

19         **MS. RABINOVITZ:**  Well, they did that because they said

20   they were doing it in order to comply with the withholding

21   obligation -- the *non-refoulement* obligation under withholding

22   and CAT.

23         And what I want to point out is that those are -- I think

24   that this is a situation that needs to be more protective.  In

25   both of those contexts -- in reinstatement of removal, you had

1  somebody who had already been ordered removed, had already had

2  an opportunity to sort of build a case, and had come back

3  illegally.  In administrative removal, you had a group of

4  people that Congress is singling out because they had serious

5  crimes.

6      Here we have a population that is no different than the

7  population who's supposed to be able to get a full withholding

8  hearing.  So I think that there is actually an argument that

9  those people should get a full withholding hearing before they

10  can be returned.  I mean, you know, I don't see what's the

11  argument for making it -- for distinguishing them.

12      And there will be people who will say, "I'm not afraid.

13  Send me back to Mexico.  I'd rather do that."  So it's not like

14  you're leaving them out.

15      And, in fact, you know, it's not so clear what -- you

16  know, in terms of, you know, when Congress enacted this

17  provision, it seems that it may have just been ratifying a

18  situation where it was a situation where people who had

19  commuter visas from Mexico, they'd just as soon wait in Mexico.

20  I mean, it's not like there's much evidence that this was

21  intended in some other way, this provision.

22      And it says that the provision allows for return

23  consistent with discretion.  Well, discretion has to be

24  operated in a way that's consistent with our obligations.

25      And so all that I'm suggesting is, in terms of what the

1  procedure should be, it has to be a rigorous procedure.  If you

2  want to look at other procedures, we see what's required for

3  people who are in regular removal proceedings.  There's no

4  basis for distinguishing these individuals.  Then you see

5  what's required in streamlined removal proceedings where those

6  individuals were targeted -- designated as people who Congress

7  specifically didn't want to give the same protections to.

8  They're getting way more protections.

9      But I'm saying even the protections there I think are more

10  restrictive than what we think are required here.  And I would

11  say it would be something more like what's an expedited removal

12  where people just have to make out a credible fear claim and

13  where they have to be asked about whether they have a fear

14  because you need something really protective.  I mean, this is

15  a big deal sending people back to a country where they could

16  be, you know, tortured or persecuted.

17      And so that's my point on that.

18          **THE COURT:**  Okay.

19          **MS. RABINOVITZ:**  The third point I wanted to make is

20  just on the arbitrary and capricious.  Counsel for the

21  government said, "Well, even if the *in absentia* rate was

22  87 percent instead of what the government said, that would

23  still be a reason for doing it."  But that's not the evidence

24  that Congress -- that the agency based it on.  It's arbitrary

25  and capricious for them to -- we can't know what they would

1   have done if they had that evidence in front of them.

2        I mean, they based it on evidence, from what we can tell,

3   that was based on a much more heightened *in absentia* rate; and

4   it's arbitrary and capricious if it's based on faulty data,

5   whether it was that they misunderstood the data or

6   misrepresented the data.  Maybe they would make the same

7   decision.  Maybe they wouldn't.  That's not for us to decide.

8   That's for them to go back and consider it with the correct

9   data.

10       The same thing in terms of the notion that there's

11   these -- that it was based on assumptions of the high-fraud --

12   you know, high asylum fraud.  I just want to make the point

13   that not only did they -- was their data completely wrong that

14   9 out of 10 cases are denied, but even if -- and ours was that

15   maybe 25 percent, you know, or 75 percent were denied, so still

16   a large number, but we don't think that that's even an accurate

17   reflection of whether an asylum application is fraudulent.

18        **THE COURT:**  But when we're going down that path, I

19   have -- this goes back to the analysis I'm supposed to apply --

20   I have an administrative record.  There are materials in the

21   administrative record.  You think "These aren't very good.  We

22   have much better statistics than they've got.  Their statistics

23   are deficient in various and sundry ways," but how can I get

24   there?

25        **MS. RABINOVITZ:**  Well, this is where their own data,

1    if you look at their own data or -- our declaration, even if

2    it's excluded, is based all on government data.

3              **THE COURT:**  Well, but that --

4              **MS. RABINOVITZ:**  And so --

5              **THE COURT:**  I mean, the fact that it's based on

6    government data, still it's extra-record information.  And, you

7    know, I think what is pretty clear, and a concern that I think

8    is a legitimate one, is courts have -- you know, we take a look

9    at the administrative record in an APA claim and we have

10   certain exemptions that get us out from confined to that

11   administrative record; but unless you apply those, we look at

12   the record.

