UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

INNOVATION LAW LAB, et al.,

  Plaintiffs,

v.

KIRSTJEN NIELSEN, et al.,

  Defendants.

Case No. 19-cv-00807-RS

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

## I. INTRODUCTION

In January of this year, the Department of Homeland Security ("DHS") began implementing a new policy regarding non-Mexican asylum seekers arriving in the United States from Mexico.[1] Denominated the "Migrant Protection Protocols" ("MPP"), the policy calls for such persons, with certain exceptions, to be "returned to Mexico for the duration of their immigration proceedings," rather than either being detained for expedited or regular removal proceedings, or issued notices to appear for regular removal proceedings. This case presents two basic questions: (1) does the Immigration and Nationalization Act authorize DHS to carry out the return policy of

---

[1] The policy is administered by DHS sub-agencies Citizenship and Immigration Services ("CIS"), Customs and Border Protection ("CBP"), and Immigration and Customs Enforcement ("ICE")). The defendants named in this action are those agencies, and certain of their officials (collectively "DHS" or "the Government").

United States District Court
Northern District of California

United States District Court
Northern District of California

the MPP, and; (2) even assuming Congress has authorized such returns in general, does the MPP include sufficient safeguards to comply with DHS's admitted legal obligation not to return any alien to a territory where his or her "life or freedom would be threatened"? In support of their motion for a preliminary injunction, the plaintiffs have sufficiently shown the answer to both questions is "no."

First, the statute that vests DHS with authority in some circumstances to return certain aliens to a "contiguous territory" cannot be read to apply to the individual plaintiffs or others similarly situated. Second, even assuming the statute could or should be applied to the individual plaintiffs, they have met their burden to enjoin the MPP on grounds that it lacks sufficient protections against aliens being returned to places where they face undue risk to their lives or freedom. Accordingly, plaintiffs' motion for a preliminary injunction will be granted.[2]

To be clear, the issue in this case is *not* whether it would be permissible for Congress to authorize DHS to return aliens to Mexico pending final determinations as to their admissibility. Nor does anything in this decision imply that DHS would be unable to exercise any such authority in a legal manner should it provide adequate safeguards. Likewise, the legal question is not whether the MPP is a wise, intelligent, or humane policy, or whether it is the best approach for addressing the circumstances the executive branch contends constitute a crisis. Policy decisions remain for the political branches of government to make, implement, and enforce.

Rather, this injunction turns on the narrow issue of whether the MPP complies with the Administrative Procedures Act ("APA"). The conclusion of this order is only that plaintiffs are likely to show it does not, because the statute DHS contends the MPP is designed to enforce does not apply to these circumstances, and even if it did, further procedural protections would be required to conform to the government's acknowledged obligation to ensure aliens are not returned to unduly dangerous circumstances.

---

[2] Plaintiffs' motion was filed as an application for a temporary restraining order. In response to a court scheduling order, the parties stipulated to deem plaintiffs' motion as one for a preliminary injunction, which now has been fully briefed and heard.

CASE NO. 19-cv-00807-RS

Furthermore, nothing in this order obligates the government to release into the United States any alien who has not been legally admitted, pursuant to a fully-adjudicated asylum application or on some other basis. DHS retains full statutory authority to detain all aliens pending completion of either expedited or regular removal proceedings. *See Jennings v. Rodriguez*, 138 S. Ct. 830 (2018).

## II.  BACKGROUND

In December of 2018, the Secretary of the DHS, Kirstjen Nielsen, announced adoption of the MPP, which she described as a "historic action to confront illegal immigration." *See* December 20, 2018 press release, "Secretary Kirstjen M. Nielsen Announces Historic Action to Confront Illegal Immigration," Administrative Record ("AR") 16-18. DHS explained that pursuant to the MPP, "the United States will begin the process of invoking Section 235(b)(2)(C) of the Immigration and Nationality Act." *Id.*  DHS asserted that under the claimed statutory authority, "individuals arriving in or entering the United States from Mexico—illegally or without proper documentation—may be returned to Mexico for the duration of their immigration proceedings." *Id.*

In January of 2019, DHS issued a further press release regarding the implementation of the MPP. *See* "Migrant Protection Protocols," AR 11-15. In a paragraph entitled "What Gives DHS the Authority to Implement MPP?" the press release asserts:

> Section 235 of the Immigration and Nationality Act (INA) addresses the inspection of aliens seeking to be admitted into the U.S. and provides specific procedures regarding the treatment of those not clearly entitled to admission, including those who apply for asylum. Section 235(b)(2)(C) provides that "in the case of an alien . . . who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the U.S.," the Secretary of Homeland Security "may return the alien to that territory pending a [removal] proceeding under § 240" of the INA.

The positions taken in press releases reflect contemporaneous policy memoranda. On January 25, 2018, Secretary Nielsen issued a memorandum stating:

> [T]he United States will begin the process of implementing Section 235(b)(2)(C) . . . with respect to non-Mexican nationals who may be arriving on land (whether or not at a designated port of entry) seeking to enter the United States from Mexico illegally or without proper documentation.

DHS Memorandum, AR 7-10; *see also* CIS Policy Memorandum, January 28, 2019, "Guidance for Implementing Section 235(b)(2)(C) of the Immigration and Nationality Act and the Migrant Protection Protocols. AR 2271-2275.

Thus, it is undisputed that the MPP represents a legal exercise of defendants' authority regarding treatment of alien applicants for admission if and only if section 235(b)(2)(C) of the Immigration and Nationality Act applies to the individual plaintiffs and those similarly situated. Section 235(b)(2)(C) is codified at 8 U.S.C. §1225(b)(2)(C) and will hereafter be referred to as the "contiguous territory return provision."

It is similarly undisputed that prior to adoption of the MPP, aliens applying for asylum at a port of entry on the U.S.-Mexico border were either placed in expedited removal proceedings pursuant subparagraph (1) of 8 U.S.C. §1225(b), or in defendants' discretion were placed in regular removal proceedings described in 8 U.S.C. §1229a. There also is no apparent dispute that aliens placed directly into regular removal proceedings frequently were permitted to remain in the United States during the pendency of those proceedings, and were not detained in custody.  In announcing the MPP, Secretary Nielsen asserted the new policy is intended to address a purported problem of aliens "trying to game the system" by making groundless asylum claims and then "disappear[ing] into the United States, where many skip their court dates." *See* December 20, 2018 press release, AR 16.

