**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| INNOVATION LAW LAB; CENTRAL AMERICAN RESOURCE CENTER OF NORTHERN CALIFORNIA; CENTRO LEGAL DE LA RAZA; UNIVERSITY OF SAN FRANCISCO SCHOOL OF LAW IMMIGRATION AND DEPORTATION DEFENSE CLINIC; AL OTRO LADO; TAHIRIH JUSTICE CENTER, *Plaintiffs-Appellees,* <br><br> v. <br><br> CHAD WOLF, Acting Secretary of Homeland Security, in his official capacity; U.S. DEPARTMENT OF HOMELAND SECURITY; KENNETH T. CUCCINELLI, Acting Director, U.S. Citizenship and Immigration Services, in his official capacity; ANDREW DAVIDSON, Acting Chief of Asylum Division, U.S. Citizenship and Immigration Services, in his official capacity; UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES; TODD C. OWEN, Executive Assistant Commissioner, Office of Field Operations, U.S. Customs and Border Protection, in his official | No. 19-15716 <br><br> D.C. No. 3:19-cv-00807-RS <br><br><br> OPINION |

2          INNOVATION LAW LAB V. WOLF

capacity; U.S. CUSTOMS AND
BORDER PROTECTION; MATTHEW T.
ALBENCE, Acting Director, U.S.
Immigration and Customs
Enforcement, in his official capacity;
U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT,
                    *Defendants-Appellants.*

Appeal from the United States District Court
for the Northern District of California
Richard Seeborg, District Judge, Presiding

Argued and Submitted October 1, 2019
San Francisco, California

Filed February 28, 2020

Before:  Ferdinand F. Fernandez, William A. Fletcher,
and Richard A. Paez, Circuit Judges.

Opinion by Judge W. Fletcher;
Dissent by Judge Fernandez

# SUMMARY[*]

### Immigration /Preliminary Injunctions

The panel affirmed the district court's grant of a preliminary injunction setting aside the Migrant Protection Protocols ("MPP"), under which non-Mexican asylum seekers who present themselves at the southern border of the United States are required to wait in Mexico while their asylum applications are adjudicated.

After the MPP went into effect in January 2019, individual and organizational plaintiffs sought an injunction, arguing, *inter alia*, that the MPP is inconsistent with the Immigration and Nationality Act ("INA"), and that they have a right to a remedy under the Administrative Procedure Act ("APA"). The district court issued a preliminary injunction setting aside the MPP.

The Government appealed and requested an emergency stay in this court pending appeal. In three written opinions, a motions panel unanimously granted the emergency stay. In a per curiam opinion, the motions panel disagreed, by a vote of two to one, with the district court's holding that plaintiffs were likely to succeed in their statutory argument that the MPP is inconsistent with 8 U.S.C. § 1225(b). Judge Watford concurred in that opinion, but wrote separately to express concern that the MPP is arbitrary and capricious because it lacks sufficient non-refoulement protections. Judge Fletcher

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

concurred only in the result, arguing that the MPP was inconsistent with 8 U.S.C. § 1225(b).

The current panel first noted that the individual plaintiffs, all of whom have been returned to Mexico under the MPP, obviously have standing. The panel also concluded that the organizational plaintiffs have standing, noting their decreased ability to carry out their core missions as well as diversion of their resources.

Addressing the question of whether a merits panel is bound by the analysis of a motions panel on a question of law, the panel followed *East Bay Sanctuary Covenant v. Trump*, Nos. 18-17274 and 18-17436 (9th Cir. Feb. 28, 2020), argued on the same day as this case, in which the court held that a motions panel's legal analysis, performed during the course of deciding an emergency motion for a stay, is not binding on later merits panels. The panel also concluded that, even if a merits panel may be bound in some circumstances by a motions panel, this panel would not be bound: two of the three judges on the motions panel disagreed in part with the Government's legal arguments in support of the MPP, and the panel's per curiam opinion did not purport to decide definitively the legal questions presented. In this respect, the panel noted that Judge Fletcher specifically addressed the effect of the legal analysis of the motions panel and expressed the hope that the merits panel, with the benefit of full briefing and argument, would decide the legal questions differently.

On the merits, the panel concluded that plaintiffs had shown a likelihood of success on their claim that the return-to-Mexico requirement of the MPP is inconsistent with § 1225(b). The Government argued that the MPP is authorized by § 1225(b)(2), which provides that, for certain

aliens arriving on land from a foreign territory contiguous to the United States, the Attorney General may return the aliens to that territory pending removal proceedings. Plaintiffs argued, however, that they were arriving aliens under § 1225(b)(1), rather than under § 1225(b)(2), and pointed out that there is a contiguous territory return provision in § (b)(2), but no such provision in § (b)(1).

The panel agreed, explaining that there are two distinct categories of "applicants for admission" under § 1225. First, there are applicants described under § 1225(b)(1), who are inadmissible based on either of two grounds, both of which relate to their documents or lack thereof. Such applicants may be placed in either expedited removal proceedings or regular removal proceedings under § 1229a. Second, there are applicants described under § 1225(b)(2), who are, in the words of the statute, "other aliens," "to whom paragraph [(b)](1)" does not apply; that is, § (b)(2) applicants are those who are inadmissible on grounds other than the two specified in § (b)(1). Such applicants are placed in regular removal proceedings. The panel noted that both § (b)(1) and § (b)(2) applicants can be placed in regular removal proceedings under § 1229a, though by different routes, but concluded that a § (b)(1) applicant does not become a § (b)(2) applicant, or vice versa, by virtue of being placed in a removal proceeding under § 1229a.

Addressing the precise statutory question posed by the MPP, the panel held that a plain-meaning reading of § 1225(b)—as well as the Government's longstanding and consistent practice—made clear that a § (b)(1) applicant may not be "returned" to a contiguous territory under § 1225(b)(2)(C), which is a procedure specific to a § (b)(2) applicant.

The panel next concluded that plaintiffs had shown a likelihood of success on their claim that the MPP does not comply with the United States' treaty-based non-refoulement obligations codified at 8 U.S.C. § 1231(b).   The panel explained that refoulement occurs when a government returns aliens to a country where their lives or liberty will be threatened on account of race, religion, nationality, membership of a particular social group, or political opinion. Further, the United States is obliged by treaty—namely, the 1951 United Nations Convention Relating to the Status of Refugees and the 1967 United Nations Protocol Relating to the Status of Refugees—and implementing statute—namely, § 1231(b)—to protect against refoulement of aliens arriving at the country's borders.

Plaintiffs argued that the MPP provides insufficient protection against refoulement.  First, under the MPP, to stay in the United States during proceedings, an asylum seeker must show that it is "more likely than not" that he or she will be persecuted in Mexico, but that standard is higher than the ordinary standing in screening interviews, in which aliens need only establish a "credible fear," which requires only a "significant possibility" of persecution.  Second, an asylum seeker under the MPP is not entitled to advance notice of, and time to prepare for, the hearing with the asylum officer; to advance notice of the criteria the asylum officer will use; to the assistance of a lawyer during the hearing; or to any review of the asylum officer's determination.  Third, an asylum officer acting under the MPP does not ask an asylum seeker whether he or she fears returning to Mexico; instead, asylum seekers must volunteer, without any prompting, that they fear returning.  The Government disagreed with plaintiffs on the grounds that: 1) § 1231(b) does not encompass a general non-

refoulement obligation; and 2) the MPP satisfies non-refoulement obligations by providing sufficient procedures.

The panel rejected both arguments. With respect to the second argument, the panel noted that the Government pointed to no evidence supporting its speculations either that aliens will volunteer that they fear returning to Mexico, or that there is little danger to non-Mexican aliens in Mexico. The panel also noted that the Government provided no evidence to support its claim that any violence that returned aliens face in Mexico is unlikely to be violence on account of a protected ground. Further, the panel quoted numerous sworn declarations to the district court that directly contradicted the unsupported speculations of the Government.

Addressing the other preliminary injunction factors, the panel concluded that there is a significant likelihood that the individual plaintiffs will suffer irreparable harm if the MPP is not enjoined; uncontested evidence in the record establishes that non-Mexicans returned to Mexico under the MPP risk substantial harm, even death, while they await adjudication of their applications for asylum. Further, the panel concluded that the balance of factors favored plaintiffs. While the Government has an interest in continuing to follow the directives of the MPP, the strength of that interest is diminished by the likelihood that the MPP is inconsistent with §§ 1225(b) and 1231(b). On the other side, the individual plaintiffs risk substantial harm, and the organizational plaintiffs are hindered in their ability to carry out their missions. The panel concluded that public interest similarly favored plaintiffs: while the public has a weighty interest in efficient administration of the immigration laws, the public also has an interest in ensuring that statutes enacted by their representatives are not imperiled by executive fiat.

Finally, considering the scope of the district court's injunction, the panel concluded that the district court did not abuse its discretion in setting aside the MPP. The panel recognized that nationwide injunctions have become increasingly controversial, but noted that it was a misnomer to call this order "nationwide," as it operates only at the southern border and directs the action of officials only in four states. The panel explained that the district court did not abuse its discretion for two mutually reinforcing reasons. First, the APA provides that a reviewing court shall "set aside" action that is not in accordance with the law and that there is a presumption that an offending agency action should be set aside in its entirety. Second, cases implicating immigration policy have a particularly strong claim for uniform relief, and this court has consistently recognized the authority of district courts to enjoin unlawful policies on a universal basis. The panel also observed that the Fifth Circuit, one of only two other federal circuits with states along the southern border, has held that nationwide injunctions are appropriate in immigration cases.