13        And it isn't a question of whether or not I think somebody

14   can come up with better statistics that are going to convince

15   me that they -- if I was in that decision-maker's position, I

16   would go another way.  That's not how I'm supposed to look at

17   it.

18             **MS. RABINOVITZ:**  Right, but we're not talking about

19   better statistics.  We're talking about government statistics,

20   statistics they relied on that they -- and statistics that they

21   chose not to rely on but that are government statistics.  We're

22   not making up new statistics.  And the expert declaration that

23   we included, which you don't have to include --

24             **THE COURT:**  Let me give you an example.  If the

25   administrative record contains within it some assessment that

1    87 percent of the people who are released they abscond and they

2    don't come back, and that's in the record and you think, "Well,

3    if we can get outside the record, I can show that that is

4    just -- that's wrong, they've got a bum calculation there," why

5    should I go down that path?

6        I mean, it really is a question of do they have -- do they

7    point to something that justifies their decision or not; and if

8    they do, then isn't it -- I'm not supposed to second-guess

9    their decisions.

10        **MS. RABINOVITZ:**  Right, but the government isn't

11   allowed to bury its head in the sand.  I mean, it can't just

12   say "We're looking to look at this data" -- and this is why

13   this may be something that comes farther down the road, but

14   they can't just say "We're going to look at this data and not

15   look at this data and we're going to misinterpret this data."

16        **THE COURT:**  Right.

17        **MS. RABINOVITZ:**  Because, like, for example, the

18   absconsion --

19        **THE COURT:**  That's, then, when you're making the

20   argument that this is the reason you go outside the record.

21        **MS. RABINOVITZ:**  Well --

22        **THE COURT:**  That whole line of analysis you've just

23   given I would interpret as this is the reason you're not going

24   to be confined to the administrative record.  That's different.

25        But you're trying to walk a fine line.  You're saying, "We

1    are willing to live with the administrative record for this

2    motion right now" --

3          **MS. RABINOVITZ:**  Right.

4          **THE COURT:**  -- "but we're willing to live with the

5    record but, Judge, let's go -- let's really look and see

6    whether or not this is" -- I'm not sure you can have it both

7    ways.

8          I mean, if you're agreeing for the reasons that you're

9    strategically agreeing to it, and I'm not questioning it, that

10   the confines of the record are what I look at, if they

11   articulate a reason that they are relying on and that is an

12   otherwise -- you know, I may not agree with it, but it's a

13   reason, then I'm not sure how far I can go.

14         **MS. RABINOVITZ:**  But is it a reason if statistics are

15   analyzed in a way that doesn't make sense?  For example, if you

16   analyze absconsion rates based on, you know, completion data

17   that is just for one year and so it doesn't take into account

18   all of the cases that are pending, then that absconsion rate is

19   going to be a lot higher, just like the denial rate is going to

20   be a lot higher.  That's not an accurate rate.  You know,

21   that's just from their own data how they're analyzing it.

22         So I'm not saying look at other data.  I mean, I think

23   there is other government data which could be judicially

24   noticeable; but if you're not ready to go there, then, you

25   know, even just on this data, the conclusions that they draw

1   from it aren't accurate.

2           **THE COURT:**  Okay.

3           **MS. RABINOVITZ:**  And, anyway, the next point was just

4   going to be that, you know, I'm not really -- I'm not really

5   sure about -- we're not challenging -- counsel's argument about

6   facial challenge as applied, I mean, we're not challenging how

7   this is being applied.  We're challenging this policy as it

8   exists.  As it exists --

9           **THE COURT:**  Which is a facial challenge.

10          **MS. RABINOVITZ:**  Okay.  So as it exists, it's not

11  reasonable.  This has nothing to do with saying, "Oh, they're

12  not doing this right.  They're not doing this right."  It's not

13  reasonable.  This fear mechanism they have is completely

14  unreasonable, and for him to say, oh, they're not giving people

15  *in absentia* orders right now, well, in fact, the government was

16  asking for *in absentia* orders at the recent hearings.

17          So I just feel like even though that's not what's at issue

18  here, I feel like there's a little bit of having it both ways

19  saying "This is facial but, on the other hand, we're not doing

20  this.  We haven't done this wrong."  Well, I think it's both.

21  The policy on its face is wrong.  It's illegal.  It's

22  unreasonable.