Although the contiguous territory return provision has existed in the statute for many years, the extent to which it has previously been utilized is unclear in the present record. While the provision theoretically could be applied with respect to aliens arriving from either Mexico or Canada, the focus of the MPP is aliens transiting through Mexico, who originated from other countries. When this suit was filed, the MPP had been implemented only at the San Ysidro port of

United States District Court
Northern District of California

entry on the California-Mexico border. Defendants have since advised that it has now been extended to the Calexico port of entry, also on the California-Mexico border, and to El Paso, Texas. Indications are that it will be further extended unless enjoined.

The CIS Policy Memorandum providing guidance for implementing the MPP specifically addresses the issue of aliens who might face persecution if returned to Mexico. Under that guidance, aliens who, unprompted, express a fear of return to Mexico during processing will be referred to an asylum officer for interview. CIS Policy Memorandum, AR 2273. The asylum officer's determination, however, is not reviewable by an immigration judge. *Id* at 2274. Although DHS insists this policy satisfies all obligations the United States has under domestic and international law to avoid "refoulement"— the forcible return of prospective asylum seekers to places where they may be persecuted—there is no dispute that the procedural protections are less robust than those available in expedited removal proceedings, or those that apply when a decision is made that an alien is subject to removal at the conclusion of regular removal proceedings.

Plaintiffs in this action are eleven individuals who were "returned" to Mexico under the MPP, and six non-profit organizations that provide legal services and advocacy related to immigration issues.[3] Plaintiffs' claims in this action are brought under the Administrative Procedures Act and international law, although the preliminary injunction is sought only under the former.

III. LEGAL STANDARD

A. Injunctions

An application for preliminary injunctive relief requires the plaintiff to "establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the

---

[3] The unopposed motion of the individual plaintiffs to proceed in this litigation under pseudonyms (Dkt. No. 4) is granted.

public interest." *Winter v. N.R.D.C., Inc.*, 555 U.S. 7, 21-22 (2008). The Ninth Circuit has clarified, however, that courts in this Circuit should still evaluate the likelihood of success on a "sliding scale." *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134 (9th Cir. 2011) ("[T]he 'serious questions' version of the sliding scale test for preliminary injunctions remains viable after the Supreme Court's decision in *Winter*."). As quoted in *Cottrell*, that test provides that, "[a] preliminary injunction is appropriate when a plaintiff demonstrates . . . that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor," provided, of course, that "plaintiffs must also satisfy the other [*Winter*] factors" including the likelihood of irreparable harm. *Id.* at 1135.

### B. The APA

Under section 706 of the APA, a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] without observance of procedure required by law." 5 U.S.C. § 706(2)(A)-(D). Accordingly, the decision-making process that ultimately leads to the agency action must be "logical and rational." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998). Courts should be careful, however, not to substitute their own judgment for that of the agency. *Suffolk Cty. v. Sec'y of Interior*, 562 F.2d 1368, 1383 (2d Cir. 1977). Ultimately, a reviewing court may uphold agency action "only on the grounds that the agency invoked when it took the action." *Michigan v. EPA*, 135 S. Ct. 2699, 2710 (2015). Post hoc rationalizations may not be considered. *American Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 539 (1981). In evaluating APA claims, courts typically limit their review to the Administrative Record existing at the time of the decision. *Sw. Ctr. for Biological Diversity v. U.S. Forest Service*, 100 F.3d 1443, 1450 (9th Cir. 1996); *accord Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 499

United States District Court
Northern District of California

1   F.3d 1108, 1117 (9th Cir. 2007).[4]

2

3                                  IV. DISCUSSION

4        A.  Justiciability

5        At the threshold, defendants oppose plaintiffs' motion for preliminary relief by arguing

6   their claims simply are not justiciable. Defendants advance several interrelated points. First,

7   defendants contend the central issue is fundamentally one of prosecutorial discretion, and

8   therefore immune from judicial review. Were plaintiffs in fact challenging a policy decision to

9   place them in regular removal proceedings as opposed to expedited removal proceedings, that

10  argument might be viable.

11       As discussed below, however, plaintiffs concede DHS has such discretion, and none of

12  their claims in this action rest on a contrary position. Rather, the complaint here alleges the statute

13  on which defendants rely simply does not confer on DHS the powers it claims to be exercising

14  under the MPP. While defendants are free to argue they have discretion under the statute to adopt

15  and enforce the MPP, whether or not they actually do is a justiciable question.

16       Next, defendants contend several different sections of the INA preclude judicial review.

17  Defendants first cite 8 U.S.C. § 1252(g), which provides that "[e]xcept as provided in this section .

18  . . no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising

19  from the decision or action by the [Secretary] to commence proceedings." Defendants argue that

20  provision is "designed to give some measure of protection to . . . discretionary determinations"

21  _____

22       [4] Here, plaintiffs submit substantial evidence outside the administrative record, which
    defendants move to strike and which plaintiffs move separately to deem admitted. The parties
23  agree extra-record evidence is admissible for limited purposes, including to support standing or a
    showing of irreparable harm.  Plaintiffs stipulate to having the present motion adjudicated based
24  on the administrative record presented by defendants, without waiving their right to challenge the
    completeness of that record at a later junction. This order relies only on matters in the
25  administrative record or which the parties otherwise agree may be considered. Further rulings on
    specific aspects of the motions to strike and to admit accordingly need not be addressed at this
26  juncture.

27

28

like "the initiation or prosecution of various stages in the deportation process," and so bars claims "attempt[ing] to impose judicial constraints upon prosecutorial discretion." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 485 n.9 (1999). This argument, however, turns on the conclusion that *if* DHS has discretion to apply the contiguous return provision to persons in the circumstances of the individual plaintiffs, its decisions to return or not return any particular alien under any such authority, might not be subject to review.

Defendants next invoke 8 U.S.C. § 1252(a), which provides, in part, "[n]otwithstanding any other provision of law," "no court shall have jurisdiction to review . . . any other decision or action of the . . . Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the . . . Secretary." As defendants admit, however, this provision applies when the relevant decision is "specified by statute to be in the discretion of the" the Secretary. *Kucana v. Holder*, 558 U.S. 233, 248 (2010). The very point of dispute in this action is whether section 1225(b)(2)(C) applies such that DHS has such discretion, or not. That threshold question is justiciable.