Dissenting, Judge Fernandez wrote that he believes that this panel is bound by the motions panel's published decision in this case. Judge Fernandez wrote that the panel is bound by the law of the circuit, which binds all courts within a particular circuit, including the court of appeals itself, and remains binding unless overruled by the court sitting en banc, or by the Supreme Court. Further, Judge Fernandez wrote that, insofar as factual differences might allow precedent to be distinguished on a principled basis, in this case, the situation before this panel is in every material way the same as that before the motions panel. Judge Fernandez also stated that, in *Lair v. Bullock*, 798 F.3d 736 (9th Cir. 2015), this court held that a motions panel's published opinion binds

future panels the same as does a merits panel's published opinion. Judge Fernandez also concluded that the law of the case doctrine binds this panel, noting that he did not perceive any of the exceptions to the doctrine to be involved here.

Applying those doctrines, Judge Fernandez concluded that: 1) plaintiffs are not likely to succeed on their claim that the MPP was not authorized by § 1225(b)(2)(C); 2) plaintiffs are not likely to succeed on their claim that the MPP's adoption violated the notice and comment provisions of the APA; and 3) the preliminary injunction should be vacated. Judge Fernandez stated that he expressed no opinion on whether the district court could issue a narrower injunction.

## COUNSEL

Scott G. Stewart (argued), Deputy Assistant Attorney General; Archith Ramkumar, Trial Attorney; Erez Reuveni, Assistant Director; William C. Peachey, Director; Joseph H. Hunt, Assistant Attorney General; Office of Immigration Litigation, United States Department of Justice, Washington, D.C., Washington, D.C.; for Defendants-Appellants.

Judy Rabinovitz (argued), Michael Tan, Omar Jadwat, Lee Gelernt, Anand Balakrishnan, and Daniel Galindo, American Civil Liberties Union Foundation, Immigrants' Rights Project, New York, New York; Jennifer Chang Newell, Katrina Eiland, Cody Wofsy, and Julie Veroff, American Civil Liberties Union Foundation, Immigrants' Rights Project, San Francisco, California; Melissa Crow, Southern Poverty Law Center, Washington, D.C.; Mary Bauer, Southern Poverty Law Center, Charlottesville, Virginia; Gracie Willis, Southern Poverty Law Center, Decatur,

Georgia; Michelle P. Gonzalez, Southern Poverty Law Center, Miami, Florida; Sean Riordan and Christine P. Sun, American Civil Liberties Union Foundation of Northern California Inc., San Francisco, California; Blaine Bookey, Karen Musalo, Eunice Lee, Kathryn Jastram, and Sayoni Maitra, Center for Gender and Refugee Studies, San Francisco, California; Steven Watt, ACLU Foundation Human Rights Program, New York, New York; for Plaintiffs-Appellees.

Adeel A. Mangi, Muhammad U. Faridi, Elizabeth Riordan Hurley, W. Robert Fair, and A. Robert Quirk, Patterson Belknap Webb & Tyler LLP, New York, New York, for Amicus Curiae Local 1924.

Alan E. Schoenfeld and Olga Musayev, Wilmer Cutler Pickering Hale and Dorr LLP, New York, New York; Julia Prochazka, Wilmer Cutler Pickering Hale and Dorr LLP, Boston, Massachusetts; Harold Hongju Koh, Rule of Law Clinic, Yale Law School, New Haven, Connecticut; for Amici Curiae Former U.S. Government Officials.

Xiao Wang, Rakesh Kilaru, Aleshadye Getachew, and Sophia Cooper, Wilkinson Walsh & Eskovitz LLP, Washington, D.C.; Chanakya A. Sethi, Wilkinson Walsh & Eskovitz LLP, New York, New York; for Amici Curiae Amnesty International USA, The Washington Office on Latin America, The Latin America Working Group, & Imumi.

Eleni Bakst, Human Rights First, New York, New York; W. Hardy Callcott, Naomi A. Igra, and Tom Magaña, Sidley Austin LLP, San Francisco, California; for Amicus Curiae Human Rights First.

Ana C. Reyes, Williams & Connolly LLP, Washington, D.C.; Alice Farmer, United Nations High Commissioner for Refugees, Washington, D.C.; for Amicus Curiae United Nations High Commissioner.

---

## OPINION

W. FLETCHER, Circuit Judge:

Plaintiffs brought suit in district court seeking an injunction against the Government's recently promulgated Migrant Protection Protocols ("MPP"), under which non-Mexican asylum seekers who present themselves at our southern border are required to wait in Mexico while their asylum applications are adjudicated. The district court entered a preliminary injunction setting aside the MPP, and the Government appealed. We affirm.

### I. Background

In January 2019, the Department of Homeland Security ("DHS") promulgated the MPP without going through notice-and-comment rulemaking. The MPP provides that non-Mexican asylum seekers arriving at our southern border be "returned to Mexico for the duration of their immigration proceedings, rather than either being detained for expedited or regular removal proceedings or issued notices to appear for regular removal proceedings." *Innovation Law Lab v. Nielsen*, 366 F. Supp. 3d 1110, 1114 (N.D. Cal. 2019) (quotation marks omitted). The MPP does not apply to certain groups, including "unaccompanied alien children," "aliens processed for expedited removal," "aliens with known physical [or] mental health issues," "returning [Legal

Permanent Residents] seeking admission," and "aliens with an advance parole document or in parole status."

DHS issued guidance documents to implement the MPP. Under this guidance, asylum seekers who cross the border and are subject to the MPP are given a Notice to Appear in immigration court and returned to Mexico to await their court date. Asylum seekers may re-enter the United States to appear for their court dates. The guidance instructs officials not to return any alien who will more likely than not suffer persecution if returned to Mexico. However, this instruction applies only to an alien "who affirmatively states that he or she has a fear of persecution or torture in Mexico, or a fear of return to Mexico." Officers are not instructed to ask aliens whether they fear returning to Mexico. If an asylum officer determines, based on an alien's volunteered statement, that he or she will more likely than not suffer persecution in Mexico, the alien is not subject to return to Mexico under the MPP.

The MPP went into effect on January 28, 2019. It was first implemented at the San Ysidro, California, port of entry and was later expanded across the entire southern border.

The MPP has had serious adverse consequences for the individual plaintiffs. Plaintiffs presented evidence in the district court that they, as well as others returned to Mexico under the MPP, face targeted discrimination, physical violence, sexual assault, overwhelmed and corrupt law enforcement, lack of food and shelter, and practical obstacles to participation in court proceedings in the United States. The hardship and danger to individuals returned to Mexico under the MPP have been repeatedly confirmed by reliable news reports. *See, e.g.*, Zolan Kanno-Youngs & Maya Averbuch, *Waiting for Asylum in the United States, Migrants*

*Live in Fear in Mexico*, N.Y. TIMES (Apr. 5, 2019), https://www.nytimes.com/2019/04/05/us/politics/asylum-united-states-migrants-mexico.html; Alicia A. Caldwell, *Trump's Return-to-Mexico Policy Overwhelms Immigration Courts*, WALL STREET J. (Sept. 5, 2019), https://www.wsj.com/articles/trumps-return-to-mexico-policy-overwhelms-immigration-courts-11567684800; Mica Rosenberg, et al., *Hasty Rollout of Trump Immigration Policy Has 'Broken' Border Courts*, REUTERS (Sept. 10, 2019), https://www.reuters.com/article/us-usa-immigration-courts-insight/hasty-rollout-of-trump-immigration-policy-has-broken-border-courts-idUSKCN1VV115; Mireya Villareal, *An Inside Look at Trump's "Remain in Mexico" Policy*, CBS NEWS (Oct. 8, 2019), https://www.cbsnews.com/news/remain-in-mexico-donald-trump-immigration-policy-nuevo-laredo-mexico-streets-danger-migrants-2019-10-08/.

The organizational plaintiffs have also suffered serious adverse consequences. The MPP has substantially hindered the organizations' "ability to carry out their core mission of providing representation to aliens seeking admission, including asylum seekers," *Innovation Law Lab*, 366 F. Supp. 3d at 1129, and has forced them to divert resources because of increased costs imposed by the MPP.

The Government has not argued in this court that either the individual or organizational plaintiffs lack standing under Article III, but we have an independent obligation to determine our jurisdiction under Article III. The individual plaintiffs, all of whom have been returned to Mexico under the MPP, obviously have Article III standing. The organizational plaintiffs also have Article III standing. The Government conceded in the district court that the organizational plaintiffs have Article III standing based on

14          INNOVATION LAW LAB V. WOLF

*East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742,
765–67 (9th Cir. 2018), given their decreased ability to carry
out their core missions as well as the diversion of their
resources, both caused by the MPP.  *See Innovation Law Lab*,
366 F. Supp. at 1120–22.   Because *East Bay Sanctuary
Covenant* was a decision by a motions panel on an emergency
stay motion, we are not obligated to follow it as binding
precedent.  *See* discussion, *infra*, Part III.   However, we are
persuaded by its reasoning and hold that the organizational
plaintiffs have Article III standing.