23          And also they are -- to say that this is limited, they've

24  made clear that they want to do this in as broad a way as they

25  can.  And so I don't -- there's no way to limit the injunction,

 1   and that comes to the next question about injunction versus

 2   remand, which I said before I'm not really quite clear what --

 3   who the remand is to or for what purpose.

 4       Our main concern is that if the agency action is

 5   violative, it needs to be vacated, enjoined.  They can't keep

 6   on carrying out this policy.  If they want to go back and come

 7   up with a policy that's not, you know, arbitrary and

 8   capricious, that doesn't violate the statute, fine, then we can

 9   look at that.

10       But it can't be, like, "Oh, just fix this and fix this and

11   fix this."  The injunction shouldn't be limited that way.  I

12   mean, the thing is this policy is unlawful.  Yes, they can come

13   back and try to fix it.  They can come back and try to do

14   notice and comment, which we think is required.  You know, they

15   can consider the factors that they should have but, you know,

16   it has to be enjoined.

17           THE COURT:  How about the stay notion?

18           MS. RABINOVITZ:  Well, I mean, if it's illegal and

19   it's hurting people, then there's no reason for a stay.  I

20   mean, the stay would defeat the purpose.

21           THE COURT:  Well, would it be so simple?

22       You know, the stay analysis is really the question of if

23   there's a significant policy involved and in order -- while

24   plainly whatever is decided here is going to be subject to

25   review, the one thing that is certain is one side or the other

1    will go to the next step.

2          And it's just a question of kind of akin to the equitable

3    analysis I have to undertake in terms of injunctive relief.

4    You know, if you make a determination to stop a substantial

5    policy, in the interim while it's under consideration, what

6    should happen?

7          **MS. RABINOVITZ:**  Well, the thing here is -- the thing

8    here is this policy hasn't been in effect very long.  They've

9    been doing it, as they said, in a limited way.  You know,

10   they've described it as an unprecedented policy.

11         We're not asking for a major change.  We're saying just go

12   back to where we were on January 28th and enjoin it.

13   Especially since we know that they're just looking for the go

14   ahead to be able to expand it more, why allow it to be expanded

15   more, you know, when we think it's illegal?

16         But if the stay issue comes up, we'd like an opportunity

17   to brief it obviously, you know, because we have reasons for

18   opposing it.

19         **THE COURT:**  Okay.  Mr. Stewart?

20         **MR. STEWART:**  Just a couple points, Your Honor.

21         I notice that my friend emphasized the facial nature of

22   the challenge.  If the challenge is facial, then it certainly

23   fails, and it clearly is facial.  On page 1 of the

24   administrative record it says the following (reading):

25               "Aliens in the following categories are not amenable

1      to MPP."

2          Several bullets down (reading):

3              "Any alien who is more likely than not to face

4          persecution or torture in Mexico."

5          Lower on that page it says (reading):

6              "If an alien who is potentially amenable to MPP

7          affirmatively states that he or she has a fear of

8          persecution or torture in Mexico or a fear of return to

9          Mexico, whether before or after they are processed for MPP

10         or other disposition, that alien will be referred to a

11         USCIS asylum officer for screening following the

12         affirmative statement of fear of persecution."

13         I'll stop reading there, Your Honor.

14         But then on pages 2273 to '74, USCIS relates this is the

15     process.  It's going to be a nonadversarial interview.  We're

16     going to make sure that the alien understands that he could be

17     subject to -- he or she could be subject to return in Mexico.

18     We're going to account for credibility, commitments from the

19     government of Mexico, possibilities about what region the alien

20     may be able to go to.  And even if somebody's amenable to

21     return through MPP, they still may not be in the exercise of

22     discretion.

23         On its face, that is a legally valid policy that

24     transgresses no legal rule on withholding even if it applied.

25             THE COURT:  Well, I mean, I understand that's your

1  argument, but I guess I don't understand why you think it being

2  a facial challenge gets you out from under.

3      Those pronouncements are made in there.  The argument that

4  the plaintiffs are making is that's deficient in terms of our

5  obligations under the *non-refoulement* issues, and that on its

6  face that's not good enough because it doesn't provide for

7  various protections that, for example, you'd find those in the

8  1231 removal process where there is fear of return.

9      So I hear you saying on its face those are sufficient, but

10 I don't understand when you say "But because it's a facial

11 challenge, it can't succeed."  That assumes, I think, that

12 those provisions are sufficient and pass muster.