Defendants further argue 8 U.S.C. § 1252(a) and (e) jointly preclude review. As noted, §1252(a) does not foreclose examination of whether application of the contiguous territory return provision to the named plaintiffs is legally correct. Defendants also assert section 1252(a)(2)(A) provides that no court shall have jurisdiction, except as permitted in section 1252(e), to review "procedures and policies adopted by the [Secretary] to implement the provisions of section 1225(b)(1)." To the extent that is a new argument, it fails because plaintiffs in this action are *not* challenging the discretionary decision to refrain from placing them in expedited removal under 1225(b)(1), and are instead litigating what the consequences of placing them in section 1229a proceedings should or should not be.

The final issue is the potential applicability of section 1252(e)(3). That subparagraph provides no court, other than the United States District Court for the District of Columbia, has jurisdiction to review "determinations under section 1225(b) of this title and its implementation," including "whether such a . . . written policy directive, written policy guideline, or written

United States District Court
Northern District of California

8

procedure issued by or under the authority of the [Secretary] to implement such section, is not consistent with applicable provisions of this subchapter or is otherwise in violation of law." 8 U.S.C. § 1252(e)(3)(A). On its face, this provision arguably requires plaintiffs' claims to proceed exclusively in the District of Columbia. In light of that concern, the parties were invited to provide further briefing after the hearing on the motion for preliminary relief. *See* Dkt. No. 68.

Plaintiffs argue section 1252(e)(3) is intended only to invest jurisdiction in the district court of the District of Columbia to hear systemic challenges specifically addressing the expedited removal scheme. Thus, plaintiffs argue, the provision's reference to "determinations under section 1225(b) of this title and its implementation," rather than "determinations under section 1225(b)(1)" should be seen as nothing more than a "scrivener's error."

The question is close, because section 1252(e)(3) otherwise would appear to describe the issues presented in this case quite well. As noted, it expressly refers to review of issues such as, "whether such a regulation, or a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement such section, is not consistent with applicable provisions of this subchapter or is otherwise in violation of law." That lines up neatly with the main thrust of plaintiffs' argument here—that contrary to defendants' claim the MPP merely addresses when discretion should be exercised to apply the contiguous territory return provision, by definition the provision in fact does *not* apply to plaintiffs.

Nevertheless, plaintiffs have the better argument that section 1252(e)(3) should not be read to require them to bring these claims in the District of Columbia. Although statutory titles and headings are not dispositive, they are instructive. *See Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47, 128 S. Ct. 2326 (2008) ("To be sure, a subchapter heading cannot substitute for the operative text of the statute . . . [T]he title of a statute  . . . cannot limit the plain meaning of the text. Nonetheless, statutory titles and section headings are tools available for the resolution of a doubt about the meaning of a statute.")(internal quotations and citations omitted).

Here, section 1252 as a whole is entitled, "Judicial review of orders of removal," and most

United States District Court
Northern District of California

of its provisions are focused on issues relating to review of individual decisions to remove an alien. More to the point in question here, subparagraph (e) is entitled "Judicial review of orders under section 1225(b)(1)" (emphasis added). Other sub-subparagraphs of (e) explicitly indicate that they are applicable to challenges to determinations made under 1225(b)(1). *See* §1252(e)(1)(A) (". . . in accordance with section 1225(b)(1) . . .); §1252(e)(2) ("any determination made under section 1225(b)(1) . . . ."); §1252(e)(4)(A) (". . . an alien who was not ordered removed under section 1225(b)(1) of this title"); §1252(e)(5) (". . . an alien has been ordered removed under section 1225(b)(1) of this title").

Given that sub-subparagraphs (1), (2), (4), and (5) of 8 U.S.C §1252(e) all expressly invoke section 1225(b)(1), the mere fact that §1252(e)(3) fails to state "1225(b)(1)" instead of only "1225(b)" is too thin a reed on which to conclude that jurisdiction of this action lies exclusively in the federal court of the District of Columbia. The omission of "(1)" may or may not constitute a "scrivener's error," in the traditional sense of that phrase, but it is not a basis to disregard the clear import of the structure of section 1252 and subparagraph (e).

Challenges to "validity of the system" undeniably are subject to section 1252(e)(3), and therefore arguably subject to exclusive jurisdiction in the District of Columbia.[5] In context, however, "the system" should be understood as a reference to the expedited removal procedure authorized under section 1225(b)(1). There can be no dispute that this action is *not* a challenge to that "system." Rather, plaintiffs acknowledge both that they are subject to expedited removal and that DHS has discretion to place them instead into regular removal proceedings under 8 U.S.C. §1229a. Indeed, in essence, plaintiffs are arguing that because they *are* subject to expedited removal, they should at a minimum have the protections they would enjoy under that regime, either by being exempt from contiguous territorial return, and/or by having additional procedural and substantive protections against being sent to places in which they would not be safe from

---

[5] Plaintiffs contend that even where section 1252(e)(3) applies and permits jurisdiction in the District of Columbia, it does not preclude jurisdiction elsewhere. While that proposition appears dubious at best, the question need not be decided here.

persecution.

Accordingly, this action is not a challenge to the "system" of expedited removal. Given the overall structure of section 1252(e), the most reasonable construction of subparagraph (3) is that it applies only to such challenges. *See Porter v. Nussle*, 534 U.S. 516, 528, 122 S.Ct. 983 (2002). ("The placement of §1146(a) within a subchapter expressly limited to postconfirmation matters undermines Piccadilly's view that §1146(a) covers preconfirmation transfers."). As a result, whether presented as a jurisdictional issue or one of venue, 8 U.S.C. §1252(e)(3) is not a bar to the particular claims plaintiffs present in this forum.[6]

B. <u>Standing</u>

In a footnote, defendants assert "[t]he organizational Plaintiffs lack standing because they lack a 'judicially cognizable interest in the prosecution or nonprosecution of another.'" Opposition at 10, n. 5. (quoting *Linda R.S. v. Richard D*., 410 U.S. 614, 619 (1973)). Defendants concede, however, that their standing arguments are foreclosed by the holding in *East Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1240 (9th Cir. 2018), where the Ninth Circuit held that similarly situated organizational plaintiffs have organizational standing premised on a diversion of resources caused by the challenged government actions. *See id*. at 1242.