## II.  Proceedings in the District Court

Plaintiffs filed suit in district court seeking an injunction,
alleging, *inter alia*, that the MPP is inconsistent with the
Immigration and Nationality Act ("INA"), specifically
8 U.S.C. §§ 1225(b) and 1231(b), and that they have a right
to a remedy under 5 U.S.C. § 706(2)(A).  Section 706(2)(A)
provides, "The reviewing court shall . . . hold unlawful and
set aside agency action, findings, and conclusions found to be
. . . arbitrary, capricious, an abuse of discretion, or otherwise
not in accordance with law."  (Internal numbering omitted.)

The district court held that plaintiffs had shown a
likelihood of success on the merits of their claim that the
MPP is inconsistent with § 1225(b).  *Id.* at 1123.  The
Government contended that the MPP is authorized by
§ 1225(b)(2).   Plaintiffs argued, however, that they are
arriving aliens under § 1225(b)(1) rather than under
§ 1225(b)(2).   They pointed out that there is a contiguous
territory return provision in § (b)(2) but no such provision in
§ (b)(1).   The district court agreed with plaintiffs:

> On its face, . . . the contiguous territory return provision may be applied to aliens described in subparagraph (b)(2)(A). Pursuant to subparagraph (b)(2)(B), however, that *expressly* excludes any alien "to whom paragraph [(b)](1) applies."

*Id.* (emphasis in original). The court concluded, "Applying the plain language of the statute, [the individual plaintiffs] simply are not subject to the contiguous territory return provision." *Id.*

The district court also held that plaintiffs had shown a likelihood of success on the merits of their claim that the MPP violates § 1231(b)(3), the statutory implementation of the United States' treaty-based non-refoulement obligations. The district court held that "plaintiffs have shown they are more likely than not to prevail on the merits of their contention that defendants adopted the MPP without sufficient regard to refoulement issues." *Id.* at 1127. In so holding, the district court noted that the MPP does not instruct asylum officers to ask asylum seekers whether they fear returning to Mexico. Rather, "the MPP provides only for review of potential refoulement concerns when an alien 'affirmatively' raises the point." *Id.* The court further held that it was more likely than not that the MPP should have been adopted through notice-and-comment rulemaking with respect to the non-refoulement aspects of the MPP. *Id.* at 1128.

With respect to the individual plaintiffs, the district court found that "[w]hile the precise degree of risk and specific harms that plaintiffs might suffer in this case may be debatable, there is no real question that it includes the

possibility of irreparable injury, sufficient to support interim relief in light of the showing on the merits." *Id.* at 1129. With respect to the organizational plaintiffs, the court found that they had "shown a likelihood of harm in terms of impairment of their ability to carry out their core mission of providing representation to aliens seeking admission, including asylum seekers." *Id.* Finally, the court held that the balance of equities and the public interest support the issuance of a preliminary injunction. *Id.*

Relying on a decision of our court, the district court issued a preliminary injunction setting aside the MPP. The court noted:

> [D]efendants have not shown the injunction in this case can be limited geographically. This is not a case implicating local concerns or values. There is no apparent reason that any of the places to which the MPP might ultimately be extended have interests that materially differ from those presented in San Ysidro.

*Id.* at 1130.

### III. Proceedings Before the Motions Panel

The district court issued its preliminary injunction on April 8, 2019. The Government filed an appeal on April 10 and the next day requested an emergency stay pending appeal. In accordance with our regular procedures, our April motions panel heard the Government's request for an emergency stay. The motions panel held oral argument on the stay on April 24. In three written opinions, the panel

unanimously granted the emergency stay on May 7. *Innovation Law Lab v. McAleenan*, 924 F.3d 503 (9th Cir. 2019).

In a per curiam opinion, the motions panel disagreed, by a vote of two to one, with the district court's holding that plaintiffs were likely to succeed in their statutory argument that the MPP is inconsistent it with 8 U.S.C. § 1225(b). *Id.* at 508–09. The panel majority stated its legal conclusion in tentative terms, writing that it was "*doubtful* that subsection (b)(1) [of § 1225] 'applies' to [plaintiffs.]" *Id.* at 509 (emphasis added).

Judge Watford concurred in the per curiam opinion but wrote separately to express concern that the MPP is arbitrary and capricious because it lacks sufficient non-refoulement protections. *Id.* at 511 (Watford, J., concurring). Judge Watford expressed concern that asylum officers do not ask asylum applicants whether they have a fear of returning to Mexico: "One suspects the agency is not asking an important question during the interview process simply because it would prefer not to hear the answer." *Id.* Judge Watford concluded, "DHS's policy is virtually guaranteed to result in some number of applicants being returned to Mexico in violation of the United States' non-refoulement obligations." *Id.*

Judge Fletcher concurred only in the result. He wrote separately, arguing that the MPP was inconsistent with 8 U.S.C. § 1225(b). *Id.* at 512 (W. Fletcher, J., concurring in the result). In his view, asylum seekers subject to the MPP are properly characterized as applicants under § 1225(b)(1) rather than § 1225(b)(2), and are thus protected against being returned to Mexico pending adjudication of their applications.

Judge Fletcher emphasized the preliminary nature of the emergency stay proceedings before the motions panel, writing, "I am hopeful that the regular argument panel that will ultimately hear the appeal, with the benefit of full briefing and regularly scheduled argument, will be able to see the Government's arguments for what they are—baseless arguments in support of an illegal policy[.]" *Id.* at 518.

## IV.  Standard of Review

When deciding whether to issue a preliminary injunction, a district court considers whether the requesting party has shown "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Likelihood of success on the merits is a threshold inquiry and the most important factor.  *See, e.g.*, *Edge v. City of Everett*, 929 F.3d 657, 663 (9th Cir. 2019).

We review a grant of a preliminary injunction for abuse of discretion.  *See, e.g.*, *United States v. California*, 921 F.3d 865, 877 (9th Cir. 2019).  "The district court's interpretation of the underlying legal principles, however, is subject to de novo review and a district court abuses its discretion when it makes an error of law." *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (en banc).

## V.  Likelihood of Success on the Merits

### A.  Effect of the Motions Panel's Decision

A preliminary question is whether a merits panel is bound by the analysis of a motions panel on a question of law, performed in the course of deciding an emergency request for a stay pending appeal.  On that question, we follow *East Bay Sanctuary Covenant v. Trump*, Nos. 18-17274 and 18-17436 (9th Cir. 2020), argued on the same day as this case, in which we held that a motions panel's legal analysis, performed during the course of deciding an emergency motion for a stay, is not binding on later merits panels.  Such a decision by a motions panel is "a probabilistic endeavor," "doctrinally distinct" from the question considered by the later merits panel, and "issued without oral argument, on limited timelines, and in reliance on limited briefing."  *Id*. at 21–22, 20.  "Such a predictive analysis should not, and does not, forever bind the merits of the parties' claims."  *Id.* at 22.  At oral argument in this case, the Government acknowledged "that law of the circuit treatment does not apply to [the motion's panel's decision]."  The Government later reiterated that it was "not advocating for law of the circuit treatment."  The Government "agree[d] that that is inappropriate in the context of a motions panel decision."

Even if, acting as a merits panel, we may be bound in some circumstances by a decision by a motions panel on a legal question, we would in any event not be bound in the case now before us.  Two of the three judges on the motions panel disagreed in part with the Government's legal arguments in support of the MPP.  Further, the motions panel's per curiam opinion did not purport to decide definitively the legal questions presented to it in the

emergency stay motion.  The per curiam spoke in terms of doubt and likelihood, rather than in terms of definitive holdings.  *Innovation Law Lab,* 924 F.3d at 509; *see also supra* I.C.2.  Indeed, Judge Fletcher, who concurred in granting the emergency stay, specifically addressed the effect of the legal analysis of the motions panel and expressed the hope that the merits panel, with the benefit of full briefing and argument, would decide the legal questions differently.

## B.  Questions on the Merits

Plaintiffs challenge two aspects of the MPP.  First, they challenge the requirement that asylum seekers return to Mexico and wait there while their applications for asylum are adjudicated.  They contend that this requirement is inconsistent with the INA, as amended in 1996 by the Illegal Immigration Reform and Immigrant Responsbility Act ("IIRIRA").  Second, in the alternative, they challenge the failure of asylum officers to ask asylum seekers whether they fear being returned to Mexico.  They contend that this failure is inconsistent with our treaty-based non-refoulement obligations.  They contend, further, that with respect to non-refoulement, the MPP should have been adopted only after notice-and-comment rulemaking.

We address these challenges in turn.  We conclude that plaintiffs have shown a likelihood of success on their claim that the return-to-Mexico requirement of the MPP is inconsistent with 8 U.S.C. § 1225(b).  We further conclude that plaintiffs have shown a likelihood of success on their claim that the MPP does not comply with our treaty-based non-refoulement obligations codified at 8 U.S.C. § 1231(b).  We do not reach the question whether they have shown a likelihood of success on their claim that the anti-refoulement

aspect of the MPP should have been adopted through notice-and-comment rulemaking.

### 1.  Return to Mexico

The essential feature of the MPP is that non-Mexican asylum seekers who arrive at a port of entry along the United States' southern border must be returned to Mexico to wait while their asylum applications are adjudicated.  Plaintiffs contend that the requirement that they wait in Mexico is inconsistent with 8 U.S.C. § 1225(b).  The government contends, to the contrary, that the MPP is consistent with § 1225(b).

The relevant text of § 1225 is as follows:

**(a) Inspection**

**(1) Aliens treated as applicants for admission**

An alien present in the United States who has not been admitted . . . shall be deemed for purposes of this chapter an applicant for admission.