13     **MR. STEWART:**  Your Honor, the attack here is -- the

14 legal rule that my friend is invoking is --

15     **THE COURT:**  In other words, let me make clear what my

16 question is.

17     **MR. STEWART:**  Yes, Your Honor.

18     **THE COURT:**  You're sort of suggesting when you say if

19 it's an as-applied -- it's a facial challenge, it can't

20 succeed, sort of suggesting, well, if they had evidence that it

21 was -- none of the protections that are being addressed there

22 are actually being implemented, that would be an as-applied

23 challenge, and that's not what they're making.  I understand

24 that distinction.

25     But they're also saying that those are not sufficient as

1   they are set forth.  It's not that "Well, those are lovely but

2   they're not actually doing them."  They're saying "Those aren't

3   sufficient on its face."

4       So I understand you say they're wrong, but that's a

5   perfectly appropriate as-applied challenge, isn't it -- I mean,

6   facial challenge, isn't it?

7          MR. STEWART:  Two responses, Your Honor.  The first is

8   that part of that does back into whether those procedures

9   apply.  I'll put that aside for now.

10      The second one --

11         THE COURT:  Because that's your return argument;

12  right?

13         MR. STEWART:  Yes, Your Honor.

14         THE COURT:  Right.

15         MR. STEWART:  The second one and this goes to the

16  legal prohibition at issue is returning somebody or removing

17  somebody to a country where they're more likely than not to

18  face persecution or torture.  It's -- and on its face, the

19  fact -- the guidance here has a plainly legitimate sweep of

20  protecting aliens from that prospect.  If it doesn't work in

21  particular cases, that's the stuff of an as-applied challenge.

22         THE COURT:  But you would agree with me that if the

23  administrative record, the policy document, says "We really --

24  our whole plan is to make sure that nobody is subjected to

25  torture and any kind of awful thing that is -- we want to avoid

1  under *non-refoulement* policies," and then there were no

2  procedures, I mean, the fact that you pronounce that you don't

3  want that to happen is not good enough.

4      I mean, it's fine that it says, "You know, we want to make

5  sure that people are not put in harm's way consistent with our

6  *non-refoulement* obligations"; but if there are no procedures to

7  ensure that, the fact that you've said it doesn't do anything

8  for you, does it?

9          **MR. STEWART:**  Your Honor, again, I don't think we have

10  that here.  We have --

11          **THE COURT:**  Oh, I understand.

12          **MR. STEWART:**  Right.  I mean, we have plenty of

13  indication here that there are procedures that gets it just

14  what could be required and just what the concern is here, and

15  that satisfies the facial challenge.

16          **THE COURT:**  Yeah, but that's a different point than

17  saying, "Well, because there's some language in there in the

18  MPP that says, 'Well, the MPP is not inconsistent with our

19  obligations under the *non-refoulement* principles because we

20  want to avoid having any people subject to that.'"  That by

21  itself is not enough.  So what?

22          **MR. STEWART:**  I'm not necessarily sure about that,

23  Your Honor.  I mean, again, it would back into some of those

24  arguments, but I'm not necessarily --

25          **THE COURT:**  If you mouth the words that you want to

 1   conform to the obligations of the government but you do nothing

 2   to suggest that it's actually going to happen, that's enough?

 3          **MR. STEWART:**   Your Honor, I think in an individual

 4   case-by-case discretionary case there doesn't need to be an

 5   announcement necessarily of, you know, we're going to make --

 6   if the obligation is satisfied, it's satisfied.   There

 7   doesn't -- that could end it.

 8          On remedy, Your Honor -- I'm sorry, Your Honor.

 9                          (Pause in proceedings.)

10          **MR. STEWART:**   And in all events, Your Honor, again, we

11   do have guidance here.   I don't want to, you know, back away

12   from that.   There is a lot to say, "Look, you know, we're going

13   to go through these steps."   So you don't have to get into that

14   case mouthing the words or that kind of a thing.   I just want

15   to be careful on that.

16          **THE COURT:**   I understand.

17          **MR. STEWART:**   On the remedy point, Your Honor, and

18   this may be the last matter I mention, your colloquy with my

19   friend kind of got her into a path where she was throwing out

20   different possibilities, different procedures, and they were --

21   they're just completely made up.   They're not something that's

22   embodied in a statute the way you have -- or a regulation the

23   way you deal with reinstated removal orders.