Defendants state they "respectfully disagree with that ruling" and question standing only to preserve their rights on appeal. Nevertheless, to the extent defendants argue *East Bay Sanctuary* is factually distinguishable, their position is not persuasive. It is true, as defendants point out, that *East Bay* involved a different statutory provision, and that standing may turn on whether a plaintiff

---

[6] Defendants also seek a discretionary transfer under 28 U.S.C. §1404 to the Southern District of California. Although the MPP was first implemented at a border crossing point in that district, defendants have not shown that the balance of factors applicable under §1404 warrant a transfer. Plaintiffs' choice of forum is supported by the institutional plaintiffs' presence in this district and is therefore entitled to deference. The issues in the litigation largely involve legal questions not tied to any district and/or federal policy decisions not made in or limited to the Southern District of California. The motion to transfer is therefore denied.

is "arguably within the zone of interests to be protected or regulated by the statute . . . in question." *Clarke v. Sec. Indus. Ass'n.*, 479 U.S. 388, 396 (1987).  Nevertheless, the organizational plaintiffs have made a showing that is stronger, if anything, than that in *East Bay Sanctuary.* Plaintiffs' organizational standing in that case was premised on various broad "diversion of resources" arguments and the potential loss of funding. *See, e.g.,* 909 F.3d at 1242 ("The Organizations have also offered uncontradicted evidence that enforcement of the Rule has required, and will continue to require, a diversion of resources, independent of expenses for this litigation, from their other initiatives.")  Here, the organizational plaintiffs have made a showing that the challenged policy directly impedes their mission, in that it is manifestly more difficult to represent clients who are returned to Mexico, as opposed to being held or released into the United States. Additionally, there is no suggestion by defendants that the individual plaintiffs lack standing.  Accordingly, to whatever extent defendants may have challenged standing, there is no basis to preclude preliminary relief on such grounds.[7]

### C.  Showing on the merits

#### 1.  Structure of 8 U.S.C. §1225

The statute at the center of this action is 8 U.S.C. §1225, which is entitled, "Inspection by immigration officers; expedited removal of inadmissible arriving aliens; referral for hearing." Paragraph (a) of the statute provides generally that aliens who are arriving in the United States, or who have not already been admitted, are deemed to be applicants for admission and that they "shall be inspected by immigration officers."[8] Paragraph (b) then divides such applicants for admission into two categories.

Subparagraph (b)(1) is entitled, "[i]nspection of aliens arriving in the United States and

---

[7]  Furthermore, defendants have not challenged the standing of the individual plaintiffs to bring these claims or to seek preliminary relief.

[8] For clarity, all statutory exceptions that are not applicable to plaintiffs and that are not relevant to the statutory construction analysis will be omitted from quotations and the discussion in this order.

certain other aliens who have not been admitted or paroled." It provides, in short, that aliens who arrive in the United States without specified identity and travel documents, or who have committed fraud in connection with admission, are to be "removed from the United States without further hearing or review" unless they apply for asylum or assert a fear of persecution. 8 U.S.C. §1225(b)(1)(A)(i). This procedure is known as "expedited removal."[9]

Subparagraph (b)(1) provides that aliens who indicate either an intention to apply for asylum or a fear of persecution are to be referred to an asylum officer for an interview. §1225(b)(1)(A)(ii). The officer is to make a written record of any determination that the alien has not shown a credible fear. §1225(b)(1)(B)(iii)(II). The record is to include a summary of the material facts presented by the alien, any additional facts relied upon by the officer, and the officer's analysis of why, in the light of such facts, the alien has not established a credible fear of persecution. *Id.*

The alien in that scenario is entitled to review by an immigration judge of any adverse decision, including an opportunity for the alien to be heard and questioned by the immigration judge, either in person or by telephonic or video connection. §1225(b)(1)(B)(iii)(II). Additionally, aliens are expressly entitled to receive information concerning the asylum interview and to consult with a person or persons of the alien's choosing prior to the interview and any review by an immigration judge. §1225(b)(1)(B)(iv). Thus, an alien processed for "expedited" removal under subparagraph (b)(1) still has substantial procedural safeguards against being removed to a place where he or she may face persecution.

Subparagraph (b)(2) is entitled, "[i]nspection of *other* aliens" (emphasis added). It provides that aliens seeking admission are "to be detained for a proceeding under section 1229a of [Title 8]" unless they are "clearly and beyond a doubt entitled to be admitted." §1225(b)(2)(A). Section

---

[9] Subparagraph (b)(1) also expressly gives defendants discretion to apply expedited removal to aliens already present in the United States who have not been legally admitted or paroled, if they are unable to prove continuous presence in the country for more than two years. §1225(b)(1)(A)(iii).

1229a, in turn, is entitled "Removal proceedings" and sets out the procedures under which immigration judges generally "conduct proceedings for deciding the inadmissibility or deportability of an alien." 8 U.S.C. § 1229a (a)(1).

Section 1225 subparagraph (b)(2)(B) *expressly* provides that (b)(2)(A) "*shall not apply* to an alien . . . to whom paragraph (1) applies." Thus, on its face, section 1225 divides applicants for admission into two mutually exclusive categories. Subparagraph (b)(1) addresses aliens who are subject to expedited removal. Subparagraph (b)(2) addresses those who are either clearly and beyond a doubt entitled to admission, or whose application for admission will be evaluated by an administrative law judge in section 1229a proceedings if they are not.

Although not expressly addressing mutual exclusivity of the two categories, the Supreme Court has described the operation of section 1225 similarly:

> [A]pplicants for admission fall into one of two categories, those covered by § 1225(b)(1) and those covered by § 1225(b)(2). Section 1225(b)(1) applies to aliens initially determined to be inadmissible due to fraud, misrepresentation, or lack of valid documentation. See § 1225(b)(1)(A)(i) (citing §§ 1182(a)(6)(C), (a)(7)) . . . . Section 1225(b)(2) is broader. It serves as a catchall provision that applies to all applicants for admission not covered by § 1225(b)(1).