. . .

**(b) Inspection of applicants for admission**

**(1) Inspection of aliens arriving in the United States and certain other aliens who have not been admitted or paroled**

**(A)     Screening**

**(i)  In general**

If an immigration officer determines that an alien . . . who is arriving in the United States . . . is inadmissible under section 1182(a)(6)(C) or 1182(a)(7) of this title, the officer shall order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution.

**(ii)  Claims for asylum**

If an immigration officer determines that an alien . . . is inadmissible under section 1182(a)(6)(C) or 1182(a)(7) of this title and the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution, the officer shall refer the alien for an interview by an asylum officer under subparagraph (B).

. . .

**(B)     Asylum interviews**

. . .

**(ii) Referral of certain aliens**

If the [asylum] officer determines at the time of the interview that an alien has a credible fear of persecution . . . , the alien shall be detained for further consideration of the application for asylum.

. . .

**(2) Inspection of other aliens**

**(A)    In general**

Subject to subparagraphs (B) and (C), in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title.

**(B)    Exception**

Subparagraph (A) shall not apply to an alien —

**(i)**       who is a crewman

> **(ii)**    to whom paragraph (1)
> applies, or
>
> **(iii)**    who is a stowaway.
>
> **(C)**    **Treatment of aliens arriving
> from contiguous territory**
>
> In the case of an alien described in
> subparagraph (A) who is arriving on
> land (whether or not at a designated
> port of arrival) from a foreign territory
> contiguous to the United States, the
> Attorney General may return the alien
> to that territory pending a proceeding
> under section 1229a of this title.

There are two categories of "applicants for admission"
under § 1225. § 1225(a). First, there are applicants described
in § 1225(b)(1). Second, there are applicants described in
§ 1225(b)(2).

Applicants described in § 1225(b)(1) are inadmissible
based on either of two grounds, both of which relate to their
documents or lack thereof. Applicants described in
§ 1225(b)(2) are in an entirely separate category. In the
words of the statute, they are "other aliens." § 1225(b)(2)
(heading). Put differently, again in the words of the statute,
§ (b)(2) applicants are applicants "to whom paragraph
[(b)](1)" does not apply. § 1225(b)(2)(B)(ii). That is,
§ (b)(1) applicants are those who are inadmissible on either
of the two grounds specified in that subsection. Section
(b)(2) applicants are all other inadmissible applicants.

Section (b)(1) applicants are more numerous than § (b)(2) applicants, but § (b)(2) is a broader category in the sense that § (b)(2) applicants are inadmissible on more grounds than § (b)(1) applicants. Inadmissible applicants under § (b)(1) are aliens traveling with fraudulent documents (§ 1182(a)(6)(C)) or no documents (§ 1182(a)(7)). By contrast, inadmissible applicants under § (b)(2) include, *inter alia*, aliens with "a communicable disease of public health significance" or who are "drug abuser[s] or addict[s]" (§ 1182(a)(1)(A)(i), (iv)); aliens who have "committed . . . a crime involving moral turpitude" or who have "violat[ed] . . . any law or regulation . . . relating to a controlled substance" (§ 1182(a)(2)(A)(i)); aliens who "seek to enter the United States . . . to violate any law of the United States relating to espionage or sabotage," or who have "engaged in a terrorist activity" (§ 1182(a)(3)(A), (B)); aliens who are "likely . . . to become a public charge" (§ 1182(a)(4)(A)); and aliens who are alien "smugglers" (§ 1182(a)(6)(E)).

The Supreme Court recently distinguished § (b)(1) and § (b)(2) applicants, stating unambiguously that they fall into two separate categories:

> [*A*]*pplicants for admission fall into one of two categories*, those covered by § 1225(b)(1) and those covered by § 1225(b)(2). Section 1225(b)(1) applies to aliens initially determined to be inadmissible due to fraud, misrepresentation, or lack of valid documentation. . . . Section 1225(b)(2) is broader. It serves as a catchall provision that applies to all applicants for admission not covered by § 1225(b)(1).

*Jennings v. Rodriguez*, 138 S. Ct. 830, 837 (2018) (emphasis added) (citations omitted).

Even more recently, the Attorney General of the United States, through the Board of Immigration Appeals, drew the same distinction and briefly described the procedures applicable to the two categories:

> Under section 235 of the Act [8 U.S.C. § 1225], all aliens "arriv[ing] in the United States" or "present in the United States [without having] been admitted" are considered "applicants for admission," who "shall be inspected by immigration officers." INA § 235(a)(1), (3). [8 U.S.C. § 1225(a)(1), (3).] In most cases, those inspections yield one of three outcomes. First, if an alien is "clearly and beyond a doubt entitled to be admitted," he will be permitted to enter, or remain in, the country without further proceedings. *Id.* § 235(b)(2)(A). [8 U.S.C. § 1225(b)(2)(A).] Second, if the alien is not clearly admissible, then, generally, he will be placed in "proceeding[s] under section 240 [8 U.S.C. § 1229a]" of the Act—that is, full removal proceedings. *Id.* Third, if the alien is inadmissible on one of two specified grounds and meets certain additional criteria, DHS may place him in either expedited or full proceedings. *Id.* § 235(b)(1)(A)(i) [8 U.S.C. § 1225(b)(1)(A)(i)]; *see Matter of E-R-M- & L-R-M-*, 25 I&N Dec. 520, 524 (BIA 2011).

*Matter of M-S-*, 27 I. & N. Dec. 509, 510 (BIA April 16, 2019).

The procedures specific to the two categories of applicants are outlined in their respective subsections. To some extent, the statutorily prescribed procedures are the same for both categories. If a § (b)(1) applicant passes his or her credible fear interview, he or she will be placed in regular removal proceedings under 8 U.S.C. § 1229a. *See* 8 C.F.R. § 208.30(f). A § (b)(1) applicant may also be placed directly into regular removal proceedings under § 1229a at the discretion of the Government. *See Matter of E-R-M- & L-R-M-*, 25 I. & N. Dec. 520, 522 (BIA 2011). A § (b)(2) applicant who is "not clearly and beyond a doubt entitled to be admitted" is automatically placed in regular removal proceedings under § 1229a. *See* § 1225(b)(2)(A).

Both § (b)(1) and § (b)(2) applicants can thus be placed in regular removal proceedings under § 1229a, though by different routes. But the fact that an applicant is in removal proceedings under § 1229a does not change his or her underlying category. A § (b)(1) applicant does not become a § (b)(2) applicant, or vice versa, by virtue of being placed in a removal proceeding under § 1229a.

However, the statutory procedures for the two categories are not identical. Some of the procedures are exclusive to one category or the other. For example, if a § (b)(1) applicant fails to pass his or her credible fear interview, he or she may be removed in an expedited proceeding without a regular removal proceeding under § 1229a. *See* § 1225(b)(1)(A), (B). There is no comparable procedure specified in § (b)(2) for expedited removal of a § (b)(2) applicant. Further, in some circumstances a § (b)(2) applicant may be "returned" to a

"territory contiguous to the United States" pending his or her regular removal proceeding under § 1229a. *See* § 1225(b)(2)(C). There is no comparable "return" procedure specified in §1225(b)(1) for a § (b)(1) applicant.

The statutory question posed by the MPP is whether a § (b)(1) applicant may be "returned" to a contiguous territory under § 1225(b)(2)(C). That is, may a § (b)(1) applicant be subjected to a procedure specified for a § (b)(2) applicant? A plain-meaning reading of § 1225(b)—as well as the Government's longstanding and consistent practice up until now—tell us that the answer is "no."

There is nothing in § 1225(b)(1) to indicate that a § (b)(1) applicant may be "returned" under § 1225(b)(2)(C). Section (b)(1)(A)(i) tells us with respect to § (b)(1) applicants that an "officer shall order the alien removed . . . without further hearing or review unless the alien indicates either an intention to apply for asylum . . . or a fear of persecution." Section (b)(1)(A)(ii) tells us that § (b)(1) applicants who indicate an intention to apply for asylum or a fear of persecution "shall" be referred by the immigration officer to an "asylum officer" for an interview. The remainder of § 1225(b)(1) specifies what happens to a § (b)(1) applicant depending on the determination of the asylum officer—either expedited removal or detention pending further consideration. § 1225(b)(1)(B)(ii)–(iii). There is nothing in § 1225(b)(1) stating, or even suggesting, that a § (b)(1) applicant is subject to the "return" procedure of § 1225(b)(2)(C).

Nor is there anything in § 1225(b)(2) to indicate that a § (b)(1) applicant may be "returned" under § 1225(b)(2)(C). Taking § 1225(b)(2) subparagraph by subparagraph, it provides as follows. Subparagraph (A) tells us that unless a

§ (b)(2) applicant is "clearly and beyond a doubt entitled to be admitted," she or he "shall be detained" for a removal proceeding under § 1229a. § 1225(b)(2)(A). Subparagraph (A) is "[s]ubject to subparagraphs (B) and (C)." *Id.* Subparagraph (B) tells us that subparagraph (A) does not apply to three categories of aliens—"crewm[e]n," § (b)(1) applicants, and "stowaway[s]." § 1225(b)(2)(B). Finally, subparagraph (C) tells us that a § (b)(2) applicant who arrives "on land . . . from a foreign territory contiguous to the United States," instead of being "detained" under subparagraph (A) pending his or her removal proceeding under § 1229a, may be "returned" to that contiguous territory pending that proceeding. § 1225(b)(2)(C). Section (b)(1) applicants are mentioned only once in § 1225(b)(2), in subparagraph (B)(ii). That subparagraph specifies that subparagraph (A)—which automatically entitles § (b)(2) applicants to regular removal proceedings under § 1229a—does not apply to § (b)(1) applicants.