24          And the remedy here, the maximum remedy would be a remand

25   without vacatur, again imposing any remedy, but it would be a

1   situation where you don't vacate the rule.  You don't declare

2   this invalid.  You don't prospectively enjoin any possible

3   guidance like the one suggested as my friend has asked the

4   Court.

5        But you remand and say, "Okay, Government, this can be

6   done lawfully if you just do this and then the policy or the

7   guidance can continue to be employed as soon as any issue is

8   addressed."  So remand without vacated would be the remedy if

9   the Court were to get that far.

10       Thank you, Your Honor.

11       **THE COURT:**  I mean, this is where, to some extent, it

12   turns on -- it's hard for counsel to talk about in the abstract

13   because I haven't yet decided, number one, how I'm going to

14   rule; and then if I do think an injunction is appropriate, what

15   the triggering basis for that is.  Because a vacatur, for

16   example, may be certainly warranted if the decision is that

17   statutorily 1225, all those arguments that plaintiffs have

18   presented, shows that this is contrary to law, then you vacate

19   it.

20       If the decision is the process is lacking and there needs

21   to be process on the *non-refoulement* issues, are you really

22   vacating the order, vacating the MPP, or are you saying you've

23   got to change the MPP?  So it's not necessarily vacating it, is

24   it, in that instance?

25       **MS. RABINOVITZ:**  Well, I think to the extent that it

1    violates the APA, this policy -- because the policy part and

2    parcel of it is this -- that there is this fear mechanism --

3              THE COURT:  Yes.

4         MS. RABINOVITZ:  -- if it violates the APA, then the

5    default remedy is vacatur.  That doesn't prevent them from

6    going back and coming up with another policy.

7              THE COURT:  I see.

8         MS. RABINOVITZ:  But in the meantime, it's vacated and

9    they can't do it; and that's what our main concern is, that

10   they not be implementing this and that they shouldn't be

11   implementing it in between while they try to tweak this or that

12   because this is a major tweak they have to do.  This is not

13   some little thing.

14        I mean, the procedure -- the process they have right now

15   is -- completely turns the whole notion of protection on its

16   head to be -- and I don't know why they would have come up with

17   this kind of process.  I don't want to, you know, impute bad

18   motives, but nobody can pass the screening and there's no

19   basis.

20        You know, when you look at what they've implemented in

21   other contexts, it's a huge departure.  They haven't even

22   acknowledged that we've used different kind of procedures in

23   other contexts and that this is a departure.  That's the

24   essence of what's arbitrary and capricious.  So it just is --

25   it --

1          **THE COURT:**  Well, changing a policy is not by

2     definition arbitrary and capricious.

3          **MS. RABINOVITZ:**  No, if they acknowledge it and

4     explain it, but they don't even acknowledge it.  At least in

5     terms of the administrative record they've given to us, we

6     don't see anything that acknowledges, "Oh, we make fear

7     determinations differently in this context, and you could do a

8     credible fear or you could do a reasonable fear or you could

9     have -- you could give IJ review instead of no IJ review."

10     I mean, this process says they don't even guarantee you an

11     interpreter.  They don't guarantee you an opportunity to

12     consult with counsel.  They don't guarantee you an interpreter.

13     It's just this on-the-spot determination by an asylum officer.

14     No review by an IJ.  You have to meet the absolute -- you know,

15     the ultimate showing of more likely than not, which is the

16     showing that's only required when you get a full-blown

17     adversarial hearing.  It's just where did this come from?

18          **THE COURT:**  Okay.  Any final comments, Mr. Stewart?

19          **MR. STEWART:**  I'd just say the government doesn't need

20     to acknowledge departure from a statute that doesn't apply,

21     Your Honor.  I think we've explained other points on that in

22     our briefing; and with that, I'd be happy to point to our

23     briefs and other points made today at argument.

24     Thank you, Your Honor.

25          **THE COURT:**  Okay.  Anything further?

1        **MS. RABINOVITZ:**  No.  Thank you, Your Honor.

2        **THE COURT:**  Thank you very much for a very interesting

3   and helpful argument, and I will take the matter under

4   submission.

5              (Proceedings adjourned at 11:55 a.m.)

6                       ---oOo---

7

8

9              CERTIFICATE OF REPORTER

10       I certify that the foregoing is a correct transcript

11  from the record of proceedings in the above-entitled matter.

12

13  DATE:  Wednesday, March 27, 2019

14

15

16

17  _____

18       Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                U.S. Court Reporter
19

20

21

22

23

24

25