*Jennings v. Rodriguez*, 138 S. Ct. 830, 837 (2018).

As set out above, there is no dispute that the MPP purports to be an implementation of the contiguous territory return provision, which appears in the statute as a sub-subparagraph under subparagraph (b)(2). The provision states, in full:

> In the case of an alien described in subparagraph (A) who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, the Attorney General may return the alien to that territory pending a proceeding under section 1229a of this title.

8 U.S.C. §1225(b)(2)(C).[10]

---

[10] Plaintiffs' complaint includes an assertion that the contiguous territory return provision may

CASE NO. 19-cv-00807-RS

On its face, therefore, the contiguous territory return provision may be applied to aliens described in subparagraph (b)(2)(A). Pursuant to subparagraph (b)(2)(B), however, that *expressly* excludes any alien "to whom paragraph (1) applies."

### 2. *Application of the contiguous territory return provision to the individual plaintiffs*

At least for purposes of this motion, there is no dispute that the individual plaintiffs are asylum seekers who lack valid admission documents, and who therefore ordinarily would be subject to expedited removal proceedings under subparagraph (1) of section 1225. Applying the plain language of the statute, they simply are not subject to the contiguous territory return provision.

Defendants advance three basic arguments to contend the plain language should not apply and that therefore the MPP represents a legal exercise of DHS's authority under the contiguous return provision. First, defendants rely on well-established law, conceded by plaintiffs, that DHS has prosecutorial discretion to place aliens in regular removal proceedings under section 1229a notwithstanding the fact that they would qualify for expedited removal under subparagraph (b)(1). Indeed, defendants are correct that the apparently mandatory language of subparagraph (b)(1)— "the officer *shall* order the alien removed from the United States without further hearing or review . . . ."—does not constrain DHS's discretion.

In *Matter of E-R-M- & L-R-M*, 25 I. & N. Dec. 520 (BIA 2011) the Board of Immigration Appeals rejected a contention that aliens subject to expedited removal could not be placed directly into 1229a proceedings instead.

––––––––––––––––––––––

lawfully be applied only to aliens who are "from" the contiguous territory. Complaint, para. 149. It may be the individual plaintiffs contend they are not subject to the provision because they are "from" countries other than Mexico. Plaintiffs did not advance this point in briefing, and it is not compelling. The statute refers to aliens "arriving on land . . . from a foreign territory contiguous to the United States." This language plainly describes the alien's entry point, not his or her country of origin.

> [W]e observe that the issue arises in the context of a purported restraint on the DHS's exercise of its prosecutorial discretion. In that context, we find that Congress' use of the term "shall" in section 235(b) (1) (A) (i) of the Act does not carry its ordinary meaning, namely, that an act is mandatory. It is common for the term "shall" to mean "may" when it relates to decisions made by the Executive Branch of the Government on whether to charge an individual and on what charge or charges to bring.

25 I. & N. Dec. at 522; *see also*, *Matter of J-A-B*, 27 I. & N. Dec. 168 (BIA 2017) ("The DHS's decision to commence removal proceedings involves the exercise of prosecutorial discretion, and neither the Immigration Judges nor the Board may review a decision by the DHS to forgo expedited removal proceedings or initiate removal proceedings in a particular case."). Plaintiffs do not dispute that DHS holds such discretion and even expressly acknowledge it in the complaint. *See* Complaint, para. 73 ("Although most asylum seekers at the southern border lack valid entry documents and are therefore eligible to be placed in expedited removal, it is well established that the government has discretion to decline to initiate removal proceedings against any individual; to determine which charges to bring in removal proceedings; and to place individuals amenable to expedited removal in full removal proceedings instead.")

Thus, defendants are correct that DHS undoubtedly has discretion to institute regular removal proceedings even where subparagraph (b)(1) suggests it "*shall* order the alien removed." The flaw in defendants' argument, however, is that DHS cannot, merely by placing an individual otherwise subject to expedited removal into section 1229a regular removal proceedings instead, somehow write out of existence the provision in subparagraph (b)(2) of section 1225 that the contiguous territory return provision does *not* apply to persons to whom subparagraph (b)(1) *does* apply. Exercising discretion to process an alien under section 1229a instead of expedited removal under section 1225(b)(1) does not mean the alien is somehow *also* being processed under section 1225(b)(2).

DHS may choose which *enforcement* route it wishes to take—1125(b)(1) expedited removal, or 1229a regular removal—but it is not thereby making a choice as to whether

1    1125(b)(1) or 1125(b)(2) applies. The language of those provisions, not DHS, determines into

2    which of the two categories an alien falls.

3        The *E-R-M- & L-R-M* decision further illustrates this distinction. There, as discussed

4    above, the Board of Immigration Appeals held DHS has discretion to place aliens subject to

5    expedited removal under subparagraph (b)(1) into regular removal proceedings. Observing that

6    other aliens are *entitled* to regular removal under (b)(2), the Board found the express exclusion

7    from (b)(2) of aliens to whom (b)(1) applies means only that they are not *entitled* to regular

8    removal, not that the DHS lacks discretion to place them in it. 25 I. & N. Dec. at 523. Thus, the

9    decision recognizes that such persons remain among those to whom (b)(1) applies and who are

10   thereby excluded from treatment under (b)(2).

11       Defendants' second argument overlaps with their first. In light of the discretion DHS has to

12   place aliens eligible for expedited removal into section 1229a proceedings, defendants contend

13   subparagraph (b)(1) only "applies"—thereby triggering the exclusion from subparagraph (b)(2)—

14   when DHS elects actually to apply it to a particular alien.  This argument is not supportable under

15   the statutory language. Subparagraph (b)(2) provides that it "shall not apply to an alien . . . to

16   whom paragraph (1) *applies*." The relevant inquiry therefore is whether the *language* of

17   subparagraph (b)(1) encompasses the alien, not whether *DHS* has decided to apply the provisions

18   of the subparagraph to him or her. Because there is no dispute the language of subparagraph (b)(1)

19   describes persons in the position of the individual plaintiffs, the exclusion from subparagraph

20   (b)(2) reaches them.