The "return-to-a-contiguous-territory" provision of § 1225(b)(2)(C) is thus available only for § (b)(2) applicants. There is no plausible way to read the statute otherwise. Under a plain-meaning reading of the text, as well as the Government's longstanding and consistent practice, the statutory authority upon which the Government now relies simply does not exist.

The Government nonetheless contends that § (b)(2)(C) authorizes the return to Mexico not only of § (b)(2) applicants, but also of § (b)(1) applicants. The Government makes essentially three arguments in support of this contention. None is persuasive.

First, the Government argues that § (b)(1) applicants are a subset of § (b)(2) applicants. Blue Brief at 35. Under the Government's argument, there are § (b)(1) applicants, defined in § (b)(1), and there are § (b)(2) applicants, defined as all applicants, including § (b)(2) and § (b)(1) applicants. The Government argues that DHS, in its discretion, can therefore apply the procedures specified in § (b)(2) to a § (b)(1) applicant. That is, as stated in its brief, the Government has "discretion to make the initial 'determin[ation]' whether to apply section 1225(b)(1) or section 1225(b)(2) to a given alien." Blue Brief at 30.

The Government's argument ignores the statutory text, the Supreme Court's opinion in *Jennings*, and the opinion of its own Attorney General in *Matter of M-S-*. The text of § 1225(b) tells us that § (b)(1) and § (b)(2) are separate and non-overlapping categories. In *Jennings*, the Supreme Court told us explicitly that § (b)(1) and § (b)(2) applicants fall into separate and non-overlapping categories. In *Matter of M-S-*, the Attorney General wrote that applicants are subject to different procedures depending on whether they are § (b)(1) or § (b)(2) applicants.

Second, the Government argues that § (b)(2)(B)(ii) allows DHS, in its discretion, to "apply" to a § (b)(1) applicant either procedures described in § (b)(1) or those described in § (b)(2). The Government's second argument is necessitated by its first. To understand the Government's second argument, one must keep in mind that § (b)(2)(A) automatically entitles a § (b)(2) applicant to a regular removal hearing under § 1229a. But we know from § (b)(1) that not all § (b)(1) applicants are entitled to a removal hearing under § 1229a. Having argued that § (b)(2) applicants include not only § (b)(2) but also § (b)(1) applicants, the Government

needs some way to avoid giving regular removal proceedings to all § (b)(1) applicants.  The best the Government can do is to rely on § (b)(2)(B)(ii), which provides: "Subparagraph (A) shall not *apply* to an alien . . . to whom paragraph [(b)](1) *applies*."  § 1225(b)(2)(B)(ii) (emphasis added).  The Government thus argues that § (b)(2)(B)(ii) allows DHS, in its discretion, to "apply," or not apply, § (b)(2)(A) to a § (b)(1) applicant.

The Government misreads § (b)(2)(B)(ii).  Subparagraph (B) tells us, "Subparagraph (A) shall not apply to an alien — (i) who is a crewman, (ii) to whom paragraph [(b)](1) applies, or (iii) who is a stowaway."  The function of § (b)(2)(B)(ii) is to make sure that we understand that the automatic entitlement to a regular removal hearing under § 1229a, specified in § (b)(2)(A) for a § (b)(2) applicant, does not apply to a § (b)(1) applicant.  However, the Government argues that § (b)(2)(B)(ii) authorizes the Government to perform an act.  That act is to "apply" the expedited removal procedures of § (b)(1) to some of the aliens under § (b)(2), as the Government defines § (b)(2) applicants.

There is a fatal syntactical problem with the Government's argument.  "Apply" is used twice in the same sentence in § (b)(2)(B)(ii).  The first time the word is used, in the lead-in to the section, it refers to the application of a statutory section ("Subparagraph (A) shall not apply").  The second time the word is used, it is used in the same manner, again referring to the application of a statutory section ("to whom paragraph [(b)](1) applies").  When the word is used the first time, it tells us that subparagraph (A) shall not apply.  When the word is used the second time, it tells us to whom subparagraph (A) shall not apply:  it does not apply to applicants to whom § (b)(1) applies.  The word is used in the

same manner both times to refer to the application of subparagraph (A). The word is not used the first time to refer to the application of a subparagraph (A), and the second time to an action by DHS.

The Government's third argument is based on the supposed culpability of § (b)(1) applicants. We know from § (b)(2)(A) that § (b)(2) applicants are automatically entitled to full removal proceedings under § 1229a. However, § (b)(2) applicants may be returned to Mexico under § (b)(2)(C) to await the outcome of their removal hearing under § 1229a. It makes sense for the Government, in its discretion, to require some § (b)(2) applicants to remain in Mexico while their asylum applications are adjudicated, for some § (b)(2) applicants are extremely undesirable applicants. As discussed above, § (b)(2) applicants include spies, terrorists, alien smugglers, and drug traffickers.

When the Government was before the motions panel in this case, it argued that § (b)(1) applicants are more culpable than § (b)(2) applicants and therefore deserve to be forced to wait in Mexico while their asylum applications are being adjudicated. In its argument to the motions panel, the Government compared § (b)(1) and § (b)(2) applicants, characterizing § (b)(2) applicants as "less-culpable arriving aliens." The Government argued that returning § (b)(2), but not § (b)(1), applicants to a contiguous territory would have "the perverse effect of privileging aliens who attempt to obtain entry to the United States by fraud . . . over aliens who follow our laws."

The Government had it exactly backwards. Section (b)(1) applicants are those who are "inadmissible under section 1182(a)(6)(C) or 1182(a)(7)" of Title 8. These two sections

describe applicants who are inadmissible because they lack required documents rather than because they have a criminal history or otherwise pose a danger to the United States. Section 1182(a)(6)(C), entitled "Misrepresentation," covers, *inter alia*, aliens using fraudulent documents.  That is, it covers aliens who travel under false documents and who, once they arrive at the border or enter the country, apply for asylum.  Section 1182(a)(7), entitled "Documentation requirements," covers aliens traveling without documents.  In short, § (b)(1) applies to bona fide asylum applicants, who commonly have fraudulent documents or no documents at all. Indeed, for many such applicants, fraudulent documents are their only means of fleeing persecution, even death, in their own countries.  The structure of § (b)(1), which contains detailed provisions for processing asylum seekers, demonstrates that Congress recognized that § (b)(1) applicants may have valid asylum claims and should therefore receive the procedures specified in § (b)(1).

In its argument to our merits panel, the Government made a version of the same argument it had made earlier to the motions panel.  After referring to (but not describing) § (b)(2) applicants, the Government now argues in its opening brief:

> Section 1225(b)(1), meanwhile, reaches, among other classes of aliens, those who engage in fraud or willful misrepresentations *in an attempt to deceive the United States* into granting an immigration benefit. *See* 8 U.S.C. § 1182(a)(6)(C). Plaintiffs have not explained why Congress would have wanted that class of aliens to be exempt from temporary return to Mexico while their full removal proceedings are ongoing.

Blue Brief at 37–38 (emphasis in original).

We need not look far to discern Congress's motivation in authorizing return of § (b)(2) applicants but not § (b)(1) applicants.  Section (b)(2)(C) was added to IIRIRA late in the drafting process, in the wake of *Matter of Sanchez-Avila*, 21 I. & N. Dec. 444 (BIA 1996).  Sanchez-Avila was a Mexican national who applied for entry as a "resident alien commuter" but who was charged with being inadmissible due to his "involvement with controlled substances."  *Id.* at 445.  *See* 8 U.S.C. § 1182(a)(2)(A)(i) (§ (b)(2) applicants include aliens who have "violat[ed] . . . any law or regulation . . . relating to a controlled substance").  In order to prevent aliens like Sanchez-Avila from staying in the United States during the pendency of their guaranteed regular removal proceeding under § 1229a, as they would otherwise have a right to do under § (b)(2)(A), Congress added § 1225(b)(2)(C).  Congress had specifically in mind undesirable § (b)(2) applicants like Sanchez-Avila.  It did not have in mind bona fide asylum seekers under § (b)(1).

We therefore conclude that plaintiffs have shown a likelihood of success on the merits of their claim that the MPP is inconsistent with 8 U.S.C. § 1225(b).

### 2.  Refoulement

Plaintiffs claim that the MPP is invalid in part, either because it violates the United States' treaty-based anti-refoulement obligations, codified at 8 U.S.C. § 1231(b)(3)(A), or because, with respect to refoulement, the MPP was improperly adopted without notice-and-comment rulemaking.  Our holding that plaintiffs are likely to succeed on their claim that the MPP is invalid in its entirety because

it is inconsistent with § 1225(b) makes it unnecessary to decide plaintiffs' second claim. We nonetheless address it as an alternative ground, under which we hold the MPP invalid in part.

Refoulement occurs when a government returns aliens to a country where their lives or liberty will be threatened on account of race, religion, nationality, membership of a particular social group, or political opinion. The United States is obliged by treaty and implementing statute, as described below, to protect against refoulement of aliens arriving at our borders.