21       Finally, defendants make a statutory intent argument based on the circumstances under

22   which the contiguous return provision was originally enacted. Defendants assert the provision was

23   adopted by Congress as a direct response to the Board of Immigration Appeals decision in *Matter

24   of Sanchez-Avila*, 21 I. & N. Dec. 444 (BIA 1996). In *Sanchez-Avila*, the government argued it

25   had a long-standing and legal practice of, in some instances, "[r]equiring aliens to remain in

26   Mexico or Canada pending their exclusion proceedings." *Id.* at 450. The government noted that it

27   has "plenary power . . . . to preserve its dominion" and a "legal right to preserve the integrity of its

28

United States District Court
Northern District of California

1  borders and ultimately its sovereignty." *Id.* Accordingly, the government argued, "its exclusion

2  policy of requiring certain aliens to await their exclusion hearings in either Mexico or Canada"

3  was "a practical exercise of plenary power." *Id.*

4      The *Sanchez-Avila* decision concluded that whatever "plenary power" the government

5  might otherwise have, it had not shown the alleged practice of returning aliens to Mexico (or

6  Canada) pending removal proceedings was "longstanding" with an "unchallenged history." *Id.* at

7  465. Nor could the plaintiffs show there was "explicit statutory or regulatory authority for a

8  practice of returning applicants for admission at land border ports to Mexico or Canada

9  to await their hearings." *Id.* As a result, the Board declined to treat the practice as valid. *Id.*

10      Defendants contend that because the contiguous territory return provision purportedly was

11  a direct Congressional response to *Sanchez-Avila,* it should be seen as authorizing the return of

12  aliens such as the named plaintiffs. The first and most fundamental problem with defendants'

13  argument, however, is that the plaintiff alien "returned" to Mexico in *Sanchez-Avila* was a resident

14  alien commuter whose application for entry was not granted given apparent grounds to exclude

15  him for "involvement with controlled substances." *Id.* at 445. Thus, there is no indication he was

16  an undocumented applicant for admission subject to expedited removal under subparagraph (b)(1).

17  To the extent Congressional intent to supersede the result of *Sanchez-Avila* can be inferred, doing

18  so would not show Congress intended the contiguous territory return provision to apply to aliens

19  subject to subparagraph (b)(1).

20      Plaintiffs insist that, to the contrary, it is reasonable to assume Congress affirmatively

21  wished to exclude aliens subject to expedited removal from the contiguous territory return

22  provision. Plaintiffs suggest because refugees and asylum seekers are among those most likely to

23  lack proper admission documents and therefore be subject to expedited removal, it is perfectly

24  sensible that Congress would expressly exclude them from the contiguous territory return

25  provision.

26      The record supports no clear conclusion of any Congressional intent beyond that

27  implemented in the plain language of the statute. It is certainly possible that if squarely presented

28

United States District Court
Northern District of California

with the question, Congress could and would choose to authorize DHS to impose contiguous territory return on aliens subject to expedited removal, and that the appearance of the provision in subparagraph (b)(2) was essentially a matter of poor drafting. It is also possible, however, that Congress authorized contiguous return only for aliens not subject to expedited removal because that was the particular issue presented by *Sanchez-Avila* and/or because there was no indication of any pressing need to "return" persons during the presumably faster process of expedited removal.[11]  Given the unambiguous language and structure of the statute, speculation about unexpressed Congressional intent does not advance the analysis.

Finally, the conclusion that plaintiffs and others similarly situated are not subject to the contiguous territory return provision is neither irrational nor unfair. While at first blush it might appear they thereby are in a better position than those who are not encompassed by section 1225(b)(1), any such perceived "advantage" flows only from the exercise of DHS's prosecutorial discretion. If persons in plaintiffs' position should not be admitted to this country, DHS retains full statutory authority to process them for expedited removal, and to detain them pending such proceedings. Accordingly, plaintiffs have made a strong showing that they are likely to succeed on the merits with respect to their claim that the MPP lacks a legal basis for applying the contiguous territory return provision in this context.

### 3.  Refoulement safeguards

Even if, contrary to the preceding discussion, the contiguous territory return provision

---

[11]  Even assuming plaintiffs are correct that persons subject to expedited removal are more likely to be asylum seekers with credible fear of persecution if not admitted, that alone would not be a basis to exclude them from contiguous territory return. If the statute were amended, or if the statutory construction of this order were rejected on appeal, that concern would more appropriately be addressed by adopting appropriate statutory and/or regulatory safeguards against "refoulement," rather than simply concluding contiguous territory return should never be applied to such persons. It is also worth noting that an asylum seeker from some country other than Mexico will not automatically be at undue risk of persecution in Mexico, even if he or she can present an extremely compelling case of persecution in his or her country of origin.

United States District Court
Northern District of California

CASE NO.  19-cv-00807-RS

could be lawfully applied to the individual plaintiffs and others like them, that does not

end the inquiry. Defendants openly acknowledge they must comply with the government's legal

obligations to avoid refoulement when removing aliens to a contiguous or any other territory

pending conclusion of section 1229a proceedings. The United States is bound by the United

Nations 1951 Convention relating to the Status of Refugees.[12] Article 33 of the Convention

provides:

> No Contracting State shall expel or return ("refouler") a refugee in
> any manner whatsoever to the frontiers of territories where his life
> or freedom would be threatened on account of his race, religion,
> nationality, membership of a particular social group or political
> opinion.

The United States has codified at least some of its obligations under the Convention at 8

U.S.C. §1231(b)(3). That section is entitled "Restriction on removal to a country where alien's life

or freedom would be threatened," and its provisions and the regulations thereunder provide for

hearings and reviews far beyond what is required by the MPP and implementing guidance. DHS

insists section 1231(b)(3) and its regulations do not apply here because it refers only to

circumstances where an alien is *removed*, as opposed to "returned."

Defendants' argument ignores that the section is admittedly intended to implement the

United States' obligations under the Convention, which expressly refer to "expel or return."

Additionally, while the record is not completely clear, there is a suggestion the prior statutory

language of "deport or return" was amended to substitute the term "remove" only as a result of the

consolidation of deportation and exclusion proceedings into unitary "removal" proceedings in

1996. If so, there would be no reason to infer the change was intended to make a substantive

alteration to the government's obligations to avoid refoulement.