Paragraph one of Article 33 of the 1951 United Nations Convention Relating to the Status of Refugees, entitled, "Prohibition of expulsion or return ('refoulement')," provides:

> No Contracting State shall expel or return ("refouler") a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion.

The United States is not a party to the 1951 Convention, but in 1968 we acceded to the United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967. *INS v. Stevic*, 467 U.S. 407, 416 (1984). "The Protocol bound parties to comply with the substantive provisions of Articles 2 through 34 of the United Nations Convention Relating to the Status of Refugees." *Id.* Twelve years later, Congress passed the Refugee Act of 1980, implementing our obligations under the

1967 Protocol. "If one thing is clear from the legislative history of the . . . entire 1980 Act, it is that one of Congress' primary purposes was to bring United States refugee law into conformance with the 1967 United Nations Protocol Relating to the Status of Refugees." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 436 (1987). The 1980 Act included, among other things, a provision designed to implement Article 33 of the 1951 Convention. After recounting the history behind 8 U.S.C. § 1253(h)(1), part of the 1980 Act, the Supreme Court characterized that section as "parallel[ing] Article 33," the anti-refoulement provision of the 1951 Convention. *INS v. Aguirre-Aguirre*, 526 U.S. 415, 427 (1999).

Section 1253(h)(1) provided, in relevant part, "The Attorney General *shall not deport or return* any alien . . . to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership of a particular social group, or political opinion." *Id.* at 419 (emphasis added). The current version is § 1231(b)(3)(A): "[T]he Attorney General *may not remove* an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." (Emphasis added.) The words "deport or return" in the 1980 version of the section were replaced in 1996 by "remove" as part of a general statutory revision under IIRIRA. Throughout IIRIRA, "removal" became the new all-purpose word, encompassing "deportation," "exclusion," and "return" in the earlier statute. *See, e.g., Salgado-Diaz v. Gonzales*, 395 F.3d 1158, 1162 (9th Cir. 2005) ("IIRIRA eliminated the distinction between deportation and exclusion proceedings, replacing them with a new, consolidated category—'removal.'").

Plaintiffs point out several features of the MPP that, in their view, provide insufficient protection against refoulement.

First, under the MPP, to stay in the United States during the pendency of removal proceedings under § 1229a, the asylum seeker must show that it is "more likely than not" that he or she will be persecuted in Mexico. More-likely-than-not is a high standard, ordinarily applied only after an alien has had a regular removal hearing under § 1229a. By contrast, the standard ordinarily applied in screening interviews with asylum officers at the border is much lower. Aliens subject to expedited removal need only establish a "credible fear" in order to remain in the United States pending a hearing under § 1229a. §§ 1225(b)(1)(A)(ii), 1225(b)(1)(B)(ii). Credible fear requires only that the alien show a "significant possibility" of persecution. § 1225(b)(1)(B)(v).

Second, under the MPP, an asylum seeker is not entitled to advance notice of, and time to prepare for, the hearing with the asylum officer; to advance notice of the criteria the asylum officer will use; to the assistance of a lawyer during the hearing; or to any review of the asylum officer's determination. By contrast, an asylum seeker in a removal proceeding under § 1229a is entitled to advance notice of the hearing with sufficient time to prepare; to advance notice of the precise charge or charges on which removal is sought; to the assistance of a lawyer; to an appeal to the Board of Immigration Appeals; and to a subsequent petition for review to the court of appeals.

Third, an asylum officer acting under the MPP does not ask an asylum seeker whether he or she fears returning to Mexico. Instead, asylum seekers must volunteer, without any

prompting, that they fear returning. By contrast, under existing regulations, an asylum officer conducting a credible fear interview is directed "to elicit all relevant and useful information bearing on whether the applicant has a credible fear of persecution or torture." 8 C.F.R. § 208.30(d). The asylum officer is specifically directed to "determine that the alien has an understanding of the credible fear determination process." § 208.30(d)(2).

The Government disagrees with plaintiffs based on two arguments. The Government first argues briefly that § 1231(b)(3)(A) does not encompass a general anti-refoulement obligation. It argues that the protection provided by § 1231(b)(3)(A) applies to aliens only after they have been ordered removed to their home country at the conclusion of a regular removal proceeding under § 1229a. It writes:

> Section 1231(b)(3) codifies a form of protection from *removal* that is available only *after* an alien is adjudged removable. See 8 U.S.C. § 1231(b)(3); 8 C.F.R. 1208.16(a). Aliens subject to MPP do not receive a final order of removal to their home country when they are returned (temporarily) to Mexico, and so there is no reason why the same procedures would apply . . . .

Blue Brief at 41 (emphasis in original).

The Government reads § 1231(b)(3)(A) too narrowly. Section 1231(b)(3)(A) does indeed apply to regular removal proceedings under § 1229a, as evidenced, for example, by 8 C.F.R. § 1208.16(a) (discussing, *inter alia*, the role of the Immigration Judge). But its application is not limited to such

proceedings. As described above, and as recognized by the Supreme Court, Congress intended § 1253(h)(1), and § 1231(b)(3)(A) as its recodified successor, to "parallel" Article 33 of the 1951 Convention. *Aguirre-Aguirre*, 526 U.S. at 427. Article 33 is a general anti-refoulement provision, applicable whenever an alien might be returned to a country where his or her life or freedom might be threatened on account of a protected ground. It is not limited to instances in which an alien has had a full removal hearing with significant procedural protections, as would be the case under § 1229a.

The Government's second argument is that the MPP satisfies our anti-refoulement obligations by providing a sufficiently effective method of determining whether aliens fear, or have reason to fear, returning to Mexico. In its brief, the Government contends that asylum seekers who genuinely fear returning to Mexico have "every incentive" affirmatively to raise that fear during their interviews with asylum officers, and that Mexico is not a dangerous place for non-Mexican asylum seekers. The Government writes:

> [N]one of the aliens subject to MPP are Mexican nationals fleeing Mexico, and all of them voluntarily chose to enter and spend time in Mexico en route to the United States. Mexico, moreover, has committed to adhering to its domestic and international obligations regarding refugees. Those considerations together strongly suggest that the great majority of aliens subject to MPP are not more likely than not to face persecution on a protected ground or torture, in Mexico. In the rare case where an MPP-eligible alien does

> have a substantial and well-grounded basis for
> claiming that he is likely to be persecuted in
> Mexico, that alien will have every incentive to
> raise that fear at the moment he is told that he
> will be returned.

Blue Brief at 45. However, the Government points to no
evidence supporting its speculations either that aliens,
unprompted and untutored in the law of refoulement, will
volunteer that they fear returning to Mexico, or that there is
little danger to non-Mexican aliens in Mexico.

The Government further asserts, again without supporting
evidence, that any violence that returned aliens face in
Mexico is unlikely to be violence on account of a protected
ground—that is, violence that constitutes persecution. The
Government writes:

> [T]he basic logic of the contiguous-territory-
> return statute is that aliens generally do not
> face *persecution* on account of a protected
> status, or torture, in the country from which
> they happen to arrive by land, as opposed to
> the home country from which they may have
> fled. (International law guards against torture
> and persecution on account of a protected
> ground, not random acts of crime or
> generalized violence.)

Blue Brief at 40–41 (emphasis in original).

Plaintiffs, who are aliens returned to Mexico under the
MPP, presented sworn declarations to the district court

directly contradicting the unsupported speculations of the Government.

Several declarants described violence and threats of violence in Mexico. Much of the violence was directed at the declarants because they were non-Mexican—that is, because of their nationality, a protected ground under asylum law. Gregory Doe wrote in his declaration:

> I did not feel safe at Benito Juarez [a migrant shelter] because the neighbors kept trying to attack the migrant community. The people who lived near the shelter tried to hurt us because they did not want us in their country. . . .
>
> At El Barretal [another migrant shelter], I felt a little more secure because we had a high wall surrounding us. Even so, one night someone threw a tear gas bomb into the shelter. When I tried to leave the shelter, people in passing cars would often yell insults at me like "get out of here, you *pinches* Hondurans," and other bad words that I do not want to repeat.

Alex Doe wrote:

> I know from personal experience and from the news that migrants have a bad name here and that many Mexicans are unhappy that so many of us are here. I have frequently been insulted by Mexicans on the street. . . . [O]ther asylum seekers and I had to flee Playas [a

neighborhood in Tijuana] in the middle of the night because a group of Mexicans threw stones at us and more people were gathering with sticks and other weapons to try to hurt us.

Christopher Doe wrote:

The Mexican police and many Mexican citizens believe that Central Americans are all criminals. They see my dark skin and hear my Honduran accent, and they automatically look down on me and label me as a criminal. I have been stopped and questioned by the Mexican police around five or six times, just for being a Honduran migrant. During my most recent stop, the police threatened to arrest me if they saw me on the street again.

. . .

I have also been robbed and assaulted by Mexican citizens. On two occasions, a group of Mexicans yelled insults, threw stones, and tried to attack me and a group of other Caravan members.

Howard Doe wrote:

I was afraid to leave the house [where I was staying] because I had seen in the news that migrants like myself had been targeted. While I was in Tijuana, two young Honduran men were abducted, tortured and killed.

. . .

On Wednesday, January 30, 2019, I was attacked and robbed by two young Mexican men. They pulled a gun on me from behind and told me not to turn around. They took my phone and told me that they knew I was Honduran and that if they saw me again, they would kill me. Migrants in Tijuana are always in danger[.]