That said, it is not clear that defendants would be obligated to provide the full panoply of

---

[12] The United States is not a direct party to the Convention, but is a party to the 1967 Protocol
Relating to the Status of Refugees, which incorporates Articles 2-34 of the Convention.

procedural and substantive protections prescribed under §1231(b)(3) and its implementing regulations, even assuming the individual plaintiffs are subject to "return" under the contiguous territory return provision. First, as noted above and as reflected generally in subdivision (b) of §1231, the potential issues relating to sending an alien to a contiguous territory as opposed to his or her "home" country may not be identical. Moreover, in this action plaintiffs are *not* contending the protections against refoulement provided under subparagraph (b)(1) of section 1225 for those placed in expedited return are insufficient. Those restrictions are quite clearly less restrictive than are required under §1231(b)(3).

Second, even though plaintiffs are not contending that DHS *must* place them in expedited removal, all their arguments depend on the fact that the expedited removal statute applies to them, absent prosecutorial discretion. Thus, it would be anomalous to conclude that they necessarily are entitled to *greater* procedural and substantive protections against refoulement—i.e., those prescribed by §1231(b)(3)—upon temporary "return" to Mexico than they would receive if the government instead elected simply to remove them permanently on an expedited basis.

Accordingly, to the extent plaintiffs contend section §1231(b)(3) applies to persons being "returned" under the contiguous territory return provision, they have not shown they are more likely than not to succeed on the merits of such an argument. That, however, does not answer the question of whether the MPP includes sufficient safeguards against refoulement.

At the preliminary injunction stage, it is neither possible nor necessary to determine what the minimal anti-refoulement procedures might be. Plaintiffs have established that persons placed in expedited removal proceedings, and persons who ultimately are found removable under section 1229a, all benefit from protections not extended to the individual plaintiffs here. The issue in this case is only whether the MPP's protections for persons like the individual plaintiffs comply with the law. Even assuming neither §1231(b)(3) nor the more limited procedures under expedited removal apply, plaintiffs have shown they are more likely than not to prevail on the merits of their contention that defendants adopted the MPP without sufficient regard to refoulement issues. Notably, the CIS Policy Memorandum, AR 2273 n.5, expressly acknowledges the government's

obligations "vis-à-vis the 1951 Convention and 1967 Protocol are reflected in Section 241(b)(3)(B)." The subsequent conclusion of that memo that "the reference to Section 241(b)(3)(B) should not be construed to suggest that Section 241(b)(3)(B) applies to MPP," may ultimately be supportable. It leaves open, however, the question of what the government's obligations are.

As noted above, the MPP provides only for review of potential refoulement concerns when an alien "affirmatively" raises the point. Access to counsel is "currently" not available. AR 2273. While an CIS officer's determination is subject to review by a supervisory asylum officer, no administrative review proceedings are available. AR 2274. These procedures undeniably provide less protection than prior legislative and administrative rulemaking procedures have concluded is appropriate upon removal, either expedited or regular.  While it might be rational to treat "return" differently, the rules must be adopted in conformance with administrative law and with governments anti-refoulement obligations. Without opining as to what minimal process might be required, plaintiffs' showing on this point suffices.

### 4. Plaintiffs' specific claims for relief

The first claim for relief set out in the complaint asserts the MPP is "contrary to law" because the contiguous return provision does not apply to persons in the position of the individual plaintiffs. As set out above, plaintiffs have the better argument on this point.

Plaintiffs' second claim for relief asserts that under 5 U.S.C. § 553(b) and (c), defendants may not adopt a "rule" without providing notice and an opportunity for comment. If it were the case that the MPP represents a lawful exercise of DHS's discretion to implement the contiguous territory return provision, plaintiffs would have no tenable "notice and comment" claim regarding that exercise of prosecutorial discretion.

Additionally, even given the conclusion above that the contiguous return provision does *not* provide a legal basis for the MPP, the issue does not rise to a violation of the notice and comment provisions under the APA. Rather, plaintiffs' claim for relief with respect to notice and

United States District Court
Northern District of California

comment is implicated if, and only if, they are subject to the contiguous territory return provision, notwithstanding the discussion above. In that instance, the question would be whether the defendants were obligated to comply with APA notice and comment rules with respect to adopting procedures to address refoulement concerns. Plaintiffs' complaint appears to recognize this point, and focuses on the allegation that the MPP procedures for addressing an alien's risk of persecution upon return to Mexico were not adopted after notice and comment.

If defendants simply were to proceed by applying the existing procedures and regulations of §1231(b)(3) to temporary "returns" under the contiguous territory return provision, they might have a good argument that no "notice and comment" procedure would be required. If, however, defendants take the position—which may be completely reasonable—that a different set of procedures should apply to contiguous territory "returns," compliance with APA notice and comment procedures more likely than not would be required. Accordingly, plaintiffs have shown they have a likelihood of success on the merits of their notice and comment claim.

The third claim for relief set out in the complaint alleges, in essence, that the adoption of the MPP was arbitrary and capricious as a whole, and that it effectively "deprives asylum seekers of a meaningful right to apply for asylum." The sixth claim for relief, which may be duplicative, also asserts impairment of the right to seek asylum. At this juncture, it is not necessary to determine whether plaintiffs might be able to prove such broader and/or "catch-all" claims.

Finally, the fourth claim for relief[13] avers the MPP is contrary to law because it has inadequate provisions to protect against refoulement. The claim invokes the UN Convention, the Protocols, section 1231(b)(3), and its implementing regulations. As discussed above, plaintiffs have not shown they are likely to prove section 1231(b)(3) applies directly. Their claims about refoulement nevertheless likely merge with their "notice and comment" and/or catch-all claims under the second and third claims for relief.  Thus, in the event DHS has statutory authority to

---

[13] As noted above, the present motion does not address the fifth claim for relief, which is not grounded in the APA.

United States District Court
Northern District of California

apply the contiguous return provision to plaintiffs and others in their position, plaintiffs have shown a likelihood of success on the refoulement issue, whether that is best characterized as a claim under their second, third, or fourth claims for relief, or some combination thereof.

### C.  Other injunction factors

Under the familiar standards, plaintiffs who demonstrate a likelihood of success on the merits, as plaintiffs have done here, must also show they are "likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 21-22. While the precise degree of risk and specific harms that plaintiffs might suffer in this case may be debatable, there is no real question that it includes the possibility of irreparable injury, sufficient to support interim relief in light of the showing on the merits.