Some of the violence in Mexico was threatened by persecutors from the aliens' home countries, and much of that violence was on account of protected grounds—political opinion, religion, and social group. Gregory Doe wrote:

I am also afraid the Honduran government will find me in Mexico and harm me. Even outside the country, the Honduran government often works with gangs and criminal networks to punish those who oppose their policies. I am afraid that they might track me down.

Dennis Doe, who had fled the gang "MS-13" in Honduras, wrote:

In Tijuana, I have seen people who I believe are MS-13 gang members on the street and on the beach. They have tattoos that look like MS-13 tattoos . . . and they dress like MS-13 members with short sleeved button up shirts. I know that MS-13 were searching for people who tried to escape them with at least one of the caravans. This makes me afraid that the

people who were trying to kill me in
Honduras will find me here.

Alex Doe, who had fled Honduras to escape the gang
"Mara 18" because of his work as a youth pastor and
organizer, wrote:

> I am also afraid that the Mara 18 will find me
> here in Mexico.  I am afraid that the Mara 18
> might send someone to find me or get
> information from someone in the caravan.
> The Mara 18 has networks throughout Central
> America, and I have heard that their power
> and connections in Mexico are growing.

Kevin Doe, who fled MS-13 because of his work as an
Evangelical Christian minister, wrote:

> [When I was returned to Mexico from the
> United States], I was met by a large group of
> reporters with cameras.  I was afraid that my
> face might show up in the news. . . .  I was
> afraid that the MS-13 might see my face in the
> news.  They are a powerful, ruthless gang and
> have members in Tijuana too.

Ian Doe wrote:

> I am not safe in Mexico.  I am afraid that the
> people who want to harm me in Honduras will
> find me here.  I have learned from the news
> that there are members of Central American
> gangs and narcotraffickers that are present
> here in Mexico that could find and kill me.

Honduran migrants like me are very visible
because of our accents and the way that we
look, and it would not be hard for them to find
me here.

Several declarants described interviews by asylum
officers in which they were not asked whether they feared
returning to Mexico. Gregory Doe wrote, "The officer never
asked me if I was afraid of being in Mexico or if anything bad
had happened to me here [in Mexico]." Christopher Doe
wrote:

> I don't remember [the officer] asking if I was
> afraid to live in Mexico while waiting for my
> asylum hearing. If she had asked, I would
> have told her about being stopped by the
> Mexican police and attacked by Mexican
> citizens. I would also have told her I am
> afraid that the people who threatened me in
> Honduras could find me in Mexico . . . .

Kevin Doe wrote:

> The officer who was doing the talking
> couldn't understand me, and I could not
> understand him very well because he was
> rushing me through the interview and I didn't
> fully understand his Spanish. The interview
> lasted about 4 or 5 minutes. . . . He never
> asked me if I was afraid of returning to
> Mexico.

Two declarants wrote that asylum officers actively prevented them from stating that they feared returning to Mexico.  Alex Doe wrote:

> When I tried to respond and explain [why I had left Honduras] the officer told me something like, "you are only going to respond to the questions that I ask you, nothing more."  This prevented me from providing additional information in the interview apart from the answers to the questions posed by the officer.

Dennis Doe wrote:

> I was not allowed to provide any information other than the answers to the questions I was asked.  I expected to be asked more questions and to have the opportunity to provide more details.  But the interview was fairly short, and lasted only about 30 minutes. . . .

> No one asked me if I was afraid to return to Mexico, if I had received threats in Mexico, or if I had felt safe in Mexico.

Two declarants did succeed in telling an asylum officer that they feared returning to Mexico, but to no avail.  Frank Doe wrote:

> He never asked me if I was afraid of returning to Mexico.  At one point, I had to interrupt him to explain that I didn't feel safe in Mexico.  He told me that it was too bad.  He

said that Honduras wasn't safe, Mexico wasn't safe, and the U.S. isn't safe either.

Howard Doe wrote:

> I told the asylum officer that I was afraid [of returning to Mexico]. I explained that I'd been kidnapped for fifteen days by Los Zetas in Tuxtla Gutierrez, Chiapas, [Mexico], and that I'd managed to escape. . . . Migrants in Tijuana are always in danger, and I am especially afraid because the Zetas torture people who escape them.

Despite having told their asylum officers that they feared returning, Frank Doe and Howard Doe were returned to Mexico.

This evidence in the record is enough—indeed, far more than enough—to establish that the Government's speculations have no factual basis. Amici in this case have filed briefs bolstering this already more-than-sufficient evidence. For example, Amnesty International USA, the Washington Office on Latin America, the Latin America Working Group, and the Institute for Women in Migration submitted an amicus brief referencing many reliable news reports corroborating the stories told by the declarants. We referenced several of those reports earlier in our opinion.

Local 1924 of the American Federation of Government Employees, a labor organization representing "men and women who operate USCIS Asylum Pre-Screening Operation, which has been responsible for a large part of USCIS's 'credible fear' and 'reasonable fear' screenings, and

for implementing [the MPP]," also submitted an amicus brief. Local 1924 Amicus Brief at 1. Local 1924 writes in its brief:

> Asylum officers are duty bound to protect vulnerable asylum seekers from persecution. However, under the MPP, they face a conflict between the directives of their departmental leaders to follow the MPP and adherence to our Nation's legal commitment to not returning the persecuted to a territory where they will face persecution. They should not be forced to honor departmental directives that are fundamentally contrary to the moral fabric of our Nation and our international and domestic legal obligations.

*Id.* at 24.

Based on the Supreme Court's conclusion that Congress intended in § 1253(h)(1) (the predecessor to § 1231(b)(3)(B)) to "parallel" the anti-refoulement provision of Article 33 of the 1951 Convention, and based on the record in the district court, we conclude that plaintiffs have shown a likelihood of success on the merits of their claim that the MPP does not comply with the United States' anti-refoulement obligations under § 1231(b). We need not, and do not, reach the question whether the part of the MPP challenged as inconsistent with our anti-refoulement obligations should have been adopted through notice-and-comment rulemaking.

## VI. Other Preliminary Injunction Factors

In addition to likelihood of success on the merits, a court must consider the likelihood that the requesting party will

suffer irreparable harm, the balance of the equities, and the public interest in determining whether a preliminary injunction is justified. *Winter*, 555 U.S. at 20. "When the government is a party, these last two factors merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

There is a significant likelihood that the individual plaintiffs will suffer irreparable harm if the MPP is not enjoined. Uncontested evidence in the record establishes that non-Mexicans returned to Mexico under the MPP risk substantial harm, even death, while they await adjudication of their applications for asylum.

The balance of equities favors plaintiffs. On one side is the interest of the Government in continuing to follow the directives of the MPP. However, the strength of that interest is diminished by the likelihood, established above, that the MPP is inconsistent with 8 U.S.C. §§ 1225(b) and 1231(b). On the other side is the interest of the plaintiffs. The individual plaintiffs risk substantial harm, even death, so long as the directives of the MPP are followed, and the organizational plaintiffs are hindered in their ability to carry out their missions.

The public interest similarly favors the plaintiffs. We agree with *East Bay Sanctuary Covenant*:

> On the one hand, the public has a "weighty" interest "in efficient administration of the immigration laws at the border." *Landon v. Plasencia*, 459 U.S. 21, 34 (1982). But the public also has an interest in ensuring that "statutes enacted by [their] representatives"

> are not imperiled by executive fiat. *Maryland v. King*, 567 U.S. 1301, 1301 (2012) (Roberts, C.J., in chambers).

932 F.3d at 779 (alteration in original).

### VII.  Scope of the Injunction

The district court issued a preliminary injunction setting aside the MPP—that is, enjoining the Government "from continuing to implement or expand the 'Migrant Protection Protocols' as announced in the January 25, 2018 DHS policy memorandum and as explicated in further agency memoranda." *Innovation Law Lab*, 366 F. Supp. 3d at 1130. Accepting for purposes of argument that some injunction should issue, the Government objects to its scope.

We recognize that nationwide injunctions have become increasingly controversial, but we begin by noting that it is something of a misnomer to call the district court's order in this case a "nationwide injunction."  The MPP operates only at our southern border and directs the actions of government officials only in the four States along that border.  Two of those states (California and Arizona) are in the Ninth Circuit.  One of those states (New Mexico) is in the Tenth Circuit.  One of those states (Texas) is in the Fifth Circuit.  In practical effect, the district court's injunction, while setting aside the MPP in its entirety, does not operate nationwide.

For two mutually reinforcing reasons, we conclude that the district court did not abuse its discretion in setting aside the MPP.

First, plaintiffs have challenged the MPP under the Administrative Procedure Act ("APA"). Section 706(2)(A) of the APA provides that a "reviewing court shall . . . hold unlawful and set aside agency action . . . not in accordance with law." We held, above, that the MPP is "not in accordance with" 8 U.S.C. § 1225(b). Section 706(2)(A) directs that in a case where, as here, a reviewing court has found the agency action "unlawful," the court "shall . . . set aside [the] agency action." That is, in a case where § 706(2)(A) applies, there is a statutory directive—above and beyond the underlying statutory obligation asserted in the litigation—telling a reviewing court that its obligation is to "set aside" any unlawful agency action.