The individual plaintiffs present uncontested evidence that they fled their homes in El Salvador, Guatemala, and Honduras to escape extreme violence, including rape and death threats. One plaintiff alleges she was forced to flee Honduras after her life was threatened for being a lesbian. Another contends he suffered beatings and death threats by a "death squad" in Guatemala that targeted him for his indigenous identity. Plaintiffs contend they have continued to experience physical and verbal assaults, and live in fear of future violence, in Mexico.

Defendants attempt to rebut the plaintiffs' showing of harm by arguing the merits—contending the individual plaintiffs were all "processed consistent[ly] with applicable law" and had sufficient opportunity to assert any legitimate fears of return to Mexico. As reflected in the discussion above, however, plaintiffs have made a strong showing that defendants' view of the law on those points is not correct. The organizational plaintiffs have also shown a likelihood of harm in terms of impairment of their ability to carry out their core mission of providing representation to aliens seeking admission, including asylum seekers. *Cf. East Bay Sanctuary*, 909 F.3d at 1242 (describing cognizable harms to organizational plaintiffs for standing purposes.)

Finally, the balance of equities and the public interest support issuance of preliminary

1    relief. As observed in *East Bay Sanctuary*:

2            the public has a "weighty" interest "in efficient administration of the
3            immigration laws at the border." *Landon v. Plasencia*, 459 U.S. 21,
         34, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982). But the public also has an
4            interest in ensuring that "statutes enacted by [their] representatives"
         are not imperiled by executive fiat. *Maryland v. King*, 567 U.S.
5            1301, 1301, 133 S.Ct. 1, 183 L.Ed.2d 667 (2012) (Roberts, C.J., in
         chambers).
6

7    909 F.3d at 1255. Additionally, similar to the situation in *East Bay Sanctuary*, while this

8    injunction will bring a halt to a current and expanding policy, and in that sense technically does

9    not preserve the "status quo," it will only "temporarily restore[] the law to what it had been for

10   many years prior." *Id.*

11

12        D.   Scope of injunction

13        Defendants urge that any injunction be limited in geographical scope. As the *East Bay*

14   *Sanctuary* court recently observed, there is "a growing uncertainty about the propriety of universal

15   injunctions." 909 F.3d at 1255.

16        Nevertheless, as *East Bay Sanctuary* also noted:

17           In immigration matters, we have consistently recognized the
         authority of district courts to enjoin unlawful policies on a universal
18           basis. *Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*,
         908 F.3d 476, 511 (9th Cir. 2018) ("A final principle is also
19           relevant: the need for uniformity in immigration policy."); *Hawaii v.
         Trump*, 878 F.3d 662, 701 (9th Cir. 2017), rev'd on other grounds, –
20           — U.S. —, 138 S. Ct. 2392, 201 L.Ed.2d 775 (2018) ("Because this
         case implicates immigration policy, a nationwide injunction was
21           necessary to give Plaintiffs a full expression of their rights.");
         *Washington [v. Trump]*, 847 F.3d [1151 (9th Cir. 2017) at 1166–67
22           ("[A] fragmented immigration policy would run afoul of the
         constitutional and statutory requirement for uniform immigration
23           law and policy." (citing *Texas v. U.S.*, 809 F.3d 134, 187–88 (5th
         Cir. 2015)) ). "Such relief is commonplace in APA cases, promotes
24           uniformity in immigration enforcement, and is necessary to provide
         the plaintiffs here with complete redress." *Univ. of Cal.*, 908 F.3d at
25           512.

26

27

28

United States District Court
Northern District of California

*Id.* Although issues sometimes arise when a ruling in a single judicial district is applied nationwide, defendants have not shown the injunction in this case can be limited geographically. This is not a case implicating local concerns or values. There is no apparent reason that any of the places to which the MPP might ultimately be extended have interests that materially differ from those presented in San Ysidro. Accordingly, the injunction will not be geographically limited.[14]

E.   Bond and stay issues

No party has suggested that it would be appropriate to condition issuance of a preliminary injunction upon the posting of a bond under the circumstances of this case. No bond will be required.[15] At argument, defendants moved orally for a stay pending appeal of any injunctive relief that might issue. Defendants contend the MPP was adopted to address certain aspects of a crisis. Even fully crediting defendants' characterization of the circumstances, they have not shown that a stay of this injunction is warranted. *See East Bay Sanctuary,* 909 F.3d at 1255. Accordingly, the request for a stay during the pendency of appeal will be denied. To permit defendants to exercise their right to seek a stay from the Court of Appeal, however, this order will not take effect until 5:00 p.m., PST, April 12, 2019.

---

[14] While the injunction precludes the "return" under the MPP of any additional aliens who would otherwise be subject to expedited removal, nothing in the order determines if any individuals, other than those appearing as plaintiffs in this action, should be offered the opportunity to re-enter the United States pending conclusion of their section1229a proceedings. Nor does anything in the injunctive relief require that any person be *paroled* into the country during such proceedings. DHS will have discretion to detain the individual plaintiffs and others when they are allowed back across the border.

[15] On its face, Federal Rule of Civil Procedure 65(c) permits a court to grant preliminary injunctive relief "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The Ninth Circuit has made clear, however, that "[d]espite the seemingly mandatory language, Rule 65(c) invests the district court with discretion as to the amount of security required, *if any.*" *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009)(citations and quotations omitted, emphasis in original). This is not a case where a bond would serve to protect against quantifiable harm in any event.

United States District Court
Northern District of California

V. CONCLUSION

Plaintiffs' motion for a preliminary injunction is granted.  Defendants are hereby enjoined and restrained from continuing to implement or expand the "Migrant Protection Protocols" as announced in the January 25, 2018 DHS policy memorandum and as explicated in further agency memoranda. Within 2 days of the effective date of this order, defendants shall permit the named individual plaintiffs to enter the United States. At defendants' option, any named plaintiff appearing at the border for admission pursuant to this order may be detained or paroled, pending adjudication of his or her admission application.

This order shall take effect at 5:00 p.m., PST, April 12, 2012.

**IT IS SO ORDERED**.

Dated:  April 8, 2019

_____
RICHARD SEEBORG
United States District Judge

United States District Court
Northern District of California

CASE NO. 19-cv-00807-RS