There is a presumption (often unstated) in APA cases that the offending agency action should be set aside in its entirety rather than only in limited geographical areas. "[W]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that rules are vacated—not that their application to the individual petitioners is proscribed." *Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 511 (9th Cir. 2018) (internal quotation marks omitted). "When a court determines that an agency's action failed to follow Congress's clear mandate the appropriate remedy is to vacate that action." *Cal. Wilderness Coalition v. U.S. Dep't of Energy*, 631 F.3d 1072, 1095 (9th Cir. 2011); *see also United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) ("The ordinary practice is to vacate unlawful agency action."); *Gen. Chem. Corp. v. United States*, 817 F.2d 844, 848 (D.C. Cir. 1987) ("The APA requires us to vacate the agency's decision if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . .'").

Second, cases implicating immigration policy have a particularly strong claim for uniform relief.  Federal law contemplates a "comprehensive and unified" immigration policy.  *Arizona v. United State*s, 567 U.S. 387, 401 (2012). "In immigration matters, we have consistently recognized the authority of district courts to enjoin unlawful policies on a universal basis."  *E. Bay Sanctuary Covenant*, 932 F.3d at 779.  We wrote in *Regents of the University of California*, 908 F.3d at 511,  "A final principle is also relevant:  the need for uniformity in immigration policy. . . .  Allowing uneven application of nationwide immigration policy flies in the face of these requirements."  We wrote to the same effect in *Hawaii v. Trump*, 878 F.3d 662, 701 (9th Cir. 2017), *rev'd on other grounds*, 138 S. Ct. 2392 (2018):  "Because this case implicates immigration policy, a nationwide injunction was necessary to give Plaintiffs a full expression of their rights." The Fifth Circuit, one of only two other federal circuits with states along our southern border, has held that nationwide injunctions are appropriate in immigration cases.    In sustaining a nationwide injunction in an immigration case, the Fifth Circuit wrote, "[T]he Constitution requires 'an *uniform* Rule of Naturalization'; Congress has instructed that 'the immigration laws of the United States should be enforced vigorously and *uniformly*'; and the Supreme Court has described immigration policy as 'a comprehensive and *unified* system.'" *Texas v. United States*, 809 F.3d 134, 187–88 (5th Cir. 2015) (emphasis in original; citations omitted).  In *Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017), we relied on the Fifth Circuit's decision in *Texas* to sustain the nationwide scope of a temporary restraining order in an immigration case.  We wrote, "[W]e decline to limit the geographic scope of the TRO.  The Fifth Circuit has held that such a fragmented immigration policy would run afoul of the

constitutional and statutory requirement for uniform immigration law and policy." *Id.* at 1166–67.

## Conclusion

We conclude that the MPP is inconsistent with 8 U.S.C. § 1225(b), and that it is inconsistent in part with 8 U.S.C. § 1231(b). Because the MPP is invalid in its entirety due to its inconsistency with § 1225(b), it should be enjoined in its entirety. Because plaintiffs have successfully challenged the MPP under § 706(2)(A) of the APA, and because the MPP directly affects immigration into this country along our southern border, the issuance of a temporary injunction setting aside the MPP was not an abuse of discretion.

We lift the emergency stay imposed by the motions panel, and we affirm the decision of the district court.

**AFFIRMED.**

---

FERNANDEZ, Circuit Judge, dissenting:

I respectfully dissent from the majority opinion because I believe that we are bound by the published decision in *Innovation Law Lab v. McAleenan* (*Innovation I*), 924 F.3d 503 (9th Cir. 2019) (per curiam).

More specifically, we are bound by both the law of the circuit and the law of the case. Of course, the rules that animate the former doctrine are not the same as those that animate the latter. *See Gonzalez v. Arizona*, 677 F.3d 383, 389 n.4 (9th Cir. 2012) (en banc).

As we have said: "Circuit law . . . binds all courts within a particular circuit, including the court of appeals itself. Thus, the first panel to consider an issue sets the law not only for all the inferior courts in the circuit, but also future panels of the court of appeals." *Hart v. Massanari*, 266 F.3d 1155, 1171 (9th Cir. 2001). Moreover: "Once a panel resolves an issue in a precedential opinion, the matter is deemed resolved, unless overruled by the court itself sitting en banc, or by the Supreme Court." *Id.* (footnote omitted). Published opinions are precedential. *See id.* at 1177; *see also Gonzalez*, 667 F.3d at 389 n.4. That remains true, even if some later panel is satisfied that "arguments have been characterized differently or more persuasively by a new litigant,"[1] or even if a later panel is convinced that the earlier decision was "incorrectly decided" and "needs reexamination."[2] And those rules are not mere formalities to be nodded to and avoided. Rather, "[i]nsofar as there may be factual differences between the current case and the earlier one, the court must determine whether those differences are material to the application of the rule or allow the precedent to be distinguished on a principled basis." *Hart*, 266 F.3d at 1172. In this case, there are no material differences — in fact, the situation before this panel is in every material way the same as that before the motions panel. Furthermore, there is no doubt that motions panels can publish their opinions,[3] even though they do not generally do so.[4] Once published, there is no difference

---

[1] *United States v. Ramos-Medina*, 706 F.3d 932, 939 (9th Cir. 2013).

[2] *Naruto v. Slater*, 888 F.3d 418, 425 n.7 (9th Cir. 2018).

[3] *See* 9th Cir. Gen. Order 6.3(g)(3)(ii); *see also id.* at 6.4(b).

[4] *See Haggard v. Curry*, 631 F.3d 931, 933 n.1 (9th Cir. 2010) (per curiam).

between motions panel opinions and other opinions; all are entitled to be considered with the same principles of deference by ensuing panels. Thus, any hesitation about whether they should be precedential must necessarily come before the panel decides to publish, not after. As we held in *Lair v. Bullock*, 798 F.3d 736 (9th Cir. 2015):

> Lair contended at oral argument that a motions panel's decision cannot bind a merits panel, and as a result we are not bound by the motions panel's analysis in this case. Not so. We have held that motions panels can issue published decisions. . . . [W]e are bound by a prior three-judge panel's published opinions, and a motions panel's published opinion binds future panels the same as does a merits panel's published opinion.

*Id.* at 747 (citations omitted). Therefore, the legal determinations in *Innovation I* are the law of the circuit.

We have explained the law of the case doctrine as "a jurisprudential doctrine under which an appellate court does not reconsider matters resolved on a prior appeal." *Jeffries v. Wood*, 114 F.3d 1484, 1488–89 (9th Cir. 1997) (en banc), *overruled on other grounds by Gonzalez*, 677 F.3d at 389 n.4. While we do have discretion to decline application of the doctrine, "[t]he prior decision should be followed unless: (1) the decision is clearly erroneous and its enforcement would work a manifest injustice, (2) intervening controlling authority makes reconsideration appropriate, or (3) substantially different evidence was adduced at a subsequent trial." *Id.* at 1489 (internal quotation marks and

footnote omitted).[5]  We have also indicated that, in general, "our decisions at the preliminary injunction phase do not constitute the law of the case,"[6] but that is principally because the matter is at the preliminary injunction stage and a further development of the factual record as the case progresses to its conclusion may well require a change in the result.[7]  Even so, decisions "on pure issues of law . . . are binding."  *Ranchers Cattlemen*, 499 F.3d at 1114.  Of course, the case at hand has not progressed beyond the preliminary injunction stage.  It is still at that stage, and the factual record has not significantly changed between the record at the time of the decision regarding the stay motion and the current record.  Therefore, as I see it, absent one of the listed exceptions, which I do not perceive to be involved here, the law of the case doctrine would also direct that we are bound by much of the motions panel's decision in *Innovation I*.

Applying those doctrines:

(1) The individuals and the organizational plaintiffs are not likely to succeed on the substantive claim that the Migrant Protection Protocols directive (the MPP) was not

---

[5] The majority seems to add a fourth exception, that is, motions panel decisions never constitute the law of the case.  That would be strange if they can constitute the law of the circuit, which they can.

[6] *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 499 F.3d 1108, 1114 (9th Cir. 2007); *see also Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1074, 1076 n.5 (9th Cir. 2015); *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1090 (9th Cir. 2013).

[7] *See Ctr. for Biological Diversity*, 706 F.3d at 1090.

authorized by 8 U.S.C. § 1225(b)(2)(C). *Innovation I*, 924 F.3d at 506–09.

(2) The individuals and organizational plaintiffs are not likely to succeed on their procedural claim that the MPP's adoption violated the notice and comment provisions of the Administrative Procedure Act. *See* 5 U.S.C. § 553(b), (c); *Innovation I*, 924 F.3d at 509–10.

(3) As the motions panel determined, due to the errors in deciding the issues set forth in (1) and (2), the preliminary injunction lacks essential support and cannot stand. Thus, we should vacate and remand.

(4) I express no opinion on whether the district court could issue a narrower injunction targeting the problem identified by Judge Watford, that is, the dearth of support for the government's unique rule[8] that an alien processed under the MPP must spontaneously proclaim his fear of persecution or torture in Mexico. *See Innovation I*, 924 F.3d at 511–12 (Watford, J., concurring)

Thus, I respectfully dissent.

---

[8] *Cf.* 8 C.F.R. § 235.3(b)(2)(i). That regulation describes information which must be provided to an alien facing expedited removal, including a Form I-867AB; the A portion of the pair of forms explains that the United States provides protection for those who face persecution or torture upon being sent home, and the B portion requires asking specific questions about whether the alien fears that kind of harm. *See* U.S. Immigration & Naturalization Serv., Forms I-867A & I-867B, *reprinted in* 9 Charles Gordon et al., Immigration Law & Procedure app. B, at 102–05 (2019).